IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00-129C |
| | ) | (Judge Allegra) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

(Pages 001-027A)

Dated: September 9, 2004

| Exhibit | | |
|---|---|---|
| A | Declaration of James M. Blue | 001-007 |
| 1 | September 9, 1994 DCAA Audit Report Number 3121-94J19200016 (attachment omitted) | 008-012 |
| 2 | September 19, 1994 DCAA Audit Report Number 3121-94J19200015 (attachment omitted) | 013-017 |
| 3 | November 22, 1994 DCE Rose letter (attachment omitted) | 018-019 |
| 4 | September 29, 1995 DCAA letter, forwarding draft DCAA Audit Report Number 3121-95J10501001 to Lockheed | 020-022 |
| 5 | May 31, 1996 DCE Becker letter | 023-024 |
| 6 | December 19, 1997 Lockheed letter (attachment omitted) | 025 |
| 7 | March 16, 1999 DCE Becker final decision | 026-027A |
| 8 | Relevant excerpts from the CAS Statute, 41 U.S.C. § 422 | 028-029 |
| 9 | Relevant excerpts from the Cost Accounting Standards | 030-031 |
| | CAS § 9903.306 (4/26/91) | 030 |
| | CAS § 9904.409-40 (4/26/91) | 031 |
| 10 | Relevant excerpts from the Federal Acquisition Regulation | 032-045 |
| | FAR § 31.101 (8/31/92) | 032 |
| | FAR § 31.205-16 (12/14/95) | 033-034 |
| | FAR § 52.230-2 (8/31/92) | 035-036 |
| | FAR § 52.230-3 (9/30/87) | 037-039 |
| | FAR § 52.243-1 (10/1/95) | 040-042 |
| | FAR § 52.243-2 (10/1/95) | 043-045 |

EXHIBIT
A
PENGAD-Bayonne, N. J.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00-129C |
| | ) | (Judge Allegra) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JAMES M. BLUE**

I, James M. Blue, hereby declare as follows on the basis of my personal knowledge and review of Lockheed Martin Corporation ("Lockheed") business records:

1. My name is James M. Blue. I am currently employed as Director of Finance, at Enterprise Information Systems ("EIS"), a segment of Lockheed. I have been employed by Lockheed, or its predecessor entities, since 1989.

2. I have held the following positions since joining Lockheed:

   1. **Director of Finance:** (October 2002 - Current.) In this position, I am responsible for the financial management and reporting of EIS operations. My responsibilities include cost/rate performance and budgeting, general accounting, government compliance, account management, program finance, and pricing/estimating.

   2. **Company Controller:** (July 1998 - September 2002.) In this position, I was responsible for the Financial Planning & Analysis (FP&A), Accounting and Government Compliance organizations. My responsibilities included controllership requirements such as cash management, operational forecasting, performance measurements and overall general & cost accounting leadership.

   3. **Manager of FP&A, Government Compliance:** (October 1995 - June 1998.) In this position, I was responsible for the operational planning and analysis of a $1.2B information technology company. My responsibilities included development of the company's financial and business strategy

long-range plan, operational/functional budgeting, financial performance reporting, and government compliance oversight requirements.

3. During my tenure at Lockheed, I have become familiar with Lockheed's method of allocating CRAY and IBM computer costs to operating companies based on each company's annual forecasted "resource commitment." I am familiar with Lockheed's disposition of the CRAY computers in 1995 and its accounting of the loss resulting from that disposition. I am also familiar with Lockheed's efforts to settle this dispute with the Government.

4. Lockheed Corporation formed the Lockheed Information Technology Company ("LITC") as a wholly owned subsidiary operating in Denver, Colorado in 1992. Lockheed centralized most data processing services and information technology resources at LITC, including CRAY computer resources, for the purposes of achieving significant Corporate-wide cost savings. Following the merger of Lockheed Corporation and Martin Marietta Corporation in 1995, LITC operations were transitioned to EIS, a Lockheed Martin IT organization.

5. To support company forecasted demands, LITC acquired two CRAY super computers, with an investment value of approximately $18.2 million.

6. The predominant users of the CRAY computers were expected to be Lockheed Missiles and Space ("LMSC") in Sunnyvale, California; Lockheed Aeronautical Systems Company ("LASC") in Marietta, Georgia; and Lockheed Advanced Development Company ("LADC" or "Skunk Works") in Palmdale, California.

7. In 1994-1995, LITC supplied CRAY computer resources to LMSC and LASC. At LMSC, the CRAY computers were used exclusively in the performance of government contracts, and at LASC they were used almost exclusively in the performance of government contracts or

on Independent Research and Development ("IR&D") work performed in support of government contracts.

8. In accordance with CAS 418, 48 C.F.R. § 9904.418, Lockheed chose one of several methods it considered to be acceptable for the allocation of CRAY computer costs in the CRAY Computing Cost Pool. Lockheed (1) supplied CRAY computer resources to operating companies; (2) accumulated LITC costs for CRAY computer hardware, maintenance, software, labor support, facility, administrative, service and telecommunications in the "CRAY Computing Cost Pool"; and (3) for the years 1994 and 1995, allocated costs in LITC's CRAY Computing Cost Pool to operating companies by charging a fixed cost for CRAY computer resources to each operating company based on the operating company's annual forecasted hours for CRAY computer resources ["resource commitments" or "Lockheed's method"]. The Government's method required allocation of CRAY costs to each operating company based on the hours actually used by the operating company ["actual usage method" or "Government's method"].

9. In return for their resource commitments, LITC guaranteed that the operating companies would receive their committed level of processing capacity on LITC's CRAY computers.

10. Because the operating companies paid a fixed cost for the availability of a certain guaranteed level of processing on LITC's CRAY computers, Lockheed considered the fixed cost to be an appropriate "resource consumption measure" for allocation under CAS 418.

11. Due in part to the operating companies' underutilization of the CRAY computers in 1994 and 1995, Lockheed disposed of the two CRAY computers. The Government recommended and concurred with this action. Exhibit 4.

12. Because Lockheed disposed of the CRAY computers before the end of their normal service life, their disposition resulted in an unanticipated loss to Lockheed of approximately $6.8 million. The CRAY computers are tangible capital assets.

13. Lockheed used the Government's actual usage method to allocate Lockheed's loss on the disposition of the CRAY computers to the two operating companies that used the computers.

14. On September 9, 1994, the Defense Contract Audit Agency ("DCAA") issued Audit Report Number 3121-94J19200016, in which it asserted "LITC is in non-compliance with CAS 418 . . . . The area of non-compliance is LITC's policies and practices regarding the allocation of CRAY computer costs to the benefiting Lockheed divisions." Exhibit 1. DCAA believed that Lockheed's method did not comply with CAS because Lockheed's allocation of CRAY computer costs was not based on "resource consumption." *Id.*

15. On September 19, 1994, DCAA issued Audit Report Number 3121-94J19200015, in which it expressed the same opinion concerning Lockheed's allocation of IBM computer costs: that Lockheed's method of allocating computer costs based on a segment's "commitment usage" or "usage commitment" rather than on "resource consumption" did not comply with CAS. Exhibit 2.

16. By letter dated November 22, 1994, Defense Corporate Executive ("DCE")[1] James Rose rejected DCAA's opinion, reasoning that "[w]hile resource consumption is one method of allocation, it is not the only method. The ACO's position is that CAS 418 allows for other methods of allocation as long as the allocation is equitable and results in a distribution of

---

[1] In Mr. Rose's November 22 letter, the term "DCE" is synonymous with the term "ACO," or "Administrative Contracting Officer." Exhibit 3.

costs that is fair and reasonable." Exhibit 3. Mr. Rose noted DCAA's statement that the differences in cost between using Lockheed's method and the Government's method "were not significant" before determining that "LITC's current practice of allocating costs meets the intent of [the] CAS 418 requirement." *Id.*

17. Lockheed's resource commitment method approved by DCE Rose is the same resource commitment method Lockheed used for allocation of CRAY computer costs.

18. LITC, Lockheed Corporation and the successor company, Lockheed Martin, understood Mr. Rose's November 22, 1994 letter to determine that Lockheed's method for allocating CRAY computer costs complied with CAS and relied on Mr. Rose's letter as a resolution of the CAS 418 issue. In it Mr. Rose stated: "LITC's current practice of allocating cost meets the intent of [the] CAS 418 requirement. Therefore, with this letter the issue of noncompliance with CAS 418 is resolved and disposed of with no additional action required." Exhibit 3.

19. Subsequently, when Lockheed Corporation merged with Martin Marietta Corporation in March 1995, the former Lockheed Corporation Corporate headquarters were moved to Bethesda, Maryland, and Louis Becker replaced James Rose as the DCE for Lockheed Martin.

20. On May 31, 1996, a year and one half after Mr. Rose issued the November 22, 1994 letter finding Lockheed's method compliant with CAS, Mr. Becker reversed course and determined that Lockheed's method did not comply with CAS, citing the reasons previously rejected by DCE Rose. Exhibit 5.

21. Because Lockheed considered its method of allocating CRAY computer costs CAS compliant, Lockheed was initially opposed to changing its method of allocating these costs,

as demanded by Mr. Becker. Nevertheless, following the DCE's resurrection of this issue, the parties attempted to settle this matter.

22. While continuing to maintain that its method complied with CAS, Lockheed agreed with the DCE and his representative to change Lockheed's cost accounting practice for CRAY computer costs to the Government's actual usage method. By letter dated December 19, 1997, Lockheed informed the DCE's representative how it would handle the adjustments resulting from the change in allocation method. Exhibit 6.

23. Lockheed implemented its agreement to change its cost accounting practice notwithstanding the dispute between the DCE and Lockheed on the cost impact of the change by using the Government's method to (1) reallocate the CRAY hourly costs for 1994 and 1995, and (2) allocate the loss on the disposition of the CRAY computers to LMSC and LASC, according to each company's actual usage of the CRAY computers.

24. The DCE and his representative did not like the impact on government contracts of Lockheed's reallocation of CRAY computer costs for calendar years 1994 and 1995 using the Government's method. On March 16, 1999, the DCE issued a final decision determining that Lockheed's method for allocating CRAY computer resources was not compliant with CAS and asserted a claim against Lockheed for $2,669,534 plus interest. Exhibit 7.

25. The total amount of CRAY costs allocable to government contracts using the Government's method is approximately $30.27 million, of which $23.46 million is for CRAY hourly costs, and approximately $6.8 million is for Lockheed's loss on the disposition of the CRAY computers. Of these costs, the Government has paid Lockheed only $20.79 million, thereby leaving a gross underpayment of approximately $9.48 million.

26. Allocating the allowable CRAY computer costs using the Government's actual usage method reveals that the Government did not pay any "increased costs."

27. The CAS clause, which has appeared at sections 52.230-3 and 52.230-2 of the Federal Acquisition Regulation, has been included or incorporated into Lockheed Martin or Lockheed Corporation's contracts with the Government. Exhibit 10.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 8th day of September 2004.

James M. Blue

James M. Blue

EXHIBIT 1

Audit Report No.
3121-94J19200016
CHRON NO. 1001

9 September 1994

Get audit Report
3121-95J10250174-S1
Exhibit J pg 5&6

REPORT ON CAS 418 NONCOMPLIANCE
ALLOCATION OF DIRECT AND INDIRECT COSTS
LOCKHEED INFORMATION TECHNOLOGY COMPANY
DENVER, COLORADO

Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

Contractor information contained in this audit report may be proprietary. The restrictions of 18 U.S.C. 1905 should be considered before this information is released to the public.

This report may not be released to any Federal agency outside the Department of Defense without the approval of Headquarters, DCAA, except to an agency requesting the report in negotiating or administering its contract.

DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
LAKEWOOD, COLORADO

FOR OFFICIAL USE ONLY

CENTRAL REGION
DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
7112 WEST JEFFERSON AVENUE SUITE 200
LAKEWOOD CO 80235-2327

IN REPLY REFER TO

Audit Report No. 3121-94J19200016

9 September 1994

SUBJECT: Report on CAS 418 Noncompliance
Allocation of Direct and Indirect Costs
Lockheed Information Technology Company
Denver, Colorado

TO: Mr. Richard Dodd
Resident Auditor, DCAA
Resident Office - Lockheed Corporation
4500 Park Granada Boulevard
Calabasas, California 91399-0357

1. Purpose and Scope of Audit

a. Our continuous audit of Lockheed Information Systems Company's (LITC) cost accounting practices during performance of contracts includes evaluating whether the LITC has complied with the CAS Board's rules, regulations, standards, and FAR Part 31. The purpose of the audit was to determine if LITC has complied with the requirements of CAS 418. LITC is responsible for compliance with the requirements of this standard. Our responsibility is to express an opinion on compliance with those requirements based on our audit.

b. The audit was conducted in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the contractors accounting practices comply with the requirements referred to above. An audit includes examining, on a test basis, evidence about the contractors compliance with those requirements. We believe that our audit provides a reasonable basis for our opinion.

2. Summary of Audit Results

a. In our opinion, LITC is in noncompliance with CAS 418. This report is limited to the cited instances of noncompliance. Accordingly, we express no opinion on whether other practices are proper, approved, or agreed to for pricing proposals, accumulating costs, or reporting contractor performance data.

FOR OFFICIAL USE ONLY

PRINTED ON RECYCLED PAPER

b. The results of audit were discussed with Ms. Jan Wade, LITC Supervisor of Administration, at our exit conference on 16 August 1994. The LITC written response is included as an attachment to this report.

c. Information in this report should not be used without first discussing its applicability with the auditor.

3. Statement of Conditions and Recommendations

Our audit disclosed that LITC's failure to comply with a cost accounting standard has resulted or may result in increased cost paid by the government. The area of non-compliance is LITC's policies and practices regarding the allocation of CRAY computer costs to the benefiting Lockheed divisions.

(a) Condition:

LITC has two CRAY computers whose annual costs are estimated at $10,057,189 for 1994. These costs are allocated to the Lockheed Missiles and Space Company (LMSC), Advanced Development Company (LADC), and Aeronautical Systems Company (LASC) based on a beginning of year usage commitment by these divisions for wall clock hours and shared Computer Processing Units (CPU). The costs allocated using the beginning of the year usage commitment versus the costs allocated based on actual usage are significantly different for the various Lockheed divisions. This practice violate CAS 418.50(e)(1) which recommends that the allocation of the costs be based on resource consumption. Specifically, in situations where pool costs do not contain a material amount of management or supervision costs, the standard specifies:

> CAS 418.50(e)(1):...Homogenous indirect cost pools of this type have a direct and definitive relationship between the activities in the pool and benefitting cost objectives. The pooled costs shall be allocated using an appropriate measure of resource consumption. This determination shall be made in accordance with the following criteria taking into consideration the individual circumstances: (1) The best representation of the beneficial or causal relationship between an indirect pool and the benefiting cost objectives is a measure of resource consumption of the activities of the indirect cost pool....

(b) Significance of Condition:

We computed a $1,236,010 estimated cost impact to the government based on each benefiting Lockheed divisions' 1993 percentage of cost reimbursable and firm fixed price types of government contracts. The projected variance in 1994 costs allocated based on the usage commitment versus cost allocations based on actual resource consumption (Computer Processing Units (CPU)) is as follows:

| Division | OVER/ (UNDER) Cost Allocation | Government Cost Reimbursable Participation | Government Fixed Price Participation | Government Cost Reimbursable Cost Impact | Government Fixed Price Cost Impact |
|---|---|---|---|---|---|
| LMSC | $2,014,404 | 87.0% | 3.2% | $1,752,531 | ($64,461) |
| LADC | $1,347,213 | 67.7% | 25.1% | $912,063 | ($338,150) |
| LASC | ($3,353,484) | 42.6% | 40.5% | ($1,428,584) | $1,358,161 |
| | | | | $1,236,010 | $955,550 |

(c) Recommendation:

The costs allocation should be based on actual resource consumption (CPUs and/or wallclock hours) by that division.

(d) LITC's Reaction to the Issue:

LITC believes their method of cost allocation is fair and reasonable. The LITC written response is included as an attachment to this report.

(e) Auditor Comments on LITC's Reaction:

Our DCAA, Technical Services Center, provided comments on LITC's data center billing practices as follows:

(i) LITC does not utilize a formal chargeback system for billing and allocating computer resources. LITC's customers are not billed for actual usage of the computer resources, but only on budgeted peak processing computer requirements. This method does not support a chargeback system which operates based on a customer's measured usage of computer resources.

(ii) Normally, computer resource consumption provides the basis for charging customers for the computer resource costs.

(iii) LITC's customers should continue to forecast and commit to a certain level of computer resource usage, but LITC should consider using measured resource utilization as a basis for allocating the costs to the various divisions for use of those resources. This practice is possible using currently produced LITC reports and would not require major technical effort by LITC.

4. Disposition of Audit Results

a. Accounting counsel and any additional audit services which the contracting officer may require are available upon request. Please contact Mr. Joe Esterak, Supervisory Auditor, at (303) 969-5000. Our FAX number is (303) 969-5056.

b. As required by FAR 30.602-2, please furnish us a copy of your determination regarding the reported noncompliances.

c. This audit was performed by Mr. Jon Brown, Auditor. We would appreciate your comments and suggestions for improving our audit services and/or related audit support.

DEFENSE CONTRACT AUDIT AGENCY

JAMES L. LASHBROOK, Branch Manager

Attachment:
LITC's Response Dated 31 August 1994

Copy furnished:
-> DCAA, CAC Network

Lockheed Corporation LITC
Attn: Ed Meehan, Director of Finance (Thru the CACO)

EXHIBIT 2

Audit Report No.
3121-94J19200015
CHRON NO. 1032

19 September 1994

REPORT ON AUDIT OF CAS 418 NONCOMPLIANCE
ALLOCATION OF DIRECT AND INDIRECT COSTS
LOCKHEED INFORMATION TECHNOLOGY COMPANY
DENVER, COLORADO

Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

Contractor information contained in this audit report may be proprietary. The restrictions of 18 U.S.C. 1905 should be considered before this information is released to the public.

This report may not be released to any Federal agency outside the Department of Defense without the approval of Headquarters, DCAA, except to an agency requesting the report in negotiating or administering its contract.

DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
LAKEWOOD, COLORADO

CENTRAL REGION
DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
7112 WEST JEFFERSON AVENUE SUITE 200
LAKEWOOD CO 80235-2327

IN REPLY REFER TO

Audit Report No. 3121-94J19200015 19 September 1994

SUBJECT: Report on Audit of CAS 418 Noncompliance
Allocation of Direct and Indirect Costs
Lockheed Information Technology Company
Denver, Colorado

TO: Mr. Richard Dodd
Resident Auditor, DCAA
Resident Office - Lockheed Corporation
4500 Park Granada Boulevard
Calabasas, California 91399-0357

1. Purpose and Scope of Audit

a. Our continuous audit of Lockheed Information Systems Company's (LITC) cost accounting practices during performance of contracts includes evaluating whether the LITC has complied with the CAS Board's rules, regulations, and standards, and FAR Part 31. The purpose of the audit was to determine if LITC has complied with the requirements of CAS 418. LITC is responsible for compliance with the requirements of this standard. Our responsibility is to express an opinion on compliance with those requirements based on our audit.

b. The audit was conducted in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the contractors accounting practices comply with the requirements referred to above. An audit includes examining, on a test basis, evidence about the contractors compliance with those requirements. We believe that our audit provides a reasonable basis for our opinion.

2. Summary of Audit Results

a. In our opinion, LITC is in noncompliance with CAS 418. This report is limited to the cited instances of noncompliance. Accordingly, we express no opinion on whether other practices are proper, approved, or agreed to for pricing proposals, accumulating costs, or reporting contractor performance data.

b. The results of audit were discussed with Ms. Jan Wade, LITC Supervisor of Administration, at our exit conference on 16 August 1994.

c. Information in this report should not be used without first discussing its applicability with the auditor.

PRINTED ON RECYCLED PAPER

FOR OFFICIAL USE ONLY

3. Statement of Conditions and Recommendations

Our audit disclosed that LITC's failure to comply with a cost accounting standard may result in increased cost paid by the government. The area of non-compliance is LITC's policies and practices regarding the allocation of IBM computer costs to the benefiting Lockheed divisions.

(a) Condition:

LITC estimates IBM computer costs at $25,438,557 for 1994. These costs are allocated based on a resource consumption termed Millions of Instructions Per Second (MIPS). These costs are allocated to the Lockheed divisions Missiles and Space Company (LMSC), Advanced Development Company (LADC), Aeronautical Systems Company (LASC), Austin Division (LAD), Aircraft Services (LAS), Corporate Offices (CORLAC), Aeromod Company, Inc. (LACI), and Sanders for 1994 based on a beginning of year commitment by those divisions for various levels of MIPS consumption.

LITC uses a preestablished rate, based on the forecasted LITC costs and the Lockheed segment commitment usage, to allocate the LITC IBM costs during the year. The billing rate is adjusted if the LITC total incurred costs vary from those budgeted by 10 percent or if an individual division's consumption exceeds 10 percent of the level committed to at the beginning of the year. Consumption that exceeds a division's commitment level but does not exceed 10 percent of that commitment, is not charged to the using division. Underutilization by a division of less than 90 percent of commitment results in that division being billed for 90 percent of their committed MIPS. For example, if a division is utilizing 50 percent of their committed level of MIPS, they will receive a cost allocation based on 90 percent of their committed level of MIPS.

We compared the projected 1994 annual allocation of IBM MIPS costs based on the LITC cost allocation practices versus allocation of the costs based on recorded usage for the first 6 months of 1994. The differences were not significant since the commitment usage and incurred usage were not significantly different, however, these practices violate 418.50(e)(1) which recommends that the allocation of the costs be based on resource consumption. Specifically, in situations where pool costs do not contain a material amount of management or supervisor costs, the standard specifies:

> CAS 418.50(e)(1):...Homogenous indirect cost pools of this type have a direct and definitive relationship between the activities in the pool and benefitting cost objectives. The pooled costs shall be allocated using an appropriate measure of resource consumption. This determination shall be

made in accordance with the following criteria taking into consideration the individual circumstances: (1) The best representation of the beneficial or causal relationship between an indirect pool and the benefiting cost objectives is a measure of resource consumption of the activities of the indirect cost pool....

(b) Significance of Condition

The following two paragraphs are hypothetical situations at LMSC regarding potential impact of the current LITC policies and procedures regarding the allocation of IBM MIPS costs.

(i) LITC allocates a minimum of 90 percent of the budgeted costs based on the division's commitment level of usage regardless of the division's actual usage. The potential impact at LITC, with $10,705,000 annual budgeted costs, is a cost allocation of $9,634,500 ($10,705,000 x 90 percent) regardless of the actual LMSC usage of computer resources. LMSC would be absorbing costs allocable to to other divisions.

(ii) LITC allows up to 10 percent above commitment level of usage without any adjustment to the cost allocated to the user division. This could cause, in the case of LMSC, underallocation of up to $1,070,500 ($10,705,000 X 10 percent) before LITC would adjust the costs allocated to LMSC. Other division would be absorbing the costs allocable to LMSC.

(c) Recommendation

The costs allocation should be based on resource consumption used by that division.

(d) LITC's Reaction to the Issue

LITC believes their method of cost allocation to be fair and reasonable. The LITC written response is included as an attachment to this report.

(e) Auditor Comments on LITC's Reaction

Our DCAA, Technical Services Center, provided comments on LITC's data center billing practices as follows:

(i) LITC does not utilize a formal chargeback system for billing and allocating computer resources. LITC's customers are not billed for actual usage of the computer resources, but only on budgeted peak processing computer requirements. This method does not support a chargeback system which operates based on a customer's measured usage of computer resources.

(ii) Normally, computer resource consumption provides the basis for charging customers for the computer resource costs.

(iii) LITC's customers should continue to forecast and commit to a certain level of computer resource usage, but LITC should consider using measured resource utilization as a basis for allocating the costs to the various divisions for use of those resources. This practice is possible using currently produced LITC reports and would not require major technical effort by LITC.

4. Disposition of Audit Results

a. Accounting counsel and any additional audit services which the contracting officer may require are available upon request. Please contact Mr. Joe Esterak, Supervisory Auditor, at (303) 969-5000. Our fax number is (303) 969-5056.

b. This audit was performed by Mr. Jon Brown, Auditor. We would appreciate your comments and suggestions for improving our audit services and/or related audit support.

DEFENSE CONTRACT AUDIT AGENCY

JAMES L. LASHBROOK, Branch Manager

Attachment:
LITC's Response Dated 31 August 1994

Copy furnished:
DCAA, CAC Network, Lockheed Corporation
LITC, Attn: Ed Meehan, Director of Finance (Thru the CACO)

EXHIBIT
3

**DEFENSE LOGISTICS AGENCY**
THE DEFENSE CONTRACT MANAGEMENT COMMAND
DEFENSE CORPORATE EXECUTIVE/LOCKHEED
4500 PARK GRANADA BOULEVARD
CALABASAS, CA 91399-0356

22 Nov 94

REPLY TO ATTN OF Ted E. Rogers 818/876-2363

SUBJECT CAS 418 Noncompliance LITC Allocation of Direct and Indirect Costs

TO Mr. Richard H Dodd
Resident Auditor, DCAA
Resident Office - Lockheed Corporation
4500 Park Granada Boulevard
Calabasas, CA. 91399-0356

On 19 September 1994 DCAA issued Audit Report No. 3121-94J19200015 citing LITC in noncompliance with CAS 418 in its allocation of direct and indirect costs. LITC's current practice is to allocate cost to the various segments using a preestablished rate, based on the forecasted LITC costs and the Lockheed segment commitment usage. The DCAA recommendation is that LITC allocations should be based on resource consumption of the segments versus commitments.

The DCAA conclusion of a CAS noncompliance is based on its belief that the requirement of CAS 418 is that the allocation should be based on resource consumption. LITC uses a preestablished rate, based on forecasted LITC costs and the Lockheed segment commitment usage, to allocate the costs. While resource consumption is one method of allocation, it is not the only method. The ACO's position is that CAS 418 allows for other methods of allocation as long as the allocation is equitable and results in a distribution of costs that is fair and reasonable. With that, CAS 418.50(e) allows for the use of preestablished rates as stated:

> (1) Preestablished rates, based on either forecasted actual or standard cost, may be used in allocating an indirect cost pool. (2) Preestablished rates shall reflect the costs and activities anticipated for the cost accounting period except as provided in paragraph(g)(3) of this subsection. Such preestablished rates shall be reviewed at least annually, and revised to reflect the anticipated conditions. (3) The contracting parties may agree on preestablished rates which are not based on costs and activities anticipated for a cost accounting period. The contractor shall have and consistently apply written policies for the establishment of these rates.

In addition, the DCMC Information Resources Technical Review dated 8 November 1994, found the billing algorithm to be technically sound and equitable. It also stated that the algorithm as designed is fair and reasonable.

DCAA also made a comparison of the costs based on the LITC cost allocation practice versus allocation of the costs based on recorded usage and found the differences were not significant. While the differences were not significant, DCAA still believes the practice violates CAS 418.50(e)(1) which recommends that the allocation of the costs be based on resource consumption. However, CAS 418.50(c) Change in Allocation Base, states:

> No change in an existing indirect cost pool allocation base is required if the allocation resulting from the existing base does not differ materiality from the allocation that results from the base determined to be most appropriate in accordance with criteria set forth in paragraphs (d) and (e) of this subsection.

As stated in the audit report, the differences were not significant.

Based on the information stated, the ACO's determination is that LITC's current practice of allocating cost meets the intent of CAS 418 requirement. Therefore, with this letter the issue of noncompliance with CAS 418 is resolved and disposed with no additional action required.

Other matters re: ADPE Review are addressed separately, see attachment.

If there are any questions, please contact Ted E. Rogers at 818/876-2363.

/S/ JR

JAMES R. ROSE
Defense Corporate Executive

cc: A. Dipasquale, Lockheed
H. Person, DCMDW-OC

EXHIBIT 4

DENVER BRANCH OFFICE
CENTRAL REGION
DEFENSE CONTRACT AUDIT AGENCY
7112 WEST JEFFERSON AVENUE SUITE 200
LAKEWOOD CO 80235-2327

IN REPLY REFER TO

29 September 1995

Mr. Bill Bernstein
President
Lockheed Information Technology Co.
1401 Delnorte Street
Denver, CO 80221

SUBJECT: Transmittal of Draft Statement of Condition and Recommendation, Super Computer Cost Avoidance

Dear Mr. Bernstein:

Attached is the draft "Statement of Condition and Recommendation, Super Computer Cost Avoidance". Please provide your comments by 31 October 1995. We will summarize your comments in our report and include them in their entirety as an appendix.

Any questions you may have concerning our request may be addressed to Mr. Steve Thorsted, Central Region EDP Supervisory Auditor, at 801/975-3553; Mr. Larry Koppenhaver, Supervisory Auditor, at 303/969-5000 or Mr. Gary LaPage, EDP Auditor, at 612/725-3296.

JAMES L. LASHBROOK
Branch Manager

Copy to:
RSA-3 (Steve Thorsted)

Enclosure:
Draft Statement of Condition and Recommendation

Audit Report No. 03121-95J10501001

STATEMENT OF CONDITION AND RECOMMENDATION
SUPER COMPUTER COST AVOIDANCE

a. Condition

LITC's High Performance and Classified Computing facilities have experienced a significant reduction in usage that has resulted in excess computing capacity. Specifically, CPU usage on the Cray YMP - 8I has decline from an average of approximately 80 percent in 1993 to a current level of 22 percent. Dedicated CPU usage on the Cray YMP - 4E is down to almost zero usage from a 1993 level of approximately 65 percent.

The sudden excess Cray Computer capacity results from: (1) the overall decline in the defense industry, (2) changes in the method of recovering computer cost and (3) fund shortfalls in some anticipated programs.

We examined three possible scenario's for dealing with the idle capacity on the Cray computers which are:

(1) Do nothing. Continue to maintain the Cray YMP - 4E and the Cray YMP - 8I.

(2) Eliminate both Cray computers and buy any needed Cray time from a third party.

(3) Eliminate the Cray YMP - 4E and maintain the Cray YMP - 8I. The Cray YMP - 8I would continue to service internal Lockheed Martin requirements.

The analysis of these alternatives done in cooperation with LITC is as follows:

| | PROJECTED ANNUAL COST REDUCTION | | |
|---|---|---|---|
| | Scenario 1 | Scenario 2 | Scenario 3 |
| Labor & Related-HPCC | $ - | $200,200 | $100,100 |
| Labor and Related-Operations | - | 133,500 | 46,000 |
| Hardware Maintenance | - | 567,600 | 270,000 |
| Software Maintenance | - | 236,900 | 26,400 |
| Power Consumption | - | 108,000 | 48,000 |
| Purchase of Outside Cray Time | - | (750,000) | - |
| Net Savings | $ - | $496,200 | $490,500 |

FOR OFFICIAL USE ONLY



PT 000038

Proprietary Matter

This analysis is based on the assumptions that:

1. Approximately 2,500 hours of third party Cray hours would need to be purchased if both Cray's were to be eliminated. The estimated cost of a third party Cray hour would be $300.

2. Scenario 2, eliminating both computers, would result in a headcount reduction of two in HPCC and 1.5 in Operations. Scenario 3, eliminating one computer, would allow headcount reductions of one in HPCC and .5 in operations.

Failure to address the excess capacity problem in a timely manner could result in unneeded expenses being incurred by Lockheed and charged to the Government.

b. Recommendation

We recommend that LITC reduce costs charged to Government contracts by eliminating excess computing capacity using either Scenario 2 or Scenario 3 (i.e. eliminating one or both of the Cray Computers). There is no material difference in cost avoidance between the two scenarios. Therefore, the selected alternative should be based on considerations other than cost.

Additionally, should LITC choose to keep one Cray computer, significantly higher utilization levels should be achieved via internal Lockheed use and/or selling computer time to other Federal Government agencies or other third parties.

c. LITC's Response

d. Auditor's Comments

EXHIBIT 5

DEFENSE CONTRACT MANAGEMENT COMMAND
Defense Corporate Executive
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

IN REPLY REFER TO:

DCMDE-GTC

May 31, 1996

SUBJECT: Noncompliance with CAS 418 Determination

Mr. Anthony M. DiPasquale
Corporate Director, Government Financial Management
Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

Dear Mr. DiPasquale:

The cost accounting practices at Lockheed Information Systems Company (LITC) has been reviewed under Audit Report No. 3121-94J19200016, dated September 9, 1994. The purpose of the audit was to determine whether the division was operating in compliance with the CAS Board's rules, regulations, and standards, and FAR Part 31. The results of the audit indicate that LITC is in noncompliance with CAS 418, Allocation of Direct and Indirect Costs.

The area of noncompliance is LITC's policies and practices regarding the allocation of CRAY computer costs to the benefiting heritage Lockheed divisions.

For 1994, LITC had two CRAY computers with annual costs estimated at $10,057,189. These costs were allocated to Lockheed Missiles and Space Company (LMSC), Advanced Development Company (LADC), and Aeronautical Systems Company (LASC). The allocations of the costs were based on a beginning of year usage commitment by divisions for wall clock hours and shared Computer Processing Units (CPU). CAS 418 recommends that the allocation of the costs be based on resource consumption.

In accordance with FAR 52.230-5, Administration of Cost Accounting Standards, request that you provide a cost impact proposal. The cost impact proposal shall include all changes made to the costing practices due to all changes in the organization's business relationships and activities. The cost impact statement with associated revised disclosure statement , if deemed necessary, shall be provided to the undersigned and the Defense Contract Audit Agency, ATTN.: John Ames, by **July 31, 1996**. The cost impact proposal shall include, as a minimum, the following information: (1) identification of all contracts and subcontracts containing the CAS clause; and (2) the effect (including cost, profit/fee, price/amount) on each contract or subcontract.

If you disagree with our position on the noncompliance issue, provide written rationale with any supporting documentation of your position regarding the situation, to this office by **June 30, 1996**. Also, if you can not comply with the cost impact proposal submittal date of **July 31, 1996**, please provide an alternate date with justification by June 30, 1996, to the undersigned.

NC418LTR.DOC

Further, you are hereby cautioned that if you implement any changed practices for the purposes of pricing or costing Government contracts, you will be considered in noncompliance with CAS 418. Moreover, action will be taken in accordance with FAR 30.602-2, Noncompliance with CAS requirements.

Finally, you are notified that a disclosed practice shall not by virtue of such disclosure, be deemed to be proper, approved, or agreed to practice for pricing proposals or accumulating and reporting contract performance cost data.

Sincerely,

LOUIS G. BECKER
Defense Corporate Executive

CC:
DCAA

Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301-897-6000

LOCKHEED MARTIN

EXHIBIT 6

December 19, 1997

Mr. Don Wheatley
Defense Contract Management Command
c/o Lockheed Martin Corporation
6901 Rockledge Drive
Bethesda, MD 20817

Subject: Treatment of Adjustments for CRAY Computer Costs Billed from LITC in 1994 and 1995

Dear Mr. Wheatley:

The purpose of this letter is the document how Aeronautical Systems, Skunk Works and Missiles & Space will handle an adjustment to their CRAY billings generated in 1994 and 1995 if an agreement is reached.

Aeronautical Systems Company

The Aeronautical Systems Company will recognize the increased costs in 1994 and 1995 overhead according to their repositioning policy for adjustments to prior year overhead amounts. The company will not file amended overhead claims because it is unnecessary. The costs would have been added to IR&D/B&P costs increasing overceiling amounts. Thus, there would be no effect on claimed overhead.

Skunk Works

The Skunk Works also has a policy to reposition a prior year's adjustment of this magnitude to the year of incurrence. Since the DCAA has already audited 1994, the decrease to overhead for the CRAY has been questioned. Skunk Works will concur with the DCAA's questioned cost for $1,253,000.

Missiles & Space

Missiles & Space included the CRAY costs in a direct computer pool in 1994 and 1995. In compliance with an agreement with the local representative of the Defense Contract Management Command, the 1994 and 1995 credits will be included in the 1997 direct computer cost pool. (A copy of the agreement is attached-see Item 2.)

If you have any additional questions, please call.

Sincerely,

Carolyn R. McGrath, Manager
Government Financial Management-Compliance

Attachment

PT 000079

EXHIBIT 7

DEFENSE CONTRACT MANAGEMENT COMMAND
Defense Corporate Executive
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

IN REPLY REFER TO: DCMDE-GTC (D. Wheatley)

March 16, 1999

SUBJECT: Final Decision / Demand for Payment
Noncompliance with CAS 403 and 418 (CRAY Computers)
Contract Number(s): N00030-94-C-0053 and all other applicable, CAS covered contracts impacted at Lockheed Missiles and Space (LMSC), Skunkworks (LADC), and Aeronautical Systems (LASC) (heritage names used) for calendar year 1994 and 1995

Mr. Anthony M. DiPasquale
Corporate Director, Government Financial Management
Lockheed Martin Corporation
6801 Rockledge Drive, Mail Point DM510
Bethesda, MD 20817-1877

Dear Mr. DiPasquale:

You are hereby advised that this is the Final Decision of the Contracting Officer. LMC and the Government have discussed this issue in detail, corresponded back and forth since May of 1996, and attempted to settle the issue via negotiations. LMC's positions have been duly considered. Please be advised that the Government disagrees strongly with many of the assertions and inferences made by LMC in its most recent letter of June 16, 1998, regarding CRAY computer costs.

DESCRIPTION OF DISPUTE:

LMC did not allocate CRAY computer costs in accordance with CAS 403-40(a)(1), CAS 403-40(b)(1), CAS 403-50b(1), CAS 418-40(c)(2), CAS 418-50(e), CAS 418-50(g)(2),(4) and (5). Computer costs were allocated to Government contracts on a basis that differed substantially from actual usage and/or the beneficial or causal relationship between supporting and receiving activities. Computer costs were not allocated to segments on the basis of the service furnished to or received by each segment. LMC developed preestablished standard rates for CRAY computer costs; however, these rates were not revised, nor were variances proportionately allocated to the cost objectives. This is evident based on the fact that LMSC and LASC each had nearly identical CRAY computer usage; yet, LMSC was allocated costs of $6.3M, while LASC was allocated costs of only $2.1M. Furthermore, LADC, which utilized practically no CRAY computing, was allocated approximately $1.4M. The allocation method employed does not comply with CAS 403 or 418, and results in increased costs to the Government.

T 001922

CRAYFD.DOC

CONTRACT TERMS:

Applicable contract terms include, but are not limited to the following clauses (or predecessors)

FAR 52.230-2
FAR 52.230-3
FAR 52.230-4
FAR 52.230-6

(These clauses require compliance with CAS 403 and 418 and the adjustment of contract prices if failure to follow any applicable CAS results in increased cost to the Government.)

FACTUAL AREAS OF AGREEMENT AND DISAGREEMENT:

The Government and LMC have not agreed to or stipulated to any factual matters concerning this issue. LMC disagrees with the Government that a CAS noncompliance occurred. The Government and LMC have not agreed to the amount of the cost impact or associated interest. Attempts to reach a settlement regarding this issue have failed. LMC and the Government have agreed that all previous offers were made solely for the purposes of settlement negotiations, and were not intended to, nor should be construed to, represent either parties' position on the matter.

CONTRACTING OFFICER'S DECISION:

The Government's position regarding this dispute is adequately detailed in DCMC's previous letters on the subject, including but not limited to the letters of May 31, 1996; November 19, 1996; March 17, 1997; April 1, 1997 and June 17, 1997. LMC has not agreed to compensate the Government for the increased costs paid by the Government resulting from the noncompliance. To briefly summarize the Government's position, LMC neglected to allocate costs in a manner compliant with CAS 403 and 418. (Furthermore, LMC did not follow its own stated practice that "any over or under recovery that exceeds 10% of LITC expenses is proportionately allocated to the using companies" {document entitled, "Service Level Agreement for LADC, 1/94 through 12/94," dated August 1994}). Compliance with these Cost Accounting Standards would have resulted in an allocation of costs based upon usage and the services furnished to or received by each segment. LMC's noncompliant practice resulted in increased costs to the Government of $2,669,534. The Government calculated the amount of increased costs, utilizing the best available and most reliable data from LMC, DCAA and DCMC. This amount represents the best estimate of the amount due, based on available information. (The estimated cost impact on the specific contract cited above was $207,925 for 1994, excluding applicable interest.)

LMC did not submit a cost impact proposal, which was requested May 31, 1996; November 19, 1996; January 8, 1997 and June 17, 1997. LMC did provide limited cost impact data on October 2, 1997. This data was factored into the Government's estimated cost impact. However, LMC never submitted the requested cost impact proposal which detailed the actual financial impact to the Government. The Government attempted negotiating the cost impact without the required cost impact proposal; however, LMC declared negotiations at an impasse on June 15, 1998.

T 001923

DEMAND FOR PAYMENT:

In accordance with FAR 32.610, I hereby demand payment of $2,669,534. This amount includes applicable interest charges of $592,587 as required by FAR 32.610(b)(2). LMC's failure to make timely payment by the date of April 16, 1999 will result in additional interest charges to cover the period from March 16,

1999 until LMC makes payment. DoD requires additional interest to be charged on any part of the $2,069,534, which remains unpaid as of the close of 30 calendar days from the date of this letter. Please make the check payable to "Defense Finance and Accounting Service." The check should not be made payable to Treasury of the United States. If payment is not received within 30 calendar days from the date of this letter, the Defense Finance and Accounting Service may deduct this indebtedness by administrative offset from an unpaid invoice in accordance with the Debt Collection Act of 1982 (P.L. 97-365; 31 USC 3716, 3717).

You are hereby notified that you may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed. The undersigned is the responsible official designated for determining the amount of the debt and for its collection. However, the DCE is not authorized to defer collection of debts; therefore, any such request will be forwarded to the appropriate DoD official.

RIGHT OF APPEAL:

You may appeal this decision to the [Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, VA 22041-3208]. If you decide to appeal, you must within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the [Armed Services] Board of Contract Appeals and provide a copy to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. Instead of appealing to the [Armed Services] Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision. If you appeal to the [Armed Services] Board of Contract Appeals, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less.

If you have questions relating to this matter, please contact the undersigned at 301-214-9899 or Mr. Don Wheatley at 301-214-9731.

Sincerely,

LOUIS G. BECKER
Defense Corporate Executive

---

Receipt of Final Decision/Demand for Payment, dated March 16, 1999 is hereby acknowledged.

Signature ____________ Date 3/16/99

cc:
DFAS
DCMC Headquarters
DCMC DACO Network
DCAA/ J. Ames
LMC/ Mr. Todd J. Kallman

T 001924