No. 00-129C
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

LOCKHEED MARTIN CORPORATION,

Plaintiff,

v.

UNITED STATES,

Defendant.

---

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

Gregory T. Allen
Raymond J. M. Wong
Defense Contract Management Agency

DORIS S. FINNERMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0300
Fax: (202) 305-7643
Attorneys for Defendant

October 22, 2004

# TABLE OF CONTENTS

PAGE(S)


STATEMENT OF THE ISSUES . . . 3

STATEMENT OF THE CASE . . . 3

I. Nature Of The Case . . . 3

II. Statement Of Facts . . . 4

A. Dispute Between The Government And LMC As To The Requirements Of The Cost Accounting Standards . . . 4

B. LMC's Allocation Of Its CRAY Computer Costs . . . 8

ARGUMENT . . . 9

I. Summary Judgment Is Appropriate . . . 9

II. Lockheed's Allocation of Costs Did Not Comply With CAS 418 . . . 10

III. Lockheed's Failure To Comply With The CAS Resulted In Increased Costs Paid By The United States . . . 17

IV. Lockheed's Contention, Raised For The First Time In Its Motion For Summary Judgment, That It Is Entitled To An Offset Or An Equitable Adjustment For Costs It Incurred In Disposing Of Its CRAY Computers, Must Be Stricken . . . 19

CONCLUSION . . . 21

# TABLE OF AUTHORITIES

CASES PAGE(S)

Allegheny Teledyne Inc. v. United States,
316 F.3d 1366 (Fed. Cir. 2003) . . . . . . . . . . 10

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 9

Braughler Co., Inc. v. United States,
127 F.3d 1476 (Fed. Cir. 1997) . . . . . . . . . . 19

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 9

James M. Ellett Construction Co. v. United States,
93 F.3d 1537 (Fed. Cir. 1996) . . . . . . . . . . 19

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . 9

Perry v. Martin Marietta Corp.,
47 F.3d 1134 (Fed. Cir. 1995) . . . . . . . . . . 10, 13

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 9

## STATUTES and REGULATIONS

41 U.S.C. § 602 . . . . . . . . . . 19

41 U.S.C. § 605 . . . . . . . . . . 19

48 C.F.R. § 9903.202-1 . . . . . . . . . . 4

48 C.F.R. § 9903.306 . . . . . . . . . . 17, 20

48 C.F.R. § 9904.402-30 . . . . . . . . . . 10

48 C.F.R. § 9904.407-30 . . . . . . . . . . 13

48 C.F.R. § 9904.407-50 . . . . . . . . . . 13, 16

48 C.F.R. § 9904.409-40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

TABLE OF AUTHORITIES (continued)

48 C.F.R. § 9904.418-20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

48 C.F.R. § 9904.418-20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

48 C.F.R. § 9904.418-40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

48 C.F.R. § 9904.418-50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14, 16

48 C.F.R. § 9904.418-60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

MISCELLANEOUS

Restatement (Second) of Contracts, § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

INDEX TO APPENDIX

Description Page

Letter from A.M. DiPasquale to James Rose,
dated April 1, 1994, w/ excerpt from enclosed Disclosure Statement . . . . . . . . . . . . . . . . . . . . . 1

Audit Report No. 3121-94J19200015,
dated September 19, 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Audit Report No. 3121-94J19200016,
dated September 9, 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Memorandum from Kenneth L. Hill, Branch Manager, DCAA to
Commander, Defense Contract Management Command, dated February 13, 1996 . . . . . . . . . . 29

DCAA Supplemental Audit Report No. 3121-95J10250174-S1,
dated September 16, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Letter from A.M. DiPasquale to Louis G. Becker,
dated December 6, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Letter from Louis G. Becker to A.M. DiPasquale,
dated January 8, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Letter from A.M. DiPasquale to Louis G. Becker,
dated March 7, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Letter from Louis G. Becker to A.M. DiPasquale,
dated March 17, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Letter from A.M. DiPasquale to Louis G. Becker,
dated March 21, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Letter from Louis G. Becker to A.M. DiPasquale,
dated April 1, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Letter from Louis G. Becker to A.M. DiPasquale,
dated June 17, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Letter from Carolyn R. McGrath to Don Wheatley,
dated June 16, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Letter from Louis G. Becker to A.M. DiPasquale,
dated April 21, 1999 . . . . . . . . . . 50

INDEX TO APPENDIX (continued)

Letter from A.M. DiPasquale to Louis G. Becker,
dated May 21, 1999 . . . . . . . . . . 52

Excerpt from Plaintiff's Objections and Responses to Defendant's
Second Set of Interrogatories, Second Request for Production of
Documents, and First Request for Admissions, dated June 25, 2001 . . . . . . . . . . 55

Service Level Agreement for LADC, January 1994 through December 1994,
signed August 1994 . . . . . . . . . . 61

Service Level Agreement for LASC, January 1994 through December 1994,
signed February 18, 1994 . . . . . . . . . . 90

Facsimile from Ron Kercher to Carolyn McGrath,
attaching Interdepartmental Communication from W. Bernstein,
dated September 24, 1993 . . . . . . . . . . 122

Letter from Jeri Kaylene Somers to Doris Finnerman,
attaching Plaintiff's Responses to Defendant's Fifth Set of Interrogatories
and Second Requests for Admissions, dated March 13, 2003 . . . . . . . . . . 134

LITC Actual Cray Utilization vs. Budget Commitment, 1994-1996 . . . . . . . . . . 156

Excerpt from "Issues Raised March 14, 2001" . . . . . . . . . . 157

Letter from Renee Varin Potratz to William Bernstein,
attaching DCAA audit report no. 3121-96J10601001,
dated April 5, 1996 . . . . . . . . . . 159

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION, | ) | |
| Plaintiff, | ) | No. 00-129C |
| v. | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rules 56 and 83.2(e) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully requests the Court to deny Lockheed's motion for summary judgment and to grant summary judgment in favor of the United States upon the ground that there is no genuine issue of material fact in dispute and the Government is entitled to judgment as a matter of law. In support of this motion, we rely upon the pleadings, the defendant's Proposed Findings of Uncontroverted Fact and exhibits thereto, the exhibits submitted in support of plaintiff's motion for summary judgment, and the following brief.

Plaintiff's motion for summary judgment raises, for the first time, a counterclaim (although not described as such) which, according to Lockheed Martin Corporation ("LMC" or "Lockheed"), is an offset against the cost impact of the Cost Accounting Standard ("CAS") violation alleged in plaintiff's complaint and defendant's counterclaim. According to Lockheed, any legal analysis as to whether, in 1994 and 1995, it properly allocated the costs associated with its CRAY computers in accordance with CAS is irrelevant because any cost impact resulting from an improper allocation of costs is offset by an allocation of costs associated with the disposition of those assets.

In addition and as an alternative to its offset claim, Lockheed, for the first time, asks this Court to award an equitable adjustment of an indeterminate sum. The basis for this award is an alleged agreement between the United States and Lockheed. The alleged agreement, however, was apparently silent as to the amount of the adjustment, as Lockheed has provided no liquidated sum for the Court's consideration. Rather, Lockheed seeks an equitable adjustment of "the allocable portion of Lockheed's loss on the disposition of the CRAY computers."

These claims – (1) that Lockheed is entitled to allocate the costs associated with the disposition of the CRAY computers, and (2) that Lockheed is entitled to an equitable adjustment – have not only not been raised previously in this proceeding, they have never been raised with the contracting officer. This is evidenced by, among other things, the absence of a single reference in any document filed in support of Lockheed's motion to the allocation of costs associated with the disposition of the CRAY computers, and the absence of a certified claim submitted to the contracting officer.

As a procedural matter, Lockheed's failure to properly raise these issues in this Court has seriously prejudiced the Government. Absolutely no discovery was conducted on these issues. The Government has no knowledge of the costs associated with the disposition of the CRAY computers or any knowledge of how Lockheed has already allocated these costs. As a jurisdictional matter, Lockheed's failure to bring these claims to its contracting officer prevents this Court from exercising jurisdiction over these issues. As a result, the Court should strike all of Lockheed's arguments that rely upon the alleged offset or seek an award of damages from the Government.

# DEFENDANT'S BRIEF

## STATEMENT OF THE ISSUES

1. Whether Lockheed's allocation of costs associated with the usage of CRAY computers to its operating companies violated CAS 418 because the allocation was not based upon the actual usage of the computers by the operating companies.

2. Whether Lockheed's failure to comply with the CAS failure resulted in increased costs paid by the United States.

3. Whether Lockheed's claims – that it is entitled to allocate the costs associated with the disposition of the CRAY computers, and that it is entitled to an equitable adjustment – should be stricken because the claims were not presented to the contracting officer or previously raised in this proceeding.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Lockheed filed this action in order to seek relief from a final decision issued by the Defense Corporate Executive ("DCE"), which demanded payment for the failure of Lockheed to comply with the Cost Accounting Standards in allocating to its business segments its costs for supercomputing services. Therefore, the only issues before the Court are the proper allocation of those costs and the increased costs paid by the United States as a result of Lockheed's improper allocation.

II. Statement Of Facts

A. Dispute Between The Government And LMC As To The Requirements Of The Cost Accounting Standards

In 1992, then Lockheed Corporation formed the Lockheed Information Technology Company ("LITC") to consolidate the process of providing mainframe and supercomputing services to its business segments. In April 1994, Lockheed revised its disclosure statement. Def. App. 1. See 48 C.F.R. § 9903.202-1. Item 8.3.1.R of the disclosure statement describes the allocation of LITC costs to Lockheed's business segments. One of the expense pools allocated to Lockheed's business segments was the HPCC/Super Computer pool. As its name implies, this pool contained costs related to supercomputer services that were provided to the business segments.[1]

The relevant portion of the Disclosure Statement giving rise to this lawsuit provides as follows:

> **Services provided to customers will be governed by service level agreements and documents of understanding. In these agreements customers commit to forecasts of resource usage. LITC plans on asset expenditures and support requirements based on assessments of the workload requirements. Each company is billed for resources forecast by them, and allocated on their behalf.** A penalty is assessed on any company that significantly over-forecasts their support and resource requirements. A company, depending on the overall mix of work forecast variances, may be liable of 90% of their forecast. Those companies whose needs exceed their forecast will be accommodated subject to available capacity. Incremental spending

[1] HPCC stands for High-Performance and Classified Computing, which included specialized computing performed on CONVEX, CRAY, and VAX systems. Def. App. 88. Costs in the pool included "CRAY computer hardware, maintenance, software, labor support, facility, administrative, service, and telecommunications." Pl. Brief at 6.

> to meet unforecasted needs will be borne exclusively by the company necessitating the investment.
>
> Direct charges- . . . **HPCC processing is being billed to the companies at standard rates per CPU hour for committed share processing and standard rates per wall clock hour for committed dedicated processing.** Available capacity above these levels is at no cost, to ensure maximum use of available resources. . . .
>
> For cost pools allocated on a usage rate basis, standard rates will be set at the start of the year and remain throughout the year provided over/under liquidation does not exceed 10%. Within this range the over/under liquidation will be rolled into the next year's rates. If the over/under liquidation exceeds 10%, rates will be adjusted to actuals a minimum of once a year, usually at year end.

Def. App. 3-4 (emphasis added). This allocation method addressed the allocation of both IBM computer costs and HPCC/Supercomputer Costs. Id.

In the summer of 1994, the Defense Contract Audit Agency ("DCAA") reviewed LITC's compliance with the rules of the Cost Accounting Standards Board. As a result of this review, the DCAA issued two audit reports: Audit Reports Nos. 3121-94J9200015 ("Audit Report 15") and 3121-94J9200016 ("Audit Report 16"). Def. App. 5-28. Audit Report 15 addressed the allocation of costs related to LITC's IBM mainframe computers. It opined that Lockheed's practice of allocating these costs based on commitments by the operating segments violated CAS 418 because that standard "recommends that the allocation of the costs be based on resource consumption." Def. App. 7. Audit Report 16 expressed the same opinion for the allocation of costs related to LITC's CRAY supercomputers. Def. App. 15. There was a significant difference, however, relating to the cost impact of the noncompliance. The auditors found that the difference between the projected 1994 allocation of IBM computer costs based upon the commitments of the segments and the projected allocation of those costs based upon the recorded

usage for the first six months of 1994 was not significant. Def. App. 7. In the case of the CRAY supercomputers, the difference between the two allocation methods was estimated to have a cost impact to the Government of $1,236,010 over the course of the year. Def. App. 15.

On November 22, 1994, James Rose, the Defense Contract Executive ("DCE") for Lockheed, wrote to the DCAA Resident Auditor at Lockheed Corporation concerning the CAS 418 noncompliance issue raised in Audit Report 15, which addressed the IBM computer costs. Pl. App. 18-19. Mr. Rose took particular note of DCAA's finding that the differences between the cost allocations using the LITC forecasting method and the allocation of the costs based on recorded usage were not significant. Based upon that information and a regulation providing that a change in allocation base is not required if the proper allocation base would not result in a material difference, Mr. Rose made a determination that "LITC's current practice of allocating cost meets the intent of CAS 418 requirement. Therefore, with this letter the issue of noncompliance with CAS 418 is resolved and disposed with no additional action required." A copy of the letter was sent to LMC.

Mr. Rose never addressed the recommendations of Audit Report 16, nor can his letter reasonably be interpreted as resolving the allocation of the CRAY costs, as the estimated differences between LITC's forecasting method and recorded usage were significant.

Following the merger of Lockheed with Martin Marietta in March 1995, Mr. Rose's responsibilities transferred to the DCE for Lockheed Martin Corporation, Louis G. Becker. Two further audit efforts concerning the CRAY cost issue at LITC were conducted by DCAA in 1996. A memorandum dated February 13, 1996, reflected that the estimated impact of the CAS 418 noncompliance on cost-reimbursable contracts was $1,077,075 in 1994. Def. App. 29. A report

of a supplemental audit of fiscal year 1994 recorded costs was issued on September 16, 1996. This report reflected the final variance in cost allocations for 1994 between the allocation used by Lockheed and an allocation based on actual usage by the various Lockheed segments. Def. App. 32.

On May 31, 1996, Mr. Becker issued a notice of noncompliance with CAS 418 to Lockheed Martin based upon the recommendations in Audit Report 16. Pl. App. 23-24. Mr. Becker also requested that LMC provide a cost impact proposal as required by Federal Acquisition Regulation ("FAR") 52.230-6 (mistakenly cited as 52.230-5). LMC responded that there was no CAS noncompliance and, therefore, no cost impact proposal was required. Def. App. 34-35.

Over the next several months, the parties exchanged correspondence setting forth their respective opinions as to the requirements of CAS. Def. App. 36-44. On June 17, 1997, Mr. Becker issued a final determination of noncompliance with CAS 403 and CAS 418, and he again requested that LMC submit a cost impact proposal within 60 days. Def. App. 45-47.

Thereafter, representatives of LMC and the DCE conducted negotiations in an attempt to resolve the CAS noncompliance issue. On December 19, 1997, LMC outlined a "compromise approach" with a description of how adjustments to the CRAY computer billings in 1994 and 1995 would be made "if an agreement is reached." Pl. App. 25; Def. App. 48. On June 16, 1998, Lockheed Martin submitted its final settlement offer. Def. App. 48-49.

On March 16, 1999, Mr. Becker issued his final decision and demand for payment. Pl. App. 26-27A. When no response was received from LMC, Mr. Becker sent a follow-up letter renewing the demand for payment and advising Lockheed that it could submit a proposal for

deferment of collection if it disputed the amount demanded. Def. App. 50-51. On May 21, 1999, LMC requested deferment of collection of the amount demanded while LMC appealed the final decision. Def. App. 52-53. On March 16, 2000, this action was filed by Lockheed Martin seeking an appeal of the DCE's final decision.

B. LMC's Allocation Of Its CRAY Computer Costs

Notwithstanding the provision in the disclosure statement that Lockheed's business segments would commit to a level of usage in a service level agreement or document of understanding, Lockheed could not produce a single such document reflecting such a commitment. Nevertheless, Lockheed documents reflect that Lockheed billed several of its business segments allegedly based upon a forecast or commitment of CRAY computer usage in 1994 and 1995. Additional Lockheed documents reflect actual billings for CRAY usage by LITC to various business segments. Finally, Lockheed documents indicate the actual usage of the CRAY computer by the business segments and the actual cost at standard rates used by Lockheed. These documents reflect the following:

**1994**

| ***Customer*** | ***Committed Amount*** | ***Amount Billed By LITC*** | ***Actual CPU Hours*** | ***Usage %*** | ***Billing If Based Upon Actual Usage @ $270/hr.*** |
|---|---|---|---|---|---|
| LMSC | $ 6,376,000 | $ 6,382,491 | 7,245.5 | 47.9 | $1,956,285 |
| LASC | 2,188,550 | 2,136,000 | 7,537.3 | 50.0 | 2,035,071 |
| LADC | 1,469,000 | 1,469,892 | 188.6 | 1.2 | 50,922 |
| LTOC | | | 112.8 | .7 | 30,456 |
| Sanders | | 8,113 | 30.1 | .2 | 8,127 |
| TOTAL | $ 10,033,550 | $ 9,996,496 | 15,114.4 | 100.0 | $4,080,861 |

Def. App. 139-147.

**1995**

| ***Customer*** | ***Committed Amount*** | ***Amount Billed By LITC*** | ***Actual CPU Hours*** | ***Usage %*** | ***Billing If Based Upon Actual Usage @ $270/hr.*** |
|---|---|---|---|---|---|
| LMSC | $ 2,318,000 | $2,318,000 | 4,959.5 | 43.6 | $1,339,065 |
| LASC | 1,144,000 | 1,144,000 | 6,186.8 | 54.4 | 1,670,436 |
| LMTO | | | 27.3 | .3 | 7,371 |
| LMIT | | 11,785 | 111.2 | 1.0 | 30,024 |
| Sanders | | | 79.9 | .7 | 21,573 |
| TOTAL | $3,462,000 | $3,473,785 | 11,364.7 | 100.0 | $3,068,469 |

Def. App. 147-153. Notwithstanding the accounting practice described in the disclosure statement that "rates [would] be adjusted to actuals a minimum of once a year" if "the over/under liquidation exceeds 10%," Def. App. 4, Lockheed did not adjust the amounts charged to its business segments, or to affected Government contracts, to reflect the variance between the preestablished rate and the actual usage rate of the computer services. Def. App. 144, 147-50 (Plaintiff's Response to Request for Admissions, Nos. 14, 15, 23-30).

ARGUMENT

I. Summary Judgment Is Appropriate

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The moving party must identify the legal and factual bases for its motion and specify those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1563 (Fed. Cir. 1987). The claims at issue may then be resolved on

summary judgment unless the responding party establishes there is a factual dispute which must be tried. Anderson, 477 U.S. at 247-48; Sweats Fashions, 833 F.2d at 1562-63.

In this case, the material facts are either not in dispute, or are not subject to a genuine dispute, and the Government is entitled to judgment as a matter of law. Accordingly, summary judgment should be granted in favor of the United States.

II. Lockheed's Allocation of Costs Did Not Comply With CAS 418

The issue before the Court is the proper allocation of costs associated with the usage of CRAY computers. Allocation of costs "'is an accounting concept involving the ascertainment of contract cost; it results from a relationship between a cost and a cost objective such that the cost objective appropriately bears all of a portion of that cost.' . . .[A]llocability is simply a determination of what portions of a cost are assigned to what party." Allegheny Teledyne Inc. v. United States, 316 F.3d 1366, 1370-71 (Fed. Cir. 2003) (citation omitted).

CAS 418 provides guidance for allocating indirect costs to "cost objectives," that is, organizational subdivisions or contracts, based upon their "beneficial or causal relationship."[2] 48 C.F.R. § 9904.418-20; see also 48C.F.R. § 9904.418-40(c) ("Pooled costs shall be allocated to cost objectives in reasonable proportion to the beneficial or causal relationship of the pooled costs to cost objectives. . . . "); Perry v. Martin Marietta Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995) (Pursuant to CAS 418, cost pools are "allocated back to the segment base and their corresponding cost objectives (the CAS-covered contracts the segments are performing) in proportion to the relative benefits received on the basis of an established methodology").

---

[2] 48 C.F.R. § 9904.402-30 defines "cost objective" as "a function, organizational subdivision, contract, or other work unit for which cost data are desired and for which provision is made to accumulate and measure the cost to processes, products, jobs, capitalized projects, etc."

With respect to its CRAY computers, Lockheed allocated the costs associated with the use of these computers by utilizing a preestablished rate: "standard rates per CPU hour for committed share processing." Def. App. 3, 157. The cost accounting standards specifically address the allocation of indirect costs when the contractor uses a preestablished rate:

> (g) Use of preestablished rates for indirect costs.
>
> (1) Preestablished rates, based on either forecasted actual or standard cost, may be used in allocating an indirect cost pool.
>
> (2) Preestablished rates shall reflect the costs and activities anticipated for the cost accounting period except as provided in paragraph (g)(3) of this subsection. Such preestablished rates shall be reviewed at least annually, and revised as necessary to reflect the anticipated conditions.
>
> (3) The contracting parties may agree on preestablished rates which are not based on costs and activities anticipated for a cost accounting period. The contractor shall have and consistently apply written policies for the establishment of these rates.
>
> (4) Under paragraphs (g) (2) and (3) of this subsection where variances of a cost accounting period are material, these variances shall be disposed of by allocating them to cost objectives in proportion to the costs previously allocated to these cost objectives by use of the preestablished rates.
>
> (5) If preestablished rates are revised during a cost accounting period and if the variances accumulated to the time of the revision are significant, the costs allocated to that time shall be adjusted to the amounts which would have been allocated using the revised preestablished rates.

48 C.F.R. § 9904.418-50.

An illustration of the allocation of costs using preestablished rates is provided:

> During a cost accounting period, Business Unit I allocates the cost of its flight services indirect cost pool to other indirect cost pools and final cost objectives using a preestablished rate. The

> preestablished rate is based on an estimate of the actual costs and activity for the cost accounting period. For the cost accounting period, Unit I establishes a rate of $200 per hour for use of the flight services activity. In March, the contractor's operating environment changes significantly; the contractor now expects a significant increase in the cost of this activity during the remainder of the year. Unit I estimates the rate for the entire cost accounting period to be $240 an hour. Pursuant to the provisions of 9904.418-50(g)(4), the Business Unit may revise its rate to the expected $240 an hour. If the accumulated variances are significant, the business unit must also adjust the costs previously allocated to reflect the revised rates.

48 C.F.R. § 9904.418-60(i).

In this case, the actual utilization of CRAY computers changed significantly from the projected usage. Lockheed, however, did not revise its rates as required. See 48 C.F.R. § 9904.418-50(g)(2) ("Such preestablished rates shall be reviewed at least annually, and revised as necessary to reflect the anticipated conditions"); 48 C.F.R. § 9904.418-50(g)(4) ("where variances of a cost accounting period are material, these variances shall be disposed of by allocating them to cost objectives. . . ."). Nor did it revise its rates as required by Lockheed's own disclosure statement. Def. App. 3 ("rates [would] be adjusted to actuals a minimum of once a year" if "the over/under liquidation exceeds 10%").

Revised rates would have addressed the material variances between the amount billed by LITC to its business segments based upon the amounts "committed" and the amounts that would have been billed if actual usage had been considered. In addition, the costs previously allocated should have been adjusted to reflect the revised rate based upon the actual costs and activity for the cost accounting period. Lockheed's failure to make any adjustment was a violation of CAS 418.

The requirement to base the allocation upon actual costs is supported by analogy to CAS 407, which governs the use of "standard costs" for direct material and labor. See Preambles to Cost Accounting Standard 418, Preamble A (Preamble to Original Publication, 5-15-80) ("the Board decided to apply to same criteria to average and pre-established direct labor rates that are used in CAS 407 for labor rate standards"). In this CAS provision, "standard cost" is "any cost computed with the use of pre-established measures." 48 C.F.R. § 9904.407-30(a)(8). Where there is a variance between the pre-established measure and the actual measure of the cost, see 48 C.F.R. § 9904.407-30(a)(9), such variances must be allocated to the cost objectives, generally as costs are incurred, but at least annually. 48 C.F.R. § 9904.407-50(b), (c), (d)(1).[3]

In this case, Lockheed allocated its costs based upon "commitments" made by the business segments, with no consideration of any variance between this measure of forecasted costs and the actual costs associated with usage of the computers. The use of this "commitment" methodology allows a contractor to pick and choose the pre-established or "committed" rate for various cost elements (rent, computer services, copying services, home office costs, etc.) with no Government input or approval required. Thus, using Lockheed's methodology, the Government pays whatever "commitment" rate the contractor elects to charge, and ignores the mandate in CAS 418.40(c) that costs be allocated to cost objectives "in proportion to the relative benefits received." Perry v. Martin Marietta Corp., 47 F.3d at 1137.

---

[3] See also CAS 401-30(a)(2), which provides: "Actual costs means an amount determined on the basis of cost incurred (as distinguished from forecasted costs), including standard cost properly adjusted for applicable variance."

This possible abuse was addressed in CAS 9904.418-50(g), which requires that (1) the pre-established rates reflect the costs and activities anticipated for the cost accounting period, CAS 9904.418-50(g)(2), and (2) the pre-established rates be adjusted where variances of a cost accounting period are material, CAS 9904.418-60(g)(4). As illustrated by the following example, without the protection of CAS 418-50(g)(2) and (4), contractors would be able to charge whatever they desired, regardless of what the actual costs were:

***EXAMPLE:*** The corporate home office of Johnson Company estimates the amount of home office personnel and space it will need based on the estimated work of its segments for the coming year. All of the contracts with Segment C of Johnson Company are Government cost-reimbursable contracts.

For 2005, Johnson Company decides to hold each of its segment managers "accountable." Thus, the corporate home office requires that each segment manager provide a "commitment" of how much work that segment will perform during the coming year. By holding the segment managers accountable, the Company believes that this will motivate the segment managers to achieve that goal and eliminate having idle personnel or space at the corporate home office. The "commitment" provided by each segment for 2005 was as follows:

| Segment | Work Commitment (% of Total) | Actual Work (% of Total) |
|---|---|---|
| A (Commercial) | $ 20 million (20%) | $20 million (33%) |
| B (Commercial) | 30 million (30%) | 30 million (50%) |
| C (Government) | 50 million (50%) | 10 million (17%) |
| Total | $100 million | $60 million |

Based on these "commitments," the Corporate Office estimates that total rental and personnel costs for 2005 will be $10 million. It therefore allocates $2 million to Segment A

(using a pre-established rate of 20% x $10 million), $3 million to Segment B (using a pre-established rate of 30% x $10 million), and $5 million to Segment C (using a pre-established rate of 50% x $10 million).

The actual rental and personnel costs for 2005 total $10 million, which is the same as the estimated costs. However, if Johnson Company used the actual work instead of the "committed work," Segment A would be allocated $3.3 million (the actual percentage of 33% x $10 million), Segment B would be allocated $5 million (the actual percentage of 50% x $10 million), and Segment C would be allocated $1.7 million (the actual percentage of 17% x $10 million).

A summary of the difference is as follows:

| Segment | Amount Charged Using Work Commitment | Amount Charged Using Actual Work | Overcharge (Undercharge) By Using Commitment |
|---|---|---|---|
| A (Commercial) | $2 million | $ 3.3 million | $(1.3 million) |
| B (Commercial) | 3 million | 5 million | (2 million) |
| C (Government) | 5 million | 1.7 million | 3.3 million |

Even though the actual amount of work for the Government division was much less than anticipated, and the actual amount of work for the commercial divisions met their projections, Johnson Company claims that it is not required to adjust the amount of costs allocated because this is a "pre-established" rate that was "committed" to by its segment managers. In other words, the Government must pay the $3.3 million of increased costs resulting from the failure of the manager of Segment C to meet his/her "commitment." This result occurs regardless of whether the original "commitment" was even a valid estimate. The Government has no input into the amount of the "commitment." Moreover, because the Government is paying these additional costs, the managers are not held "accountable," as Lockheed contends.

To further illustrate Lockheed's position, one could argue that the concept of "commitments" can be applied to pre-established direct labor rates. However, CAS 9904.407-50(d) requires that the contractor adjust the pre-established rate to reflect actual costs when the variances are material. Similarly, CAS 9904.418-50(a)(2) provides that "in accounting for direct costs a business unit shall use actual costs" unless a pre-established rate is used as provided in CAS. Further, if pre-established rates are used, CAS 9904.418-50(a)(2)(ii)(B) requires that the contractor adjust its rates to reflect actual costs when the variances are material. Thus, CAS is consistent in its requirement that when pre-established rates are used, there must be an adjustment for any variances that are material in amount.

In the case of direct labor, the absence of such an adjustment could lead to instances such as the following:

***EXAMPLE:*** All of Smith Company's contracts are cost-reimbursable, Government contracts. Smith Company uses standard rates. The standard rates are based on the "commitment" rates submitted by its division managers. The division managers are held responsible for assuring that the"commitment" rates are recovered on the contract.

At the beginning of 2005, Division X of Smith Company was comprised of highly experienced engineers, technicians, and computer programmers. However, early in 2005, Division X experienced a large unexpected turnover when many of its experienced personnel left the division. This resulted in a lower actual average rate than was "committed" to by the division manager of Division X. The results are summarized as follows:

| Direct labor Category | Division X Commitment Rate | Division X Actual Rates | Difference | Hours Worked | Amount of Overcharge |
|---|---|---|---|---|---|
| Engineer | $65 | $40 | $25 | 10,000 | $250,000 |
| Technician | $50 | $30 | $20 | 10,000 | $200,000 |
| Computer Programmer | $40 | $25 | $15 | 10,000 | $150,000 |
| Total | | | | | $600,000 |

Smith Company argues that the amount charged to each contract must use the "commitment" rate. Since the division manager of Division X must be held to his/her "commitment," Smith Company contends that Government is not entitled to recover the $600,000 of overcharges. The result is the same as using Lockheed's methodology: the Government must pay the additional costs resulting from the failure of Lockheed's managers to meet their "commitment."

CAS clearly reflects that the use of any pre-established rate must account for actual costs, and adjustments are required when the variance between the pre-established rate and actual costs is material. Lockheed's methodology, which did not account for any variance, is a violation of CAS.

III. Lockheed's Failure To Comply With The CAS Resulted In Increased Costs Paid By The United States

The provisions of Title 41, United States Code, section 422(h) require that the contractor and the United States "agree to a contract price adjustment, with interest, for any increased costs paid" to the contractor by the United States because of a failure by the contractor comply with applicable cost accounting standards. See also 48 C.F.R. § 9903.306(a) (defining "increased costs").

In a document prepared by Lockheed, Lockheed admits that the impact of its CAS noncompliance on cost-reimbursement contracts resulted in an overpayment by the Government of $540,000. Def. App. 158. However, Lockheed also contends that a reallocation of costs would impact firm, fixed-price contracts, resulting in an underpayment by the Government of $1,740,000. Id. In addition, Lockheed contends that the Government owes Lockheed $9,650,000 for losses associated with the disposition of the CRAY computers.[4] Our opposition to Lockheed's claims arising from the disposition of the CRAY computers is discussed below, at pages 19-20. We disagree with Lockheed's contention that its CAS noncompliance had a cost impact on fixed-price contracts.

CAS 9903.306(b) provides as follows:

> If the contractor under any fixed-price contract, including a firm fixed-price contract, fails during contract performance to follow its cost accounting practices or to comply with applicable Cost Accounting Standards, increased costs are measured by the difference between the contract price agreed to and the contract price that would have been agreed to had the contractor proposed in accordance with the cost accounting practices used during contract performance. The determination of the contract price that would have been agreed to will be left to the contracting parties and will depend on the circumstances of each case.

---

[4] According to the document prepared by Lockheed, the amounts allegedly allocable to the Government include $23.48 million for costs associated with usage of the CRAY and $8.45 million for costs associated with the disposition of the CRAYs, for a total amount of $31.91 million allegedly allocable to the Government. This document also indicates that the Government has paid $22.26 million of these costs, leaving a balance allegedly owed of $9.65 million.

Lockheed's current position is that the Government has paid $20.79 million of the $30.27 million costs associated with the CRAYs. Pl. Br. at 11. Lockheed has provided no explanation of these figures, nor has it provided any documentation from which these numbers were allegedly derived. The sole evidentiary support provided by Lockheed is the declaration of Mr. Blue, which demonstrates that Mr. Blue has no personal knowledge of the costs incurred by LITC for usage and disposition of the CRAY computers or of the amounts paid by the Government.

Thus, for Lockheed to claim that its CAS noncompliance resulted in cost impact on its fixed-price contracts, Lockheed must establish "the contract price that would have been agreed to" had Lockheed's proposal been in accordance with compliant cost accounting practices.

In this case, the best estimate of computer costs was the amount committed to by each operating segment. This best estimate was presumably used by Lockheed in determining the price for its fixed-price contracts, and it would not have changed even if Lockheed had used a compliant method for allocation of costs (that is, a pre-established rate adjusted for actual costs). Since any adjustment for variances are made at the end of the accounting period, they generally do not affect firm, fixed-price contracts negotiated during the accounting period. Here, Lockheed has not established that the contract price that would have been agreed to is any different from the contract price agreed to. Therefore, Lockheed cannot demonstrate that its CAS noncompliance resulted in a cost impact on fixed-price contracts.

Pursuant to FAR 32.610, the Government is also entitled to interest from the date of the demand, March 16, 1999.

IV. Lockheed's Contention, Raised For The First Time In Its Motion For Summary Judgment, That It Is Entitled To An Offset Or An Equitable Adjustment For Costs It Incurred In Disposing Of Its CRAY Computers, Must Be Stricken

Lockheed's motion for summary judgment advances two arguments: (1) that it is entitled to allocate its costs associated with the disposition of CRAY computers, which allocation should offset any cost impact resulting from an allocation of costs associated with the usage of the CRAY computers, and (2) that it is entitled to an equitable adjustment equal to "the allocable portion of Lockheed's loss on the disposition of the CRAY computers." The first time that

Lockheed raised these issues in this proceeding is in its motion. It did not raise them in its complaint, in its reply to the Government's counterclaim, or in the joint preliminary status report. Because Lockheed did not raise these issues, the Government did not propound any discovery as to the facts underlying the claims or the merits of the claims.

Even more importantly, Lockheed has not raised these issues with the contracting officer. The contracts at issue in this case are contracts in effect during 1994 and 1995 and are subject to the Contract Disputes Act ("CDA"). See Complaint, ¶ 3; 41 U.S.C. § 602(a). The CDA expressly requires that "all claims by a contractor against the government . . . shall be in writing and shall be submitted to the contracting officer for decision." 41 U.S.C. § 605(a). Compliance with this provision is a jurisdictional prerequisite to the filing of a complaint in this Court. Braughler Co., Inc. v. United States, 127 F.3d 1476, 1480 (Fed. Cir. 1997). Thus, for the Court to possess jurisdiction pursuant to the CDA, there must be a valid claim presented to the contracting officer for a decision. James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541 (Fed. Cir. 1996).

As already noted, Lockheed has never presented to its contracting officer any claim relating to the costs associated with the disposition of its CRAY computers.[5] Accordingly, the Court lacks jurisdiction to entertain any such claim.[6]

---

[5] Even if Lockheed had submitted such a claim to its contracting officer, Lockheed wrongly represents that it disposed of the CRAY computers in 1995. See Pl. PFUF ¶ 8. First, the evidence upon which Lockheed relies does not support its proposed finding of fact. The declaration of Mr. Blue, asserts only the following: "Due in part to the operating companies' underutilization of the CRAY computers in 1994 and 1995, Lockheed disposed of the two CRAY computers." Pl. App. 3. Second, a contemporaneous Lockheed document states that the "CRAYs were removed from service in 1996," Def. App. 40, and a DCAA audit report dated April 5, 1996, discussed the possible replacement of LITC's CRAY computers, Def. App. 160-63. These documents demonstrate that the CRAY computers were not disposed in 1995.

CAS 9904.409-40(a)(4) provides that "[t]he gain or loss which is recognized upon disposition of a tangible capital asset "shall be assigned to the cost accounting period in which the disposition occurs." If the disposition occurred in 1996, then the gain or loss must be assigned to 1996. Nothing in CAS permits the contractor to offset a loss incurred in 1996 against the increased costs paid by the Government in 1994 and 1995. Cf. 48 C.F.R. § 9903.306(e) (when the failure to follow CAS increases costs paid under one or more contracts but decreases costs under other contracts, no adjustment to the contract price is required "so long as the cost decreases . . . are at least equal to the increased cost under the other affected contracts').

[6] Lockheed's claim for an equitable adjustment is based upon an alleged agreement with the Government. As evidence of the alleged agreement, Lockheed cites a single letter from Lockheed dated December 19, 1997. Pl. Br. 14. This letter states: "The purpose of this letter is [to] document how [the business segments] will handle an adjustment to their CRAY billings generated in 1994 and 1995 if an agreement is reached." Pl. App. 25 (emphasis added). A subsequent letter from Lockheed describes the December 1997 letter as "a compromise approach." Def. App. 48.

"An agreement is a manifestation of mutual assent on the part of two or more persons." Restatement (Second) of Contracts, § 3. Absent a shred of evidence that an authorized representative of the Government accepted Lockheed's "compromise approach," Lockheed has fallen far short of proving the existence of an agreement, and Lockheed's claim must fail.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests the Court to deny Lockheed's motion for summary judgment, grant defendant's cross-motion for summary judgment, and enter judgment in favor of the Government in the amount of $540,000 plus interest from March 16, 1999.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Doris S. Finnerman
DORIS S. FINNERMAN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0300\
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

Gregory T. Allen
Raymond J. M. Wong
Defense Contract Management Agency

October 22, 2004

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 00-129C<br>(Judge Allegra) |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to RCFC 56(h)(1), defendant respectfully submits the following proposed findings of uncontroverted fact in support of Defendant's Motion For Summary Judgment:

1. In April 1994, Lockheed Corporation ("Lockheed") revised its disclosure statement. Def. App. 1.

2. Item 8.3.1.R of the disclosure statement sets forth Lockheed's description of its allocation of LITC costs to Lockheed's business segments. One of the expense pools to be allocated was the HPCC/Super Computer pool. As its name implies, this pool contained costs related to supercomputer services that were provided to the business segments. Def. App. 3-4.

3. The disclosure statement provides, in part:

> **Services provided to customers will be governed by service level agreements and documents of understanding. In these agreements customers commit to forecasts of resource usage. LITC plans| on asset expenditures and support requirements based on assessments of the workload requirements. Each company is billed for resources forecast by them, and allocated on their behalf.** A penalty is assessed on any company that significantly over-forecasts their support and resource requirements. A company, depending on the overall mix of work forecast variances, may be liable of 90% of their forecast. Those companies whose needs exceed their forecast will be accommodated subject to available capacity. Incremental spending

> to meet unforecasted needs will be borne exclusively by the company necessitating the investment.
>
> Direct charges- . . . **HPCC processing is being billed to the companies at standard rates per CPU hour for committed share processing and standard rates per wall clock hour for committed dedicated processing.** Available capacity above these levels is at no cost, to ensure maximum use of available resources. . . .
>
> For cost pools allocated on a usage rate basis, standard rates will be set at the start of the year and remain throughout the year provided over/under liquidation does not exceed 10%. Within this range the over/under liquidation will be rolled into the next year's rates. If the over/under liquidation exceeds 10%, rates will be adjusted to actuals a minimum of once a year, usually at year end.

Def. App. 3-4 (emphasis added).

4. Item 8.3.1.R was intended to address the allocation of both IBM computer costs and HPCC/Supercomputer Costs. Id.

5. In the summer of 1994, the Defense Contract Audit Agency ("DCAA") reviewed LITC's compliance with the rules of the Cost Accounting Standards Board and issued two audit reports: Audit Reports Nos. 3121-94J9200015 ("Audit Report 15") and 3121-94J9200016 ("Audit Report 16"). Def. App. 5-28. Audit Report 15 dealt with the allocation of costs related to LITC's IBM mainframe computers. Audit Report 16 dealt with the allocation of costs related to LITC's CRAY supercomputers.

6. Audit Report 15 opined that Lockheed's practice of allocating IBM computer costs based on commitments by the operating segments violated CAS 418 because that standard "recommends that the allocation of the costs be based on resource consumption." Def. App. 7. The auditors also found that the difference between the projected 1994 allocation of IBM computer costs based upon the commitments of the segments and the projected allocation of

those costs based upon the recorded usage for the first six months of 1994 was not significant. Id.

7. Audit Report 16 opined that Lockheed's practice of allocating CRAY supercomputer costs based on commitments by the operating segments violated CAS 418 because that standard "recommends that the allocation of the costs be based on resource consumption." It also found that the difference between the allocation of costs based on commitment and the allocation of costs based on resource consumption would result in an estimated cost impact to the Government of $1,236,010 over the course of the year 1994. Def. App. 15.

8. On November 22, 1994, James Rose, the Defense Contract Executive ("DCE") for Lockheed, wrote to the DCAA Resident Auditor at Lockheed Corporation concerning the CAS 418 noncompliance issue raised in Audit Report 15, with respect to IBM computer costs. Mr. Rose took note of DCAA's finding that the differences between the cost allocations using the LITC forecasting method and the allocation of the costs based on recorded usage were not significant. Based upon that information and a regulation providing that a change in allocation base is not required if the proper allocation base would not result in a material difference, Mr. Rose made a determination that "LITC's current practice of allocating cost meets the intent of CAS 418 requirement. Therefore, with this letter the issue of noncompliance with CAS 418 is resolved and disposed with no additional action required." A copy of the letter was sent to LMC. Pl. App. 18-19.

9. Mr. Rose never addressed the recommendations of Audit Report 16.

10. Following the merger of Lockheed with Martin Marietta in March 1995, responsibility for the cost accounting practices at Lockheed transferred to the DCE for Lockheed Martin Corporation, Louis G. Becker. Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 16.

11. A DCAA memorandum dated February 13, 1996, reflected the estimated impact of the CAS 418 noncompliance on cost-reimbursable contracts in 1994 was $1,077,075. Def. App. 29.

12. DCAA issued a report of a supplemental audit of fiscal year 1994 recorded costs on September 16, 1996. This report reflected the final variance in cost allocations for 1994 between the allocation used by Lockheed and an allocation based on actual usage by the various Lockheed segments. Def. App. 30-33.

13. On May 31, 1996, Mr. Becker issued a notice of noncompliance with CAS 418 to Lockheed Martin based upon the recommendations in Audit Report 16. Mr. Becker also requested that LMC provide a cost impact proposal. Pl. App. 23-24.

14. LMC responded that there was no CAS noncompliance and, therefore, no cost impact proposal was required. Def. App. 34-35.

15. For several months, the parties exchanged correspondence setting forth their respective opinions as to the requirements of CAS. Def. App. 36-44.

16. On June 17, 1997, Mr. Becker issued a final determination of noncompliance with CAS 403 and CAS 418, and he again requested that LMC submit a cost impact proposal within 60 days. Def. App. 45-47.

17. During the next several months, representatives of LMC and the DCE conducted negotiations in an attempt to resolve the CAS noncompliance issue. Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 18.

18. On December 19, 1997, LMC outlined a "compromise approach" with a description of how adjustments to the CRAY computer billings in 1994 and 1995 would be made "if an agreement is reached." Pl. App. 25; Def. App. 48.

19. On June 16, 1998, Lockheed Martin submitted its final settlement offer. Def. App. 48-49.

20. On March 16, 1999, Mr. Becker issued his final decision and demand for payment in the amount of $2,669,534. Pl. App. 26-27A.

21. Mr. Becker sent a follow-up letter renewing the demand for payment and advising Lockheed Martin that it could submit a proposal for deferment of collection if it disputed the amount demanded. Def. App. 50-51.

22. On May 21, 1999, LMC requested deferment of collection of the amount demanded while LMC appealed the final decision. Def. App. 52-53.

23. According to Lockheed, there were three "service level agreements and documents of understanding" such as are referenced in Lockheed's disclosure statement submitted to James Rose on April 1, 1994: (1) an Interdepartmental Communication from W. Bernstein, dated September 24, 1993; (2) a Service Level Agreement for LADC, January 1994 through December 1994, dated August 1994; and (2) a Service Level Agreement for LASC, January 1994 through December 1994, dated February 18, 1994. Def. App. 57.

24. The Interdepartmental Communication from W. Bernstein, dated September 24, 1993, projected CRAY costs for 1994 as follows:

| | |
|---|---|
| LADC | $2,800,000 |
| LASC | 2,189,000 |
| LMSC | 6,376,000. |

Def. App. 124, 127, 129, 132.

25. The Service Level Agreement for LADC, January 1994 through December 1994, dated August 1994, stated, "LADC has no work forecasted for the LITC, HPCC processors in 1994." Def. App. 85.

26. There were no "service level agreements and documents of understanding" reflecting commitments for CRAY usage in 1995. Def. App. 57 (Pl. Resp. to Interrog. No. 6).

27. For 1994, LMSC, LASC, and LADC committed to a certain level of costs based on anticipated CRAY usage. LMSC, LASC, and LADC committed to cost levels as follows:

| ***Customer*** | ***Dollar Commitment*** |
|---|---|
| LMSC | $ 6,376,000 |
| LASC | 2,188,550 |
| LADC | 1,469,000 |
| Total | $ 10,033,550 |

Def. App. 139-40 (Plaintiff's Responses to Requests for Admissions, Nos. 1-3); 156.

28. For 1994, the total costs billed by LITC for CRAY computers was as follows:

| ***Customer*** | ***Amount Billed*** |
|---|---|
| LMSC | $ 6,382,491 |
| LASC | 2,136,000 |
| LADC | 1,469,892 |
| Sanders | 8,113 |
| Total | $ 9,996,496 |

Def. App. 140-42 (Plaintiff's Responses to Requests for Admissions, Nos. 4-7).

29. For 1994, actual CRAY usage was as follows:

| ***Customer*** | ***Actual CPU Hours*** | ***Usage %*** |
|---|---|---|
| LMSC | 7,245.5 | 47.9 |
| LASC | 7,537.3 | 50.0 |
| LADC | 188.6 | 1.2 |
| LTOC | 112.8 | .7 |
| Sanders | 30.1 | .2 |
| | 15,114.3 | 100.0% |

Def. App. 142-43 (Plaintiff's Responses to Requests for Admissions, Nos. 8-12).

30. For 1994, LMSC and LADC did not utilize the CRAY computers in accordance with their respective commitments, but they were billed for the full amount of their commitment. Def. App. 144 (Plaintiff's Response to Request for Admissions, No. 14).

31. For 1994, LASC was not billed for the difference between its commitment and its actual usage of the CRAY. Def. App. 144 (Plaintiff's Response to Request for Admissions, No. 15).

32. LADC included the $1,469,882 costs billed by LITC in its fiscal year 1993 overhead claim. LADC was billed by LITC for its committed amount of $1,469,882 evenly over the 12 months of 1994. Def. App. 144-45 (Plaintiff's Responses to Requests for Admissions, Nos. 15-16).

33. Although LITC billed Sanders for CRAY usage, Sanders had not previously made any hour or dollar commitment for CRAY usage. Def. App. 145-46 (Plaintiff's Response to Request for Admissions, No. 18).

34. For 1995, LMSC and LASC each committed $634,000 for CRAY computer usage. Def. App. 147-48 (Plaintiff's Responses to Requests for Admissions, Nos. 23, 25); 156.

35. For 1995, LMSC also committed $2,154,000 for excess capacity for CRAY computer usage. Def. App. 147-48 (Plaintiff's Response to Request for Admissions, No. 24); 156.

36. For 1995, LASC also committed $757,000 for excess capacity for CRAY computer usage. Def. App. 148 (Plaintiff's Response to Request for Admissions, No. 26); 156.

37. For 1995, LITC billed LMSC $634,000 for CRAY computer usage. Def. App. 148-49 (Plaintiff's Response to Request for Admissions, No. 27[1]).

38. For 1995, LITC billed LMSC $1,684,000 for excess capacity. Def. App. 149 (Plaintiff's Response to Request for Admissions, No. 28[1]).

39. For 1995, LITC billed LASC $634,000 for actual CRAY computer usage. Def. App. 149 (Plaintiff's Response to Request for Admissions, No. 29[1]).

40. For 1995, LITC billed LASC $510,000 for excess capacity. Def. App. 149-50 (Plaintiff's Response to Request for Admissions, No. 30[1]).

41. For 1995, LMIT's actual CRAY usage cost was $11,785. Def. App. 150 (Plaintiff's Response to Request for Admissions, No. 31).

42. For 1995, LMSC actually used the CRAY computers for 4,959.5 CPU hours. Def. App. 150 (Plaintiff's Response to Request for Admissions, No. 32).

---

[1] Lockheed neither admitted nor denied this request for admission, although the information is within the possession of Lockheed. Therefore, pursuant to Rule 36, the request is deemed admitted.

43. For 1995, LASC actually used the CRAY computers for 6,186.8 CPU hours. Def. App. 150-51 (Plaintiff's Response to Request for Admissions, No. 33).

44. For 1995, LMTO actually used the CRAY computers for 27.3 CPU hours. Def. App. 151 (Plaintiff's Response to Request for Admissions, No. 34).

45. For 1995, LMIT actually used the CRAY computers for 111.2 CPU hours. Def. App. 151-52 (Plaintiff's Response to Request for Admissions, No. 35).

46. For 1995, Sanders actually used the CRAY computers for 79.9 CPU hours. Def. App. 152 (Plaintiff's Response to Request for Admissions, No. 36).

47. Although LITC billed LMIT for CRAY computer usage in 1995, LMIT had not previously made any hour or dollar commitment for CRAY computer usage. Def. App. 152 (Plaintiff's Response to Request for Admissions, No. 37[1]).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Doris S. Finnerman
DORIS S. FINNERMAN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

OF COUNSEL:

Gregory T. Allen
Raymond J. M. Wong
Defense Contract Management Agency

Tel: (202) 307-0300\
Fax: (202) 305-7643

Attorneys for Defendant

October 22, 2004

No. 00-129C
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

LOCKHEED MARTIN CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# APPENDIX IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

Gregory T. Allen
Raymond J. M. Wong
Defense Contract Management Agency

DORIS S. FINNERMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0300
Fax: (202) 305-7643
Attorneys for Defendant

October 22, 2004

# INDEX TO APPENDIX

Description | Page


Letter from A.M. DiPasquale to James Rose,
dated April 1, 1994, w/ excerpt from enclosed Disclosure Statement . . . . . 1

Audit Report No. 3121-94J19200015,
dated September 19, 1994 . . . . . 5

Audit Report No. 3121-94J19200016,
dated September 9, 1994 . . . . . 13

Memorandum from Kenneth L. Hill, Branch Manager, DCAA to
Commander, Defense Contract Management Command, dated February 13, 1996 . . . . . 29

DCAA Supplemental Audit Report No. 3121-95J10250174-S1,
dated September 16, 1996 . . . . . 30

Letter from A.M. DiPasquale to Louis G. Becker,
dated December 6, 1996 . . . . . 34

Letter from Louis G. Becker to A.M. DiPasquale,
dated January 8, 1997 . . . . . 36

Letter from A.M. DiPasquale to Louis G. Becker,
dated March 7, 1997 . . . . . 39

Letter from Louis G. Becker to A.M. DiPasquale,
dated March 17, 1997 . . . . . 41

Letter from A.M. DiPasquale to Louis G. Becker,
dated March 21, 1997 . . . . . 43

Letter from Louis G. Becker to A.M. DiPasquale,
dated April 1, 1997 . . . . . 44

Letter from Louis G. Becker to A.M. DiPasquale,
dated June 17, 1997 . . . . . 45

Letter from Carolyn R. McGrath to Don Wheatley,
dated June 16, 1998 . . . . . 48

Letter from Louis G. Becker to A.M. DiPasquale,
dated April 21, 1999 . . . . . 50

INDEX TO APPENDIX (continued)

Letter from A.M. DiPasquale to Louis G. Becker,
dated May 21, 1999 . . . . . 52

Excerpt from Plaintiff's Objections and Responses to Defendant's
Second Set of Interrogatories, Second Request for Production of
Documents, and First Request for Admissions, dated June 25, 2001 . . . . . 55

Service Level Agreement for LADC, January 1994 through December 1994,
signed August 1994 . . . . . 61

Service Level Agreement for LASC, January 1994 through December 1994,
signed February 18, 1994 . . . . . 90

Facsimile from Ron Kercher to Carolyn McGrath,
attaching Interdepartmental Communication from W. Bernstein,
dated September 24, 1993 . . . . . 122

Letter from Jeri Kaylene Somers to Doris Finnerman,
attaching Plaintiff's Responses to Defendant's Fifth Set of Interrogatories
and Second Requests for Admissions, dated March 13, 2003 . . . . . 134

LITC Actual Cray Utilization vs. Budget Commitment, 1994-1996 . . . . . 156

Excerpt from "Issues Raised March 14, 2001" . . . . . 157

Letter from Renee Varin Potratz to William Bernstein,
attaching DCAA audit report no. 3121-96J10601001,
dated April 5, 1996 . . . . . 159

**Lockheed Corporation**

4500 Park Granada Boulevard
Calabasas, California 91399

April 1, 1994

Mr. James Rose
Defense Corporate Executive
Defense Contract Management District West
Lockheed Corporation
4500 Park Granada Boulevard
Calabasas, CA 91399

Subject: Revised Lockheed Corporation Disclosure Statement Dated April 1, 1994

Dear Mr. Rose:

Attached is a revised Disclosure Statement for Lockheed Corporation's home office. This supersedes the last version you received dated June 18, 1993. This statement incorporates the changes documented in our letter to you of October 8, 1993 and our subsequent conversation where you stated your wording preferences. In addition, we have expanded the description of LITC allocation methods for computing resources and made some minor wording changes in other sections to reflect recent developments.

We would be happy to provide you with copies of our redlined drafts to facilitate the review of the document.

Sincerely,

A. M. DiPasquale, Corporate Director
Government Finance Relations

Enclosure

cc: Richard Dodd, DCAA

| COST ACCOUNTING STANDARDS DISCLOSURE STATEMENT *REQUIRED BY PUBLIC LAW 91-379* | COVER SHEET AND CERTIFICATION<br>LOCKHEED CORPORATION |
|---|---|

| Item No. | Item Description |
|---|---|

0.1 Company or Reporting Unit:

| | |
|---|---|
| Name | LOCKHEED CORPORATION |
| Street Address | 4500 Park Granada Boulevard |
| City, State and ZIP Code | Calabasas, CA 91399 |
| Division or Subsidiary of (if applicable) | |

0.2 Reporting Unit is:

[x] Corporate (home) office B. [ ] Group office C. [ ] Division or subsidiary D. [ ] Other

0.3 Official to Contact Concerning this Statement:

| | |
|---|---|
| Name and title | A. M. DiPasquale<br>Director, Government Finance Relations |
| Phone number (including area code and extention) | (818) 876-2260 |

0.4 Date of

| | |
|---|---|
| This statement | 4/1/94 |
| Most recent prior statement | 6/18/93 |

CERTIFICATION

I certify that to the best of my knowledge and belief this Statement is the complete and accurate disclosure as of the above date by the above-name organization of its cost accounting practices, as required by the Disclosure Regulation of the Cost Accounting Standards Board under 50 U.S.C. App. 2168, Public Law 91-379 (4 CFR 351).

THIS DOCUMENT CONTAINS TRADE SECRETS AND COMMERCIAL OR FINANCIAL INFORMATION THAT IS PRIVILEGED OR CONFIDENTIAL. THE DISCLOSURE OF SUCH INFORMATION IS PROHIBITED UNDER THE FREEDOM OF INFORMATION ACT (5) U.S.C. SEC. 552) AND OTHER STATUTE(S) PROHIBITING DISCLOSURE (....E.G. 18 U.S.C. SEC. 1905).

A. M. DiPasquale,
Director, Government Finance Relations

THE PENALTY FOR MAKING A FALSE STATEMENT IN THIS DISCLOSURE IS PRESCRIBED IN 18 U.S.C. 1001

FORM CASB-DS-1

| COST ACCOUNTING STANDARDS BOARD **DISCLOSURE STATEMENT** *REQUIRED BY PUBLIC LAW 91-379* | CONTINUATION SHEET Page 15 of 20 Pages<br>Name of Reporting Unit: LOCKHEED CORPORATION |
|---|---|

Item No. | Item Description

8.3.1 DIRECTLY CHARGEABLE EXPENSES

| TYPE OF EXPENSE OR NAME OF POOL OF EXPENSES | 8.4.0 MAJOR TYPES OF EXPENSE | 8.5.0 ALLOCATION BASE |
|---|---|---|
| R. Computers (LITC) | | |
| o IBM Unclassified Computer (LITC) | Dedicated hardware, maintenance, software, proportionate share of labor/management support plus LITC facility, telecommunications, administration, disaster recovery and customer service allocation. | Standard rates for CPU usage based on committed to MIPS allocated, for DASD on megabytes allocated, and for tape on tape mountings. Unique software, dedicated hardware allocated support will be charged to requesting segment. |
| o IBM Classified Computer (LITC) | Dedicated hardware, maintenance software, proportionate share of labor/management support plus LITC facility, telecommunications, administration, disaster recovery, security and customer service allocation. | Standard rates for CPU usage based on MIPS allocated, for DASD on megabytes allocated, and for tape on tape mountings. Unique software, dedicated hardware, and allocated support will be charged to requesting segment. |
| o HPCC/Super Computer (LITC) | Dedicated hardware, maintenance software, proportionate share of labor/management support plus LITC facility, telecommunications, administration, disaster recovery and customer service allocation. | Machine unit pool usage is charged out to users based on wall clock hours for dedicated use and CPU hours for shared usage. Different wall clock hour rates apply, based on processor configuration. |
| | Extended operations support includes labor costs for remote site CRAY, Convex, IBM, DEC, MPP, Tandem, and Unisys equipment at the operating companies. | Full time equivalent labor. |

NOTE: LITC has adopted industry practice with respect to its overall chargeout strategy. Services provided to customers will be governed by service level agreements and documents of understanding. In these agreements customers commit to forecasts of resource usage. LITC plans on asset expenditures and support requirements based on assessments of the workload requirements. Each company is billed for resources forecast by them, and allocated on their behalf. A penalty is assessed on any company that significantly over-forecasts their support and resource requirements. A company, depending on the overall mix of work forecast variances, may be liable for 90% of their forecast. Those companies whose needs exceed their forecast will be accommodated subject to available capacity. Incremental spending to meet unforecasted needs will be borne exclusively by the company necessitating the investment.

Direct charges-Where LITC acquires hardware, software or related products on behalf of another Lockheed company, LITC will bill these costs directly to that company at cost or in the case of a capital item will bill appropriate depreciation or amortization. 1993 Transition-IBM processing is being billed to the companies at a fixed price for CPU, DASD and Tape utilization. HPCC processing is being billed to the companies at standard rates per CPU hour for committed share processing and standard rates per wall clock hour for committed dedicated processing. Available capacity above these levels is at no cost, to enure maximum use of available resources.

| COST ACCOUNTING STANDARDS BOARD **DISCLOSURE STATEMENT** *REQUIRED BY PUBLIC LAW 91-379* | CONTINUATION SHEET Page 16 of 20 Pages Name of Reporting Unit LOCKHEED CORPORATION |
|---|---|

| Item No. | Item Description |
|---|---|

8.3.1 DIRECTLY CHARGEABLE EXPENSES

| TYPE OF EXPENSE OR NAME OF POOL OF EXPENSES | 8.4.0 MAJOR TYPES OF EXPENSE | 8.5.0 ALLOCATION BASE |
|---|---|---|

R. Computers (LITC) (continued)

NOTE (continued):

Certain serviced company site costs may be billed to LITC for cost accumulation purposes. These costs will ultimately be billed back to the sites with no LITC overhead applied.

For cost pools allocated on a usage rate basis, standard rates will be set at the start of the year and remain throughout the year provided over/under liquidation does not exceed 10%. Within this range the over/under liquidation will be rolled into the next year's rates. If the over/under liquidation exceeds 10%, rates will be adjusted to actuals a minimum of once a year, usually at year end.

| | | |
|---|---|---|
| S. Corporate Aircraft (Gulfstream) | Salaries<br>Fuel and Oil<br>Lease Costs<br>Repair and Maintenance<br>Maintenance | Formula described for allocating Residual expenses. |

FORM CASB-DS-1

Audit Report No.
3121-94J19200015
CHRON NO. 1032

19 September 1994

REPORT ON AUDIT OF CAS 418 NONCOMPLIANCE
ALLOCATION OF DIRECT AND INDIRECT COSTS
LOCKHEED INFORMATION TECHNOLOGY COMPANY
DENVER, COLORADO

Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

Contractor information contained in this audit report may be proprietary. The restrictions of 18 U.S.C. 1905 should be considered before this information is released to the public.

This report may not be released to any Federal agency outside the Department of Defense without the approval of Headquarters, DCAA, except to an agency requesting the report in negotiating or administering its contract.

DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
LAKEWOOD, COLORADO



FOR OFFICIAL USE ONLY

CENTRAL REGION
DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
7112 WEST JEFFERSON AVENUE SUITE 200
LAKEWOOD CO 80235-2327

IN REPLY REFER TO

Audit Report No. 3121-94J19200015 19 September 1994

SUBJECT: Report on Audit of CAS 418 Noncompliance
Allocation of Direct and Indirect Costs
Lockheed Information Technology Company
Denver, Colorado

TO: Mr. Richard Dodd
Resident Auditor, DCAA
Resident Office - Lockheed Corporation
4500 Park Granada Boulevard
Calabasas, California 91399-0357

1. Purpose and Scope of Audit

a. Our continuous audit of Lockheed Information Systems Company's (LITC) cost accounting practices during performance of contracts includes evaluating whether the LITC has complied with the CAS Board's rules, regulations, and standards, and FAR Part 31. The purpose of the audit was to determine if LITC has complied with the requirements of CAS 418. LITC is responsible for compliance with the requirements of this standard. Our responsibility is to express an opinion on compliance with those requirements based on our audit.

b. The audit was conducted in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the contractors accounting practices comply with the requirements referred to above. An audit includes examining, on a test basis, evidence about the contractors compliance with those requirements. We believe that our audit provides a reasonable basis for our opinion.

2. Summary of Audit Results

a. In our opinion, LITC is in noncompliance with CAS 418. This report is limited to the cited instances of noncompliance. Accordingly, we express no opinion on whether other practices are proper, approved, or agreed to for pricing proposals, accumulating costs, or reporting contractor performance data.

b. The results of audit were discussed with Ms. Jan Wade, LITC Supervisor of Administration, at our exit conference on 16 August 1994.

c. Information in this report should not be used without first discussing its applicability with the auditor.

PRINTED ON RECYCLED PAPER



FOR OFFICIAL USE ONLY

Audit Report No. 3121-94J19200015

3. Statement of Conditions and Recommendations

Our audit disclosed that LITC's failure to comply with a cost accounting standard may result in increased cost paid by the government. The area of non-compliance is LITC's policies and practices regarding the allocation of IBM computer costs to the benefiting Lockheed divisions.

(a) Condition:

LITC estimates IBM computer costs at $25,438,557 for 1994. These costs are allocated based on a resource consumption termed Millions of Instructions Per Second (MIPS). These costs are allocated to the Lockheed divisions Missiles and Space Company (LMSC), Advanced Development Company (LADC), Aeronautical Systems Company (LASC), Austin Division (LAD), Aircraft Services (LAS), Corporate Offices (CORLAC), Aeromod Company, Inc. (LACI), and Sanders for 1994 based on a beginning of year commitment by those divisions for various levels of MIPS consumption.

LITC uses a preestablished rate, based on the forecasted LITC costs and the Lockheed segment commitment usage, to allocate the LITC IBM costs during the year. The billing rate is adjusted if the LITC total incurred costs vary from those budgeted by 10 percent or if an individual division's consumption exceeds 10 percent of the level committed to at the beginning of the year. Consumption that exceeds a division's commitment level but does not exceed 10 percent of that commitment, is not charged to the using division. Underutilization by a division of less than 90 percent of commitment results in that division being billed for 90 percent of their commited MIPS. For example, if a division is utilizing 50 percent of their committed level of MIPS, they will receive a cost allocation based on 90 percent of their committed level of MIPS.

We compared the projected 1994 annual allocation of IBM MIPS costs based on the LITC cost allocation practices versus allocation of the costs based on recorded usage for the first 6 months of 1994. The differences were not significant since the commitment usage and incurred usage were not significantly different, however, these practices violate 418.50(e)(1) which recommends that the allocation of the costs be based on resource consumption. Specifically, in situations where pool costs do not contain a material amount of management or supervisor costs, the standard specifies:

CAS 418.50(e)(1):...Homogenous indirect cost pools of this type have a direct and definitive relationship between the activities in the pool and benefitting cost objectives. The pooled costs shall be allocated using an appropriate measure of resource consumption. This determination shall be

made in accordance with the following criteria taking into consideration the individual circumstances: (1) The best representation of the beneficial or causal relationship between an indirect pool and the benefiting cost objectives is a measure of resource consumption of the activities of the indirect cost pool....

(b) Significance of Condition

The following two paragraphs are hypothetical situations at IMSC regarding potential impact of the current LITC policies and procedures regarding the allocation of IBM MIPS costs.

(i) LITC allocates a minimum of 90 percent of the budgeted costs based on the division's commitment level of usage regardless of the division's actual usage. The potential impact at LITC, with $10,705,000 annual budgeted costs, is a cost allocation of $9,634,500 ($10,705,000 x 90 percent) regardless of the actual IMSC usage of computer resources. IMSC would be absorbing costs allocable to to other divisions.

(ii) LITC allows up to 10 percent above commitment level of usage without any adjustment to the cost allocated to the user division. This could cause, in the case of IMSC, underallocation of up to $1,070,500 ($10,705,000 X 10 percent) before LITC would adjust the costs allocated to IMSC. Other division would be absorbing the costs allocable to IMSC.

(c) Recommendation

The costs allocation should be based on resource consumption used by that division.

(d) LITC's Reaction to the Issue

LITC believes their method of cost allocation to be fair and reasonable. The LITC written response is included as an attachment to this report.

(e) Auditor Comments on LITC's Reaction

Our DCAA, Technical Services Center, provided comments on LITC's data center billing practices as follows:

(i) LITC does not utilize a formal chargeback system for billing and allocating computer resources. LITC's customers are not billed for actual usage of the computer resources, but only on budgeted peak processing computer requirements. This method does not support a chargeback system which operates based on a customer's measured usage of computer resources.

(ii) Normally, computer resource consumption provides the basis for charging customers for the computer resource costs.

(iii) LITC's customers should continue to forecast and commit to a certain level of computer resource usage, but LITC should consider using measured resource utilization as a basis for allocating the costs to the various divisions for use of those resources. This practice is possible using currently produced LITC reports and would not require major technical effort by LITC.

4. Disposition of Audit Results

a. Accounting counsel and any additional audit services which the contracting officer may require are available upon request. Please contact Mr. Joe Esterak, Supervisory Auditor, at (303) 969-5000. Our fax number is (303) 969-5056.

b. This audit was performed by Mr. Jon Brown, Auditor. We would appreciate your comments and suggestions for improving our audit services and/or related audit support.

DEFENSE CONTRACT AUDIT AGENCY

James L. Lashbrook

JAMES L. LASHBROOK, Branch Manager

Attachment:
LITC's Response Dated 31 August 1994

Copy furnished:
DCAA, CAC Network, Lockheed Corporation
LITC, Attn: Ed Meehan, Director of Finance (Thru the CACO)

Lockheed
Information Technology Company

1401 Del Norte Street
Denver, Colorado 80221

August 31, 1994

Mr. Jon Brown
Defense Contract Audit Agency
Denver Branch Office
7112 West Jefferson Avenue, Suite 200
Lakewood, CO 80235-2327

Subject: Report on Audit of CAS-418 Non-Compliance Allocation of Direct and Indirect Costs

Ref: DCAA Draft audit Report, Same Subject

Dear Mr. Brown:

LITC strenuously objects to DCAA's conclusion of CAS-418 non-compliance. LITC is in compliance with the spirit and letter of this standard's stated requirements. DCAA bases its finding on resource consumption being the only acceptable base to determine cost allocation. The CAS language speaks to beneficial or causal relationships in determining fair and equitable allocation of costs. LITC uses causal relationships to allocate its cost because it more fairly distributes its costs to segments serviced. DCAA's beneficial relationship based on consumption allocates cost beyond the benefits received. LITC's cost allocation process must give consideration to reasons expenses were incurred and for whose benefit.

All of LITC's customers previously had their own data centers. They know what a fair and reasonable price is for the services they require. They also understand that a commitment to a resource, whether acquired individually or through/from LITC, is a long-term commitment irrespective of usage.

DCAA comments that normally, computer resource consumption provides the basis for charging customers for the computer resource costs. LITC does not represent a normal situation. The customer dynamics are much more diverse than the normal data center circumstances. As such, other options must be explored. CAS-418 allows for a number of alternatives should conditions warrant.

CAS-418.50 (f)

> "provides for a special allocation where a particular cost objective in relation to other cost objectives receives significantly more or less benefit from an indirect cost pool than would be reflected by the allocation of such costs using a base determined pursuant to paragraphs (d) and (e) of this section."

CAS-418.50 (g)(3) states:

> The contracting parties may agree on pre-established rates which are not based on costs and activities anticipated for a cost accounting period. The contractor shall have and consistently apply written policies for the establishment of these rates.

LITC, from its inception, has had a commitment policy approved by its Board of Directors which states if you, as a custome·, commit to a resource, you are responsible for the cost until such time as the issue is addressed. LITC's IBM pricing policy, as stated in the audit report and as concluded by DCAA, does not currently result in harm to the government. IBM workloads can be forecasted accurately and LITC does not anticipate wide swings in actual vs. forecast/-committed use. In the HPCC area, however, the situation is different. In 1994, the HPCC workload fell off due to a downturn in the defense business base, direct charging implementation for this resource, and alternative solutions being available to our customers. LASC, LMSC, and LADC are the primary customers and principal parties that committed to the expenditure of funds for HPCC resources. LASC is meeting its commitments; LMSC and LADC are not. DCAA's approach would have LASC pay a higher cost for their use, thereby relieving LMSC and LADC from their commitment. This is unfair to LASC and does not meet the spirit of the CAS-418 requirements. Where is the consideration for the causal relationship in DCAA's recommendation?

CAS-403.50 (a)(2) states:

> Where the expense of a given function is to be allocated by means of a particular allocation base, all segments shall be included in the base unless (i) any excluded segment did not receive significant benefits or <u>contribute significantly to the cause</u> of the expense to be allocated and (ii) any included segment did receive significant benefits from or <u>contribute significantly to the cause of the expense in question</u>. (Emphasis added.)

HPCC services can be considered in a class with special facilities. The CAS-418 standard does not provide guidance for accounting for the costs of special

facilities. Therefore, allowances must be made to ensure that the approach taken is fair and reasonable.

LITC believes its formal chargeback system is fair and reasonable; is compliant with the spirit and letter of the CAS; and passes the reasonable man test with respect to our chargeback approach. DCAA's position does not meet this test. It is, therefore, evident that other approaches which meet and are described in CAS-418 should be applied to LITC's situation. Doing so would allow the DCAA to find LITC compliant with CAS-418.

Thank you for the opportunity to provide these comments.

Sincerely,

Edward J. Meehan
Chief Financial Officer

EJM/csm

cc: W. Bernstein
A. DiPasquale, CORLAC
J. Wade

Audit Report No.
3121-94J19200016
CHRON NO. 1001

9 September 1994

REPORT ON CAS 418 NONCOMPLIANCE
ALLOCATION OF DIRECT AND INDIRECT COSTS
LOCKHEED INFORMATION TECHNOLOGY COMPANY
DENVER, COLORADO

Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

Contractor information contained in this audit report may be proprietary. The restrictions of 18 U.S.C. 1905 should be considered before this information is released to the public.

This report may not be released to any Federal agency outside the Department of Defense without the approval of Headquarters, DCAA, except to an agency requesting the report in negotiating or administering its contract.

DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
LAKEWOOD, COLORADO

FOR OFFICIAL USE ONLY

CENTRAL REGION
DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
7112 WEST JEFFERSON AVENUE SUITE 200
LAKEWOOD CO 80235-2327

IN REPLY REFER TO

Audit Report No. 3121-94J19200016 9 September 1994

SUBJECT: Report on CAS 418 Noncompliance
Allocation of Direct and Indirect Costs
Lockheed Information Technology Company
Denver, Colorado

TO: Mr. Richard Dodd
Resident Auditor, DCAA
Resident Office - Lockheed Corporation
4500 Park Granada Boulevard
Calabasas, California 91399-0357

1. Purpose and Scope of Audit

a. Our continuous audit of Lockheed Information Systems Company's (LITC) cost accounting practices during performance of contracts includes evaluating whether the LITC has complied with the CAS Board's rules, regulations, and standards, and FAR Part 31. The purpose of the audit was to determine if LITC has complied with the requirements of CAS 418. LITC is responsible for compliance with the requirements of this standard. Our responsibility is to express an opinion on compliance with those requirements based on our audit.

b. The audit was conducted in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the contractors accounting practices comply with the requirements referred to above. An audit includes examining, on a test basis, evidence about the contractors compliance with those requirements. We believe that our audit provides a reasonable basis for our opinion.

2. Summary of Audit Results

a. In our opinion, LITC is in noncompliance with CAS 418. This report is limited to the cited instances of noncompliance. Accordingly, we express no opinion on whether other practices are proper, approved, or agreed to for pricing proposals, accumulating costs, or reporting contractor performance data.

FOR OFFICIAL USE ONLY

b. The results of audit were discussed with Ms. Jan Wade, LITC Supervisor of Administration, at our exit conference on 16 August 1994. The LITC written response is included as an attachment to this report.

c. Information in this report should not be used without first discussing its applicability with the auditor.

3. Statement of Conditions and Recommendations

Our audit disclosed that LITC's failure to comply with a cost accounting standard has resulted or may result in increased cost paid by the government. The area of non-compliance is LITC's policies and practices regarding the allocation of CRAY computer costs to the benefiting Lockheed divisions.

(a) Condition:

LITC has two CRAY computers whose annual costs are estimated at $10,057,189 for 1994. These costs are allocated to the Lockheed Missiles and Space Company (LMSC), Advanced Development Company (LADC), and Aeronautical Systems Company (LASC) based on a beginning of year usage commitment by these divisions for wall clock hours and shared Computer Processing Units (CPU). The costs allocated using the beginning of the year usage commitment versus the costs allocated based on actual usage are significantly different for the various Lockheed divisions. This practice violate CAS 418.50(e)(1) which recommends that the allocation of the costs be based on resource consumption. Specifically, in situations where pool costs do not contain a material amount of management or supervision costs, the standard specifies:

> CAS 418.50(e)(1):...Homogenous indirect cost pools of this type have a direct and definitive relationship between the activities in the pool and benefitting cost objectives. The pooled costs shall be allocated using an appropriate measure of resource consumption. This determination shall be made in accordance with the following criteria taking into consideration the individual circumstances: (1) The best representation of the beneficial or causal relationship between an indirect pool and the benefiting cost objectives is a measure of resource consumption of the activities of the indirect cost pool....

(b) Significance of Condition:

We computed a $1,236,010 estimated cost impact to the government based on each benefiting Lockheed divisions' 1993 percentage of cost reimbursable and firm fixed price types of government contracts. The projected variance in 1994 costs allocated based on the usage commitment versus cost allocations based on actual resource consumption (Computer Processing Units (CPU)) is as follows:

| Division | OVER/ (UNDER) Cost Allocation | Government Cost Reimbursable Participation | Government Fixed Price Participation | Government Cost Reimbursable Cost Impact | Government Fixed Price Cost Impact |
|---|---|---|---|---|---|
| LMSC | $2,014,404 | 87.0% | 3.2% | $1,752,531 | ($64,461) |
| LADC | $1,347,213 | 67.7% | 25.1% | $912,063 | ($338,150) |
| LASC | ($3,353,484) | 42.6% | 40.5% | ($1,428,584) | $1,358,161 |
| | | | | $1,236,010 | $955,550 |

(c) Recommendation:

The costs allocation should be based on actual resource consumption (CPUs and/or wallclock hours) by that division.

(d) LITC's Reaction to the Issue:

LITC believes their method of cost allocation is fair and reasonable. The LITC written response is included as an attachment to this report.

(e) Auditor Comments on LITC's Reaction:

Our DCAA, Technical Services Center, provided comments on LITC's data center billing practices as follows:

(i) LITC does not utilize a formal chargeback system for billing and allocating computer resources. LITC's customers are not billed for actual usage of the computer resources, but only on budgeted peak processing computer requirements. This method does not support a chargeback system which operates based on a customer's measured usage of computer resources.

(ii) Normally, computer resource consumption provides the basis for charging customers for the computer resource costs.

(iii) LITC's customers should continue to forecast and commit to a certain level of computer resource usage, but LITC should consider using measured resource utilization as a basis for allocating the costs to the various divisions for use of those resources. This practice is possible using currently produced LITC reports and would not require major technical effort by LITC.

4. Disposition of Audit Results

a. Accounting counsel and any additional audit services which the contracting officer may require are available upon request. Please contact Mr. Joe Esterak, Supervisory Auditor, at (303) 969-5000. Our FAX number is (303) 969-5056.

b. As required by FAR 30.602-2, please furnish us a copy of your determination regarding the reported noncompliances.

c. This audit was performed by Mr. Jon Brown, Auditor. We would appreciate your comments and suggestions for improving our audit services and/or related audit support.

DEFENSE CONTRACT AUDIT AGENCY

JAMES L. LASHBROOK, Branch Manager

Attachment:
LITC's Response Dated 31 August 1994

Copy furnished:
→ DCAA, CAC Network

Lockheed Corporation LITC
Attn: Ed Meehan, Director of Finance (Thru the CACO)

Lockheed
Information Technology Company

1401 Del Norte Street
Denver, Colorado 80221

August 31, 1994

Mr. Jon Brown
Defense Contract Audit Agency
Denver Branch Office
7112 West Jefferson Avenue, Suite 200
Lakewood, CO 80235-2327

Subject: Report on Audit of CAS-418 Non-Compliance Allocation of Direct and Indirect Costs

Ref: DCAA Draft audit Report, Same Subject

Dear Mr. Brown:

LITC strenuously objects to DCAA's conclusion of CAS-418 non-compliance. LITC is in compliance with the spirit and letter of this standard's stated requirements. DCAA bases its finding on resource consumption being the only acceptable base to determine cost allocation. The CAS language speaks to beneficial <u>or</u> causal relationships in determining fair and equitable allocation of costs. LITC uses causal relationships to allocate its cost because it more fairly distributes its costs to segments serviced. DCAA's beneficial relationship based on consumption allocates cost beyond the benefits received. LITC's cost allocation process must give consideration to reasons expenses were incurred and for whose benefit.

All of LITC's customers previously had their own data centers. They know what a fair and reasonable price is for the services they require. They also understand that a commitment to a resource, whether acquired individually or through/from LITC, is a long-term commitment irrespective of usage.

DCAA comments that <u>normally</u>, computer resource consumption provides the basis for charging customers for the computer resource costs. LITC does not represent a normal situation. The customer dynamics are much more diverse than the normal data center circumstances. As such, other options must be explored. CAS-418 allows for a number of alternatives should conditions warrant.

CAS-418.50 (f)

> "provides for a special allocation where a particular cost objective in relation to other cost objectives receives significantly more or less benefit from an indirect cost pool than would be reflected by the allocation of such costs using a base determined pursuant to paragraphs (d) and (e) of this section."

CAS-418.50 (g)(3) states:

> The contracting parties may agree on pre-established rates which are not based on costs and activities anticipated for a cost accounting period. The contractor shall have and consistently apply written policies for the establishment of these rates.

LITC, from its inception, has had a commitment policy approved by its Board of Directors which states if you, as a customer, commit to a resource, you are responsible for the cost until such time as the issue is addressed. LITC's IBM pricing policy, as stated in the audit report and as concluded by DCAA, does not currently result in harm to the government. IBM workloads can be forecasted accurately and LITC does not anticipate wide swings in actual vs. forecast/-committed use. In the HPCC area, however, the situation is different. In 1994, the HPCC workload fell off due to a downturn in the defense business base, direct charging implementation for this resource, and alternative solutions being available to our customers. LASC, LMSC, and LADC are the primary customers and principal parties that committed to the expenditure of funds for HPCC resources. LASC is meeting its commitments; LMSC and LADC are not. DCAA's approach would have LASC pay a higher cost for their use, thereby relieving LMSC and LADC from their commitment. This is unfair to LASC and does not meet the spirit of the CAS-418 requirements. Where is the consideration for the causal relationship in DCAA's recommendation?

CAS-403.50 (a)(2) states:

> Where the expense of a given function is to be allocated by means of a particular allocation base, all segments shall be included in the base unless (i) any excluded segment did not receive significant benefits or <u>contribute significantly to the cause</u> of the expense to be allocated and (ii) any included segment did receive significant benefits from or <u>contribute significantly to the cause of the expense in question</u>. (Emphasis added.)

HPCC services can be considered in a class with special facilities. The CAS-418 standard does not provide guidance for accounting for the costs of special

facilities. Therefore, allowances must be made to ensure that the approach taken is fair and reasonable.

LITC believes its formal chargeback system is fair and reasonable; is compliant with the spirit and letter of the CAS; and passes the reasonable man test with respect to our chargeback approach. DCAA's position does not meet this test. It is, therefore, evident that other approaches which meet and are described in CAS-418 should be applied to LITC's situation. Doing so would allow the DCAA to find LITC compliant with CAS-418.

Thank you for the opportunity to provide these comments.

Sincerely,

Edward J. Meehan
Chief Financial Officer

EJM/csm

cc: W. Bernstein
A. DiPasquale, CORLAC
J. Wade

Audit Report No.
3121-94J19200016
CHRON NO. 1001

9 September 1994

Get audit Report
3121-95J10250174-S1
Exhibit J pg. 5&6

REPORT ON CAS 418 NONCOMPLIANCE
ALLOCATION OF DIRECT AND INDIRECT COSTS
LOCKHEED INFORMATION TECHNOLOGY COMPANY
DENVER, COLORADO

Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

Contractor information contained in this audit report may be proprietary. The restrictions of 18 U.S.C. 1905 should be considered before this information is released to the public.

This report may not be released to any Federal agency outside the Department of Defense without the approval of Headquarters, DCAA, except to an agency requesting the report in negotiating or administering its contract.

DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
LAKEWOOD, COLORADO

FOR OFFICIAL USE ONLY

CENTRAL REGION
DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
7112 WEST JEFFERSON AVENUE SUITE 200
LAKEWOOD CO 80235-2327

IN REPLY REFER TO
Audit Report No. 3121-94J19200016

9 September 1994

SUBJECT: Report on CAS 418 Noncompliance
Allocation of Direct and Indirect Costs
Lockheed Information Technology Company
Denver, Colorado

TO: Mr. Richard Dodd
Resident Auditor, DCAA
Resident Office - Lockheed Corporation
4500 Park Granada Boulevard
Calabasas, California 91399-0357

1. Purpose and Scope of Audit

a. Our continuous audit of Lockheed Information Systems Company's (LITC) cost accounting practices during performance of contracts includes evaluating whether the LITC has complied with the CAS Board's rules, regulations, and standards, and FAR Part 31. The purpose of the audit was to determine if LITC has complied with the requirements of CAS 418. LITC is responsible for compliance with the requirements of this standard. Our responsibility is to express an opinion on compliance with those requirements based on our audit.

b. The audit was conducted in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the contractors accounting practices comply with the requirements referred to above. An audit includes examining, on a test basis, evidence about the contractors compliance with those requirements. We believe that our audit provides a reasonable basis for our opinion.

2. Summary of Audit Results

a. In our opinion, LITC is in noncompliance with CAS 418. This report is limited to the cited instances of noncompliance. Accordingly, we express no opinion on whether other practices are proper, approved, or agreed to for pricing proposals, accumulating costs, or reporting contractor performance data.

FOR OFFICIAL USE ONLY

b. The results of audit were discussed with Ms. Jan Wade, LITC Supervisor of Administration, at our exit conference on 16 August 1994. The LITC written response is included as an attachment to this report.

c. Information in this report should not be used without first discussing its applicability with the auditor.

3. Statement of Conditions and Recommendations

Our audit disclosed that LITC's failure to comply with a cost accounting standard has resulted or may result in increased cost paid by the government. The area of non-compliance is LITC's policies and practices regarding the allocation of CRAY computer costs to the benefiting Lockheed divisions.

(a) Condition:

LITC has two CRAY computers whose annual costs are estimated at $10,057,189 for 1994. These costs are allocated to the Lockheed Missiles and Space Company (LMSC), Advanced Development Company (LADC), and Aeronautical Systems Company (LASC) based on a beginning of year usage commitment by these divisions for wall clock hours and shared Computer Processing Units (CPU). The costs allocated using the beginning of the year usage commitment versus the costs allocated based on actual usage are significantly different for the various Lockheed divisions. This practice violate CAS 418.50(e)(1) which recommends that the allocation of the costs be based on resource consumption. Specifically, in situations where pool costs do not contain a material amount of management or supervision costs, the standard specifies:

> CAS 418.50(e)(1):...Homogenous indirect cost pools of this type have a direct and definitive relationship between the activities in the pool and benefitting cost objectives. The pooled costs shall be allocated using an appropriate measure of resource consumption. This determination shall be made in accordance with the following criteria taking into consideration the individual circumstances: (1) The best representation of the beneficial or causal relationship between an indirect pool and the benefiting cost objectives is a measure of resource consumption of the activities of the indirect cost pool....

(b) Significance of Condition:

We computed a $1,236,010 estimated cost impact to the government based on each benefiting Lockheed divisions' 1993 percentage of cost reimbursable and firm fixed price types of government contracts. The projected variance in 1994 costs allocated based on the usage commitment versus cost allocations based on actual resource consumption (Computer Processing Units (CPU)) is as follows:

Audit Report No. 3121-94J19200016

| Division | OVER/ (UNDER) Cost Allocation | Government Cost Reimbursable Participation | Government Fixed Price Participation | Government Cost Reimbursable Cost Impact | Government Fixed Price Cost Impact |
|---|---|---|---|---|---|
| LMSC | $2,014,404 | 87.0% | 3.2% | $1,752,531 | ($64,461) |
| LADC | $1,347,213 | 67.7% | 25.1% | $912,063 | ($338,150) |
| LASC | ($3,353,484) | 42.6% | 40.5% | ($1,428,584) | $1,358,161 |
| | | | | $1,236,010 | $955,550 |

(c) Recommendation:

The costs allocation should be based on actual resource consumption (CPUs and/or wallclock hours) by that division.

(d) LITC's Reaction to the Issue:

LITC believes their method of cost allocation is fair and reasonable. The LITC written response is included as an attachment to this report.

(e) Auditor Comments on LITC's Reaction:

Our DCAA, Technical Services Center, provided comments on LITC's data center billing practices as follows:

(i) LITC does not utilize a formal chargeback system for billing and allocating computer resources. LITC's customers are not billed for actual usage of the computer resources, but only on budgeted peak processing computer requirements. This method does not support a chargeback system which operates based on a customer's measured usage of computer resources.

(ii) Normally, computer resource consumption provides the basis for charging customers for the computer resource costs.

(iii) LITC's customers should continue to forecast and commit to a certain level of computer resource usage, but LITC should consider using measured resource utilization as a basis for allocating the costs to the various divisions for use of those resources. This practice is possible using currently produced LITC reports and would not require major technical effort by LITC.



FOR OFFICIAL USE ONLY

Audit Report No. 3121-94J19200016

4. Disposition of Audit Results

a. Accounting counsel and any additional audit services which the contracting officer may require are available upon request. Please contact Mr. Joe Esterak, Supervisory Auditor, at (303) 969-5000. Our FAX number is (303) 969-5056.

b. As required by FAR 30.602-2, please furnish us a copy of your determination regarding the reported noncompliances.

c. This audit was performed by Mr. Jon Brown, Auditor. We would appreciate your comments and suggestions for improving our audit services and/or related audit support.

DEFENSE CONTRACT AUDIT AGENCY

JAMES L. LASHBROOK, Branch Manager

Attachment:
LITC's Response Dated 31 August 1994

Copy furnished:
→ DCAA, CAC Network

Lockheed Corporation LITC
Attn: Ed Meehan, Director of Finance (Thru the CACO)

Lockheed
Information Technology Company

1401 Del Norte Street
Denver, Colorado 80221

August 31, 1994

Mr. Jon Brown
Defense Contract Audit Agency
Denver Branch Office
7112 West Jefferson Avenue, Suite 200
Lakewood, CO 80235-2327

Subject: Report on Audit of CAS-418 Non-Compliance Allocation of Direct and Indirect Costs

Ref: DCAA Draft audit Report, Same Subject

Dear Mr. Brown:

LITC strenuously objects to DCAA's conclusion of CAS-418 non-compliance. LITC is in compliance with the spirit and letter of this standard's stated requirements. DCAA bases its finding on resource consumption being the only acceptable base to determine cost allocation. The CAS language speaks to beneficial or causal relationships in determining fair and equitable allocation of costs. LITC uses causal relationships to allocate its cost because it more fairly distributes its costs to segments serviced. DCAA's beneficial relationship based on consumption allocates cost beyond the benefits received. LITC's cost allocation process must give consideration to reasons expenses were incurred and for whose benefit.

All of LITC's customers previously had their own data centers. They know what a fair and reasonable price is for the services they require. They also understand that a commitment to a resource, whether acquired individually or through/from LITC, is a long-term commitment irrespective of usage.

DCAA comments that normally, computer resource consumption provides the basis for charging customers for the computer resource costs. LITC does not represent a normal situation. The customer dynamics are much more diverse than the normal data center circumstances. As such, other options must be explored. CAS-418 allows for a number of alternatives should conditions warrant.

CAS-418.50 (f)

> "provides for a special allocation where a particular cost objective in relation to other cost objectives receives significantly more or less benefit from an indirect cost pool than would be reflected by the allocation of such costs using a base determined pursuant to paragraphs (d) and (e) of this section."

CAS-418.50 (g)(3) states:

> The contracting parties may agree on pre-established rates which are not based on costs and activities anticipated for a cost accounting period. The contractor shall have and consistently apply written policies for the establishment of these rates.

LITC, from its inception, has had a commitment policy approved by its Board of Directors which states if you, as a customer, commit to a resource, you are responsible for the cost until such time as the issue is addressed. LITC's IBM pricing policy, as stated in the audit report and as concluded by DCAA, does not currently result in harm to the government. IBM workloads can be forecasted accurately and LITC does not anticipate wide swings in actual vs. forecast/-committed use. In the HPCC area, however, the situation is different. In 1994, the HPCC workload fell off due to a downturn in the defense business base, direct charging implementation for this resource, and alternative solutions being available to our customers. LASC, LMSC, and LADC are the primary customers and principal parties that committed to the expenditure of funds for HPCC resources. LASC is meeting its commitments; LMSC and LADC are not. DCAA's approach would have LASC pay a higher cost for their use, thereby relieving LMSC and LADC from their commitment. This is unfair to LASC and does not meet the spirit of the CAS-418 requirements. Where is the consideration for the causal relationship in DCAA's recommendation?

CAS-403.50 (a)(2) states:

> Where the expense of a given function is to be allocated by means of a particular allocation base, all segments shall be included in the base unless (i) any excluded segment did not receive significant benefits or <u>contribute significantly to the cause</u> of the expense to be allocated and (ii) any included segment did receive significant benefits from or <u>contribute significantly to the cause of the expense in question</u>. (Emphasis added.)

HPCC services can be considered in a class with special facilities. The CAS-418 standard does not provide guidance for accounting for the costs of special

facilities. Therefore, allowances must be made to ensure that the approach taken is fair and reasonable.

LITC believes its formal chargeback system is fair and reasonable; is compliant with the spirit and letter of the CAS; and passes the reasonable man test with respect to our chargeback approach. DCAA's position does not meet this test. It is, therefore, evident that other approaches which meet and are described in CAS-418 should be applied to LITC's situation. Doing so would allow the DCAA to find LITC compliant with CAS-418.

Thank you for the opportunity to provide these comments.

Sincerely,

Edward J. Meehan
Chief Financial Officer

EJM/csm

cc: W. Bernstein
A. DiPasquale, CORLAC
J. Wade

CENTRAL REGION
DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
7112 WEST JEFFERSON AVENUE STE 200
LAKEWOOD, CO 80235-2327

IN REPLY REFER TO
3121-94J19200016 13 February 1996

MEMORANDUM FOR COMMANDER, DEFENSE CONTRACT MANAGEMENT COMMAND - DENVER, ORCHARD PLACE, SUITE 200, 5975 GREENWOOD PLAZA BLVD, ENGLEWOOD, COLORADO 80111-4715

ATTENTION: DCMDW-GDO, Renee Varin-Potratz

SUBJECT: Audit Report Number 3121-94J19200016, Report on CAS 418 Noncompliance Allocation of Direct and Indirect Costs Lockheed Information Technology Company

Enclosed is a copy of our audit report on the above subject. The Corporate Audit Coordinator has informed us that an initial determination of LITC's CAS 418 noncompliance was not made by the prior Lockheed Corporate Administrative Executive (CAE). We understand your office has been delegated the responsibility for resolving LITC's incurred cost and CAS issues and, accordingly, we are providing you with a copy of our report.

In our report, we estimated the cost impact using LITC's recorded allocation of CRAY computer costs for January through July 1994 projected through the end of the year. We recomputed the CFY 1994 cost impact using the total recorded CFY 1994 CRAY allocations to assist you in assessing the approximate cost impact of the potential CAS 418 noncompliance for the CFY 1994.

| Receiving Divisions | Over/(Under) Cost Allocation | Gov't Cost Reimbursable Participation | Gov't Fixed Price Participation | Gov't Cost Reimbursable Cost Impact | Gov't Fixed Price Cost Impact |
|---|---|---|---|---|---|
| LMSC | $1,584,174 | 87.0% | 3.2% | $1,378,231 | ($50,694) |
| LADC | $1,349,931 | 67.7% | 25.1% | $913,903 | ($338,833) |
| LASC | ($2,852,250) | 42.6% | 40.5% | ($1,215,059) | $1,155,161 |
| | | | | $1,077,075 | $765,634 |

Please contact Acting Supervisory Auditor Sally Mills, or Senior Auditor, Jon Brown, with any questions on this subject at (303) 969-5000, or FAX (303) 969-5056.

for Sally Mills
KENNETH L. HILL
Branch Manager

PRINTED ON RECYCLED PAPER

FOR OFFICIAL USE ONLY

184

# DEFENSE CONTRACT AUDIT AGENCY

## SUPPLEMENTAL AUDIT REPORT

16 September 1996

**PREPARED FOR:** Administrative Contracting Officer (Ms. Renee Varin-Potratz)
Defense Contract Management Command - Denver
Orchard Place 2, Suite 200
5975 Greenwood Plaza Boulevard
Englewood, Colorado 80111-4715

**PREPARED BY:** Denver Branch Office
7112 W. Jefferson Avenue, Suite 200
Lakewood, CO 80235-2327
Telephone No. (303) 969-5000
FAX No. (303) 969-5056

**SUBJECT:** Supplemental Audit of Fiscal Year 1994 Recorded Costs
For the Period 27 December 1993 to 26 December 1994

**REFERENCES:** DCAA: Supplemental Audit Report No. 3121-95J10250174-S1
Chron No. 0784

**CONTRACTOR:** Lockheed Information Technology Company
1410 Del Norte Street
Denver, CO 80221

**REPORT RELEASE RESTRICTIONS:** See Page 34

**CONTENTS:**


| | Page |
|---|---|
| Subject of Supplemental Audit | 1 |
| Executive Summary | 1 |
| Scope of Supplemental Audit | 1 |
| Results of Supplemental Audit | 2 |
| Contractor Organization and Systems | 31 |
| DCAA Personnel and Report Authorization | 33 |
| Supplemental Audit Report Distribution and Restrictions | 34 |
| Attachment 1: Contractor's Responses | 36 |


FOR OFFICIAL USE ONLY

Exhibit J
Page 4 of 6

Explanatory Notes

1. Allocation of Questioned Costs

The questioned $449,051 in HPCC costs have been allocated to the Lockheed Divisions from the HPCC cost pool based on the recorded division's 1994 resource consumption percentages. The questioned $221,249 in IBM costs have been allocated to the Lockheed Divisions from the System Software & Computing Operations (IBM) cost pool based on IBM billed costs. The questioned costs were allocated to the Lockheed divisions as follows:

| | High Performance Computing Center | | | | IBM Systems Software Operations | |
|---|---|---|---|---|---|---|
| Lockheed Divisions | Division Resource Consumption | Questioned Note 1 | Questioned Note 2 | Questioned Total | Division Billings | Questioned |
| LMSC | 52.23% | $234,539 | $1,584,174 | $1,818,713 | 42.93% | $ 94,982 |
| LASC | 39.39% | 176,881 | (2,852,250) | (2,675,369) | 38.27% | 84,672 |
| LADC | 1.30% | 5,838 | 1,349,931 | 1,355,769 | 0.86% | 1,903 |
| LAS | | | | | 5.38% | 11,903 |
| LAD | | | | | 1.85% | 4,093 |
| SANDERS | 0.16% | 718 | (11,880) | (11,162) | 7.15% | 15,819 |
| CORLAC | | | | | 1.44% | 3,186 |
| LACI | | | | | 2.05% | 4,536 |
| LFWC | 6.37% | 28,605 | | 28,605 | | |
| CALCOMP | | | | | 0.06% | 133 |
| OTHER | 0.55% | 2,470 | (69,975) | (67,505) | 0.01% | 22 |
| | | $449,051 | $ 0 | $ 449,051 | | $221,249 |

2. High Performance & Classified Computing CRAY Computer Costs

a. Summary of Conclusions:

We questioned LITC's allocation of $5,868,210 of the $9,996,493 in CRAY computer costs, a major cost element of the HPCC cost collection pool. HPCC costs were not allocated to benefiting cost objectives on a reasonable casual-beneficial relationship. This item is currently a potential CAS 418 noncompliance issue, which we have reported in detail in our Audit Report No. 3121-94J19200016, dated 9 September 1994. These costs are questioned and reallocated in accordance with FAR 31.201-4, Allocability, as follows:

HPCC CRAY COMPUTER COST ALLOCATIONS

| Lockheed Division | CPU Hours | Usage % | Costs Allocated Based on Usage | Billed | Variance Questioned |
|---|---|---|---|---|---|
| LMSC | 7,245.6 | 48.0% | $4,798,317 | $6,382,491 | $ 1,584,174 |
| LADC | 188.6 | 1.2% | 119,958 | 1,469,889 | $ 1,349,931 |
| LASC | 7,537.3 | 49.9% | 4,988,250 | 2,136,000 | ($2,852,250) |
| LTOC | 112.8 | 0.7% | 69,975 | | ($ 69,975) |
| Sanders | 30.1 | 0.2% | 19,993 | 8,113 | ($ 11,880) |
| | 15,114.4 | 100.0% | $9,996,493 | $9,996,493 | |

b. Basis of Recorded Costs:

LITC recorded 1994 Lockheed Divisional billings of $9,996,493 for the two CRAY computer costs. These costs were allocated to the Lockheed Missiles and Space Company (LMSC), Advanced Development Company (LADC), and Aeronautical Systems Company (LASC) based on a beginning of year usage commitment by these divisions for wall clock hours and shared Computer Processing Units (CPU).

c. Audit Evaluation:

We determined the costs allocated using the beginning of the year usage commitment versus the costs allocated based on actual usage are significantly different for the various Lockheed divisions. We computed a significant cost impact to the government based on each benefiting Lockheed division's 1993 percentage of cost reimbursable and firm fixed price types of government contracts. LITC's practice of allocating costs based on budgeted estimates of resource consumption, without adjustment during the year or at year end, violates CAS 418.50(e)(1), which recommends that the allocation of the costs be based on resource consumption. Additionally, LITC's allocation did not meet the FAR 31.201-4, Allocability, criteria for allocations to be on a causal-beneficial basis. Our adjustment of $9,996,493 represents the difference between 1994 costs allocated based on the usage commitment and 1994 cost allocations based on actual resource consumption.

d. Contractor's Response:

LITC does not concur with our findings. LITC believes the Lockheed heritage DCE, Mr. James R. Rose, evaluated their method of allocation and issued a determination that LITC's current practice of allocating costs meets the intent of CAS 418 requirements and that the issue was resolved. In addition, LITC believes the Government ADP Technical Review team determined that the billing algorithm to be technically sound, equitable, fair, and reasonable.

e. Auditor's Response:

- DCE Determination on Current Cost Charging Practice

LITC erroneously cited disposition of another CAS 418 potential noncompliance issue unrelated to this issue. The DCE's, Mr. James R. Rose, correspondence concerning a determination that LITC's current practice of allocating costs meets the intent of CAS 418 is in reference to our Audit Report No. 3121-94J19200015, dated 19 September 1994. The potential CAS noncompliance concerned LITC billing rates for IBM costs.

The potential CAS 418, Allocation of Direct & Indirect Costs, noncompliance concerning the CRAY computers in the High Performance Computer Center was reported in our Audit Report No. 3121-94J19200016, dated 9 September 1994. That potential noncompliance is now under review by Mr. Lou Becker, the current DCE for the Lockheed Martin Corporation.

- Government ADP Technical Review Report

The DCMDW ADP Report, dated 8 November 1994, referred to by LITC, is limited to a technical opinion regarding the billing algorithm and the concept of billings based on budgeted resource consumption. The recommendation to the DCE was to treat allocation of budgeted capacity not used as a corporate issue. We believe this is being addressed by the DCE in the resolution of the CAS 418 potential noncompliance.

Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301-897-6781

LOCKHEED MARTIN

RECEIVED
DEC

Anthony M. DiPasquale
Corporate Director
Government Financial Management

December 6, 1996

Mr. Louis G. Becker
Defense Corporate Executive
Defense Contract Management Command
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

Subject: Noncompliance with CAS 418 Determination
Audit Report No. 3121-94J19200016
Allocation of CRAY Computer Costs to LADC, LMSC and LASC

Dear Mr. Becker:

Thank you for supplying us with a copy of the DCAA Audit Report that generated your inquiry. We were confused about which one you were referring to since the issues in the two Lockheed Information Systems Company (LITC) audit reports were very similar. We have been under the impression that the CRAY issue was closed based on the Defense Contract Management Command (DCMDW) ADP report (copy attached) which was issued after the above referenced DCAA audit report.

In their report the DCAA felt a CAS 418 noncompliance existed because the cost of the two CRAY computers were charged out based on the annual usage commitments and not on actual resource consumption. Our response to the DCAA position was attached to the audit report so we won't reiterate those arguments here. The DCMDW ADP team did not agree with the DCAA conclusion either. On page six of the report they stated:

> "Segments that budgeted for capacity not used are allocated cost by the LITC billing algorithm. The philosophy of LITC is to obtain the capacity forecasted by components. Once these resources are obtained, each component is responsible for payment of the forecasted resources whether it is utilized or not. Clearly, there is sufficient incentive for accurate forecasting.
>
> LITC did not ignore changing projections for usage during the year. The HPCC was severely downsized. Workloads were transferred among mainframes to reduce costs. These actions should be recognized by the CACO as necessary and productive in reducing the amount of idle capacity allocated to participating companies who overstate their consumption needs.
>
> Recommendation
>
> The DCE should:
>
> 7a-1. Treat allocation of budgeted capacity not used as a corporate issue. The algorithm as designed is fair and reasonable."

We believe that this report supports our position that a CAS noncompliance does not exist and, therefore, no cost impact proposal is required.

Sincerely,

A. M. DiPasquale

Attachment

DEFENSE CONTRACT MANAGEMENT COMMAND
Defense Corporate Executive
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

IN REPLY REFER TO: DCMDE-GTC (D. Wheatley) January 8, 1997

SUBJECT: Noncompliance with CAS 418 Determination
Audit Report No. 3121-94J19200016
Allocation of CRAY Computer costs to LADC, LMSC, and LASC

REFERENCE: LMC letter dated December 6, 1996

Mr. Anthony M. DiPasquale
Corporate Director, Government Financial Management
Lockheed Martin Corporation
6801 Rockledge Drive, Mail Point DM510
Bethesda, MD 20817-1877

Dear Mr. DiPasquale:

Thank you for your response regarding the subject CAS noncompliance and for supplying us with a copy of the DCMC ADP Technical Review of LITC. It appears that LMC is relying on this report as the Government's disposition of this noncompliance. The ADP report is a technical review, and while it may address matters related to the CAS 418 issue, the resolution of this financial matter is outside the scope of the report. As stated on page 3 of the report, it provides "technical assistance to the DCE, DACO, or ACO... verification and validation of financial information is not within the scope of this report." Additionally, the report addresses more than just the CRAY computers, and it is sometimes difficult to distinguish when the report is addressing a CRAY issue, IBM issue or issues related to both. Nevertheless, the report does raise some interesting issues which may help us resolve this CAS noncompliance.

Based on this report, LMC concludes that the DCMDW ADP Team did not agree with DCAA, a CAS 418 noncompliance does not exist, and a cost impact proposal is not required. I do not agree with these conclusions. I believe a more accurate conclusion is that the DCMC Technical Review Team understood LITC's practice of charging based upon estimated usage (vice actual) as a forecasting tool and to hold segments accountable for their forecasts. However, the ADP Team also concluded that this practice was not typical, did not utilize an optimal distribution base, and served to allocate budgeting errors to the offending segments by charging them for more than they actually utilized. Most importantly the ADP Team, clearly recognized that the CAS 418 noncompliance was an issue outside the purview of their report and should be addressed by the DCE.

For the sake of brevity, you did not reiterate the rebuttals contained in the August 31, 1994 Lockheed letter from Edward Meehan. Mr. Meehan's letter addresses the IBM and CRAY issues; however, based on your December 6, 1996 letter, it still represents the LMC position on the CRAY computer issue. I would like to address the positions presented in this Lockheed rebuttal letter.

Mr. Meehan presents several arguments from CAS 418; yet, near the end of the letter he states that "HPCC services can be considered in a class with special facilities" therefore CAS 418 does not apply. If LMC believed the CRAY computers were special facilities, it seems illogical to make arguments from CAS 418 to support the LMC position. I do not believe the CRAY computers are special facilities; however, one could argue that they are centralized services.

LMC states, "The CAS language speaks to beneficial or causal relationships in determining fair and equitable allocation... LITC uses causal relationships to allocate its costs because it more fairly distributes its cost to segments serviced... consumption allocates cost beyond the benefits received." After some further elaboration on these arguments, Lockheed cites two CAS 418 provisions, as follows:

> CAS 418.50(f) provides for a special allocation where a particular cost objective in relation to other cost objectives receives significantly more or less benefit from an indirect cost pool that would be reflected by the allocation of such costs using a base determined pursuant to paragraphs (d) and (e) of this section.
>
> CAS 418.50 (g)(3) The contracting parties may agree on pre-established rates which are not based on costs and activities anticipated for a cost accounting period. The contractor shall have and consistently apply written policies for the establishment of these rates.

LMC did not quote the next part of CAS 418.50(f) which states that special allocations may be used only when the Government and contractor agree on the special allocation. In this case of CRAY, the Government and contractor have not agreed to any special allocation. CAS 418.50(g)(3) states that the contracting parties (Government and contractor) may agree to preestablished rates which are not based on costs and activities anticipated. Lockheed has not presented evidence of any such agreement.

LMC cites the following CAS 403 provision to supports its position:

> CAS 403.50 (a)(2) Where the expense of a given function is to be allocated by means of a particular allocation base, all segments shall be included in the base unless (i) any excluded segment did not receive significant benefits or contribute significantly to the cause of the expense to be allocated and (ii) any included segment did receive significant benefits from or contribute significantly to the cause of the expense in question.

CAS 403 deals with the "allocation of the expenses of a home office to segments." I do not think Lockheed is arguing that any of the three segments (LADC, LMSC, and LASC) should be excluded from the allocation base, since they comprise over 80% of LITC's workload. Based on the portions of the citation that Lockheed underlined, it appears Lockheed is reemphasizing the fact that the causal relationship can be considered when deciding how to allocate costs. The fact that the casual relationship can be used in some instances is clear from the provisions of CAS 418 as well.

However, CAS gives very explicit direction concerning when causal or beneficial type relationships are to be used. In summary, concerning the citations and explanations from CAS offered by Lockheed, Lockheed's points of rebuttal from CAS do not appear related to the facts of the issue at hand and Lockheed has ignored other more pertinent CAS provisions. I would like to present the CAS provisions which I believe are more applicable. They are as follows:

> CAS 418-40(c)(2) If the cost pool does not contain a material amount of the costs of management or supervision of activities involving direct labor or direct material costs, resource consumption can be specifically identified with cost objectives. The pooled costs shall be allocated based on the specific identifiability of resource consumption with cost objectives by means of one of the following allocation bases: (i) A resource consumption measure (ii) An output measure, or (iii) A surrogate that is representative of resources consumed.
>
> CAS 418-50(e) Allocation measures for indirect cost pools that do not include material amounts of the costs of management or supervision of activities involving direct labor or direct material

costs. Homogeneous indirect cost pools of this type have a direct and definitive relationship between activities in the pool and benefiting cost objectives. The pooled costs shall be allocated using an appropriate measure of resource consumption. This determination shall be made in accordance with the following criteria taking into consideration the individual circumstances:

CAS 403-40(b) (1) Centralized Service Functions. Expenses of centralized service functions performed by a home office for its segments shall be allocated to segments on the basis of the service furnished to or received by each segment. Centralized service functions performed by a home office for its segments are considered to consist of specific functions which, but for the existence of a home office , would be performed by or acquired by some or all of the segments individually. Examples include centrally performed personnel administration and centralized data processing. (emphasis added)

These CAS provisions are relevant to the situation at hand, and require little explanation for their application to be understood. When management and supervision of direct labor costs or direct material costs is a small portion of an indirect cost pool (which is the case at LITC), the cost pool shall be allocated utilizing a measure of resource consumption. If one wants to utilize CAS 403 to shed light on this issue, CAS 403-40(b)(1) indicates that a centralized service, such as a computer operation, which supports many segments shall be allocated on the basis of services furnished to or received by each segment. I am unable to find support in CAS for the allocation of costs to a cost objective based solely on an estimate, without any equitable adjustment and/or comparison of the estimate with actuals. From my understanding, Lockheed allocated costs based upon a beginning of year estimate. Regardless of whether or not each segment used more than, less than or exactly what they forecasted, no adjustment to their allocation was made.

Lockheed certainly has the right to hold segments accountable for their estimated computer usage by whatever means it deems appropriate. The Government is not questioning Lockheed's right to make this business decision. However, the Government is questioning Lockheed's right to charge the Government for computer services the Government never received or from which it derived no benefit, via an allocation method that is not compliant with CAS 418.

Now that you have DCMC's written position on this issue, I request that we establish a time to discuss this matter and bring this issues to a close. I still believe that LMC is required to submit a Cost Impact Proposal, unless LMC can prove to me that a CAS 418 noncompliance does not exist. If LMC is unable to prove this, and will not agree to submit a cost impact proposal, I will disposition this matter in accordance with FAR 52.230-5, so that both parties can move forward and work towards the resolution of other issues.

We look forward to disposing of this and other CAS issues in the near future. If you or your staff have any questions regarding these matters, please contact Mr. Don Wheatley on x9731.

Sincerely,

LOUIS G. BECKER
Defense Corporate Executive

CC:
DCAA / J. Ames, M. Klee
LMC / C. McGrath

Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301-897-6781

LOCKHEED MARTIN

**Anthony M. DiPasquale**
Corporate Director
Government Financial Management

March 7, 1997

Mr. Louis G. Becker
Defense Corporate Executive
Defense Contract Management Command
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

Subject: Noncompliance with CAS 418-Determination in DCAA Audit
Allocation of CRAY Computer costs to LADC, LMSC and LASC

Dear Mr. Becker:

Thank you for the opportunity to provide additional information on this issue. It was very helpful that your office provided a detailed description of your position so that we could prepare a focused reply.

We inferred from your letter that you were unable to find justification in CAS 418 for the allocation method that Lockheed Martin was utilizing in 1994 and 1995 for two CRAY computers in Denver. Basically, you supported your position (confirming the finding of the DCAA audit) with three citations that you felt were more applicable to the situation in question than those cited by LMC in earlier correspondence. The first, CAS 418-(c) (2), states that pooled costs will be allocated based on the specific identifiability of resource consumption using (1) a resource consumption measure, (2) an output measure or (3) a surrogate that is representative of the resources consumed. CAS 418-50(e) reiterates that pooled costs shall be allocated using an appropriate measure of resource consumption, the first choice a measure of resource consumption followed by output of the activities. Your third reference is to CAS 403-40(b) which calls for centralized service functions to be allocated on the basis of the service furnished to or received by the segments. All three references are consistent in their requirement to allocate costs to segments benefiting from the resource supplied by the cost pool.

The DCAA's audit stated that the only acceptable allocation base was to use central processing time or wall clock hours, measurements of activity of the computer itself. One could argue that these are really measurements of output (the second choice in the allocation hierarchy) but since none of these terms are defined in CAS that isn't easy to state unequivocally. Lockheed Martin's position is that central processing time and wall clock hours are not the only way to measure resource consumption. Another way to look at it is that the resource that is being consumed is actually computing capacity. The corporation had a limited number of dollars to invest in very expensive CRAY computing resources. By requiring forecasts of usage from segments, the corporation was committing resources to a particular user segment. The computing center had committed to the segment that a certain amount of resources would be available to them for a year. Therefore, the computing capacity was "consumed" by the requesting segment as it was unavailable to others. Of course, one could argue that if a segment didn't use all the time that they had committed to, it was available for others to use. But that is not true. There was no one else to take up the slack, the other segment or segments were already using what they needed and had no requirement for additional capacity. The computing center provided the resources that were requested and committed the dollars to fixed costs.

As an alternative, the computing center could have gone out and obtained three computers, one for each segment. The segments would have then been allocated the cost of one computer each. The Government

wouldn't have measured the central processing time for the annual allocation of costs because it would have been irrelevant. In this situation the Government wouldn't have had any problem with the allocation amounts as long as usage was reasonable. If excess capacity developed, the Government would have expected a reduction in the number of computers (resources).

The CRAY computers were handled the same way. Instead of three computers, there were two to be shared among the three segments. Each segment was allocated a portion of the costs according to the capacity they stated that they needed. Excess capacity was eliminated as it was recognized. (As it turned out both CRAYS were removed from service in 1996.)

We believe that the method employed was consistent with CAS which allows for a selection from various acceptable allocation methods. Under CAS 418, we believe that the resource that was consumed was computer capacity. Additionally, under CAS 403 the service that was furnished was also computer capacity. Since CAS does not define resource consumption, we feel that our definition is just as viable as the DCAA's.

Sincerely,

A. M. DiPasquale

 SS 28 MAR 97

# DEFENSE CONTRACT MANAGEMENT COMMAND

Defense Corporate Executive
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

IN REPLY REFER TO: DCMDE-GTC (D. Wheatley)

March 17, 1997

SUBJECT: Noncompliance with CAS 418 Determination
Audit Report No. 3121-94J19200016
Allocation of CRAY Computer costs to LADC, LMSC, and LASC

Mr. Anthony M. DiPasquale
Corporate Director, Government Financial Management
Lockheed Martin Corporation
6801 Rockledge Drive, Mail Point DM510
Bethesda, MD 20817-1877

Dear Mr. DiPasquale:

In an effort to resolve this issue, LMC and the Government have corresponded back and forth for approximately a year. On June 14, 1996, LMC stated its belief that the subject CAS 418 noncompliance issue had been dispositioned by the former DCE Jim Rose; however, a similar yet different issue had been dispositioned. On December 6, 1996, LMC stated its belief that the DCMC ADP Team had resolved this CAS 418 Noncompliance issue. However, the DCMC ADP team had issued a technical report, which in part related to the issue of LITC's CRAY computers, but the CAS 418 issue was not the purview of the report. In LMC's most recent letter, dated March 7, 1997, LMC attempts to defend its accounting practice, stating that, "Another way to look at it is that the resource that is being consumed is actually computing capacity... the computing capacity was "consumed" by the requesting segments as it was unavailable to others... there was no one else to take up the slack..."

I believe LMC's rationale is unpersuasive. The rationale ignores the clear provisions of CAS, and LMC has not offered one CAS provision which supports its practice of allocating costs based solely on estimates, with no provision to analyze the variance between estimated and actual costs, much less to make adjustments based upon the variance. The essence of LMC's argument is that estimation of resource consumption at the beginning of the year, when no one else is available to "take up the slack" during the course of the year, equates to the measurement of resource consumption, regardless of how the resource is actually consumed. This rationale seems to stretch the CAS provision beyond a reasonable interpretation. Lockheed correspondence clearly indicates that a segment may use, at no cost, any available capacity it needs, beyond its original estimate (provided excess capacity is available). One could argue that segments become incentivised to forecast lower than anticipated usage, in hopes of allowing other segments to subsidize their computer costs.

LMC goes on to argue that it could have purchased three computers, one for each segment, with each segment being allocated the full cost of a computer. LMC states, "The Government would not have measured the central processing time for the annual allocation of costs because it would have been irrelevant." First of all, LMC measures the "processing time" for computers, not the Government.

Secondly, if LMC chose to allocate the computer costs for each segment based only on estimated usage (the same manner it is allocating the computer costs to the segments), the CAS 418 noncompliance would have simply been "pushed down" to the next intermediate cost pool. Thirdly, LMC would still be required to allocate the costs of the computer at each segment based on a measure of resource consumption.

LMC's last argument is that in CAS 403, the service furnished is computer capacity. I do not see the term "capacity" used anywhere in CAS 403; however, CAS 403 does discuss centralized service functions and uses "centralized data processing" as an example. CAS 403 fully supports the Government position on this issue. CAS 403-50(b)(1) specifically states:

> (1) Section 9904.403-60 illustrates various expense pools which may be used together with appropriate allocation basis. The allocation of centralized service functions shall be governed by a hierarchy of preferable allocation techniques which represent beneficial or casual relationships. The preferred representation of such relationships is a measure of the activity of the organization performing the function. Supporting functions are usually labor-oriented, machine-oriented, or space-oriented. Measures of the activities of such functions ordinarily can be expressed in terms of labor hours, machine hours, or square footage. Accordingly, costs of these functions shall be allocated by use of a rate, such as a rate per labor hour, rate per machine hour or cost per square foot, unless such measures are unavailable or impractical to ascertain. In these latter cases the basis for allocation shall be a measurement of the output of the supporting function. Output is measured in terms of units of end product produced by the supporting function, as for example, number of printed pages for a print shop, number of purchase orders processed by a purchasing department, number of hires by an employment office.

LMC's argument that "computing capacity" is allocated and "consumed" when requesting segments forecast the need for specific amounts of computer resources, seems contrary to sound cost accounting and generally accepted business practice. All business entities commit to resources based upon estimates of the future need for those resources. A corporation purchases more buildings when it believes it needs more plant/office capacity, and it hires more employees when it believes it needs more labor capacity. However, CAS 418 does not allow for the allocation of labor costs based solely on beginning-of-the-year estimates, regardless of how actual labor is used during the year. If LMC's argument and application of CAS is carried to its logical conclusion,-- practically all costs could be allocated to Government contracts based solely upon beginning-of-the-year estimates, with no reconciliation to actual costs.

CAS 418 and 403 prescribe methods to be used for the equitable allocation of costs. CAS requires a measure of resource consumption to be used, not merely an estimate of resource consumption, as LMC purports. I will issue a determination of compliance or noncompliance by approximately March 28, 1997. If LMC wants to provide any additional information, please supply it as soon as possible. Any questions or comments regarding this matter may be directed to Don Wheatley.

Sincerely,

LOUIS G. BECKER
Defense Corporate Executive

CC:
DCAA / J. Ames, M. Klee

Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301·897·6781

RECEIVED
MAR 24 1997
DCE

LOCKHEED MARTIN

Anthony M. DiPasquale
Corporate Director
Government Financial Management

March 21, 1997

Mr. Louis G. Becker
Defense Corporate Executive
Defense Contract Management Command
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

Subject: Noncompliance with CAS 418 Determination
Audit Report No. 3121-94J19200016
Allocation of CRAY Computer Costs to LADC, LMSC and LASC

Dear Mr. Becker:

We continue to believe that the method utilized for the allocation of CRAY computer cost is in compliance with CAS 418. The issue appears to boil down to the definition of a resource consumption measure. CAS does not provide a definition, therefore, it is our opinion that there is more than one acceptable definition. This is supported by the fact that our agreement with the Government on the business computing portion of LITC demonstrates that arms length service agreements provide another acceptable method to determine resource consumption.

In an additional attempt to explain our logic, please consider this analogy. Underutilized leased space (within one year and the result of less than forecasted business activity) is a cost to the segment that leased the space, not to any other segments that may also separately lease space in the same building. In essence, LITC was leasing out computer capacity. This allocation method assigned the costs to the segment that caused the cost to be incurred.

Accordingly, if your intent is to issue a final determination of noncompliance on March 28, 1997, we request an extension to April 28 in order to perform additional research and to obtain other opinions on this matter. We also respectfully request that the prior DLA ADPE team be consulted. We believe that the only reason the issue was not previously resolved was that Mr. Rose and the ADPE team wanted to assess our CRAY cost cutting actions. They considered a timely response to budget variances critical to the service agreement method of charging. As we have mentioned before, LITC rapidly reduced personnel and released the equipment in a very responsive manner.

Sincerely,

A. M. DiPasquale

DEFENSE CONTRACT MANAGEMENT COMMAND
Defense Corporate Executive
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

IN REPLY REFER TO: DCMDE-GTC (D. Wheatley)

April 1, 1997

SUBJECT: Noncompliance with
CAS 418, Allocation of Direct and Indirect Costs and
CAS 403, Allocation of Home Office Expenses to Segments

Audit Report No. 3121-94J19200016
Allocation of CRAY Computer costs to LADC, LMSC, and LASC

Mr. Anthony M. DiPasquale
Corporate Director, Government Financial Management
Lockheed Martin Corporation
6801 Rockledge Drive, Mail Point DM510
Bethesda, MD 20817-1877

Dear Mr. DiPasquale:

In response to LMC's letter of March 21, 1997, I continue to believe that LMC's method used to allocate CRAY computer costs is in noncompliance with CAS 418 and CAS 403. LMC has had approximately one year to support its position regarding this issue. My intent is to issue a final determination of noncompliance; however, I will honor your request and give LMC until April 28, 1997 to provide additional information.

LMC requested that my office consult with the DLA ADPE team. Please be advised that during our research and review of this issue, members of that team were consulted. Any questions or comments regarding this issue may be directed to me or Don Wheatley.

Sincerely,

LOUIS G. BECKER
Defense Corporate Executive

CRAYNC.DOC

DEFENSE CONTRACT MANAGEMENT COMMAND
Defense Corporate Executive
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

IN REPLY REFER TO: DCMDE-GTC (D. Wheatley) June 17, 1997

SUBJECT: Final Determination of Noncompliance with
CAS 403, Allocation of Home Office Expenses to Segments and
CAS 418, Allocation of Direct and Indirect Costs

Allocation of CRAY Computer Costs

Mr. Anthony M. DiPasquale
Corporate Director, Government Financial Management
Lockheed Martin Corporation
6801 Rockledge Drive, Mail Point DM510
Bethesda, MD 20817-1877

Dear Mr. DiPasquale:

After giving due consideration to all the facts surrounding this issue, and allowing LMC many opportunities to support its position, the Government still believes that LMC is in noncompliance with CAS 403 and 418. Computer costs were allocated to Government contracts based solely upon estimated usage, which differed substantially from actual usage. This resulted in LMSC and LASC being allocated approximately $6.3M and $2.2M respectively, for basically the identical usage of wall-clock hours and CPU hours. Furthermore, even though LADC used basically none of the CRAY computing, and was not included in the beginning of the year budgeted forecast of estimated usage, LADC was allocated $1.4M. For over a year LMC has presented many different arguments in attempt to support the position that its practice is acceptable. I find none of the arguments persuasive.

The Government's position on this matter is detailed in my letters of March 17, 1997 and January 8, 1997

Most recently, LMC asked that I delay the issuance of the final determination until April 28, 1997, so LMC could provide additional data and hold a meeting with Mr. Ed Meehan of Enterprise Information Systems (EIS). A meeting was held on April 22, 1997 and LMC presented very little new information. At the meeting, LMC agreed to clarify if LASC had in fact used double the budgeted CPU hours, while only being charged for the budgeted hours. Additionally LMC agreed to provide copies of the service level agreements for use of the CRAY computers for 1994. I would like to respond briefly to these issues.

LMC's response concerning LASC being billed only for estimated CPU hours, when in fact LASC used double the estimated CPU hours is basically that, "in total" (CPU hours and wall-clock hours) LASC utilized computer hours equivalent to the dollar value of the budgeted hours. While in total the computer hours budgeted (6,890) and computer hours actually used (7,744) are similar, the

composition of the computer hours budgeted and computer hours used was different. The facts indicate that LASC had budgeted for 3,510 wall-clock hours at a rate of $370/hr. and 3,380 CPU- hours at a rate of $270/hr., budgeting total estimated usage of $2,211,300. However, when LASC only used 207 wall-clock hours, it was allocated $1,298,700 (the cost of 3,510 hours) and when LASC used 7,537 CPU hours (double the estimated CPU hour usage) it was allocated only $912,600 (the cost of 3,380 hours). LASC did in fact use double its estimated CPU hours. The shared CPU hours and dedicated wall-clock hours are not equivalent/interchangeable, as reflected in their different rates per hour. LMC's statement in a memo dated April 24, 1997, that "LASC did not double their projected usage... LASC usage equated to their commitment.." is not accurate. Furthermore, the same memo states that LMSC met its commitment of $6.4M. Mr. Meehan (EIS) was asked about this statement that LASC met its commitment of $6.4M, and he agreed it was inaccurate.

At the April 22, 1997 meeting LMC agreed to provide copies of the "1994 service level agreements." LMC provided only one such agreement. LMC has stated that the "service level agreements" were used to forecast usage at the beginning of the year , and that the companies committed at the beginning of the year to a certain level of computer usage; however, the LADC agreement for January - December 1994 was not signed until August of 1994. Furthermore, nowhere in the agreement does it detail the CRAY computer hours that LADC committed to, nor does it bind LADC to pay for a certain number of computer hours. Section 2.7.1.1 of the agreement states that any over or under recovery that exceeds 10%, will be proportionately allocated to the using companies. LMC did not follow the "service level agreement" and allocate the "under recovery" proportionately to the companies which used the CRAY computers. LMC has not substantiated its claims regarding the use of "service level agreements."

After careful review of the facts and giving due consideration to all of LMC's positions, in accordance with FAR 30.602-2(a) I have determined that LMC is in noncompliance with CAS 403-40(a)(1), CAS 403-40(b)(1), CAS 403 50-b(1), CAS 418-40(c)(2), CAS 418-50(e), CAS 418-50(g)(4) and (5). I have also determined that the cost impact is material. The rationale for this determination is contained primarily in my previous letters of March 17, 1997 and January 8, 1997, along with the narrative above.

Based upon these determinations, LMC is required to submit a cost impact proposal in the form and manner specified by the Contracting Officer, within 60 days, identifying the cost impact on each separate CAS covered contract from the date of failure to comply until the noncompliance is corrected. Per contract clause FAR 52.230-6(a)(3) and (b)(3) (eff. April 1996), Administration of Cost Accounting Standards, or its predecessor, I request that you submit a cost impact proposal which identifies the cost impact on each separate CAS covered contract from the date of failure to comply, until the noncompliance is corrected. Contracts containing the CAS clauses (e.g. FAR 52.230-2 or 52.230-3) are considered CAS covered. The cost impact proposal should be in sufficient detail to permit the evaluation and negotiation of the impact upon each covered contract and subcontract, and as a minimum should include the following information: (1) identification of all contracts and subcontracts that are CAS covered, (2) the impact (including cost, profit/fee, price/amount) on each contract or subcontract and shift of costs between CAS covered contracts by contract type and other contractor activity, (3) impact on funds of the various Agencies/Departments. The cost impact proposal shall include all changes made to the costing practices due to all changes in the organization's business relationships and activities. The cost impact statement with associated revised disclosure statement , if deemed necessary, should be provided to DCMC, ATTN: Mr. Don Wheatley and DCAA, ATTN: Mr. John Ames, by **August 18, 1997.**

Lastly, please be advised that if LMC does not submit a cost impact proposal or submits an inadequate cost impact proposal, the Government will exercise its contractual right per FAR 52.230-6(c), which is further explained in FAR 30.602-2(d), Remedies for contractor failure to make required submissions. If LMC decides that it will not submit a cost impact proposal, please notify this office as soon as possible. Any questions or comments regarding this issue may be directed to me or Don Wheatley.

LOUIS G. BECKER
Defense Corporate Executive

cc:
DCAA- J. Ames

Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301-897-6000

LOCKHEED MARTIN

June 16, 1998

Mr. Don Wheatley
Defense Contract Management Command
c/o Lockheed Martin Corporation
6901 Rockledge Drive
Bethesda, MD 20817

Subject: Treatment of Adjustments for CRAY Computer Costs Billed from LITC in 1994 and 1995

Reference: (1) DiPasquale to Becker, Dated December 6, 1996, Subject: Noncompliance with CAS 418 Determination; (2) DiPasquale to Becker, Dated March 7, 1997, Subject: Same; (3) DiPasquale to Becker, Dated March 21, 1997, Subject: Same; (4) McGrath to Wheatley, Dated December 19, 1997, Subject: Same

Dear Mr. Wheatley:

The purpose of this letter is to document my position regarding the CRAY computer issue. A summary of correspondence to your office follows.

- In Reference (1) we provided excerpts from the Joint DCMDW/DCMDN ADP Technical Review Report #OC-0017 dated November 8, 1994. The most notable quote is that the technical team found the algorithm fair and reasonable. The report does a good job of explaining the reasons for the billing methodology that was developed by LITC.

- In Reference (2) we reiterated our position that central processing time and wall clock hours are not the only basis available for allocating computer resources under CAS 418 as you suggest. Lockheed Martin had selected a resource consumption measure (computer resource commitments) under CAS 418 rather than the output measure of machine time which you prefer.

- In Reference (3) we reaffirmed our prior position and asked that Mr. Becker consult with the Joint DCMDW/DCMDN ADP Technical team prior to issuing a final determination letter.

- Finally in an attempt to settle the issue, Reference (4) outlined a compromise approach. Without agreeing that a noncompliance occurred, Lockheed Martin agreed to shift the costs as recommended by the DCAA to the participating companies based on usage. The operating companies handled these adjustments in accordance with local practice or, in the case of Missiles & Space, an existing advance agreement.

In summary, Lockheed Martin feels that our offer is very generous especially since we do not believe that a noncompliance has occurred. We have reallocated the costs as you requested. However, you do not like the resulting impact on contracts. Keep in mind that LMC is incurring a substantial financial cost if our proposal is accepted.

- For 1994, Aeronautical Systems Company will have increased overhead applied to a 56% U. S Government fixed price contract base resulting in $1.6m which can not be recovered.

- For 1995 Aeronautical Systems Company will accept another $.3m in overhead that it can not recover on fixed price contracts.

- For 1994, Skunk Works will have reduced overhead on a 70% cost reimbursement contracts base resulting in a $.9m disallowance.

- To date, Missiles and Space has written off $4.8m in CRAY costs that exceeded a self imposed cap.

Obviously, the Government has or will enjoy a cost avoidance of at least $7.6m in CRAY costs if our proposal is accepted. We will be making no more concessions on this issue, as we believe we have been more than reasonable in our attempts to settle this matter.

Attached is a copy of the specific service agreements you requested earlier for 1994. These are unsigned copies but these were easily located and will illustrate what the executed documents looked like.

Sincerely,

Carolyn R. McGrath

Carolyn R. McGrath, Manager
Government Financial Management

cc: Louis Becker

Attachment

DEFENSE CONTRACT MANAGEMENT COMMAND
Defense Corporate Executive
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

IN REPLY REFER TO: DCMDE-GTC (D. Wheatley)

April 21, 1999

SUBJECT: DEMAND FOR PAYMENT (Second Notice)
Noncompliance with CAS 403 and 418 (CRAY Computers)

Mr. Anthony M. DiPasquale
Corporate Director, Government Financial Management
Lockheed Martin Corporation
6801 Rockledge Drive, Mail Point DM510
Bethesda, MD 20817-1877

Dear Mr. DiPasquale:

This letter is sent as a follow-up to my previous letter of March 16, 1999, which demanded payment from LMC. As of the date of this letter, neither payment nor a response from LMC has been received. In accordance with FAR 32.610, I hereby demand payment of $2,682,565. This amount includes applicable interest charges of $605,618 as required by FAR 32.610(b)(2). This amount has been updated to reflect interest charges through April 21, 1999. LMC's failure to make timely payment by the date of May 21, 1999 will result in additional interest charges to cover the period from April 21, 1999 until LMC makes payment. DoD requires additional interest to be charged on any part of the $2,682,565 which remains unpaid as of the close of 30 calendar days from the date of this letter. Please make the check payable to "Defense Finance and Accounting Service." The check should not be made payable to Treasury of the United States. If payment is not received within 30 calendar days from the date of this letter, the Defense Finance and Accounting Service may deduct this indebtedness by administrative offset from an unpaid invoice in accordance with the Debt Collection Act of 1982 (P.L. 97-365; 31 USC 3716, 3717). This will be your last notice from this office, before this matter is transferred to the Defense Finance and Accounting Service for collection.

SUBJECT: DEMAND FOR PAYMENT (Second Notice)
Noncompliance with CAS 403 and 418 (CRAY Computers)

You are hereby notified that you may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed. The undersigned is the responsible official designated for determining the amount of the debt and for its collection. However, the DCE is not authorized to defer collection of debts; therefore, any such request will be forwarded to the appropriate DoD official.

If you have questions relating to this matter, please contact the undersigned at 301-214-9899 or Mr. Don Wheatley at 301-214-9731.

Sincerely,

LOUIS G. BECKER
Defense Corporate Executive

---

Demand for Payment, dated April 21, 1999 is hereby acknowledged.

Signature Date

cc:
DFAS
DCMC Headquarters
DCMC DACO Network
DCAA/ J. Ames
LMC/ Mr. Todd J. Kallman

Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301-897-6781

LOCKHEED MARTIN

Anthony M. DiPasquale
Corporate Director
Government Financial Management

May 21, 1999

Mr. Louis G. Becker
Defense Corporate Executive
Defense Contract Management Command
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

Subject: CRAY Computers Issue, Your Demand for Payment, Dated April 21, 1999

Dear Mr. Becker:

In accordance with the penultimate paragraph of the referenced letter, Lockheed Martin Corporation (LMC) requests deferment of collection of $2,682,565 during the pendancy of LMC's appeal of your final decision on this matter. The issue and amount are in dispute and LMC intends to appeal your final decision.

It is perplexing that the results of protracted negotiations, that were originally agreed to by your office, have since been withdrawn. Following, for the record, is a recap of events and outline of the issues for appeal.

1. LMC allocated CRAY costs in compliance with CAS 418 using a resource consumption measure (computer resource commitments). LMC used the same method for allocating business computing costs in the same facility.

2. DCAA questioned LMC's allocation method, stating that the only acceptable method was actual usage.

3. The joint DCMDW/DCMDN ADP Technical Review Team disagreed with DCAA and found that LMC's allocation method was fair and reasonable for CRAY costs and business computing costs (Report # OC-0017, dated November 8, 1994).

4. The cognizant DCE then issued a memo on November 22, 1994 that addressed and resolved the allocating methodology in LMC's favor, but only referenced the DCAA report relating to business computing costs.

5. LMC believed that the November 1994 DCE memo and Technical Team report closed all issues.

6. In November 1996 your office informed LMC that the November 1994 decision memo from the previous DCE only covered the business half of the facility.

7. While LMC disagreed with the DCAA report on CRAY computer costs, as did the ADP Technical Team, we entered into negotiations with your office in 1997 in order to resolve the matter.

8. A "handshake" agreement was reached in late 1997, and your office drafted a Memorandum of Agreement (MOA). The MOA documented the fact that LMC had ultimately agreed to reallocate the CRAY costs per the DCAA report.

9. LMC's reallocation of CRAY costs resulted in a $2.8 million benefit to the Government ($1.9 million at Lockheed Martin Aeronautical Systems (LMAS) and $.9 million at Lockheed Martin Skunk Works (LMSW)).

10. The handshake agreement and draft MOA were subsequently withdrawn by your office because the cost impact at our Lockheed Martin Missiles and Space Company (LMMS) was unacceptable to your office. Specifically, your office objects to the LMMS reallocation results, which are governed by local advance agreements that deal with the year adjustments are to be made and applicable cost caps.

While the preceding facts recap events up to the dispute, following is a recap of our position for appeal.

1. All Corporate CRAY costs have been allocated to segments per the DCAA report on CRAY costs, per the draft MOA and per the advance agreements at LMMS.

2. The DCE does not have authority to disregard advance agreements at LMMS.

3. If the DCE and DFAS deduct this alleged $2,682,565 indebtedness from payments due LMMS, LMC will consider it a unilateral vacating of advance agreements at LMMS concerning methods of handling subsequent cost adjustments and multi-year cost caps. Government vacating of the internal cost cap agreements at LMMS will result in additional LMMS cost billings to its Government customers of approximately $5 million.

4. If LMC's appeal is successful, the negative impact to the Government is $ 2.8 million (for reversal of the allocations made per the DCAA report at LMAS and LMSW).

In summary, LMC transferred all costs per the DCAA report. Further, we believe that: (1), LMC's cost allocation method was compliant (as deemed so by the previous DCE); (2), Government voiding of LMMS's advance agreements results in a net cost increase to the Government of nearly $3 million, even if the Government prevails in litigation; and (3), the Government bears a negative impact of $ 2.8 million if it loses the litigation because LMC will reverse the cost impact at LMAS and LMSW.

LMC fails to understand the contracting officer's present position as compared to his position taken in the draft MOA and LMC's offer that benefits the Government by $2.8 million. LMC is still willing to abide by the already implemented handshake agreement that benefits the Government by $2.8 million, if your office withdraws the final decision.

If you have any questions regarding our position on this matter or our intent to litigate, please call me at 301-897-6781.

Sincerely

A.M. DiPasquale

CC: DCAA/J. Ames
LMC/ D.M. Christenson, Esq.
LMC/T.J. Kallman
Miller & Chevalier/ C.T. Kipps, Esq.
Miller & Chevalier/ A.B. Styles, Esq.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00-129C |
| | ) | (Judge Andewelt) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S SECOND SET OF INTERROGATORIES, SECOND REQUEST FOR PRODUCTION OF DOCUMENTS, AND FIRST REQUEST FOR ADMISSIONS

Plaintiff Lockheed Martin Corporation, Inc. ("Lockheed Martin") hereby submits its Objections and Responses to Defendant's Second Set of Interrogatories and Second Request for Production of Documents and First Set of Admissions. Lockheed Martin reserves the right to supplement its responses, including any objections that may be applicable, based upon any additional information that may be discovered subsequent to this response.

**GENERAL OBJECTIONS**

1. Lockheed Martin objects to Defendant's Second Set of Interrogatories and Second Requests for Production of Documents and First Set of Admissions to the extent that they seek documents protected by the attorney-client privilege and/or work product doctrine.

2. Lockheed Martin objects to Defendant's Second Set of Interrogatories and Second Requests for Production of Documents and First Set of Admissions to the extent that they are overly broad or unduly burdensome.

3. Subject to and without waiving these objections, Lockheed Martin has made a good faith effort to respond to the Government's interrogatories, requests and admissions.

4. Lockheed Martin's discovery and review of records is continuing. To the extent appropriate, these responses will be supplemented as required by Rule 26(e) of the Rules of the United States Court of Federal Claims.

INTERROGATORY NO. 6:

Identify with particularity all "service level agreements and documents of understanding" that are referenced in Lockheed's Disclosure Statement submitted to James Rose on April 1, 1994.

RESPONSE:

Government Documents 000479-000507; 002566-002597; Lockheed Martin Documents T001910-T001921 have thus far been identified. If more documents are discovered, this response will be supplemented.

7. Prior to 1997, LMC did not make any adjustment of the allocation of HPCC/Super Computer costs based upon the actual usage in 1994 and 1995 by the three Lockheed Martin operating companies (LADC, LASC, and LMSC).

Response: Denies.

8. LADC decided in September 1993 that it would no longer use the CRAY computer. (See PT 000034).

Response: Admits and avers that LADC needed the approval of LITC's Board of Directors prior to foregoing future use of the CRAY computer.

9. LITC's Board of Directors approved LADC's decision to no longer use the CRAY computer (See PT 000034).

Response: Admits.

10. LADC was charged $1.4 million for 1994 Cray costs.

Response: Admits.

11. Lockheed's Disclosure Statement submitted to James Rose on April 1, 1994, has never been deemed adequate by the Government.

Response: Admits, and avers that the Government has not deemed any of Lockheed or Lockheed Martin's disclosure statements to be adequate since approximately 1985. Further avers that the Government did not deem the 1994 Disclosure Statement to be inadequate.

Clarence T. Kipps, Jr., Esq.
MILLER & CHEVALIER, Chartered
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 626-5800
Fax: (202) 628-0858

Attorney of Record

Lockheed Martin Corporation

Of Counsel:

David M. Christenson, Esq.
LOCKHEED MARTIN CORPORATION
6801 Rockledge Drive
Bethesda, Maryland 20817
Tel: (301) 897-6127
Fax: (301) 897-6333

Jeri Kaylene Somers, Esq.
MILLER & CHEVALIER, Chartered
655 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 626-5800
Fax: (202) 628-0858

I declare under penalty of perjury that the foregoing is true and correct.
Executed on JUNE 22, 2001.

Edward J. Meehan

Edward Meehan

# SERVICE LEVEL AGREEMENT
# FOR
# LADC

January 1994
through
December, 1994

Approved by:

| Name | Date Signed: |
| --- | --- |
| A. O. Vignoni - LADC | 8/17/94 |
| W. Bernstein - LITC | 8/30/94 |

Document Control # SLA-LADC-02-001

## Table of Contents

1. Introduction to Service Level Agreements ........ 1
1.1 Service Level Agreement (SLA) Structure ........ 1
1.2 SLA Content ........ 1
2. Service Level Agreement - Common Elements ........ 2
2.1 Terms of the Agreement ........ 2
2.1.1 Effective date ........ 2
2.1.2 Duration ........ 2
2.1.3 Revisions ........ 2
2.2 Delineation of Responsibilities ........ 2
2.2.1 LITC Responsibilities ........ 2
2.2.2 Customer Responsibilities ........ 2
2.2.3 Shared Responsibilities ........ 3
2.3 LITC Procedures Documents ........ 3
2.4 Documents of Understanding ........ 3
2.5 LITC Service Offerings ........ 4
2.5.1 Standard Service ........ 4
2.5.1.1 Disaster Recovery ........ 4
2.5.1.2 Service Coordination Meetings ........ 4
2.5.1.3 System Maintenance ........ 4
2.5.1.4 Auditable Service ........ 5
2.5.1.5 Operational Features ........ 5
2.5.1.5.1 24 x 7 Coverage ........ 5
2.5.1.5.2 UPS / Redundant mechanical systems ........ 5
2.5.1.5.3 Physical Security ........ 5
2.5.1.6 Video Teleconferencing ........ 5
2.5.2 Additional Services ........ 5
2.5.2.1 Customer Service Center ........ 5
2.5.2.2 Service Request Management ........ 5
2.5.2.3 Problem Management ........ 5
2.5.2.4 Change Management ........ 5
2.5.2.5 Configuration Management ........ 5
2.5.2.6 Network ........ 5
2.5.3 Custom Services ........ 6
2.6 Resource Utilization Forecasts ........ 6
2.6.1 Forecasting Procedures - Denver Based Processing Requirements ........ 6
2.6.2 Forecasting Procedures - LITC Extended Operations Requirements ........ 7
2.7 Service Pricing ........ 7

2.7.1 Standard Services ........ 7
2.7.1.1 Philosophy ........ 7
2.7.1.2 1994 Billing Rates and MIPS Forecast for Denver Based Processing ........ 10
2.7.1.3 Billing Reports ........ 10
3. International Business Machines (IBM) Environment ........ 11
3.1 Scope of Agreement ........ 11
3.2 Resource Consumption Metrics ........ 11
3.2.1 CPU Usage ........ 11
3.2.2 DASD Usage ........ 11
3.2.3 Tape Mounts ........ 11
3.3 Service Metrics - IBM ........ 12
3.3.1 Measurement Methods and Tools ........ 12
3.3.1.1 Availability ........ 12
3.3.1.2 Response Time ........ 13
3.3.1.3 Batch Management ........ 14
3.3.1.4 Problem Management and Call Metrics ........ 14
3.3.1.5 Customer Satisfaction ........ 15
3.4 VM Systems ........ 16
3.4.1 LADC CMS ........ 16
3.5 MVS Systems (Palmdale) ........ 18
3.5.1 LADC (MVS/XA) - Systems B and C ........ 18
3.5.2 CICS Subsystem - System B ........ 18
3.5.3 TSO System - System B ........ 19
3.5.4 IMS Subsystem - System B ........ 19
3.5.5 DB2 Subsystem - System B ........ 19
3.5.6 CICS Subsystem - System C ........ 20
3.5.7 TSO System - System C ........ 20
3.5.8 IMS Subsystem - System C ........ 20
3.5.9 DB2 Subsystem - System C ........ 21
4. HPCC ........ 22
4.1 Scope of Agreement ........ 22
4.2 Service Metrics ........ 22
4.2.1 Measurement Methods and Tools ........ 22
4.2.1.1 Intel Availability ........ 22
4.2.1.2 System Performance ........ 23
4.2.1.3 Batch Turnaround ........ 23
4.2.1.4 Workload Prioritization ........ 23
4.2.1.5 Problem Management and Call Metrics ........ 23
4.2.1.6 Customer Satisfaction ........ 23

4.3 HPCC Systems ..... 24
4.3.1 Dedicated processing commitments - LITC Denver processors ..... 24
4.3.2 Intel Processor(s) - located in Palmdale, California ..... 24
GLOSSARY ..... 25

# 1. Introduction to Service Level Agreements

## 1.1 Service Level Agreement (SLA) Structure

The SLA is organized with separate sections for each of the following areas:

- Common elements - information that is pertinent to all computing environments
- IBM Environment - information that is specific to the IBM/Amdahl computing environment
- HPCC Environment - information that is specific to the HPCC platforms
- Tandem Environment - information that is specific to the Tandem computing environment
- Digital Equipment Corporation (DEC) Environment - information that is specific to the DEC platform
- Unisys Environment - information that is specific to the Unisys environment
- Appendix A - Documents of Understanding (DOUs)
- Glossary

## 1.2 SLA Content

Only SLA sections that are pertinent to the LADC processing environment will be included in the Service Level Agreement for LADC.

As a section is finalized, signatures will be obtained from both LADC and LITC. A section that is incomplete or still in negotiation will not delay signature of sections that have been finalized.

Nothing in this document is intended to supersede existing LITC and/or LADC Management Polices and Procedures.

All time references in this document are expressed in Pacific time (standard or daylight savings time, whichever is applicable).

Information concerning philosophies or procedures for any area covered by a DOU are not addressed in the SLA. Please refer to the appropriate DOU for this information.

Detailed procedures for Change Management, Problem Management and Service Request Management are located in the latest LITC procedures manuals. Copies are available through the LADC Site Services Manager or by following procedures established by LADC.

# 2. Service Level Agreement - Common Elements

## 2.1 Terms of the Agreement

### 2.1.1 Effective date

The effective date of this agreement is the period beginning January 1, 1994 through December 31, 1994.

### 2.1.2 Duration

The duration of this agreement is one year. A review of service levels and pricing stated in this agreement will be conducted if:

- Major changes are made to operating systems, environments, or applications
- Either LADC or LITC determines that it is advisable to do so.

### 2.1.3 Revisions

A change to a Service Level Agreement (SLA) or Document Of Understanding (DOU) is requested using an LITC Service Request Form. The change will be negotiated between the LITC Service Level Management Coordinator, LADC Site Services Manager or designee, and the appropriate management personnel from both locations. The negotiated change is an addendum to the SLA until such time as the SLA and/or DOU is permanently updated. Both companies agree to negotiate in good faith in an attempt to adjust the agreement to meet current needs.

## 2.2 Delineation of Responsibilities

### 2.2.1 LITC Responsibilities

LITC responsibilities include:

- Ensuring all service level commitments are met or exceeded
- Ensuring LITC resources required to support this agreement are available
- Ensuring all service level measurement tools are functional
- Ensuring all required reports are provided, in a timely manner
- Providing meaningful resource utilization reporting
- Developing, in conjunction with LADC, documents of understanding between customer I/S organizations and LITC technical groups
- Providing sufficient notification to LADC of pending changes to the LITC computing environment, to allow LADC to evaluate the impact, concur as required, and disseminate the information
- Ensuring that software tools and access are available to LADC personnel to facilitate on-going application monitoring, analysis, and optimization efforts
- Ensuring LADC management approval for requests for local changes in configurations and schedules
- Providing adequate disaster recovery capabilities to ensure minimum business interruption exposure
- Keeping appropriate LADC personnel and management appraised of actions that are planned and/or in process to correct deviations from agreed to service level commitments.

### 2.2.2 Customer Responsibilities

LADC responsibilities include:

- Ensuring LADC resources required to support this agreement are available
- Identifying service level requirements
- Providing workload requirements
- Providing key points-of-contact for change or outage notification
- Ensuring compliance with LITC policies and procedures outlined in section 2.3 of the SLA
- Developing, in conjunction with LITC, documents of understanding between customer I/S organizations and LITC technical groups
- Ensuring LADC disaster recovery readiness through the creation of a disaster recovery plan and participation in disaster recovery exercises, as required.

- Notifying users of LADC systems of changes affecting major subsystems or components
- Notifying LITC of system or environmental changes affecting major subsystems or components

### 2.2.3 Shared Responsibilities

- LITC commits to work with LADC to identify cost reduction opportunities.
- LITC and LADC will jointly pursue opportunities to improve operating procedures and relationships.
- LITC and LADC will work together to improve prime shift system availability.

## 2.3 LITC Procedures Documents

In an effort to prevent disruption of service and to ensure delivery of service levels agreed to in this document the following LITC procedures will be utilized:

**Change Management**

Implementations of changes to any component of the LADC environment that is managed by LITC, are performed in accordance with established LITC change management policies and procedures. Refer to the *Procedure Document for Change Management* for additional information.

Applications modification responsibility rests with LADC, however any change that may effect the LITC system service, including availability and performance, must be coordinated with LITC personnel. Notification for LADC local changes will be provided to LITC in a timely manner.

**Problem Management**

Problems affecting components managed by or located at LITC are resolved in accordance with established recovery time commitments. LITC uses an online system to document problems, communicate status, and track problem resolution times. Refer to *Procedure Document for Problem Management* for additional information.

**Service Request Management**

LITC Service Requests are used to initiate and track actions requested of any LITC group in support of but not limited to; software, hardware, or telecommunication installations or upgrades, or I/S acquisitions. Customers should submit authorized service requests to LITC through their Site Services Manager. Refer to the *Procedure Document for Service Request Processing* for additional information.

During this agreement the cost for work requested of LITC will be based on the following guidelines:

- Charges will be applied to requests for custom efforts requiring ten or more hours of labor.
- Charges will be applied to offset costs associated with significant accelerations of standard efforts.
- Labor costs will be billed at a rate of $53 per hour.

## 2.4 Documents of Understanding

Documents of Understanding (DOUs) are established to clearly define specific responsibilities between the I/S organizations at LITC and the customer location(s), in support of the service level agreement. DOUs are created to ensure that all parties are in agreement and have a clear understanding of their responsibilities. DOU modifications may be required due to changes in the processing environment or scope of responsibilities. The DOUs will be reviewed on an annual basis.

The following Documents of Understanding exist between LADC and LITC

- LITC Customer Service Center
- Telecommunications and Network Services

- Software Management (IBM systems)
- Computer Security and Access Administration
- Systems Storage Management
- LITC Configuration Management
- Database and Transaction Processing Systems

## 2.5 LITC Service Offerings

### 2.5.1 Standard Service

#### 2.5.1.1 Disaster Recovery

LITC, with assistance from LADC, is responsible for the creation, maintenance, and testing of a formal data center Disaster Recovery Plan (DRP). The DRP will include information concerning re-establishment of telecommunications, recovery of data center hardware, operating systems, subsystems, and restoration of customer data, as defined by LADC. LADC retains responsibility to ensure that formal business recovery plans are developed, maintained, and tested. As required, LITC will provide assistance with the development of the business recovery plans. A copy of each business recovery plan must be forwarded to the LITC Disaster Recovery Coordinator for review. The availability of this plan will ensure that LITC has adequate knowledge of customer business requirements that may impact the data center DRP and recovery procedures. Any concerns or questions will be communicated to the LADC Site Services Manager. The Site Services Manager is responsible to ensure the concerns are properly addressed and resolved to the satisfaction of all parties.

Exercise (testing) requirements must be forwarded to the LITC Disaster Recovery Coordinator, for review and approval. An exercise date and time will be established and communicated to the appropriate personnel. Prior to the exercise, LADC will take the lead in the development of a unique test plan in cooperation with LITC and with reference to LITC criteria. As mutually agreed, LITC may be present at each exercise. LADC with LITC's assistance will ensure the exercise process is thoroughly documented and all corrective actions are noted and resolved. LADC will assist, as appropriate, with any additional reports needed by the LITC Disaster Recovery Coordinator.

#### 2.5.1.2 Service Coordination Meetings

LITC conducts regularly scheduled service coordination meetings with each customer company. The objectives of the meeting are to communicate significant LITC activities and strategies, conduct dialog on customer plans and activities that might relate to or impact LITC, and provide a forum for capture, tracking, and reporting on mutual issues and problems.

#### 2.5.1.3 System Maintenance

LITC will schedule maintenance activities during times that are acceptable to LADC. Maintenance actions are required for technical support personnel to perform modifications or upgrades to facility, hardware, software, and network components. Applications may or may not be available for use during scheduled maintenance activities. LITC, LITC extended, and LADC personnel will schedule maintenance activities through the LITC Change Management Coordinator following standard LITC Change Management policies and procedures. The scheduling process will not hinder the orderly and timely coordination of change implementation at local or remote locations.

Efforts will be made to schedule maintenance activities impacting availability during the following hours:

VM: Sunday evening between 5:00 P.M. and 11:00 P.M.

MVS: Sunday evening between 4:00 P.M. and midnight

HPCC: Sunday between 7:00 A.M. and 3:00 P.M.

Maintenance activities that do not impact availability are scheduled on an event-driven basis. The LADC Site Change Coordinator receives advance notification of any scheduled outages such that activities can be communicated and coordinated with the LADC customer community. LITC and LADC jointly coordinate scheduled maintenance actions to minimize impact to committed workloads.

#### 2.5.1.4 Auditable Service

LITC services are fully auditable in nature. In the event of an I/S cost audit either internally or from an external government agency, any issues or questions arising regarding LITC related costs should be referred to LITC through the appropriate jurisdictional regional agencies. We are routinely audited both internally and by government agencies for I/S operations audits, ADPE audits and cost audits. All audit results will be made available to customer companies, as requested.

#### 2.5.1.5 Operational Features

##### 2.5.1.5.1 24 x 7 Coverage

LITC operates 24 hours a day, 7 days a week. Any variance to this schedule will be negotiated with the LITC customer community.

##### 2.5.1.5.2 UPS / Redundant mechanical systems

LITC electrical systems powering computer rooms A, B, and C (non-HPCC computers and peripherals) are supported by battery backup and automatic transfer to diesel generator power, in the event city power is interrupted. Backup diesel generator fuel is maintained in underground storage tanks on the LITC premises. Computer room D (HPCC) provides short-term battery backup, to allow for orderly shutdown of the processors and associated peripherals when a power interruption occurs. There is no backup generator capability for computer room D.

##### 2.5.1.5.3 Physical Security

Physical security provided for LITC includes; a fenced perimeter, security cameras inside and out, and on-site security guards. Access through the two property entrances, is controlled by card keyed gates, and security cameras which are monitored by the main security office, 24 hours a day, 7 days a week.

#### 2.5.1.6 Video Teleconferencing

Video Teleconferencing (VTC) provides an effective way of conferencing face-to-face while avoiding cost, time, and inconvenience due to travel, either local or long distance. The Network Control Center at LITC, Denver manages the VTC Scheduling System. LITC provides the network switching activities for all customer sites. Please refer to the *Lockheed Video Teleconferencing Procedures* for additional information.

### 2.5.2 Additional Services

The philosophies and policies relating to the following standard services are available in the document identified in each section.

#### 2.5.2.1 Customer Service Center

Refer to the *Document of Understanding for the LITC Customer Service Center* (D1).

#### 2.5.2.2 Service Request Management

Refer to the *Procedure Document for Service Request Processing.*

#### 2.5.2.3 Problem Management

Refer to the *Procedure Document for Problem Management.*

#### 2.5.2.4 Change Management

Refer to the *Procedure Document for Change Management.*

#### 2.5.2.5 Configuration Management

Refer to the *Document of Understanding for Configuration Management* (D7).

#### 2.5.2.6 Network

Refer to the *Document of Understanding for Telecommunications and Network Services* (D2).

### 2.5.3 Custom Services

At times, customers may require services that are outside the definition of LITC Standard Service Offerings. These services might include items such as; customized billing support, unique service metrics, LITC management of a function that is normally considered the customer's responsibility, or customized service level or performance reporting. LITC has defined these types of requirements as custom services. Custom services are requested through the LITC Service Request Process. Depending on the costs associated with implementation and the scope of the service, custom services may or may not incur additional costs.

## 2.6 Resource Utilization Forecasts

### 2.6.1 Forecasting Procedures - Denver Based Processing Requirements

On an annual basis, LITC requests a resource utilization forecast for processing done at LITC Denver from the Lockheed companies it services. The forecast request is sent to the I/S Director of each customer company the first week in July and should be returned to LITC Finance by the first week in August. The purpose of the forecast is to provide the basis for which LITC will budget hardware, software, labor, and related expenses for the following year. The cost base and resource requirements developed from this forecast are used to develop preliminary pricing for the next budget cycle and forward pricing for an additional four years. The following data is required:

**IBM/Amdahl**

*MIPS*

LADC is required to provide a forecast of MIPS requirements for the five year period. LITC will provide current resource utilization and trend data, at the time of request. LADC is asked to provide MIPS requirements for each quarter of the next year. This will provide LITC with a quarterly projection of resource requirements in order to match more closely any hardware and software changes throughout the year. Annual MIPS requirements for the next four years are also required. This will enable LITC to project costs and provide forward pricing input to the companies.

*DASD*

DASD is charged to LADC based on allocated devices. Resource requirements by quarter for the first year and annually for the following four years are necessary for LITC planning purposes. Data should be submitted in megabyte requirements.

*Tape*

LITC charges LADC for tape hardware and related support on the basis of number of tape mounts. LITC will provide current utilization and trend data, at the time of request. A quarterly forecast for the first year of the projection period and average annual requirements for the following four years are required. The quarterly forecast should be stated as the projected average monthly number of tape mounts for each quarter of the year.

**HPCC**

The annual HPCC forecast should include: data storage, dedicated wall clock hours, and shared CPU processing requirements for all systems. The LADC forecast should also include memory requirements for any job(s) requiring more than the current LITC maximum memory configuration. LADC is asked to provide this information for each quarter of the next year. This will provide LITC with a quarterly projection of resource requirements in order to match more closely any hardware and software changes throughout the year. LITC HPCC manages its capacity based on the workload commitments from the Lockheed companies requiring HPCC support.

**All Platforms**

*Service Requests*

LADC is asked to provide an annual projection of service requests requiring ten or more hours of labor, custom efforts or significant acceleration of planned activities. This data will be used to assist in determining staffing levels.

*Forecast Adjustments*

Out of cycle forecast adjustments are requested by completing an LITC Service Request form. Please define new resource requirements, the requested effective date, and the reason for the adjustment. Submit the request through the normal LITC Service Request process. Lead time requirements may vary based on the scope of the request.

### 2.6.2 Forecasting Procedures - LITC Extended Operations Requirements

LITC is responsible for all mainframe data processing expenses, corporate wide. To assure that these costs can be properly monitored, an expense forecast is requested from each customer company on an annual basis. This forecasting, which includes remote IBM, HPCC, Tandem, DEC, and Unisys processing requirements, will occur during the month of November. The input includes; expenses, head count, and special computing requirements. This information is used by LITC, to provide corporate expense forecasts and fixed asset requirements for a five year period.

LITC will supply each company a forecasting template, annually. LITC will work closely with each company to develop a technical and financial plan and forecast, designed to meet the operating and financial objectives of the company and LITC. The template will be used for jointly forecasting extended operations expenses and headcount. Additional supporting hardware and software schedules are also required. Forecasts should include a detailed expense projection for the following year, and a summary forecast for the four subsequent years. Sufficient explanation of projections should be included to allow forecasting of capital requirements. A template will also be provided so that each company can forecast remote resource consumption (CPU, DASD, printing, and tape).

During the annual forecasting cycle, LITC will provide an expense forecast for direct charge items that are to be passed through to the customer company. This forecast will include hardware depreciation, hardware maintenance, software amortization, lease, and maintenance expenses that are incurred on LITC's books, but are unique to the customer company.

## 2.7 Service Pricing

### 2.7.1 Standard Services

#### 2.7.1.1 Philosophy

**Overview**

Standard rates are calculated annually, and reviewed throughout the year. Allocated costs include; facility, administrative, customer service, and telecommunication costs. Expenses are budgeted and tracked at a cost pool level. Rates are developed based on forecast usage and budgeted expenses. At year end, any over or under recovery that exceeds 10% of LITC expenses is proportionately allocated to the using companies. Over/under recovery of cost pools within 10% are rolled over into the following year's cost pools.

**IBM/Amdahl**

IBM/Amdahl processing at LITC, Denver is charged to users in three main categories; CPU, DASD, and Tape.

CPU - Processor usage is charged at a *standard rate per MIPS allocated.* MIPS (millions of instructions per second) are an industry standard for processor capacity rating. Each customer is required to forecast and commit to a certain level of MIPS for their MVS and/or VM systems. The

committed-to MIPS level is the basis for determining LPAR (logical partition) or Domain size. This is the MIPS level for which the company is billed, and represents peak processing requirements. Additional MIPS, if available, can be utilized at no additional cost.

DASD - Storage charges are based on a *standard rate per megabyte of DASD allocated* to each company.

Tape - Charges are based on a *standard rate per tape mount*. There is no differentiation between silo and manual mounts, since LITC will make the determination as to where tape data sets reside.

**HPCC**

Cray and Convex cost pools consist of LITC hardware, software, and HPCC labor support. The Cray and Convex computing cost pools are charged out to customers based on negotiated cost sharing of HPCC resources. Negotiated costs include front end and peripheral costs. For HPCC, LADC is guaranteed a committed level of workload processing capacity and may avail themselves of additional uncommitted capacity at no additional cost. Unused resources committed to another company will be liquidated first, and will be billed at the rates specified in section 2.7.1.2 1994 Billing Rates. If LITC recovers its costs from committed levels of usage and capacity remains, it is available at no cost.

**Exception Billing**

Upon evaluation of specific criteria, and with the agreement of all affected companies, LITC may agree to extract resource usage from one company's assigned resources for purposes of billing the end using company. Criteria for such billing includes, but is not limited to, the following:

- Identifiability of the resources to be billed.
- Practicality and obvious benefits for this exception billing.
- Agreement of all affected parties as to resource identification and billing method.

The method employed for exception billing will be the following:

- Determination of resources consumed (historical, over a reasonable time period)
- Translation of the average/trended resources to LITC standard billing units
- Charging of resources to the using company, and crediting of the costs to the company to whom the resources are originally committed will occur at either a fixed amount or based on actual utilization on a monthly basis, depending on the circumstances. If actual resources are used, MIs (millions of instructions) will be the only unit of measure. A standard rate per MI will be calculated annually.

**Alternative Pricing**

As an incentive to reduce overall Lockheed Corporation costs, LITC may price certain processes on a policy priced basis. To qualify for this alternative pricing, which in effect prices the services based on incremental costs incurred by LITC to provide the services, and allows for some absorption of LITC fixed costs over a wider customer base, there must be an absolute savings to the corporation. An example would be CAD/CAM processing. The pricing for such processes would be structured such that the cost to provide services from LITC is less than the cost of continued extended LITC processing. This approach incentivizes the customers to eliminate resources at their sites and improves utilization of resources at LITC, Denver.

**Billing Schedule**

*Denver Central Services*

Since MIPS are allocated based on annual forecasts, no monthly determination of utilized MIPS is required for billing purposes. However, the cut-off for determination of allocated DASD and actual tape mounts is midnight on the next-to-last Friday of the fiscal month. This is the 4th Friday of a five week month and the 3rd Friday of a four week month. The cut-off date for direct or pass-through charges is the end of the fiscal month. These are items expensed on LITC's books, but the expense is billed the following month, to the customer company for whom the items were acquired. In the case of capitalized hardware or software, the assets reside on LITC's books, with the depreciation or amortization passed through to the customer company on a monthly basis. Annual prepaid items are passed through to the company, where they handle the expensing of the prepaid amount in a manner consistent with their policies and procedures. Pass-through charges are accumulated on LITC's books in the customer-specific cost centers (8XX).

Resource billing amounts are communicated to each company on the first Tuesday following month-end. LITC accrues processing revenues and Accounts Receivable. The customer company accrues processing expense and related Accounts Payable.

Actual invoices are generated and faxed/mailed to the customer company by the second Friday of the month for resources used during the prior month. A check is issued to LITC by the customer company during the third week of the month.

*Extended Operations*

Each month the customer invoices LITC for extended operations at the site. This invoice will be for the incurred costs for extended operations (IBM, HPCC, DEC, Tandem and/or Unisys) at the site. Typical extended operations billings include hardware, software, floor space, labor support and other operating costs. LADC extended operations billing will include all costs incurred in support of the HPCC Intel Processor(s) and the IBM MVS systems located in Palmdale, California. Due to timing considerations, the current month billing is based on actuals for the prior month.

LITC processes the invoice for payment. LITC also issues an invoice back to the company for the extended operations, less any amounts more appropriately charged to other Lockheed operating companies. No additional overhead burden from LITC is applied. Additional costs may be added to the invoice for items paid for by LITC on behalf of the company (pass-through charges).

Actual invoices are generated and faxed/mailed to the customer company. Checks are issued to the customer company during the third week of the month.

*Dedicated Services & Support*

LITC will invoice the company each month, as costs are incurred by LITC, for services and/or support that is dedicated to the specific operating company. An example would be equipment purchased by LITC and placed at the customer site. Depreciation will be billed to the customer company on a monthly basis. Other types of costs include, but are not limited to, hardware and software maintenance and monthly lease expenses. No LITC overhead burden is applied to these costs. Due to general ledger timing constraints, there may be up to a one-month lag in the billing of these expenses. Supporting documentation, such as a copy of the paid invoice, will be provided.

The LITC Service Request process must be followed for system changes requested by the customer company, and performed by LITC personnel. Companies will be billed for labor associated with company specific changes, under established guidelines. A fixed bid estimate of this cost will be provided, and must be approved by both LITC and the requesting company's management, prior to the commencement of such work. Service requests will be billed on an as-completed basis. Copies of the approved service request forms will be attached for invoicing purposes.

*LITC Denver Personnel Support of Site Processing*

Certain LITC personnel are assigned to support remote operations at the various operating companies. This support could include IBM, DEC, Tandem and/or Unisys processing. This staff is proportionately allocated to the remote operations cost pools based on the level of support that is forecast. Costs in these pools include labor (salaries and fringe), prorated department operating expenses and LITC Administrative and Customer Service costs. Full-time-equivalent (FTE) rates are calculated for each of these pools and allocated back to supporting companies based on the level of support budgeted.

*Unallowable Costs*

Unallowable costs are tracked in separate general ledger accounts at LITC. These expenses are billed to the operating companies proportionate to their Denver central services billings. The separate billing of unallowables, along with any required adjustments to central services billings, occur at year end.

#### 2.7.1.2 1994 Billing Rates and MIPS Forecast for Denver Based Processing

**IBM/Amdahl Processing**

MIPS Forecast - VM - 3.3

CPU - $69,154 per MIPS, per year

DASD - $2.40 per megabyte, per year

TAPE - $1.12 per tape mount

Billable MIs - $0.012 (Exception billing/actual resources)

**HPCC Processing - Denver Processors**

Y-MP4E (4 proc.) $464.00 per Wall Clock Hour

Y-MP4E (3 proc.) $370.00 per Wall Clock Hour

Y-MP4E (2 proc.) $232.00 per Wall Clock Hour

Y-MP8I $270.00 per CPU Hour

#### 2.7.1.3 Billing Reports

LITC issues monthly invoices summarizing resources billed -- MIPS, allocated DASD, tape mounts, and direct charges. A separate invoice is provided for HPCC resources.

LITC provides a monthly data file containing the source data (SMF or VM Account records) for processing that occurs within the assigned LPARs, domains, or guests.

Monthly invoices are provided to the customer Finance organization. Copies of the summarized invoice are also provided to the Site Services Manager.

# 3. International Business Machines (IBM) Environment

## 3.1 Scope of Agreement

Service level commitments are specified in this SLA for the following LITC-supported operating systems and associated subsystems:

LADC - VM
LADC - MVS (Palmdale)

Prime time hours for the VM operating systems for LADC are Monday thru Friday from 6:30 A.M. to 5:30 P.M. Prime time hours for the MVS operating systems located at Palmdale, California are Monday thru Friday 7:00 A.M. to 6:00 P.M.

Processing requirements during holidays are negotiated in accordance with LADC approved holiday schedules. All processing during holidays is coordinated by the LITC Customer Service Center personnel and reflects negotiated requirements of LADC customers.

## 3.2 Resource Consumption Metrics

The following reports will be provided, to the site services manager, on a monthly basis for processing that occurs:

### 3.2.1 CPU Usage

CPU reports will include a table and graphs. The table will contain weekly data points, reported monthly, representing "peak" MIPS utilization for major subsystems. Weekly "peak" hour utilization will be graphed against forecasted MIPS, at the operating system level. A bar/whisker 24 hour utilization plot, for Monday through Friday hourly average utilization, at the operating system level, will also be provided.

### 3.2.2 DASD Usage

A graphical representation of actual DASD used will be plotted against DASD forecasted, and DASD allocated. The graph will be produced at the operating system level. Data points are based on a billing month-end snapshot.

### 3.2.3 Tape Mounts

A table representing actual monthly tape mounts versus forecasted tape mounts will be prepared and will include the percentage of actual tape mounts to forecasted mounts. A report of the top 10 heavy tape mount jobs, by job name, will also be provided.

## 3.3 Service Metrics - IBM

### 3.3.1 Measurement Methods and Tools

- LITC utilizes specific methods and tools to measure:
  - Availability
  - Response Time
  - Batch Management
  - Problem Management and Call Metrics
  - Service Requests.
- LITC will be responsible for the creation of monthly service level reports. LITC will provide the software system support to enable LADC to generate the data. LADC will gather the necessary MVS and HPCC data and forward the information to the LITC Service Level Analyst.
- Monthly service level reports will be generated for Denver and Palmdale processing. Service level reports will be forwarded to the LADC Site Manager for distribution.
- A report card is created each month to measure LITC service level performance against service level targets established in this agreement. The report card shall indicate a pass or fail status for each category.
- Availability and response time measurements are subsystem dependent and may not be applicable to all subsystems in your environment.

#### 3.3.1.1 Availability

Percent availability is defined as the percentage of time that an environment is available for customer use within the total possible hours of availability. LITC tracks percent availability as a measurement to continuously improve customer service. Percent availability components for MVS and VM are measured and reported at the logical partition (LPAR), domain, guest, subsystem, and network levels. Weekly data are compiled and monthly charts produced showing percent availability for environments addressed in this agreement. The charts plot the service level commitments, availability during prime time hours, and availability during scheduled hours.

**LPAR, Domain, Guest, or Subsystem Availability**

Availability for prime time is calculated as follows:

$$\text{Percent availability} = \frac{\text{Prime time (PT) hours - (PT planned outages + PT unplanned outages)}}{\text{Prime time hours}}$$

Availability for scheduled hours is calculated as follows:

$$\text{Percent availability} = \frac{\text{Scheduled Hours (SH) - (SH planned outages + SH unplannned outages)}}{\text{Scheduled hours}}$$

LPAR, domain, guest, or subsystem outages are defined as:

- any action requiring an IPL or subsystem restart
- key hardware component failures
- stand-alone system time required to perform testing or maintenance.

Planned outages are events coordinated and scheduled in advance. Unplanned outages are unscheduled and unpredictable.

The prime time availability commitment for LPAR, guest, and subsystem availability is 99.5%.

The scheduled hours availability commitment for LPAR, guest, and subsystem availability is 97%.

**Network Availability**

Network availability is reported in both a graphical and tabular format that reflects true network availability and assesses the impact of network outages based on lost user hours. For purposes of this report, an outage is considered, a loss of connectivity in a component that is defined as part of the Wide Area Network (WAN). Failure of a local networking component such as a terminal, terminal controller, PC gateway, or local area network would not be recorded in the availability statistics, but would be reported and monitored through the problem management system.

Network availability reports extrapolate data from monitored workloads and users accessing the LADC systems. Network availability reports are generated at the company level. Statistics will be reported for prime time hours and non-prime time hours and will differentiate between planned and unplanned outages.

A connectivity matrix will be produced, for each company, which will indicate the average number of users who would be affected when a specific network component fails. Impact of the network outage will be calculated as follows:

$$\text{Network availability} = \frac{\text{Total User Hours (PT or Non-PT)} - \text{Lost Users Hours}}{\text{Total User Hours (PT or Non-PT)}}$$

Lost User Hours = duration of outage x the average number of users

Total User Hours Prime Time (PT) = number of prime time hours per day x number of days per month x average number of prime time users per hour

Total User Hours Non-prime Time (Non-PT) = number of non-prime time hours per day x number of days per month x average number of non-prime time users per hour

The prime time availability commitment is 99.5%.

The non-prime time availability commitment is 97%.

### 3.3.1.2 Response Time

In the event that LADC I/S or customer's perception of response time is unsatisfactory, LITC will aggressively pursue and resolve problems by committing to monitoring and tracking performance until satisfactory service levels are restored.

### System Response Time

Standard response time monitoring of the LADC VM and MVS mainframe systems and subsystems response time is performed with a tool called NETSPY. Environments that are not monitored are identified in the detail sections for that system or subsystem. Data are collected on a daily basis, plotted weekly and reported monthly for environments addressed in this agreement. The charts include 90th and 50th percentile data.

Response time measurements for the MVS environment will be implemented by LITC following the authorization of access for LITC personnel.

### Network Response Time

Network NETSPY 90th and 50th percentiles response times are used to calculate performance indices representing the overall responsiveness of each specific network. On a daily basis, the 90th and 50th percentile network response times are measured for each subsystem or guest. The 90th and 50th percentile figures are multiplied by the corresponding number of transactions, the results are added together and then divided by the total number of transactions. This number is collected on a daily basis, plotted weekly and reported monthly providing network response time indicators for environments addressed in this agreement.

The network 90th percentile response time commitment is 2.77 seconds.

The network 50th percentile response time commitment is 1.17 seconds.

### 3.3.1.3 Batch Management

Batch management metrics do not apply to the LADC VM environment.

LADC MVS batch metrics will be created on a monthly basis. These metrics include the percentage of jobs completed without incident, the number of jobs submitted, number of abends, number of reruns, and number of change notices processed for the current month, rolling twelve months, and year-to-date.

Percentage of jobs completed without incident is calculated as follows:

$$\frac{\text{Number of jobs submitted - number of abends}}{\text{Number of jobs submitted}}$$

Data will be monitored and reported monthly.

### 3.3.1.4 Problem Management and Call Metrics

Problems are classified and prioritized according to severity (1 through 4), assigned to technical support personnel for resolution, and entered into the LITC online database. Problem management reports track resolution status for all problems reported to the LITC Customer Service Center. The reports are used to compare actual problem recovery times to service level commitments.

Metrics include:
The number of problems opened this month, the number of problems resolved this month, the number of problems resolved within the committed recovery time and the 95th percentile recovery time, for each problem severity.

Additional metrics for call management and problem reporting include:
The total problem records opened this month, total problem records closed this month, number of carryover problems from the previous month, current backlog of problems, number of calls received

by the Customer Service Center and number of calls resolved while the customer is on the telephone.

Reports contain data for the current month, rolling twelve months, and a year-to-date total.

**Note:** MVS batch processing problems are reflected in the Batch Management reports and are not included in the Problem Management metrics.

Target service levels for problem recovery by severity are:

Severity 1 - within 2 hours
Severity 2 - within 4 hours
Severity 3 - within 7 days
Severity 4 - within 14 days

### 3.3.1.5 Customer Satisfaction

LITC, with support of the LADC I/S management, will survey and assess customer satisfaction using an automated online survey relating service levels provided to service level objectives established in this agreement.

Long-term customer satisfaction is measured by comparing current and past survey results. The I/S commitment is to:

Maintain or improve the overall score for LADC VM customer satisfaction (4.25) during 1994.

Maintain or improve the overall score for LADC MVS customer satisfaction (TBD) during 1994.

### 3.4 VM Systems

The following paragraphs specify LITC service level objectives for the LADC VM operating system.

- LADC (CMS)

#### 3.4.1 LADC CMS

The following paragraphs specify LITC service level objectives for LADC CMS and associated categories for products and utilities:

- Operating System & Support Subsystems
- Network Access and Print Services
- Office Automation
- DBMSs and 4GLs
- Text Processing
- Program Development Services
- Decision Support Services and Graphics

**Hours of Availability**

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as described in Section 2.5.1.3.

**Response Time**

Standard response time monitoring is performed. See section 3.3.1.2 for details.

The 90th percentile response time commitment is 1.34 seconds.

The 50th percentile response time commitment is 0.37 seconds.

**Batch Schedules**

Batch processing requirements are supported by VMSCHEDULE which does not require intervention by LITC PS&C personnel.

**Critical LADC CMS Components**

LITC plans to monitor and report on the service level objectives established for LADC CMS as defined in this document. Currently, LADC CMS associated categories for products and utilities have critical services components that do not have service level measurement and reporting mechanisms in place.

LITC understands and recognizes in order to maintain satisfactory service levels for the LADC customer community, at times will require service commitments beyond the level of LADC CMS. In the event that LADC I/S or customer's perception of system performance is unsatisfactory, LITC plans to aggressively pursue and resolve problems associated with the lower level critical services and components by committing to monitoring and tracking the reliability of the affected components until satisfactory service levels are restored. The following are examples of LADC CMS critical services and components:

<u>LADC CMS (Operating System & Support Subsystems)</u>:

- VM/HPO, ASSEMBLER, EREP, DSF, VSE/VSAM, VMBACKUP, VMSCHED, VMOPERATOR, Performance Monitoring Utilities, Tape Monitoring Utilities (TDISK).

LADC CMS (Network Access and Print Services):

- Access Methods (e.g. ACF/VTAM), Intersystem Interfaces (e.g. RSCS, BDT, etc.).

LADC CMS (Office Automation):

- Office Vision (e.g. Document Processing, Note Processing, Calendar processing, PH, LIM,etc.).

LADC CMS (DBMSs and 4GLs):

- Database Storage Structures and Access Languages (e.g. NOMAD, SYSTEMW, etc.).

LADC CMS (Text & Word Processing):

- Text Processing (e.g. DCF Script, etc.), Word Processing (e.g. DW/370), etc.).

LADC CMS (Program Development Services):

- ISPF, PASF, Compilers (e.g. REXX, etc.).

LADC CMS (Decision Support Services and Graphics):

- Graphics Software (e.g. GDDM, etc.), ESS.

## 3.5 MVS Systems (Palmdale)

The following paragraphs specify LITC service level objectives for the LADC MVS operating system located in Palmdale, California.

The MVS operating environment is managed by LADC personnel with support provided by LITC. Systems software and WAN telecommunications responsibility is managed remotely from the LITC, Denver facility. The LADC local telecommunications environment remains the responsibility of LADC personnel. Operational responsibility resides at the LADC, Palmdale location and is under management of LADC with support from LITC extended personnel.

All service level commitments addressed in this SLA apply to both the LADC classified and unclassified processing environments.

### 3.5.1 LADC (MVS/XA) - Systems B and C

The following paragraphs specify LITC service level commitments for the LADC (MVS/XA) operating system B and C and associated applications.

**Hours of Availability**

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance schedules as specified in Section 2.5.1.3.

**Batch Schedules**

Batch processing requirements for LADC customers are supported by negotiated schedules. Batch processing is managed by LADC Operations personnel and initiated and tracked by an automated scheduling system. If special, user-requested batch processing is required, the activity is negotiated between authorized LADC representatives and scheduled with LADC Operations personnel.

### 3.5.2 CICS Subsystem - System B

The following paragraphs specify LITC service level commitments for the System B - Production CICS subsystem running under LADC.

**Hours of Availability**

Scheduled hours of availability are:

| | |
|---|---|
| Monday through Friday | 7:00 A.M. to 6:00 P.M. |
| Saturday | 7:00 A.M. to 3:30 P.M. |

**Response Time**

Standard response time monitoring is performed. See section 3.3.1.2 for details.

### 3.5.3 TSO System - System B

The following paragraphs specify LITC service level commitments for the System B - TSO subsystem running under LADC.

**Hours of Availability**

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

**Response Time**

Standard response time monitoring is performed. See section 3.3.1.2 for details.

### 3.5.4 IMS Subsystem - System B

The following paragraphs specify LITC service level commitments for the System B - Production IMS subsystem running under LADC.

**Hours of Availability**

Scheduled hours of availability are:

| | |
|---|---|
| Monday through Friday | 7:00 A.M. to 10:00 P.M. |
| Saturday | 7:00 A.M. to 12:30 P.M. |

**Response Time**

Standard response time monitoring is performed. See section 3.3.1.2 for details.

### 3.5.5 DB2 Subsystem - System B

The following paragraphs specify LITC service level commitments for the System B - Production DB2 subsystem running under LADC.

**Hours of Availability**

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

**Response Time**

No response time monitoring is performed.

### 3.5.9 DB2 Subsystem - System C

The following paragraphs specify LITC service level commitments for the System C - Production DB2 subsystem running under LADC.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

No response time monitoring is performed.

# 4. HPCC

## 4.1 Scope of Agreement

Service level commitments are specified in this SLA for the following processors and operating systems:

- Intel Processor(s) - located in Palmdale, California

The Intel processors are currently supported by LADC personnel. LADC and LITC will jointly monitor the Intel workloads. The SLA will be modified to reflect changes in support requirements or responsibilities, based on the results of this monitoring.

**Notes:**

- LADC has no work forecasted for the LITC, Denver HPCC Processors in 1994.

## 4.2 Service Metrics

### 4.2.1 Measurement Methods and Tools

LITC utilizes specific methods and tools to measure:

- Intel Availability - Processor Hours
- Availability - Network - see Network Availability (Section 3.3.1.1)
- Problem Management and Call Metrics
- Customer Satisfaction

Intel availability is measured at the processor level.

A report card is created each month to measure I/S service level performance against service level targets established in this agreement. The report card indicates a pass or fail status for each commitment.

Monthly service level reports are generated and forwarded to the LADC Site Services Manager for distribution.

#### 4.2.1.1 Intel Availability

Percent availability is defined as the percentage of time that an environment is available for customer use with the total possible hours of availability. LITC tracks percent availability as a measurement to continuously improve customer service. LITC will monitor and report Intel availability at the processor level.

Processor availability is calculated as follows:

$$\text{Processor Availability} = \frac{\text{Total hours} - (\text{planned} + \text{unplanned outages})}{\text{Total hours}}$$

Total hours = 24 x 7 = 168 hours per week

Planned outages are events coordinated and scheduled in advance. Unplanned outages are unscheduled and unpredictable. Note: Switch over time will be considered a planned outage. Outages caused by LADC problems that are out of scope of this agreement are not included in the availability objective.

The Intel Processor Availability commitment is (TBD)

Network Availability - Monitored and reported at the Company level (See Section 3.3.1.1 for details)

#### 4.2.1.2 System Performance

Network response - End to end customer perceived response must be such that there is no noticeable delay between a key stroke and its appearance on the screen.

#### 4.2.1.3 Batch Turnaround

Batch turnaround monitoring for the Intel Processor(s) remains the responsibility of LADC personnel.

#### 4.2.1.4 Workload Prioritization

Batch and interactive workload prioritization remains the responsibility of LADC.

#### 4.2.1.5 Problem Management and Call Metrics

Problem Management and Call Metrics are tracked at the company level. Please refer to section 3.3.1.4 for details.

#### 4.2.1.6 Customer Satisfaction

LITC, with support of the customer I/S management, will survey and assess customer satisfaction using an automated online survey relating service levels provided to service level commitments established in this agreement. Advance notification will be provided and customer company concurrence obtained prior to conducting the survey.

Long-term customer satisfaction is measured by comparing current and past survey results. The I/S commitment is to:

Maintain or improve the overall score for LADC HPCC customer satisfaction (3.93) during 1994.

## 4.3 HPCC Systems

### 4.3.1 Dedicated processing commitments - LITC Denver processors

LADC is charged for resource commitments on the Cray processors located in Denver. Continual effort will be made to reduce the HPCC costs and thus the LADC commitment.

### 4.3.2 Intel Processor(s) - located in Palmdale, California

The following paragraphs specify LITC service level commitments for the Intel processor(s) located in Palmdale, California.

**Hours of Availability**

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance windows specified in Paragraph 2.5.1.3.

**Batch Schedules**

LADC is responsible for batch scheduling requirements.

# GLOSSARY

## C

**Classified Environment -** A term used to define the LADC classified mainframe computer environment.

**CMS** - Conversational Monitor System.

**Conversational Monitor System (CMS)** - A virtual machine operating system providing general interactive time sharing, problem solving, and program development capabilities. Operates under the control of the IBM VM operating system.

**CPU** - Central Processing Unit - That part of a computer comprised of circuits that control the interpretation and execution of instructions.

**Cray** - A supercomputer vendor - CRAY Research.

**CSC** - Customer Service Center - Lockheed acronym for the user help desk.

## D

**DASD** - Direct Access Storage Device - Hardware component that provides storage for and access to mainframe-based data and applications.

**Disaster Recovery** - Execution of the disaster plan in the event of a major disruption to computer center or network operations.

**DISK** - A hardware component that provides storage for and access to mainframe-based data and applications.

**DOU** - Document of understanding.

## E

**E-Mail** - Electronic Mail.

**End User** - The user of information technology hardware, software, networks, or other services.

## H

**Help Desk** - Same as User Help Desk.

**HPCC** - High-Performance and Classified Computing - Specialized computing performed on CONVEX, CRAY, and VAX systems.

## I

**IBM** - International Business Machines Corporation, located in Armonk, New York.

**I/M** - Information Management

**Initial Program Load** - The process by which a configuration image is loaded into storage at the beginning of a workday or after a system failure.

**IPL** - Initial program load

**I/S** - Information Services - Lockheed organizations that provide computer systems, networks, and support services for users.

## L

**LADC** - Lockheed Advanced Development Company located in Palmdale, California.

**LADC CMS** - System 82 - is a multi-service VM processing region designed to support the OfficeVision environment for LADC. This environment is currently shared with CORLAC.

**LITC** - Lockheed Information Technology Company - The Lockheed subsidiary corporation, located in Denver, Colorado, that provides centralized I/S services.

**LPAR** - Logical Partition

## M

**MIPS** - Millions of instructions per second. A unit of measure of processing performance equal to one million instructions per second.

## N

**NETSPY** - A Legent Corporation response time measurement tool for SNA environments.

O

**OV** - OfficeVision

P

**PF** - Programmable Function - Keys on a data entry keyboard that are programmed as macros to perform one or more functions.

**PROFS** - Professional Office System.

S

**Service Request** - Service Request forms are used to initiate, and track actions requested of any LITC group in support of but not limited to; software, hardware or telecommunication installations or upgrades, or I/S acquisitions.

**SLA** - Service Level Agreement

**SMC** - Systems Management Controls

**SNA** - System Network Architecture.

T

**TBD** - To Be Determined

U

**Unclassified Environment**- A term used to define the LADC unclassified mainframe computer environment.

**User Help Desk** - An I/S function which receives trouble and information requests from users and attempts resolution. If unable to resolve during the initial call, the user help desk documents the problem, forwards to the appropriate technical personnel, and tracks and reports status through problem resolution.

**UserID** - User Identification - A computer identification for users, that when entered in conjunction with a password, allows a user to log onto a computer systems.

V

**VM** - Virtual Machine - An IBM-developed and licensed operating system for computers based upon System/370/390 architecture. The role of the VM based systems is to provide a robust environment with tools and services for customers to perform their own production and ad-hoc computing activities.

**VTAM** - Virtual Telecommunications Access Method

Y

**Y-MP** A supercomputer developed by CRAY Research.

# SERVICE LEVEL AGREEMENT
# FOR
# LASC

January 1994
through
December, 1994

Approved by:

| Name | Date Signed |
|---|---|
| G. M. Haase | Feb. 18, 1994 |
| G. Haase - LASC Finance | |

Table of Contents

1. Introduction to Service Level Agreements ........ 1
1.1 Service Level Agreement (SLA) Structure ........ 1
1.2 SLA Content ........ 1
2. Service Level Agreement ........ 2
2.1 Terms of the Agreement ........ 2
2.1.1 Effective date ........ 2
2.1.2 Duration ........ 2
2.1.3 Revisions ........ 2
2.2 Delineation of Responsibilities ........ 2
2.2.1 LITC Responsibilities ........ 2
2.2.2 Customer Responsibilities ........ 2
2.2.3 Shared Responsibilities ........ 3
2.3 LITC Procedures Documents ........ 3
2.4 Documents of Understanding ........ 3
2.5 LITC Service Offerings ........ 4
2.5.1 Standard Service ........ 4
2.5.1.1 Disaster Recovery ........ 4
2.5.1.2 Service Coordination Meetings ........ 4
2.5.1.3 System Maintenance ........ 4
2.5.1.4 LINKS Software ........ 5
2.5.1.5 Auditable Service ........ 5
2.5.1.6 Operational Features ........ 5
2.5.1.6.1 24 x 7 Coverage ........ 5
2.5.1.6.2 UPS / Redundant mechanical systems ........ 5
2.5.1.6.3 Physical Security ........ 5
2.5.2 Additional Services ........ 5
2.5.2.1 Customer Service Center ........ 5
2.5.2.2 Service Request Management ........ 5
2.5.2.3 Problem Management ........ 5
2.5.2.4 Change Management ........ 6
2.5.2.5 Configuration Management ........ 6
2.5.2.6 Network ........ 6
2.5.3 Custom Services ........ 6
2.6 Resource Utilization Forecasts ........ 6
2.6.1 Forecasting Procedures - Denver Based Processing Requirements ........ 6
2.6.2 Forecasting Procedures - LITC Extended Operations Requirements ........ 7
2.7 Service Pricing ........ 8

3.5.1 LG3 (VM/SP HPO) .......... 24
Appendix A .......... 27
GLOSSARY .......... 28

# 1. Introduction to Service Level Agreements

## 1.1 Service Level Agreement (SLA) Structure

The SLA is organized with separate sections for each of the following areas:

- Common elements - information that is pertinent to all computing environments
- IBM Environment - information that is specific to the IBM/Amdahl computing environment
- Appendix A - Documents of Understanding (DOUs)
- Glossary

The following sections will be completed at a later date

- HPCC Environment - information that is specific to the HPCC platforms
- Tandem Environment - information that is specific to the Tandem computing environment
- Digital Equipment Corporation (DEC) Environment - information that is specific to the DEC platform
- Unisys Environment - information that is specific to the Unisys environment

## 1.2 SLA Content

Only SLA sections that are pertinent to the LASC processing environment will be included in the Service Level Agreement for LASC.

As a section is finalized, signatures will be obtained from both LASC and LITC. A section that is incomplete or still in negotiation will not delay signature of sections that have been finalized.

All time references in this document are expressed in Eastern time (standard or daylight savings time, whichever is applicable).

Nothing in this document is intended to supersede existing LITC and/or LASC Management Polices and Procedures.

Information concerning philosophies or procedures for any area covered by a DOU are not addressed in the SLA. Please refer to the appropriate DOU for this information.

Detailed procedures for Change Management, Problem Management, and Service Request Management are located in the latest LITC procedures manuals. Copies are available through the LASC Site Services Manager or procedures established by LASC.

# 2. Service Level Agreement

## 2.1 Terms of the Agreement

### 2.1.1 Effective date

The effective date of this agreement is the period beginning January 1, 1994 through December 31, 1994.

### 2.1.2 Duration

The duration of this agreement is one year. A review of service levels and pricing stated in this agreement will be conducted if:

- Major changes are made to operating systems, environments, or applications
- Either LASC or LITC determines that it is advisable to do so.

### 2.1.3 Revisions

A change to a Service level Agreement (SLA) or Document Of Understanding (DOU) is requested using an LITC Service Request Form. The change will be negotiated among the LITC Service Level Management Coordinator, LASC Site Services Manager or designee, and the appropriate management personnel from both locations. The negotiated change is an addendum to the SLA until such time as the SLA and/or DOU is permanently updated. Both companies agree to negotiate in good faith in an attempt to adjust the agreement to meet current needs.

## 2.2 Delineation of Responsibilities

### 2.2.1 LITC Responsibilities

LITC responsibilities include:

- Ensuring all service level commitments are met or exceeded
- Ensuring LITC resources required to support this agreement are available
- Ensuring all service level measurement tools are functional
- Ensuring all required reports are provided
- Providing meaningful resource utilization reporting
- Developing, in conjunction with LASC, documents of understanding between customer I/S organizations and LITC technical groups
- Notifying LASC of pending changes to the LITC computing environment
- Ensuring that software tools and access are available to LASC personnel to facilitate on-going application monitoring, analysis, and optimization efforts
- Providing adequate disaster recovery capabilities to ensure minimum business interruption exposure
- Keeping appropriate LASC personnel and management apprised of actions that are planned and/or in process to correct deviations from agreed to service level commitments.

### 2.2.2 Customer Responsibilities

LASC responsibilities include:

- Ensuring LASC resources required to support this agreement are available
- Accurately identifying service level requirements
- Providing workload requirements
- Providing key points-of-contact for change or outage notification
- Ensuring compliance with LITC policies and procedures outlined in section 2.3 of the SLA
- Developing, in conjunction with LITC, documents of understanding between customer I/S organizations and LITC technical groups
- Notifying users of LASC systems of changes affecting major subsystems or components
- Ensuring LASC disaster recovery readiness through the creation of a business recovery plan and participation in disaster recovery exercises, as required
- Notifying LITC of system or environmental changes affecting major subsystems or components.

### 2.2.3 Shared Responsibilities

- LITC commits to work with LASC to identify cost reduction opportunities.
- LITC and LASC will jointly pursue opportunities to improve operating procedures and relationships.
- LITC and LASC will work together to improve prime shift system availability.

## 2.3 LITC Procedures Documents

In an effort to prevent disruption of service and to ensure delivery of service levels agreed to in this document, LITC, LASC, and LITC Extended Personnel will utilize the following LITC procedures to manage all components that interface with the LITC environment:

#### Change Management

Implementations of changes to any component of the LASC environment that interfaces with or is managed by LITC are performed in accordance with established LITC change management policies and procedures. Refer to the *Procedure Document for Change Management* for additional information.

Applications modification responsibility rests with LASC, however, any change that may effect the LITC system service, including availability and performance, must be coordinated with the appropriate LITC personnel.

#### Problem Management

Problems affecting components managed by, interfacing with, or located at LITC are resolved in accordance with established recovery time commitments. LITC uses an online problem reporting system to document problems, communicate status, and track problem resolution times. Refer to *Procedure Document for Problem Management* for additional information.

#### Service Request Management

LITC Service Requests are used to initiate and track actions requested of any LITC group in support of but not limited to; software, hardware or telecommunication installations or upgrades, or I/S acquisitions. Customers should submit authorized service requests to LITC through their Site Services Manager. Refer to the *Procedure Document for Service Request Processing* for additional information. During this agreement the cost for work requested of LITC will be based on the following guidelines:

- Charges will be applied to requests for custom efforts requiring ten or more hours of labor.
- Charges will be applied to offset costs associated with significant accelerations of standard efforts.
- Labor costs will be billed at a rate of $53 per hour.

## 2.4 Documents of Understanding

Documents of Understanding (DOUs) are established to clearly define specific responsibilities between the I/S organizations at LITC, and the customer location(s), in support of the service level agreement. DOUs are created to ensure that all parties are in agreement and have a clear understanding of their responsibilities. DOU modifications may be required due to changes in the processing environment or scope of responsibilities. The DOUs will be reviewed on an annual basis.

The following Documents of Understanding exist between LASC and LITC

- LITC Customer Service Center
- Telecommunications and Network Services
- Software Management
- Security Support
- Production Scheduling and Control
- Systems Storage Management
- LITC Configuration Management
- Computer Operations Support
- Database and Transaction Processing Systems

Copies of the DOUs are located in Appendix A.

## 2.5 LITC Service Offerings

### 2.5.1 Standard Service

#### 2.5.1.1 Disaster Recovery

LITC is responsible for the creation, maintenance, and testing of a formal data center Disaster Recovery Plan (DRP). LASC is responsible for providing the necessary business requirements to facilitate this effort. The DRP will include information concerning re-establishment of telecommunications, recovery of data center hardware, operating systems, subsystems, and restoration of customer data, as defined by LASC. LASC retains responsibility to ensure that formal business recovery plans are developed, maintained, and tested. A copy of each business recovery plan must be forwarded to the LITC Disaster Recovery Coordinator for review. The availability of this plan will ensure that LITC has adequate knowledge of customer business requirements that may impact the data center DRP and recovery procedures. The LASC Site Services Manager is responsible to ensure the concerns are properly addressed and resolved to the satisfaction of all parties.

Exercise (testing) requirements should be forwarded to the LITC Disaster Recovery Coordinator for review and approval. LITC will establish an exercise date and time. Prior to the exercise, LASC will develop a test plan to provide adequate testing of LITC's pre-defined criteria. The test plan must be reviewed by LITC prior to the testing date. The LITC Disaster Recovery Coordinator will be present at each exercise to ensure the exercise process is thoroughly documented and all corrective actions are noted and resolved. The LITC Disaster Recovery Coordinator will develop and forward a summary of the exercise to the appropriate LITC and customer management.

#### 2.5.1.2 Service Coordination Meetings

LITC conducts regularly scheduled service coordination meetings with each customer company. The objectives of the meeting are to communicate significant LITC activities and strategies, conduct dialog on customer plans and activities that might relate to or impact LITC, and provide a forum for capture, tracking, and reporting on mutual issues and problems.

#### 2.5.1.3 System Maintenance

LITC intends to schedule maintenance activities during times that are acceptable to LASC. Maintenance actions are required for technical support personnel to perform modifications or upgrades to facility, hardware, software, and network components. Applications may or may not be available for use during scheduled maintenance activities.

LITC will attempt to schedule maintenance activities impacting availability during the following hours:

MVS: Sunday evening between 6:00 P.M. and 12:00 A.M.

VM: Sunday evening between 6:00 P.M. and 12:00 A.M.

HPCC: Sunday between 10:00 A.M. and 6:00 P.M.

Maintenance activities that do not impact availability are scheduled on an event-driven basis. The LASC Site Change Coordinator receives advance notification of any scheduled outages such that activities can be communicated and coordinated with the LASC customer community. LITC and LASC jointly coordinate scheduled maintenance actions to minimize impact to committed workloads.

#### 2.5.1.4 LINKS Software

Library Network System (LINKS) is a corporate wide VM system providing an online technical library. In order to reduce costs and facilitate information sharing, LINKS is located in Denver and access is available to each Lockheed company. Maintenance of the LINKS product is contracted through LMSC with administrative cognizance residing at Corlac.

#### 2.5.1.5 Auditable Service

LITC services are fully auditable in nature. In the event of an I/S cost audit either internally or from an external government agency, any issues or questions arising regarding LITC related costs should be referred to LITC through the appropriate jurisdictional regional agencies. LITC is routinely audited both internally and by government agencies for I/S operations, ADPE, and cost. All audit results will be made available to customer companies, as required.

#### 2.5.1.6 Operational Features

##### 2.5.1.6.1 24 x 7 Coverage

LITC operates 24 hours a day, 7 days a week. Any variance to this schedule will be negotiated with the LITC customer community.

##### 2.5.1.6.2 UPS / Redundant mechanical systems

LITC electrical systems powering computer rooms A, B, and C (non-HPCC computers and peripherals) are supported by battery backup and automatic transfer to diesel generator power, in the event city power is interrupted. Backup diesel generator fuel is maintained in underground storage tanks on the LITC premises. Computer room D (HPCC) provides short-term battery backup, to allow for orderly shutdown of the processors and associated peripherals when a power interruption occurs. There is no backup generator capability for computer room D.

##### 2.5.1.6.3 Physical Security

Physical security provided for LITC includes; a fenced perimeter, security cameras inside and out, and on-site security guards. Access through the two property entrances, is controlled by card keyed gates, and security cameras which are monitored by the main security office, 24 hours a day, 7 days a week.

### 2.5.2 Additional Services

The philosophies and policies relating to the following standard services are available in the document identified in each section.

#### 2.5.2.1 Customer Service Center

Refer to the *Document of Understanding for the LITC Customer Service Center* (Appendix A - D1).

#### 2.5.2.2 Service Request Management

Refer to the *Procedure Document for Service Request Processing.*

#### 2.5.2.3 Problem Management

Refer to the *Procedure Document for Problem Management.*

#### 2.5.2.4 Change Management

Refer to the *Procedure Document for Change Management.*

#### 2.5.2.5 Configuration Management

Refer to the *Document of Understanding for Configuration Management* (Appendix A - D7).

#### 2.5.2.6 Network

Refer to the *Document of Understanding for Telecommunications and Network Services* (Appendix A - D2).

### 2.5.3 Custom Services

At times, customers may require services that are outside the definition of LITC Standard Service Offerings. These services might include items such as; customized billing support, unique service metrics, LITC management of a function that is normally considered the customer's responsibility, or customized service level or performance reporting. LITC has defined these types of requirements as custom services. Custom services are requested through the LITC Service Request Process. Depending on the costs associated with implementation and the scope of the service, custom services may or may not incur additional costs.

## 2.6 Resource Utilization Forecasts

### 2.6.1 Forecasting Procedures - Denver Based Processing Requirements

LITC requests a resource utilization forecast for processing done at LITC Denver on an annual basis from the Lockheed companies it services. The forecast request is sent to the I/S Director of each customer company the first week in July and should be returned to LITC Finance by the first week in August. The purpose of the forecast is to provide the basis for which LITC will budget hardware, software, labor, and related expenses for the following year. The cost base and resource requirements developed from this forecast are used to develop preliminary pricing for the next budget cycle and forward pricing for an additional four years. The following data is required:

**IBM/Amdahl Platforms**

*MIPS*

LASC is required to provide a forecast of MIPS requirements for the five year period. LITC will provide current resource utilization and trend data, at the time of request. LASC is asked to provide MIPS requirements for each quarter of the next year. This will provide LITC with a quarterly projection of resource requirements in order to match more closely any hardware and software changes throughout the year. Annual MIPS requirements for the next four years are also required. This will enable LITC to project costs and provide forward pricing input to the companies.

*DASD*

DASD is charged to LASC based on allocated devices. Resource requirements by quarter for the first year and annually for the following four years are necessary for LITC planning purposes. Data should be submitted in megabyte requirements.

*Tape*

LITC charges LASC for tape hardware and related support on the basis of number of tape mounts. LITC will provide current utilization and trend data, at the time of request. A quarterly forecast for the first year of the projection period and average annual requirements for the following four years are required. The quarterly forecast should be stated as the projected average monthly number of tape mounts for each quarter of the year.

HPCC Platforms

The annual HPCC forecast should include; memory requirements on a per job basis, disk storage, dedicated wall clock hours, and shared CPU processing requirements. LITC HPCC manages its capacity based on the workload commitments from the Lockheed companies requiring HPCC support.

All Platforms

*Service Requests*

LASC is asked to provide an annual projection of service requests requiring ten or more hours of labor, custom efforts or significant acceleration of planned activities. This data will be used to assist in determining staffing levels.

Out of cycle forecast adjustments are requested by completing an LITC Service Request form. Define the new resource requirements, the requested effective date, and the reason for the adjustment. The request should be submitted through the normal LITC Service Request process. Lead time requirements may vary based on the scope of the request.

### 2.6.2 Forecasting Procedures - LITC Extended Operations Requirements

LITC is responsible for all mainframe associated data processing expenses, corporation wide. To assure that these costs can be properly monitored, an expense forecast is requested from each customer company on an annual basis. This forecasting, which includes remote IBM, HPCC, Tandem, DEC, and Unisys processing requirements, will occur during the month of November. The input includes; expenses, head count, and special computing requirements. This information is used by LITC to provide corporate expense forecasts and fixed asset requirements for a five year period.

LITC will supply each company a forecasting template annually. LITC will work closely with each company to develop a technical and financial plan and forecast, designed to meet the operating and financial objectives of the company and LITC. The template will be used for jointly forecasting extended operations expenses and headcount. Additional supporting hardware and software schedules are also required. Forecasts should include a detailed expense projection for the following year, and a summary forecast for the four subsequent years. Sufficient explanation of projections should be included to allow forecasting of capital requirements. A template will also be provided so that each company can forecast remote resource consumption (CPU, DASD, printing, and tape).

During the annual forecasting cycle, LITC will provide an expense forecast for direct charge items that are to be passed through to the customer company. This forecast will include hardware depreciation, hardware maintenance, software amortization, lease, and maintenance expenses that are incurred on LITC's books, but are unique to the customer company.

## 2.7 Service Pricing

### 2.7.1 Standard Services

#### 2.7.1.1 Philosophy

Overview

Standard rates are calculated annually, and reviewed throughout the year. Expenses are budgeted and tracked at a cost pool level. Rates are developed based on forecast usage and budgeted expenses. At year end, any over or under recovery that exceeds 10% of LITC expenses is proportionately allocated to the using companies. Over/under recovery of cost pools within 10% are rolled over into the following year's cost pools.

IBM/Amdahl Platform

IBM/Amdahl processing at LITC Denver is charged to users in three main categories; CPU, DASD, and Tape.

CPU - Processor usage is charged at a *standard rate per MIPS allocated.* MIPS (millions of instructions per second) are an industry standard for processor capacity rating. Each customer is required to forecast and commit to a certain level of MIPS for their MVS and/or VM systems. The committed-to MIPS level is the basis for determining LPAR (logical partition) or Domain size. This is the MIPS level for which the company is billed, and represents peak processing requirements. Additional MIPS, if available, can be utilized at no additional cost.

DASD - Storage charges are based on a *standard rate per megabyte of DASD allocated* to each company.

Tape - Charges are based on a *standard rate per tape mount.* There is no differentiation between silo and manual mounts, since LITC will make the determination as to where tape data sets reside.

HPCC Platform

Cray and Convex cost pools consist of LITC hardware, software, and HPCC labor support. Allocated costs include; facility, administrative, customer service, and telecommunication costs. The Cray and Convex computing cost pools are charged out to customers based on commitments for wall clock hours of utilization for dedicated and classified processing. Shared resource utilization is charged out based on commitments for shared CPU hours. Both the wall clock hours and CPU hour rates include front end and peripheral costs. The companies are guaranteed committed levels of workload processing capacity and may avail themselves of uncommitted, available capacity at no cost.

Chargeback System Responsibilities

LITC will not utilize a formal resource chargeback system for purposes of billing computing resources on a detailed job or ID usage basis. However, certain software tools are utilized by LITC for determining DASD allocation and tape mounts. MIPS are charged out based on the forecast/committed level.

LITC will bill the company who is the "owner" of the LPAR, Domain, or Guest for the assigned MIPS, the allocated DASD, and the tape mounts. Each company is responsible for providing support (programming, administrative, etc.) to further define and report resource utilization that occurs within their LPAR(s), Domain(s), or Guest(s). LITC will provide the source data (SMF or VM Account records) for processing that occurs within the assigned LPARs. It is the individual company's responsibility to develop and/or maintain a chargeback system that further distributes costs, including rate development, chargeback methodologies, etc., as needed at the individual companies.

LITC will issue a monthly invoice that summarizes resources being billed for -- MIPS, allocated DASD, tape mounts, and direct charges. A separate invoice containing HPCC charges is provided.

### Exception Billing

Upon evaluation of specific criteria, and with the agreement of all affected companies, LITC may agree to extract resource usage from one company's assigned resources for purposes of billing the end using company. Criteria for such billing includes, but is not limited to, the following:

- Identifiability of the resources to be billed.
- Practicality and obvious benefits for this exception billing.
- Agreement of all affected parties as to resource identification and billing method.

The method employed for exception billing will be the following:

- Determination of resources consumed (historical, over a reasonable time period)
- Translation of the average/trended resources to LITC standard billing units
- Charging of resources to the using company, and crediting of the costs to the company to whom the resources are originally committed will occur at either a fixed amount or based on actual utilization on a monthly basis, depending on the circumstances. If actual resources are used, MIs (millions of instructions) will be the only unit of measure. A standard rate per MI will be calculated annually.

### Alternative Pricing

As an incentive to reduce overall Lockheed Corporation costs, LITC may price certain processes on a policy priced basis. To qualify for this alternative pricing, which in effect prices the services based on incremental costs incurred by LITC to provide the services, and allows for some absorption of LITC fixed costs over a wider customer base, there must be obvious savings to the corporation. An example would be CAD/CAM processing. The pricing for such processes would be structured such that the cost to provide services from LITC is less than the cost of continued extended LITC processing. This approach incentivizes the customers to eliminate resources at their sites and improves utilization of resources at LITC, Denver.

### Billing Schedule

*Denver Central Services*

Since MIPS are allocated based on annual forecasts, no monthly determination of utilized MIPS is required for billing purposes. However, the cut-off for determination of allocated DASD and actual tape mounts is midnight on the next-to-last Friday of the fiscal month. This is the 4th Friday of a five week month and the 3rd Friday of a four week month. The cut-off date for direct or pass-through charges is the end of the fiscal month. These are items expensed on LITC's books, but the expense is billed the following month, to the customer company for whom the items were acquired. In the case of capitalized hardware or software, the assets reside on LITC's books, with the depreciation or amortization passed through to the customer company on a monthly basis. Annual prepaid items are passed through to the company, where they handle the expensing of the prepaid amount in a manner consistent with their policies and procedures. Pass-through charges are accumulated on LITC's books in the customer-specific cost centers (8XX).

Resource billing amounts are communicated to each company on the first Tuesday following month-end. LITC accrues processing revenues and Accounts Receivable. The customer company accrues processing expense and related Accounts Payable.

Actual invoices are generated and faxed/mailed to the customer company by the second Friday of the month for resources used during the prior month. A check is issued to LITC by the customer company during the third week of the month.

*Extended Operations*

Each month the customer invoices LITC for extended operations at the site. This invoice will be for the incurred costs for extended operations (IBM, HPCC, DEC, Tandem and/or Unisys) at the site. Typical extended operations billings include hardware, software, floor space, labor support and other operating costs. Due to timing considerations, the current month billing is based on actuals for the prior month.

LITC processes the invoice for payment. LITC also issues an invoice back to the company for the extended operations, less any amounts more appropriately charged to other Lockheed operating companies. No additional overhead burden from LITC is applied. Additional costs may be added to the invoice for items paid for by LITC on behalf of the company (pass-through charges).

Actual invoices are generated and faxed/mailed to the customer company. Checks are issued to the customer company during the third week of the month.

*Dedicated Services & Support*

LITC will invoice the company each month, as costs are incurred by LITC, for services and/or support that is dedicated to the specific operating company. An example would be equipment purchased by LITC and placed at the company site. Depreciation will be billed to the company on a monthly basis. Other types of costs include, but are not limited to, hardware and software maintenance and monthly lease expenses. No LITC overhead burden is applied to these costs. Due to general ledger timing constraints, there may be up to a one-month lag in the billing of these expenses. Supporting documentation, such as a copy of the paid invoice, will be provided.

The LITC Service Request process must be followed for system changes requested by the customer company, and performed by LITC personnel. Companies will be billed for labor associated with company specific changes, under established guidelines. A fixed bid estimate of this cost will be provided, and must be approved by both LITC and the requesting company's management, prior to the commencement of such work. Service requests will be billed on an as-completed basis. Copies of the approved service request forms will be attached for invoicing purposes.

Participating companies are billed, by LITC, for use of the Library Network System (LINKS) on a quarterly basis. The invoiced amount is a fixed dollar allocation, based on the company's IR&D/B&P percentage.

*LITC Denver Personnel Support of Site Processing*

Certain LITC personnel are assigned to support remote operations at the various operating companies. This support could include IBM, DEC, Tandem and/or Unisys processing. This staff is proportionately allocated to the remote operations cost pools based on the level of support that is forecast. Costs in these pools include labor (salaries and fringe), prorated department operating expenses and LITC Administrative and Customer Service costs. Full-time-equivalent (FTE) rates are calculated for each of these pools and allocated back to supporting companies based on the level of support budgeted.

*Unallowable Costs*

Unallowable costs include items such as; hotel expense that is greater than the GSA maximum. LITC will make every effort to hold unallowable costs to a minimum. Unallowable costs are tracked in separate general ledger accounts at LITC. These expenses are billed to the operating companies proportionate to their Denver central services billings. The separate billing of unallowables, along with any required adjustments to central services billings, occur at year end.

### 2.7.1.2 1994 Billing Rates and MIPS Forecast

MIPS Forecast - MVS - 92.7
VM - 54.0

CPU - $69,154 per MIPS, per year

DASD - $2.40 per megabyte, per year

TAPE - $1.12 per tape mount

Billable MIs - $0.012 (Exception billing/actual resources)

**HPCC**

Y-MP4E (4 proc.) - $464.00 per wall clock hour

Y-MP4E (3 proc.) - $370.00 per wall clock hour

Y-MP4E (2 proc.) - $232.00 per wall clock hour

Y-MP8I - $270.00 per CPU hour

### 2.7.1.3 Billing Reports

- LITC issues monthly invoices summarizing resources billed -- MIPS, allocated DASD, tape mounts, and direct charges. A separate invoice is provided for HPCC resources.
- LITC provides a monthly data file containing the source data (SMF or VM Account records) for processing that occurs within the assigned LPARs, domains, or guests.
- Monthly invoices are provided to the customer Finance organization. Copies of the summarized invoice are also provided to the Site Services Manager.

# 3. International Business Machines (IBM) Environment

## 3.1 Scope of Agreement

Service level commitments are specified in this SLA for the following LITC-supported operating systems and associated subsystems:

- LG1 (MVS/ESA)
  Subsystems are LG1DB2, LG1CADAM, LG1CATIA, and LG1TSO
- LG2 (MVS/ESA)
  Subsystems are LG2IMS, LG2DB2, LG2CICS, and LG2TSO
- LG3 (VM/SP HPO)
- LG4 (MVS/ESA)
- LG7 (MVS/XA)
  Subsystems are LG7TSO, LG7CADAM, and LG7CATIA
- LG6 (MVS/ESA)
  Subsystems are LG6TSO, LG6DB2, LG6IMS, LG6CICS, and LG6CATIA

Prime time hours for the MVS and VM operating systems for LASC are Monday thru Friday from 7:00 A.M. to 5:00 P.M.

Processing requirements during holidays are negotiated in accordance with LASC approved holiday schedules. All processing during holidays is coordinated by LITC PS&C personnel and reflects negotiated requirements of LASC customers.

## 3.2 Resource Consumption Metrics

The following reports will be provided to the site services manager on a monthly basis:

### 3.2.1 CPU Usage

CPU reports will include a table and graphs. The table will contain weekly data points, reported monthly, representing "peak" MIPS utilization for major subsystems. Weekly "peak" hour utilization will be graphed against forecasted MIPS, at the operating system level. A bar/whisker 24 hour utilization plot, for Monday through Friday hourly average utilization, at the operating system level, will also be provided.

### 3.2.2 DASD Usage

A graphical representation of actual DASD used will be plotted against DASD forecasted, and DASD allocated. The graph will be produced at the operating system level. Data points are based on a billing month-end snapshot.

### 3.2.3 Tape Mounts

A table representing actual monthly tape mounts versus forecasted tape mounts will be prepared and will include the percentage of actual tape mounts to forecasted mounts. A report of the top 10 heavy tape mount jobs, by job name, will also be provided.

## 3.3 Service Metrics

### 3.3.1 Measurement Methods and Tools

- LITC utilizes specific methods and tools to measure:
  - Availability
  - Response Time
  - Batch Management
  - Problem Management and Call Metrics
  - Service Requests.
- Availability and response time measurements are subsystem dependent and may not be applicable to all subsystems in your environment.
- A report card is created each month to measure LITC service level performance against service level targets established in this agreement. The report card shall indicate a pass or fail status for each category.
- Monthly service level reports are generated and forwarded to the LASC Site Manager for distribution.

#### 3.3.1.1 Availability

Percent availability is defined as the percentage of time that an environment is available for customer use within the total possible hours of availability. LITC tracks percent availability as a measurement to continuously improve customer service. Percent availability components are measured and reported at the logical partition (LPAR), domain, guest, subsystem, and network levels. Weekly data are compiled and monthly charts produced showing percent availability for environments addressed in this agreement. The charts plot the service level commitments, availability during prime time hours, and availability during scheduled hours.

**LPAR, Domain, Guest, or Subsystem Availability**

Availability for prime time is calculated as follows:

$$\text{Percent availability} = \frac{\text{Prime time (PT) hours - (PT planned outages + PT unplanned outages)}}{\text{Prime time hours}}$$

Availability for scheduled hours is calculated as follows:

$$\text{Percent availability} = \frac{\text{Scheduled Hours (SH) - (SH planned outages + SH unplannned outages)}}{\text{Scheduled hours}}$$

LPAR, domain, guest, or subsystem outages are defined as:

- any action requiring an IPL or subsystem restart
- key hardware component failures
- stand-alone system time required to perform testing or maintenance.

Planned outages are events coordinated and scheduled in advance. Unplanned outages are unscheduled and unpredictable.

The prime time availability commitment for LPAR, guest, and subsystem availability is 99.5%.

The scheduled hours availability commitment for LPAR, guest, and subsystem availability is 97%.

Network Availability

Network availability is reported in both graphical and table formats that reflect the number of outages and cumulative duration of the outages by category. For purposes of this report, an outage is considered a loss of connectivity in a component that is defined as part of the Wide Area Network (WAN). Failure of a local networking component such as a terminal, terminal controller, PC gateway, or local area network would not be recorded in the availability statistics, but would be reported and monitored through the problem management system.

Outage categories are:

Category 1 - One or more users were logged off (lost connectivity) and no alternate path was established for a period of time greater than 15 minutes.

Category 2 - One or more users were logged off, but were able to reconnect within 15 minutes.

Network availability reports are generated at the company level. Outage statistics will be reported for prime time hours and non-prime time hours.

Due to methodology changes in monitoring and reporting network availability, there are no network availability commitments during the first quarter of 1994. Data will be monitored and reported monthly and the establishment of commitments will be reviewed prior to second quarter 1994.

### 3.3.1.2 Response Time

In the event that LASC I/S or customer's perception of response time is unsatisfactory, LITC will aggressively pursue and resolve problems by committing to monitoring and tracking performance until satisfactory service levels are restored.

System Response Time

Standard response time monitoring of LASC MVS and VM mainframe system and subsystem response time is performed with a tool called NETSPY. TSO response time is measured with the Resource Management Facility (RMF) Monitor I facility and reported as percentage of transactions that are 1st period, 1st period response time, and all period response time. Environments that are not monitored are identified in the detail sections for that system or subsystem. Data are collected on a daily basis, plotted weekly and reported monthly for environments addressed in this agreement. The charts include 90th and 50th percentile data.

Due to customer requested resource capping and methodology changes in monitoring and reporting response times, there are no response time commitments during the first quarter of 1994. Data will be monitored and reported monthly and the establishment of commitments will be reviewed prior to second quarter 1994.

Network Response Time

Network NETSPY 90th and 50th percentiles response times are used to calculate performance indices representing the overall responsiveness of each specific network. On a daily basis, the 90th and 50th percentile network response times are measured for each subsystem or guest. The 90th and 50th percentile figures are multiplied by the corresponding number of transactions, the results are added together and then divided by the total number of transactions. This number is collected on a daily basis, plotted weekly and reported monthly providing network response time indicators for environments addressed in this agreement.

Due to customer requested resource capping and methodology changes in monitoring and reporting response times, there are no response time commitments during the first quarter of 1994. Data will be monitored and reported monthly and the establishment of commitments will be reviewed prior to second quarter 1994.

**3.3.1.3 Batch Management**

LASC batch metrics are created on a monthly basis. These metrics include the percentage of jobs completed without incident, the number of jobs submitted, number of abends, number of reruns, and number of change notices processed for the current month, rolling twelve months, and year-to-date.

Percentage of jobs completed without incident is calculated as follows:

$$\frac{\text{Number of jobs submitted - number of abends}}{\text{Number of jobs submitted}}$$

Due to methodology changes in monitoring and reporting batch metrics there are no batch service level commitments during the first quarter of 1994. Data will be monitored and reported monthly and the establishment of commitments will be reviewed prior to second quarter 1994.

#### 3.3.1.4 Problem Management and Call Metrics

Problems are classified and prioritized according to severity (1 through 4), assigned to technical support personnel for resolution, and entered in the Information Management (I/M) database. I/M reports indicate and track resolution status for all problems. The reports are used to compare actual problem recovery times to service level commitments.

Metrics include:
The number of problems opened this month, the number of problems resolved this month, the number of problems resolved within the committed recovery time and the 90th percentile recovery time, for each problem severity.

Additional metrics for call management and problem reporting include:
The total problem records opened this month, total problem records closed this month, number of carryover problems from the previous month, current backlog of problems, number of calls received by the Customer Service Center, and number of calls resolved while the customer is on the telephone.

Reports contain data for the current month, rolling twelve months, and a year-to-date total.

**Note:** MVS batch processing problems are reflected in the Batch Management reports and are not included in the Problem Management metrics.

Target service levels for problem recovery by severity are:

Severity 1 - within 2 hours
Severity 2 - within 4 hours
Severity 3 - within 7 days
Severity 4 - within 14 days

Problem recovery commitments will be revisited prior to second quarter.

#### 3.3.1.5 Customer Satisfaction

LITC with support of the customer I/S management will survey and assess customer satisfaction using an automated online survey relating service levels provided to service level commitments established in this agreement.

Long-term customer satisfaction is measured by comparing current and past survey results. The I/S commitment is to:

Maintain or improve the overall score for LASC customer satisfaction (3.125) during 1994.

## 3.4 MVS Systems and Subsystems

### 3.4.1 LG1 (MVS/ESA)

The following paragraphs specify LITC service level commitments for the LG1 (MVS/ESA) operating system and associated applications.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

Host response time is not measured at the operating system level. Refer to individual subsystems for response time monitoring tools and techniques.

#### Batch Schedules

Batch processing requirements for LG1 customers are supported by negotiated schedules. Batch processing is managed by LITC-extended personnel and initiated and tracked by an automated tracking system. If special, user-requested batch processing is required, the activity is negotiated with authorized LASC I/S representatives and scheduled with LITC-extended personnel.

### 3.4.2 LG1TSO Subsystem

The following paragraphs specify LITC service level commitments for the LG1TSO subsystem running under LG1.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

Standard response time monitoring is performed. See section 3.3.1.2 for details.

### 3.4.3 LG1DB2 Subsystem

The following paragraphs specify LITC service level commitments for the LG1DB2 subsystem running under LG1.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

No response time monitoring for LG1DB2 is performed.

### 3.4.4 LG1CADAM Interactive System

The following paragraphs specify LITC service level commitments for the LG1CADAM subsystem running under LG1.

**Hours of Availability**

Scheduled hours of availability are:

| | |
|---|---|
| Monday through Friday | 5:00 A.M. to Midnight |
| Saturday | 5:00 A.M. to 4:00 P.M. |
| Sunday | On an as-requested basis |

**Response Time**

The response time objective is an average of 0.25 seconds per attention. Response time is measured with the CADSTATS facility.

**Batch Schedules**

There are no batch processing requirements for the LG1CADAM environment.

### 3.4.5 LG1CATIA Interactive System

The following paragraphs specify LITC service level commitments for the LG1CATIA subsystem running under LG1.

**Hours of Availability**

Scheduled hours of availability are:

| | |
|---|---|
| Monday through Friday | 5:00 A.M. to Midnight |
| Saturday | 5:00 A.M. to 4:00 P.M. |
| Sunday | On an as-requested basis |

**Response Time**

No response time monitoring is performed.

**Batch Schedules**

There are no batch processing requirements for the LG1CATIA environment.

### 3.4.6 LG2 (MVS/ESA)

The following paragraphs specify LITC service level commitments for the LG2 (MVS/ESA) operating system and associated applications.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance schedules as specified in Section 2.5.1.3.

#### Batch Schedules

Batch processing requirements for LG2 customers are supported by negotiated schedules. Batch processing is managed by LITC PS&C personnel and initiated and tracked by an automated scheduling system. If special, user-requested batch processing is required, the activity is negotiated with authorized LASC I/S representatives and scheduled with LITC PS&C personnel (see Appendix A - D5 *PS&C Document of Understanding*).

### 3.4.7 LG2CICS Subsystem

The following paragraphs specify LITC service level commitments for the LG2CICS subsystem running under LG2.

#### Hours of Availability

Scheduled hours of availability are:

| | |
|---|---|
| Monday through Friday | 6:00 A.M. to Midnight |
| Saturday | 6:00 A.M. to 5:00 P.M. |
| Sunday | On an as requested basis |

#### Response Time

Standard response time monitoring is performed. See section 3.3.1.2 for details.

### 3.4.8 LG2TSO Subsystem

The following paragraphs specify LITC service level commitments for the LG2TSO subsystem running under LG2.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

Standard response time monitoring is performed. See section 3.3.1.2 for details.

### 3.4.9 LG2IMS Subsystem

The following paragraphs specify LITC service level commitments for the LG2IMS subsystem running under LG2.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

Standard response time monitoring is performed. See section 3.3.1.2 for details.

### 3.4.10 LG2DB2 Subsystem

The following paragraphs specify LITC service level commitments for the LG2DB2 subsystem running under LG2.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

No response time monitoring is performed.

#### Batch Schedules

Batch processing requirements for LG2DB2 customers are initiated, tracked, and managed by LASC applications personnel.

### 3.4.11 LG4 (MVS/ESA)

The following paragraphs specify LITC service level commitments for the LG4 (MVS/ESA) operating system and associated applications. The LG4 LPAR is defined as a communications LPAR only. The network is owned by, all peripherals are attached to, and all LITC print to LASC is generated via LG4.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance schedules as specified in Section 2.5.1.3.

#### Batch Schedules

There are no batch processing requirements for LPAR LG4.

### 3.4.12 LG7 (MVS/XA)

The following paragraphs specify LITC service level commitments for the LG7 (MVS/XA) operating system and associated applications.

Note: In the first quarter 1994, the classified portion of the F-22 program will be separated and moved from the IBM 3090-600 platform to the IBM 3090-200 platform. What remains will be declassified and will become known as LG6 (MVS/ESA).

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance schedules as specified in Section 2.5.1.3.

#### Response Time

Host response time is not measured at the operating system level. Refer to individual subsystems for response time monitoring tools and techniques.

#### Batch Schedules

There are no batch processing requirements for LG7.

### 3.4.13 LG7TSO Subsystem

The following paragraphs specify LITC service level commitments for the LG7TSO subsystem running under LG7.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

Standard response time monitoring is performed. See section 3.3.1.2 for details.

#### Batch Schedules

Batch processing requirements for LG7TSO customers are initiated, tracked, and managed by LASC applications personnel.

### 3.4.14 LG7CADAM Subsystem

The following paragraphs specify LITC service level commitments for the LG7CADAM subsystem running under LG7.

#### Hours of Availability

Scheduled hours of availability are:

| | |
|---|---|
| Monday through Saturday | 6:00 A.M. to 6:00 P.M. |
| Sunday | On an as-requested basis |

#### Response Time

The response time objective is an average of 0.25 seconds per attention. Response time is measured with the CADSTATS facility.

#### Batch Schedules

There are no batch processing requirements for LG7CADAM.

### 3.4.15 LG7CATIA Interactive System

The following paragraphs specify LITC service level commitments for the LG7CATIA subsystem running under LG7.

#### Hours of Availability

Scheduled hours of availability are:

| | |
|---|---|
| Monday through Saturday | 6:00 A.M. to 6:00 P.M. |
| Sunday | On an as-requested basis |

#### Response Time

No response time monitoring is performed.

#### Batch Schedules

There are no batch processing requirements for LG7CATIA

### 3.4.16 LG6 (MVS/ESA)

The following paragraphs specify LITC service level commitments for the LG6 (MVS/ESA) operating system and associated applications.

Note: In the first quarter 1994, the classified portion of the F-22 program will be separated and moved from the IBM 3090-600 platform to the IBM 3090-200 platform. What remains will be declassified and will become known as LG6 (MVS/ESA).

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

Host response time is not measured at the operating system level. Refer to individual subsystems for response time monitoring tools and techniques.

#### Batch Schedules

Batch processing requirements for LG6 customers are supported by negotiated schedules. Batch processing is managed by LITC-extended personnel. If special, user-requested batch processing is required, the activity is negotiated with authorized LASC I/S representatives and scheduled with LITC-extended personnel (see Appendix A - D5 *PS&C Document of Understanding* ).

### 3.4.17 LG6TSO Subsystem

The following paragraphs specify LITC service level commitments for the LG6TSO subsystem running under LG6.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

Standard response time monitoring is performed. See section 3.3.1.2 for details.

### 3.4.18 LG6DB2 Subsystem

The following paragraphs specify LITC service level commitments for the LG6DB2 subsystem running under LG6.

#### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

#### Response Time

No response time monitoring is performed.

### 3.4.19 LG6IMS Subsystem

The following paragraphs specify LITC service level commitments for the LG6IMS subsystem running under LG6.

**Hours of Availability**

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as specified in Section 2.5.1.3.

**Response Time**

Standard response time monitoring is performed. See section 3.3.1.2 for details.

### 3.4.20 LG6CATIA Interactive System

The following paragraphs specify LITC service level commitments for the LG6CATIA subsystem running under LG6.

**Hours of Availability**

Scheduled hours of availability are:

| | |
|---|---|
| Monday through Saturday | 6:00 A.M. to 6:00 P.M. |
| Sunday | On an as-requested basis |

**Response Time**

No response time objective is performed.

**Batch Schedules**

There are no batch processing requirements for LG6CATIA.

## 3.5 VM Systems

### 3.5.1 LG3 (VM/SP HPO)

The following paragraphs specify LITC service level commitments for LG3VM and associated categories for products and utilities:

- Operating System & Support Subsystems
- Network Access and Print Services
- Office Automation
- DBMSs and 4GLs
- Text Processing
- Program Development Services
- Decision Support Services and Graphics
- F22 E-Mail

### Hours of Availability

Scheduled hours of availability are 24 hours per day, 7 days per week, with the exception of the scheduled maintenance activities as described in Section 2.5.1.3.

### Response Time

Standard response time monitoring is performed. See section 3.3.1.2 for details.

### Batch Schedules

Batch processing for Systems Software requirements are supported by VMSCHEDULE which does not require intervention by LITC PS&C personnel. Scheduling of user applications is not supported on LG3VM.

### Critical LG3VM Components

LITC plans to monitor and report on the service level commitments established for LG3VM as defined in this document. Currently, LG3VM associated categories for products and utilities have critical services components that do not have service level measurement and reporting mechanisms in place.

LITC understands in order to maintain satisfactory service levels for the LASC customer community, at times will require service commitments beyond the level of LG3VM. In the event that LASC I/S or customer's perception of system performance is unsatisfactory, LITC plans to aggressively pursue and resolve problems associated with the lower level critical services and components by committing to monitoring and tracking the reliability of the affected components until satisfactory service levels are restored. The following are examples of LG3VM critical services and components:

LG3VM (Operating System & Support Subsystems):

- VM/SP HPO, VSAM, VMBACKUP, VMTAPE, VMSECURE, VMSCHEDULE, VMOPERATOR, Charge back Utilities, Performance Monitoring Utilities, Tape Management Utilities, VMBG, Engineering/Scientific Environment Utilities and local modifications to CMS, VMTAPE, VMSECURE and VMBACKUP.

LG3VM (Network Access and Print Services):

- Access Methods (e.g. VTAM, TPX, TCP/IP, etc.), Intersystem Interfaces (e.g. SNA-FTP, DTF, Shared SNA Network, etc.), Printing (e.g. ROUTEPRT, PRT3812 etc.).

LG3VM (Office Automation):

- Profs (e.g. Document Processing, Note Processing, Calendar processing, FIND etc.).

LG3VM (DBMSs and 4GLs):

- Database Storage Structures and Access Languages (e.g. NOMAD, RIM, ARTEMIS, etc.).

LG3VM (Text Processing):

- Text Processing (e.g. DCF Script, BOOKMASTER, BOOKMANAGER, GML, etc.).

LG3VM (Program Development Services):

- Panel Management (e.g. DMS/CMS, ISPF, etc.), ISPF/PDF, PASF, Compilers (e.g. APL, FORTRAN, OS PL/I, COBOL, REXX, etc.), Nastran.

LG3VM (Decision Support Services and Graphics):

- Graphics Software (e.g. DISSPLA, Plot10, GDDM, etc.), Calcomp, Versatec, Tel-a-Graf, Supercalc, CUECHART, Comshare System W (MIDS II), etc.

LG3VM (F-22 E-Mail):

- Softswitch Central.

## Appendix A

The following Documents of Understanding exist between LASC and LITC

- LITC Customer Service Center (D1)
- Telecommunications and Network Services (D2)
- Software Management (D3)
- Security Support (D4)
- Production Scheduling and Control (D5)
- Systems Storage Management (D6)
- LITC Configuration Management (D7)
- Computer Operations Support (D8)
- Database and Transaction Processing Systems (D9)

# GLOSSARY

## C

**CADAM** - Computer-Aided Design and Manufacturing - Software tools that assist in the design and manufacture of products.

**CAD/CAM** - Computer-Aided Design and Computer-Aided Manufacturing - Software tools that assist in the design and manufacture of products.

**CAEDS** - Computer-Aided Engineering Design System - Software tools that assist in the design and manufacture of products.

**CATIA** - Computer-Aided Three-Dimensional Interactive Application - Software tools that assist in the design and manufacture of products.

**CICS** - Customer Information Control System - A general purpose licensed program that controls online communication between terminal users and a database.

**CPU** - Central Processing Unit - That part of a computer comprised of circuits that control the interpretation and execution of instructions.

**CSC** - Customer Service Center - Lockheed acronym for the user help desk.

## D

**DASD** - Direct Access Storage Device - Hardware component that provides storage for and access to mainframe-based data and applications.

**DB2** - Database 2 - An IBM database application used by LASC.

**Disaster Recovery** - Execution of the disaster plan in the event of a major disruption to computer center or network operations.

**DOU** - Document of Understanding.

## E

**E-Mail** - Electronic Mail.

**End User** - The user of information technology hardware, software, networks, or other services.

**ESA** - Enterprise System Architecture

**Extended Architecture (XA)** - An extension to the IBM System/370 architecture that takes advantage of continuing high performance enhancements to computer system hardware.

## H

**Help Desk** - Same as User Help Desk.

## I

**IBM** - International Business Machines Corporation, located in Armonk, New York.

**IMS** - Information Management System - An IBM database application used by LASC.

**IMSTEST** - Information Management System Test - An IBM database application used for test purposes.

**I/M** - Information Management

**Initial Program Load** - The process by which a configuration image is loaded into storage at the beginning of a workday or after a system failure.

**IPL** - Initial program load

**I/S** - Information Services - Lockheed organizations that provide computer systems, networks, and support services for users.

## J

**JES2** - Job Entry Subsystem-2

## L

**LITC** - Lockheed Information Technology Company - The Lockheed subsidiary corporation, located in Denver, Colorado, that provides centralized I/S services.

**LASC** - Lockheed Aeronautical Systems Company - The Lockheed subsidiary

corporation, located in Marietta, Georgia that designs and manufactures airplanes.

LPAR - Logical Partition

M

MIPS - Millions of instructions per second. A unit of measure of processing performance equal to one million instructions per second.

MVS - Multiple Virtual Storage - An IBM-developed and licensed operating system for computers based upon System/370 architecture.

MVS/ESA - Multiple Virtual Storage Enterprise Systems Architecture - An IBM-developed and licensed operating system for computers based upon System/370 architecture.

N

NETSPY -A Legent Corporation statistical response time measurement tool for SNA environments.

O

OV - OfficeVision

P

PF - Programmable Function - Keys on a data entry keyboard that are programmed as macros to perform one or more functions.

PS&C - Production Scheduling and Control

PROFS - Professional Office System.

S

Service Request - Service Request forms are used to initiate, and track actions requested of any LITC group in support of but not limited to; software, hardware or telecommunication installations or upgrades, or I/S acquisitions.

SLA - Service Level Agreement

SLCO - Service Level Change Order

SLO - Service Level Objective

SMC - Systems Management Controls

SNA - System Network Architecture.

SQL - Structured Query Language.

T

TBD - To Be Determined

TCP/IP - Transmission Control Protocol and Internet Protocol

TSO - Time Sharing Option

U

User Help Desk - An I/S function which receives trouble calls from users and attempts resolution. If unable to resolve during initial call, the user help desk documents the problem, forwards to the appropriate technical personnel, and tracks and reports status through problem resolution.

UserID- User Identification - A computer identification for users, that when entered in conjunction with a password, allows a user to log onto a computer systems.

V

VM - Virtual Machine - An IBM-developed and licensed operating system for computers based upon System/370/390 architecture. The role of the VM based systems is to provide a robust environment with tools and services for customers to perform their own production and ad-hoc computing activities.

VPS - VTAM Printer Support

VTAM - Virtual Telecommunications Access Method

JUN.-16'98(TUE) 06:40 LOCKHEED DATA CENTER TEL:303 430 2002 P.001

LOCKHEED MARTIN

Lockheed Martin Data Center Services
1401 Del Norte Street
Denver, CO 80221

## Facsimile Cover Sheet

**To:** Carolyn McGrath
**Company:**
**Voice:**
**Fax:** 301-897-6492

**From:** Ron Kercher
**Voice** 303-430-2151
**Fax:** 303-430-2225 or 303-430-2002
**e-mail:**

**Date:** 6/16/98
**Pages:** 12
(Including this cover page)

**Comments:**

T 001910

**Lockheed**
*Information Technology Company*

## INTERDEPARTMENTAL COMMUNICATION

**TO:** Distribution

**FROM:** W. Bernstein

**DATE:** September 24, 1993

**SUBJECT:** LITC HPCC Costs for 1993 and 1994

Total high performance computing-related costs for 1993 are now estimated to total $18,727,195, of which $14,145,894 is for costs incurred by, and paid by LITC.

HPCC cost distribution to the companies for 1993 is proposed as follows:

| | PAYABLE TO LITC | TO BE PAID BY LOB | TOTAL |
|---|---|---|---|
| LMSC | $ 5,600,000 | $ 4,581,301 | $10,181,301 |
| LASC | $ 4,300,000 | $ 0 | $ 4,300,000 |
| LADC | $ 4,245,894 | $ 0 | $ 4,245,894 |
| TOTAL | $14,145,894 | $ 4,581,301 | $18,727,195 |

These figures represent total costs for both Denver and LOB-based HPCC resources for the entire year, and will guarantee enough LITC HPCC capacity to satisfy the 1993 forecasts provided by each company. Capacity which may become available due to temporary reductions in various companies' workload or due to delays in transitions will be made available to the LOBs at no additional cost. Priorities for use of the any available capacity will be based on relative magnitude of the 1993 LITC costs shown above.

1994 HPCC resources have been sized to meet our understanding of your 1994 capacity and and service level requirements provided by each company as summarized below:

| | | |
|---|---|---|
| LMSC | Cray Shared | 20,600 CPU Hours |
| | Cray Dedicated | 2,200 Wall Clock Hours |
| | Convex Shared | 5,003 CPU Hours |
| | Convex Dedicated | 3,000 Wall Clock Hours |

T 001911

| | | |
|---|---|---|
| **LASC** | Cray Shared | 3,380 CPU Hours |
| | Cray Dedicated | 2,600 Wall Clock Hours |
| | Convex Dedicated | 7,280 Wall Clock Hours |
| | MPP Dedicated* | 910 Wall Clock Hours |
| **LADC** | Cray Shared | 0 CPU Hours |
| | Cray Dedicated | 1,213 Wall Clock Hours |
| | MPP Dedicated* | 6,370 Wall Clock Hours |

* Note: Cray Y-MP4E wall clock hours have been converted to effective MPP wall clock hours as appropriate

The following platforms will be provided to meet these needs.

a) Cray Y-MP8I as a "shared" or "dedicated" resource, with 4 or 5 processors as workload requires, to be used primarily for unclassified work.

b) Cray Y-MP4E as a "shared" or "dedicated" resource, with 3 or 4 processors as workload requires, to be used primarily for classified work, special large jobs and other dedicated use requirements.

c) MPP as a "dedicated" resource, sized to provide required performance for large matrix solves, for classified work, special large jobs and other dedicated use requirements.

d) MPP as a "shared" or "dedicated" resource, sized for code development and porting, in the unclassified environment, at zero charge.

e) Convex C220 as an unclassified "shared" resource, and unclassified file server.

f) Convex C210 as a "DoD classified, shared" resource and DoD classified front-end to the Cray platforms.

g) Convex C3860/3880 as an "F-22 dedicated" processor.

HPCC cost distribution to the companies for 1994 is proposed as follows:

| | | |
|---|---|---|
| **LMSC** | $8,600,000 | |
| **LASC** | $5,352,000 | (exclusive of F-22 Convex MSC/NASTRAN-related charges) |
| **LADC** | $2,800,000 | (exclusive of costs associated with the Cray Y-MPEL (if it is retained) and of any costs associated with the Cray Y-MP2E after January 1, 1994) |

It is important to note that LITC costs are essentially "fixed". Modest reductions or increases in forecasts will not result in any decrease or increase in costs.

T 001912

Based on this fixed price proposal, which represents 100% LITC HPCC cost recovery and the current forecasted utilization, the following effective rates would apply.

**1994 "EFFECTIVE" HPCC RATES**

| | MPP | Y-MP8I/4 | Y-MP8I/5 | Y-MP4E/3 | Y-MP4E/4 |
|---|---|---|---|---|---|
| **Shared $/CPU Hr.** | N/A* | 270 | 270 | 200 | 200 |
| **Dedicated $/WCH** | 345 | 626 | 783 | 370 | 464 |

* Note: Costs associated with shared MPP utilization will be determined pending security approvals.

**These rates should be used for comparison only. Moderate changes in utilization, reductions or additions, will not change operational costs.**

LITC has made significant progress in reducing the costs associated with high performance computing. Cost reductions are dramatic, as shown below:

| | 1992 | 1993 | 1994 |
|---|---|---|---|
| **X-MP4 Shared $/CPU Hr. (In Y-MP units)** | 450 | | |
| **Y-MP8I Shared $/CPU Hr.** | | 337 | 270 |
| **Y-MP8I Dedicated $/WCH** | | 781 | 626 |
| **Y-MP4E Shared $/CPU Hr.** | | 250 | 200 |
| **Y-MP4E Dedicated $/WCH** | | 580 | 464 |
| **MPP Dedicated $/WCH** | | | 345 |

These figures reflect more than a 25% reduction in rates for shared resources from 1992 to 1993. Based on current forecasts and projected costs, effective rates from 1993 to 1994 will be reduced by an additional 20%. The MPP platform offers the opportunity for significantly reducing costs. The current platform has been sized to meet required performance levels for specific codes that can take advantage of parallel processing, and for capacity required to replace the Cray Y-MP2E.

We are very pleased to offer the required services at these fixed costs. This will allow the using companies to better manage costs, and allow us to make available any unused capacity at no additional charge.

T 001913

Please confirm your acceptance of this proposal by October 1, 1993.

W. Bernstein
President

Distribution: R. Cobb
J. Phillips
A. Vignoni

cc: G. Connolly
D. Ford
A. Pair
C. Pearson
E. Meehan

T 001914

Distribution: A. Vignoni
W. Bernstein

**LADC 1993/1994 HPCC Costs Detail**

LADC's LITC HPCC costs for 1993 will be $4,245,894. LITC will guarantee availability of 75% of the LITC Y-MP4E or equivalent, provide unlimited use of the Burbank based Y-MP2E until the end of 1993 or until it can be shut down whichever is sooner, and continue to provide the Y-MPEL4 currently based in Palmdale. Any unused Denver Cray capacity will be made available at no additional cost.

LADC will be responsible for any and all costs associated with the Y-MP2E after December 1993.

Customer security requires that a single platform be dedicated to SAP/SAR and unclassified SAP/SAR-related processing at this time. LITC will provide time on the MPP for this purpose, reducing the need for large amounts of Cray capacity, and is working with the vendor to assist porting codes to the MPP for this purpose. Additionally, a small MPP will be provided at no additional charge in the unclassified environment for code conversion and porting.

As codes are optimized for the MPP platform, significant additional workload throughput will be possible within the available wall clock hours available to LADC.

Projected costs for 1994 do not include expenses associated with retention of the Cray Y-MPEL4. LITC is prepared to absorb the Y-MPEL4 workload at no additional cost, which presents an additional opportunity for savings to LADC of approximately $1M in 1994.

**PROJECTED COSTS FOR 1994**

| | |
|---|---|
| Cray/MPP (Shared and Dedicated) | $2,800,000 |
| Cray Y-MP2E | - |
| Cray Y-MPEL | 1,100,000* |
| Total | $3,900,000 |

* Note: **The Cray Y-MPEL workload may be absorbed at LITC at no additional cost, which would yield significant additional savings to LADC and the corporation. LADC will be responsible for all costs associated with the Y-MP2E if retained after January 1, 1994.**

T 001915

cc: G. Connolly
D. Ford
E. Meehan

T 001916

Distribution: R. Cobb
W. Bernstein

**LASC 1993/1994 HPCC COSTS DETAIL (Revised 9-29-93)**

LASC's LITC HPCC costs for 1993 will be $4,300,000. LITC will guarantee availability of Cray platforms as required to meet the LASC 1993 forecast, and absorb all costs associated with the F-22 Convex C3860 and peripherals. Any unused Denver Cray capacity will be made available at no additional cost.

Projected costs for 1994 do not include charges for MSC/NASTRAN currently in use on the Convex C3860 (yet to be determined). LITC is actively working to reach agreement with MSC to provide a reduced cost for MSC/NASTRAN on a corporatewide basis.

1994 costs do include depreciation for all additional upgrades currently planned for the Convex C3860, e.g., two additional processors, additional 2Gb of memory, an EMASS Tower, and 100Gb of additional disk.

Maintenance costs associated with the Convex C3860/3880 and additional equipment are included in these totals.

Customer security requires that any platform used for SAP/SAR processing be dedicated to SAP/SAR and unclassified SAP/SAR-related processing at this time. LITC will provide time on the MPP for this purpose, allowing the Cray platforms to be used for unclassified and DoD processing. LITC is working with the vendor to assist porting of all codes needed for SAP/SAR processing to the MPP for this purpose. Additionally, a small MPP will be provided at no additional charge in the unclassified environment for code conversion and porting.

**PROJECTED COSTS FOR 1994**

| | |
|---|---|
| Cray/MPP (Shared and Dedicated) | $2,189,000 |
| Convex | 3,163,000 |
| Total | $5,352,000 |

cc: D. Ford
E. Meehan
A. Pair

T 001917

Distribution: J. Phillips
W. Bernstein

**LMSC 1993/1994 HPCC COSTS DETAIL**

LMSC's LITC HPCC costs for 1993 will be $5,600,000. This includes all charges associated with Cray processing in Denver and for the Convex C210 and C220 from June through December 1993. LITC will guarantee availability of Cray platforms as required to meet the LMSC1993 forecast (revised upward as of August, 1993), and full use of the Convex platforms within existing capacity limitations. Any unused Denver Cray capacity will be made available at no additional cost.

Projected costs for 1994 include provisions to meet the forecasted unclassified and classified workload, and full use of the Convex C210 and C220 (except that capacity needed for FILESERV). LITC will continue to make the Convex's available to other potential users, and will reduce LMSC charges as appropriate.

cc: D. Ford
E. Meehan
C. Pearson

T 001918

1993 Costs for LITC HPCC resources will be distributed as follows:

| | LITC | LOB | TOTAL |
|---|---|---|---|
| LMSC | $5,600,000 | $4,581,301 | $10,181,301 |
| LASC | $4,300,000 | 0 | $4,300,000 |
| LADC | $4,245,894 | 0 | $4,245,894 |

This will guarantee enough LITC HPCC capacity to satisfy the 1993 forecasts provided by each of the companies. Additional HPCC capacity, if available, will be free of charge.

---

**LADC 1993 Costs**

LADC's LITC HPCC costs for 1993 will be $2,500,000. This includes all LITC Cray usage in 1993 and the costs associated with the capitalization of $1,500,000 of the Y-MP2E for 1993.

| Costs | 1993 | |
|---|---|---|
| LITC HPCC | 2,500,000 | |
| Y-MP2E (est.) | 624,000 | (cost of the 2E - $1,500,000) |
| Y-MPEL4 (est.) | 1,121,894 | |
| | 4,245,894 | |

LITC will capitalize $1,500,000 associated with the Y-MP2E, lease and maintenance, in LITC start up costs.
LADC will be responsible for any and all costs associated with the Y-MP2E after December 1993.

---

**LASC 1993 Costs**

LASC's LITC HPCC costs for 1993 will be $3,400,000. This includes all LITC Cray usage in 1993 and costs associated with the Convex C3860 that is on the LITC books.

| Costs | 1993 |
|---|---|
| LITC HPCC | 3,400,000 |
| LASC C3860 costs (est.) | 900,000 |
| | 4,300,000 |

---

**LMSC 1993 Costs**

LMSC's LITC HPCC costs for 1993 will be $5,600,000. This includes all LITC Cray usage in 1993 and costs associated with the Convex C210 and C220 from June through December.

| Costs | 1993 |
|---|---|
| LITC HPCC | 5,600,000 |
| LMSC costs (est.) | 4,581,301 |
| | 10,181,301 |

T 001919

---

**1994**

LITC intends to meet the 1994 HPCC requirements by providing the following:

a) Y-MP81 as a "shared" resource.
With 4 or 5 processors as workload requires.

b) Y-MP4E as a "dedicated" resource.
For classified work, special large jobs and other dedicated requirements.
With 3 or 4 processors as workload requires.

c) MPP as a "dedicated" resource.
For classified work, special large jobs and other dedicated requirements.

d) MPP in the unclassified environment as a "shared" resource.
For code development, porting and other unclassified requirements.

e) Convex C220 as a "shared" resource.

f) Convex C210 as a "DoD classified shared" resource.
For DoD classified front-end to the Cray and a "shared" classified processor.

g) Convex C3880 as a "F-22 dedicated" processor.

Costs for HPCC resources for 1994 will be distributed as follows:

| | | |
|---|---|---|
| LMSC | $8,600,000 | |
| LASC | $5,100,000 | (not including MSC Nastran charges) |
| LADC | $2,800,000 | (not including EL4 costs, assume 2E gone as of Jan 1) |

These costs are based on the HPCC resources required to satisfy preliminary forecasts provided by each company.

| | | | | |
|---|---|---|---|---|
| LMSC | Cray Shared | 20,600 CPU Hrs | *270 = | $5,562,000 |
| | Cray Dedicated | 2,200 WCH | *370 = | $814,000 4E364 |
| | Convex Shared | 5003 CPU Hrs | est. costs | $2,200,000 |
| | Convex Dedicated | 3000 WCH | | $8,576,000 |
| | MPP | 0 WCH | | |
| LASC | Cray Shared | 3,380 CPU Hrs | *270 = | $912,600 |
| | Cray Dedicated | 2,600 WCH | *370 = | $962,000 4E364 |
| | Convex Dedicated | 7280 WCH | est. cost | $2,900,000 |
| | MPP | 910 WCH | *345 = | $313,950 |
| | | | | $5,088,550 — 77 [illegible] |
| | | | | 250 |
| | | | | 5,338 |
| LADC | Shared | 0 CPU Hrs | | |
| | Dedicated | 1,213 WCH | *464 = | $562,832 4E464 |
| | MPP | 6,370 WCH | *345 = | $2,197,650 |
| | | | | $2,760,482 |

T 001920

Modest reductions or increases in forecasts will not cause an increase or decrease in costs. You are no longer required to stay within the 10%, below or above your forecast and the 10% reserve buffer will be used as additional capacity and will be used for free.

**1994 Rates**

| | MPP | Y-MP8I4 | Y-MP8I5 | Y-MP4E3 | Y-MP4E4 |
|---|---|---|---|---|---|
| Shared | N/A* | $270/cpu | $270/cpu | $200/cpu | $200/cpu |
| Dedicated | $345/wch | $626/wch | $783/wch | $370/wch | $464/wch |

* will be determined pending security approval

The rates for 1994 represent a significant reduction over 1993 rates.

| | 1992 | 1993 | 1994 |
|---|---|---|---|
| X-MP4 | $450/cpu | | |
| Y-MP8I Shared | | $337/cpu | $270/cpu |
| Y-MP8I Dedicated | | $781/wch | $626/wch |
| Y-MP4E Shared | | $250/cpu | $200/cpu |
| Y-MP4E Dedicated | | $580/wch | $464/wch |
| MPP | | | $345/wch |

T 001921

MILLER & CHEVALIER
CHARTERED

655 FIFTEENTH STREET, N.W., SUITE 900
WASHINGTON, D.C 20005-5701
202.626.5800 FAX: 202.628.0858
WWW.MILLERCHEVALIER.COM

March 13, 2003

VIA HAND-DELIVERY

Doris S. Finnerman, Esquire
Commercial Litigation Branch, Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
FAX (202) 307-0972

Re: *Lockheed Martin Corporation v. United States of America*, No. 00-129C

Dear Dorie:

As promised, please find enclosed the following documents:

Attachment A: Letter dated January 10, 2003 from John F. Lehman at the Defense Contract Management Agency to Barry Taylor at EIS (enclosing DCAA Audit Report No. 1461-2003C19100003 dated December 20, 2002).

Attachment B: Plaintiff's Responses to Defendant's Fifth Set of Interrogatories and Second Requests for Admissions.

Also enclosed are the Four (4) Audit Paper Production binders (Bates Range 0001 to 1344) of raw data you requested for the Cray Computer Worksheet provided to you following our November 2002 meeting.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Jeri Kaylene Somers

cc: David M. Christenson, Esquire (with attachments)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00-129C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S OBJECTIONS AND RESPONSES TO
DEFENDANT'S FIFTH SET OF INTERROGATORIES
AND SECOND REQUESTS FOR ADMISSIONS

Plaintiff Lockheed Martin Corporation, Inc. ("Lockheed Martin") hereby submits its Objections and Responses to Defendant's Fifth Set of Interrogatories and Second Requests for Admissions. Lockheed Martin reserves the right to supplement its responses, including any objections that may be applicable, based upon any additional information that may be discovered subsequent to this response.

**GENERAL OBJECTIONS**

1. Lockheed Martin objects to Defendant's Fifth Set of Interrogatories and Second Requests for Admissions to the extent that they seek documents protected by the attorney-client privilege and/or work product doctrine.

2. Lockheed Martin objects to Defendant's Fifth Set of Interrogatories and Second Requests for Admissions to the extent that they are overly broad or unduly burdensome.

3. Lockheed Martin objects to Defendant's Second Request for Admissions to the extent that the Requests reference factual data without identifying the documents from which the data originated.

4. Subject to and without waiving these objections, Lockheed Martin has made a good faith effort to respond to the Government's interrogatories, requests and admissions.

5. Lockheed Martin's discovery and review of records is continuing. To the extent appropriate, these responses will be supplemented as required by Rule 26(e) of the Rules of the United States Court of Federal Claims.

## INTERROGATORIES

INTERROGATORY NO. 26:

Plaintiff's responses to defendant's Interrogatory Nos. 10 and 12 state that Sanders and LMIT were the only Lockheed segments in addition to LMSC, LADC, and LASC that used the Cray computers in 1994. However, other documents indicate that LTOC incurred 112.8 hours of Cray computer usage in 1994. State whether LTOC incurred 112.8 hours of Cray computer usage in 1994. If the answer is "yes," identify the hours used and any costs billed to LTOC.

*Response:* LMC requested that defendant United States identify the source document or "other documents" for the factual allegations contained in this Interrogatory. The United States identified an audit report dated January 30, 2001, entitled "Audit of Fiscal Year 1995 Incurred Costs," working paper C-1h. The United States failed to provide any bates numbers identifying this document. Despite many attempts, we have been unable to identify the specific document allegedly referenced in this Interrogatory, and therefore cannot respond with any degree of accuracy or certainty. As a result of analyzing CRAY usage reports, LMC has determined that LTOC did incur 112.8 hours of Cray computer usage. However, LTOC (Lockheed Technical Operations Company) was a business that reported to LMSC, Sunnyvale and these hours have been considered in the billing amount to the Sunnyvale business. To further support this assertion, the usage documents verify a common or identical user for both LMSC and LTOC. In

addition, the summation of hours associated with LTOC rolls up to represent total LMSC usage. The invoice details substantiate this fact.

INTERROGATORY NO. 27:

Plaintiff's responses to defendant's Interrogatories Nos. 10 and 12 state that Sanders and LMIT were the only Lockheed segments in addition to LMSC, LADC, and LASC that used the Cray computers in 1994 and 1995. However, other documents indicate that LMTO incurred 27.3 hours of Cray usage in 1995. State whether LMTO incurred 27.3 hours of Cray computer usage in 1995. If the answer is "yes," identify the hours used and any costs billed to LMTO.

*Response:* LMC requested that defendant United States identify the source document or "other documents" for the factual allegations contained in this Interrogatory. The United States identified an audit report dated January 30, 2001, entitled "Audit of Fiscal Year 1995 Incurred Costs," working paper C-1h. The United States failed to provide any bates numbers identifying this document. Despite many attempts, we have been unable to identify the specific document allegedly referenced in this Interrogatory, and therefore cannot respond with any degree of accuracy or certainty. As a result of analyzing CRAY usage reports, LMC has determined that, as a result of the Lockheed and Martin Marietta merger, LTOC was renamed to Lockheed Martin Technical Operations (LMTO). LMTO did incur 27.3 hours but as stated these hours were considered in the billing algorithm for Sunnyvale. The invoice details substantiate this fact. Also see response to Interrogatory No. 26.

INTERROGATORY NO. 28:

Plaintiff's response to Interrogatory No. 14 states that LMSC and LASC budgeted $634,000 each for actual expected Cray computer processing for 1995. Explain how the

budgeted amount of $634,000 was determined, and, if an anticipated billing rate was used, state the billing rate that was used.

*Response:* The using companies determine the amount of capacity that is required and committed. LITC then implements the required resources to accommodate this request. LMC has provided documents to the United States at various points that acknowledge the $634,000 commitment levels for both LMSC and LASC.

INTERROGATORY NO. 29:

Plaintiff's response to Interrogatory No. 12 shows a total of $20,254.82 billed to customers other than LMSC, LADC, and LASC in 1995. However, PT000059 shows $44,000 utilization by miscellaneous customers. Explain why these amounts are not the same.

*Response:* We believe the difference of approximately $24K represents LITC's internal use that would not be billed directly to the provider organization (LITC).

INTERROGATORY NO. 30:

For each request for admission below, to which LMC does not respond with an unqualified admission, explain in detail LMC's denial or qualification. If you choose to response to this interrogatory within your responses to the requests for admission, so state.

*Response:* LMC will respond to this interrogatory within the responses to the Requests.

**REQUESTS FOR ADMISSION**

Request No. 1: For 1994, LMSC committed $6,376,000 for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT 000059. The source document, a chart containing three sections, appears to have been sent by facsimile by "Wanda" to Carolyn McGrath. The facsimile cover sheet states in the message

section as follows: "Carolyn, Attached chart is from Jim Blue per discussions with him." The document itself provides no additional information concerning whether the underlying numbers came from discussion with Jim Blue, or from another source, nor can LMC verify or dispute the accuracy of this data in the abstract. Nonetheless, upon review of PT000059, plaintiff admits that the document states that LMSC committed $6,376,000 for Cray computer usage.

Request No. 2: For 1994, LASC committed $2,211,000 for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT 000059. See Response to Request No. 1 regarding this document. Upon review of PT 000059, plaintiff admits that the document identified states that LASC committed $2,211,000 for Cray computer usage. Upon review of other documents, LMC avers that LASC's committed amount for 1994 was in fact $2,188,550.

Request No. 3: For 1994, LADC committed $1,469,000 for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT 000059. See Response to Request No. 1 regarding this document. Upon review of PT 000059, plaintiff denies that the document identified reflects that LADC committed $1,469,000. Rather, PT 000059 states that LADC committed $1,400,000. LMC believes that PT 000059 reflects ROM estimates. The actual committed value that is substantiated through billing invoices is $1,469,000.

Request No. 4: For 1994, LITC billed LMSC $6,382,000 for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as

000881, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999, with several attachments. Upon review of 000881, plaintiff denies that the document identified reflects that LITC billed LMSC $6,382,000 for Cray computer usage. Rather, 000881 states that LITC billed LMSC $6,382,491. The actual 1994 billing to LMSC is $6,382,491.92.

Request No. 5: For 1994, LITC billed LASC $2,136,000 for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as 000881, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999, with several attachments. Upon review of 000881, plaintiff admits that the document identified states that LITC billed LASC $2,136,000 for Cray computer usage. The actual billing in exact terms was $2,135,999.59.

Request No. 6: For 1994, LITC billed LADC $1,469,000 for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as 000881, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999, with several attachments. Upon review of 000881, plaintiff denies that the document identified reflects that LITC billed LADC $1,469,000 for Cray computer usage. Avers that 000881 states that LITC billed LADC $1,469,889. In addition, avers that billing invoice detail discloses actual billing to LADC in 1994 as $1,469,892.00.

Request No. 7: For 1994, LITC billed Sanders $8,113 for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as 000881, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999,

with several attachments. Upon review of 000881, LMC admits that the document identified states that LITC billed Sanders $8,113 for Cray computer usage. LMC avers that, based upon ledger billing details, the actual billings to Sanders for Cray computing was $8,113.16.

Request No. 8: For 1994, LMSC actually used the Cray computers for 7,245.6 CPU hours.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as 000881, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999, with several attachments. Upon review of 000881, LMC admits that the document identified states that LMSC used the Cray computers for 7,245.6 CPU hours. LMC avers that, based upon actual usage reports, LMSC, in 1994, used 7,245.4559 CPU hours.

Request No. 9: For 1994, LASC actually used the Cray computers for 7,537.3 CPU hours.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as 000881, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999, with several attachments. Upon review of 000881, plaintiff admits that the document identified states that LASC used the Cray computers for 7,537.3 CPU hours.

Request No. 10: For 1994, LADC actually used the Cray computers for 188.6 CPU hours.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as 000881, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999, with several attachments. Upon review of 000881, plaintiff admits that the document identified states that LADC used the Cray computers for 188.6 CPU hours.

Request No. 11: For 1994, LTOC actually used the Cray computers for 112.8 CPU hours.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as 000881, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999, with several attachments. Upon review of 000881, plaintiff admits that the document identified states that LTOC used the Cray computers for 112.8 CPU hours.

Request No. 12: For 1994, Sanders actually used the Cray computers for 30.1 CPU hours.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as 000881, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999, with several attachments. Upon review of 000881, plaintiff admits that the document identified states that Sanders used the Cray computers for 30.1 CPU hours.

Request No. 13: For 1994, actual usage at the standard rate of $270 was used to determine if the commitments by the business segments had been met.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified a document described as "Lockheed Martin memorandum dated September 24, 1994," which was allegedly provided to the Government on April 24, 2002. Defendant did not provide bate stamp numbers, although all documents provided to the Government by LMC can be identified by bate stamps. Nonetheless, LMC has identified this document at T001910-21, which is the actual usage report of 1994, and admits that a rate of $270 per CPU hour was used to cost actual usage. This information would then be used to compare to each business' committed levels in order to determine capacity issues.

Request No. 14: For 1994, LMSC and LADC did not utilize the Cray computers in accordance with their respective commitments, but they were billed for the full amount of their commitment.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant did not identify the source document, however, it appears that defendant relied on T001910-21, which is a document entitled "Lockheed Martin memorandum dated September 24, 1994," for the factual allegations contained in this Request for Admission. Plaintiff's response is based on this assumption. LMC admits this Request. In addition, LMC avers that, essentially, based upon actual utilization, LASC had met their committed levels. In the case of LMSC and LADC, both business units actual usage were significantly below their committed levels and were billed up to committed cost.

Request No. 15: For 1994, LASC was not billed the difference between its commitment and its actual usage of the Cray computers.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant did not identify the source document, however, it appears that defendant relied on T001910-21, which is a document entitled "Lockheed Martin memorandum dated September 24, 1994," for the factual allegations contained in this Request for Admission. Plaintiff's response is based on this assumption. LMC admits the allegations contained in this Request and avers that, as noted above in the response to Request No. 14, LASC had essentially met their committed levels.

Request No. 16: LADC included its 1994 commitment of $1,469,000 in the LADC incurred cost claim for 1993.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as an audit report dated May 17, 1996 and entitled "Assist Audit for Incurred Cost of CFY 1994 Transfers to LITC, Contractor Fiscal Year 1994." Defendant did not provide bate stamp numbers, although all documents provided to the Government by LMC can be identified by bate stamps. Nonetheless, LMC has identified this document at 004009. Upon review of the document, defendant denies that the document states that LADC included its 1994 commitment of $1,469,000 in the LADC incurred cost claim for 1993. Rather, LMC avers that the document identified states that LMSW (LADC) included the $1,469,882 LITC billed Cray Computer Costs for CFY 1994 as part of the FY 1993 Overhead Claim.

Request No. 17: LITC billed LADC on a monthly basis throughout 1994 for the total amount of $1,469,000.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States has not provided the information requested, nor has LMC been able to identify the source document. LMC denies this Request, and avers that, based upon invoice detail, LADC was billed their committed amount of $1,469,892 evenly over 12 months of 1994.

Request No. 18: Although LITC billed Sanders for 1994 Cray computer usage, Sanders had not previously made any hour or dollar commitment for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT 000059. See Response to Request No. 1 regarding this document. Upon review of PT 000059, plaintiff admits the allegations contained in this Request, and avers that the decision to invest and

floor CRAY computer resources was never based upon requirements from Sanders. This business decision was based upon requirements of LMSC, LASC and LADC.

Request No. 19: Although LTOC used the Cray computers in 1994, LITC did not bill LTOC for these services.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States has not provided the information requested, nor has LMC been able to identify the source document. Nonetheless, LMC admits that LITC did not bill LTOC directly for the use of the Cray computers, and aver that, as previously stated in response to Interrogatory No. 26, LTOC was a business unit reporting to LMSC, Sunnyvale.

Request No. 20: For 1994, the total actual costs for the HPCC cost pool was $12,664,929.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as 000879, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999, with several attachments. Upon review of the document, defendant admits that the document states that the total amount of computing costs allocated to HPCC was $12,664,929. Furthermore, LMC avers that based upon a DEC YTD Cost Center report, actual 1994 HPCC pool costs were $ 12,546,821. Actual HPCC billings were $12, 664,929.

Request No. 21: For 1994, the total actual costs for the Cray computer in the HPCC cost pool was $9,996,493.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as 000881, which is a Defense Contract Audit Agency (DCAA) Audit Report, dated June 14, 1999,

with several attachments. Upon review of the document, defendant admits that the document states that $9,996,493 was allocated in HPCC Cray computer costs. The above stated amount represents actual 1994 CRAY billings to LMSC, LASC, LADC, and Sanders.

Request No. 22: The variance between costs billed to customers and the actual HPCC pool costs in 1994 was included in the LITC HPCC cost pool for 1995.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States has not provided the information requested, nor has LMC been able to identify the source document. Nonetheless, LMC admits that the variance between costs billed to customers, and the actual HPCC pool costs in 1994, representing less than 1% of the total pools costs, was rolled forward into 1995 and expensed in that time frame.

Request No. 23: For 1995, LMSC committed $634,000 for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT000059. See Response to Request No. 1 regarding this document. Upon review of PT000059, plaintiff admits that the document identified states that LMSC committed $634,000 for Cray computer usage for 1995.

Request No. 24: For 1995, LMSC also committed $2,154,000 for excess capacity, which represented budgeted costs for the LITC HPCC pool that would not be absorbed through commitments for anticipated usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT000059. See Response to Request No. 1 regarding this document. Upon review of

PT000059, plaintiff admits that the document identified states that LMSC committed $2,154,000 for excess capacity for Cray computer usage for 1995. Plaintiff denies that the document identified states that the $2,154,000 for excess capacity represented budgeted costs for the LITC HPCC pool that would not be absorbed through commitments for anticipated usage. Furthermore, Plaintiff avers that the $2,154,000 represents budgeted excess capacity for LMSC, which was determined during the financial planning period, and that the actual excess capacity was approximately $1.684M.

Request No. 25: For 1995, LASC committed $634,000 for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT000059. See Response to Request No. 1 regarding this document. Upon review of PT000059, plaintiff admits that the document identified states that LASC committed $634,000 for Cray computer usage for 1995.

Request No. 26: For 1995, LASC also committed $757,000 for excess capacity.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT000059. See Response to Request No. 1 regarding this document. Upon review of PT000059, plaintiff admits that the document identified states that LASC committed $757,000 for excess capacity for Cray computer usage for 1995. Furthermore, as stated in response to Request No. 24, $757,000 represents budgeted excess capacity; the actual excess capacity for LASC was approximately $510,000.

Request No. 27: For 1995, LITC billed LMSC $634,000 for actual Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant did not identify the source document, however, it appears that defendant relied on PT000059 for the factual allegations contained in this Request for Admission. Plaintiff's response is based on this assumption. See Response to Request No. 1 regarding this document. Upon review of PT000059, plaintiff denies that the document identified states that LITC billed LMSC $634,000 for actual Cray computer usage for 1995. Rather, PT000059 states that the budget usage for LMSC was $634,000.

Request No. 28: For 1995, LITC billed LMSC $1,684,000 for excess capacity.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT000059. See Response to Request No. 1 regarding this document. Upon review of PT000059, plaintiff denies that the document identified states that LITC billed LMSC $1,684,000 for excess capacity for Cray computer usage for 1995. Rather, the document identified states that the actual excess capacity for LMSC was $1,684,000.

Request No. 29: For 1995, LITC billed LASC $634,000 for actual Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant did not identify the source document, however, it appears that defendant relied on PT000059 for the factual allegations contained in this Request for Admission. Plaintiff's response is based on this assumption. See Response to Request No. 1 regarding this document. Upon review of PT000059, plaintiff denies that PT000059 states that LITC billed LASC $634,000 for actual Cray computer usage for 1995. Rather, PT000059 states that the budget usage for LASC was $634,000.

Request No. 30: For 1995, LITC billed LASC $510,000 for excess capacity.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT000059. See Response to Request No. 1 regarding this document. Upon review of PT000059, plaintiff denies that the document identified states that LITC billed LASC $510,000 for excess capacity for Cray computer usage for 1995. Rather, the document identified states that the actual excess capacity for LASC was $510,000.

Request No. 31: For 1995, LITC billed LMIT $11,785 for actual Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States has not provided the information requested. As a result of analyzing the 1995 Cray usage reports, LMC admits that the reports confirm that LMC's actual Cray usage cost was $11,785.

Request No. 32: For 1995, LMSC actually used the Cray computers for 4,959.5 CPU hours.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States identified an audit report dated January 30, 2001, entitled "Audit of Fiscal Year 1995 Incurred Costs," working paper C-1h. The United States failed to provide any bates numbers identifying this document. Despite many attempts, we have been unable to identify the specific document allegedly referenced in this Interrogatory, and therefore cannot respond with any degree of accuracy or certainty. As a result of analyzing the 1995 CRAY usage reports, LMC admits that the reports confirm the above stated hours.

Request No. 33: For 1995, LSSC actually used the Cray computers for 6,186.8 CPU hours.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States identified an audit report dated

January 30, 2001, entitled "Audit of Fiscal Year 1995 Incurred Costs," working paper C-1h. The United States failed to provide any bates numbers identifying this document. Despite many attempts, we have been unable to identify the specific document allegedly referenced in this Interrogatory, and therefore cannot respond with any degree of accuracy or certainty. As a result of analyzing CRAY usage reports, LMC admits that the 1995 actual usage report confirms 6,186.8 CPU incurred hours for LASC.

Request No. 34: For 1995, LMTO actually used the Cray computers for 27.3 CPU hours.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States identified an audit report dated January 30, 2001, entitled "Audit of Fiscal Year 1995 Incurred Costs," working paper C-1h. The United States failed to provide any bates numbers identifying this document. Despite many attempts, we have been unable to identify the specific document allegedly referenced in this Interrogatory, and therefore cannot respond with any degree of accuracy or certainty. As a result of analyzing CRAY usage reports, LMC has determined that the 1995 actual usage report confirms 27.279 CPU incurred hours for LMTO.

Request No. 35: For 1995, LMIT actually used the Cray computers for 112.2 CPU hours.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States identified an audit report dated January 30, 2001, entitled "Audit of Fiscal Year 1995 Incurred Costs," working paper C-1h. The United States failed to provide any bates numbers identifying this document. Despite many attempts, we have been unable to identify the specific document allegedly referenced in this Interrogatory, and therefore cannot respond with any degree of accuracy or certainty. As a result

of analyzing CRAY usage reports, LMC has determined that the 1995 actual usage reports confirm 111.1792 CPU incurred hours for LMIT.

Request No. 36: For 1995, Sanders actually used the Cray computers for 79.9 CPU hours.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States identified an audit report dated January 30, 2001, entitled "Audit of Fiscal Year 1995 Incurred Costs," working paper C-1h. The United States failed to provide any bates numbers identifying this document. Despite many attempts, we have been unable to identify the specific document allegedly referenced in this Interrogatory, and therefore cannot respond with any degree of accuracy or certainty. As a result of analyzing CRAY usage reports, LMC has determined that the 1995 actual usage reports confirm 79.9040 CPU incurred hours for Sanders.

Request No. 37: Although LITC billed LMIT for Cray computer usage in 1995, LMIT had not previously made any hour or dollar commitment for Cray computer usage.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as PT000059. See Response to Request No. 1 regarding this document. Upon review of PT000059, plaintiff denies that the document identified reflects that LITC billed LMIT for Cray computer usage in 1995 or that LMIT had not previously made any hour or dollar commitment for Cray computer usage.

Request No. 38: Although LMTO used the Cray computers in 1995, LITC did not bill LMTO for these services.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. Defendant identified the source document as

PT000059. See Response to Request No. 1 regarding this document. Upon review of PT000059, plaintiff denies that the document identified reflects that LMTO used the Cray computers in 1995 or that LITC did not bill LMTO for these services.

Request No. 39: For 1995, the total actual cost for the HPCC cost pool was $9,206,000.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States has not provided the information requested. LMC is unable to identify the source document, or determine which of the numerous cost documents reflect the number identified in this Request. Accordingly, LMC denies the request.

Request No. 40: For 1995, the total actual costs for the Cray computer in the HPCC cost pool was $4,293,000.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States has not provided the information requested. LMC is unable to identify the source document, or determine which of the numerous cost documents reflect the number identified in this Request. Accordingly, LMC denies the request.

Request No. 41: The variance between costs billed to customers and the actual HPCC pool costs in 1995 was included in the 1996 HPCC cost pool for EIS.

*Response:* LMC requested that defendant United States identify the source document for the factual allegations contained in this Request. The United States has not provided the information requested. LMC is unable to identify the source document, or determine which of the numerous cost documents reflect the number identified in this Request. Accordingly, LMC denies the request.

Request No. 42: CAS 403 is the applicable standard for the allocation of LITC's Cray computer services.

*Response:* Deny, and aver that CAS 403 is one of the applicable standards for the allocation of LITC's Cray computer services.

Request No. 43: CAS 418 is not the applicable standard for the allocation of LITC's Cray computer services.

*Response:* Deny, and aver that CAS 418 is one of the applicable standards for the allocation of LITC's Cray computer services.

Clarence T. Kipps, Jr., Esq.
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 626-5800
Fax: (202) 628-0858

Attorney of Record
Lockheed Martin Corporation

Of Counsel:

David M. Christenson, Esq.
LOCKHEED MARTIN CORPORATION
6801 Rockledge Drive
Bethesda, Maryland 20817
Tel: (301) 897-6127
Fax: (301) 897-6333

Jeri Kaylene Somers, Esq.
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 626-5800
Fax: (202) 628-0858

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this ____th day of March, 2003, I caused to be mailed via first class mail Defendant's Response to Plaintiff's Fifth Set of Interrogatories and Requests for Admissions addressed as follows:

Dorie Finnerman, Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 514-7300

______________________________
Jeri Kaylene Somers, Esq.

156

94cray.xls

## LITC 1994 Actual Cray Utilization vs. Budget Commitment ($M)

| Customer | Budget Commitment | Usage @ Std. Rates* | Comments | Actual % | Billing at Actual Usage | Customer Impact |
|---|---|---|---|---|---|---|
| LMSC (Sunnyvale, CA) | $ 6.376 | $ 2.031 | Did not fulfill commitment for which LITC capacitized | 48.1% | $ 4.802 | $ (1.574) |
| LASC (Marietta, GA) | $ 2.211 | $ 2.131 | LASC fulfilled commitment | 50.4% | $ 5.038 | $ 2.827 |
| LADC (Palmdale, CA) | $ 1.400 | $ 0.062 | LADC had minimal usage late Dec-93 (Jan. billing) | 1.5% | $ 0.147 | $ (1.253) |
| Sanders | | $ 0.008 | Not budgeted, used as needed | | $ - | $ - |
| Totals | $ 9.987 | $ 4.232 | | 100.0% | $ 9.987 | $ (0.000) |

Note: *Usage at standard rates includes shared CPU (Pecos sys.) and dedicated CPU (Del Norte) for the entire year.

## LITC 1995 Actual Cray Utilization vs. Budget Commitment ($M)

| Customer | Budget Usage | Usage @ Std. Rates** | Comments | Actual % | Billing at Actual Usage | Customer Impact |
|---|---|---|---|---|---|---|
| LMSC (Sunnyvale, CA) | $ 0.634 | $ 0.529 | | 44.6% | $ 0.566 | $ (0.068) |
| LASC (Marietta, GA) | $ 0.634 | $ 0.658 | | 55.4% | $ 0.702 | $ 0.068 |
| LADC (Palmdale, CA) | | $ - | | 0.0% | $ - | $ - |
| Other Misc.*** | | $ 0.044 | see note below | | | |
| Totals | $ 1.268 | $ 1.229 | | 100.0% | $ 1.268 | $ - |

Notes: **Usage at standard rates includes only shared CPU (Pecos sys.) for the entire year. The Del Norte system was utilized only for internal testing by LITC employees.
***Miscellaneous customers brought on board in attempt to mitigate the fixed cost impact to LMSC and LASC

| Customer | Budget Excess Cap. | Actual Excess Cap. | Utilization Actual % | Billing at Actual Usage | Customer Impact |
|---|---|---|---|---|---|
| LMSC (Sunnyvale, CA) | $ 2.154 | $ 1.684 | 44.6% | $ 0.979 | $ (0.705) |
| LASC (Marietta, GA) | $ 0.757 | $ 0.510 | 55.4% | $ 1.215 | $ 0.705 |
| Totals | $ 2.911 | $ 2.194 | | $ 2.194 | $ (0.000) |

## LITC 1996 Actual Cray Utilization vs. Budget Commitment ($M)

| Customer | Budget Usage | Usage @ Actual** | Comments | Usage Billing | Write-off Billing | Total | Actual % Usage | Billing at Actual Usage | Customer Impact |
|---|---|---|---|---|---|---|---|---|---|
| LMSC (Sunnyvale, CA) | *Dedicated* | $ 0.291 | | $ 0.291 | | $ 0.291 | 100.0% | $ 7.733 | $ 7.443 |
| Other Misc.*** | | $ 0.023 | see note below | $ 0.023 | | $ 0.023 | incidental | $ 0.023 | $ - |
| LM Corporate | | $ - | | | $ 7.443 | $ 7.443 | | | $ - |
| Totals | $ - | $ 0.314 | | $ 0.314 | $ 7.443 | $ 7.756 | 100.0% | $ 7.756 | $ 7.443 |

Notes: **Actual cost includes $ Cray J90 and $7.4426M write of other Cray systems in 1996.
Notes: **Usage at actual includes 100% billing to Sunnyvale, offset by incidental usage of other customers.
***Incidental users of LMSC dedicated Cray J90 system. Billings to these users offset LMSC costs.

| | Actual Write-off |
|---|---|
| Asset Write-off billed to LM Corporation | $ 7.443 |

| Grand Total Impact (Includes excess capacity adj. and asset write-off) | 1994 | 1995 | 1996 | Cumulative |
|---|---|---|---|---|
| LMSC (Sunnyvale, CA) | $ (1.574) | $ (0.773) | $ 7.443 | $ 5.096 |
| LASC (Marietta, GA) | $ 2.827 | $ 0.773 | | $ 3.600 |
| LADC (Palmdale, CA) | $ (1.253) | | | $ (1.253) |
| Totals | $ (0.000) | $ (0.000) | $ 7.443 | $ 7.443 |

LMSC 4.802 .566 .479 .241

LASC 5.038 .702 1.215 6.955 13.593

Proprietary Matter

PT 000059

[redacted]

– In-Year Adjustments Made Per CAS 418 (e) (g)
– Y/E ± 10% Variance Test/Adj. Employed

# LITC Followed CAS D.S. and Was CAS Compliant

4

LOCKHEED MARTIN

# Cost Impact Conclusion:

**Conclusion:**

| Cray Costs Allocable to Gov't | Cray Costs Paid By Gov't | Price Adjustment | |
|---|---|---|---|
| $ 31.91 | $ 22.26 | $0 | - LMC methodology did not result in increase costs to the Gov't |

| | | LITC Allocation to Segments (Billings) | Amount not billed to/paid by Government | Amount billed to/paid by Gov't. | Allocation to Segments Utilizing Gov't Method | Allocation Difference between Lockheed & Gov't Method | Cost Reimb. | Fixed Price | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1993 - 1995 LITC Billings | | | | | | | | | |
| LASC | Aeronautical Systems | $ 5.99 | | $ 5.99 | $ 9.85 | $ 3.86 | $ 1.42 | $ 2.44 | $ 3.86 |
| LMSC | Missiles & Space | $ 13.38 | $ 1.20 | $ 12.18 | $ 11.89 | $ (0.29) | $ (0.26) | $ (0.03) | $ (0.29) |
| LADC | Skunk Works | $ 4.09 | | $ 4.09 | $ 1.72 | $ (2.37) | $ (1.70) | $ (0.68) | $ (2.37) |
| **Subtotal** | | $ 23.46 | $ 1.20 | $ 22.26 | $ 23.46 | $ 1.20 | $ (0.54) | $ 1.74 | $ 1.20 |
| **1997 Corporate Reallocation/Write Down** | | | | | | | | | |
| LASC | Aeronautical Systems | $ 3.60 | $ 3.60 | | | | | | |
| LMSC | Missiles & Space | $ 3.60 | $ 3.60 | | $ 8.45 | $ 8.45 | $ 6.04 | 2.42 | $ 8.45 |
| LADC | Skunk Works | $ 1.25 | $ 1.25 | | | | | | |
| **Total** | | $ 31.91 | $ 9.65 | $ 22.26 | $ 31.91 | $ 9.65 | $ 5.49 | $ 4.16 | $ 9.65 |



Lockheed Martin Company Proprietary

DEFENSE LOGISTICS AGENCY
DEFENSE CONTRACT MANAGEMENT COMMAND
DEFENSE CONTRACT MANAGEMENT AREA OPERATIONS, DENVER
ORCHARD PLACE 2, SUITE 200
5975 GREENWOOD PLAZA BLVD.
ENGLEWOOD, CO 80111-4715

IN REPLY REFER TO DCMC GDOC

April 23, 1996

Mr. William Bernstein
Lockheed Information Technology Company
1401 Del Norte Street
Denver, CO 80221

Dear Mr. Bernstein:

A review of the acquisition of a single, small Cray system as stated in your 17 Jan 96 letter has been accomplished.

The attached Audit Report No. 3121-96J10601001, 05 Apr 96, concerning the Audit of High Performance Computer Utilization, indicates that the replacement of both the Cray computers with a Cray J90 computer will result in annual cost avoidance of $982,000. Therefore, the installation of the Cray J90 computer is hereby recommended.

If you have any questions, your point of contact is Ms. Renee Varin Potratz at (303)843-4300x119.

Sincerely,

Renée Varin Potratz

RENEE VARIN POTRATZ
Administrative Contracting Officer
Colorado Central Team

Attachment
cc:
DCAA Denver



Proprietary Matter

PT 000143

# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT

5 April 1996

**PREPARED FOR:** Administrative Contracting Officer
ATTN: Mr. Gerald A. Miller
Defense Contract Management Command, Denver
Orchard Place 2, Suite 200
5975 Greenwood Plaza Boulevard
Englewood, Colorado 80111-4715

**PREPARED BY:** Denver Branch Office
7112 W. Jefferson Avenue, Suite 200
Lakewood, Colorado 80235-2327
Telephone No. (303) 969-5000
FAX No. (303) 969-5056

**SUBJECT:** Audit of High Performance Computer Utilization

**REFERENCES:** DCAA: Audit Report No. 3121-96J10601001
DCAA: Audit Report No. 3121-95J10501001

**CONTRACTOR:** Lockheed Information Technology Company
1401 Del Norte Street
Denver, Colorado 80221

**REPORT RELEASE RESTRICTIONS:** See Page 5

**CONTENTS:**


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 1 |
| Results of Audit | 2 |
| DCAA Personnel and Report Authorization | 4 |
| Audit Report Distribution and Restrictions | 5 |




ORIGINAL

Audit Report No. 03121-96J10601001

## SUBJECT OF AUDIT

As a part of our comprehensive audit of Lockheed Information Technology Corporation (LITC), we reviewed the acquisition of a Cray J90 Computer for the High Performance and Classified Computing (HPCC) center. LITC provides computing services to the Lockheed Martin Corporation. We performed the audit to evaluate whether the acquisition of a Cray J90 computer represents the best alternative for providing Cray computing resources for the Lockheed Martin Company. The audit was conducted during February and March of 1996.

## EXECUTIVE SUMMARY

In our opinion, the replacement of both of the Cray computers with a Cray J90 computer will result in annual cost avoidance of $982,000. Our previous audit (reference Audit Report No. 3121-95J10501001) of the HPCC disclosed that LITC could provide a more cost effective delivery of computer services if it either disposed of the Cray YMP - 4E computer or disposed of both the Cray YMP - 4E and the Cray YMP - 8I and purchased Cray computing resources from an outside vendor.

## SCOPE OF AUDIT

We conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the data and records reviewed are free of material misstatement. Our audit includes:

- assessing control risk to use as a basis for planning the nature, timing and extent of testing;
- examining, on a test basis, evidence supporting the amounts and disclosures in the data and records reviewed;
- assessing the accounting principles used and significant estimates made by LITC and;
- evaluating the overall data and records presentation.

We evaluated the acquisition of a Cray J90 computer using the applicable requirements contained in:

- Federal Acquisition Regulation (FAR),
- DoD FAR Supplement (DFARS), and
- Cost Accounting Standards.

Audit Report No. 03121-96J10601001

Our audit specifically included:

- interviewing key managerial personnel, and
- reviewing costs for various computer systems.

## RESULTS OF AUDIT

Our audit disclosed that LITC's replacement of both of its Cray super computers with a smaller Cray J90 computer will result in an annual cost avoidance of approximately $982,000. We recommend that LITC continue with the installation of the Cray J90 computer.

In our previous audit, we examined three possible scenarios for dealing with the idle Cray computer capacity:

(1) Do nothing (i.e., continue to maintain the Cray YMP - 4E and the Cray YMP - 8I).

(2) Eliminate both Cray computers and buy any needed Cray time from a third party. This alternative was projected to save $496,000.

(3) Eliminate the Cray YMP - 4E and maintain the Cray YMP - 8I. The Cray YMP - 8I would continue to service internal Lockheed Martin requirements. This alternative was projected to save $491,000 annually.

*Our analysis of the fourth alternative, the purchase of a small Cray J90 computer, follows:*

| PROJECTED ANNUAL COST REDUCTION | |
|---|---|
| Labor and Related - HPCC | $100,100 |
| Labor and Related - Operations | 89,000 |
| Hardware Maintenance | 510,900 |
| Software Maintenance | 226,400 |
| Power Consumption | 105,600 |
| Depreciation of Cray J90 | < 50,000> |
| Net Savings | $982,000 |

This analysis is based on the assumptions that:

1. The cost of the Cray J90 is depreciated over a period of four years.

**FOR OFFICIAL USE ONLY**

2. Replacement of the Cray YMP-4E and the Cray YMP-8I with a Cray J90 will result in a headcount reduction of one in the HPCC department and one in the operations department.

We discussed our findings with Ms. Jan Wade, Administrative Supervisor, on 1 April 1996.

We examined only the acquisition of a Cray J90 computer. Accordingly, we express no opinion on the contractor's system of internal controls taken as a whole.

We would like to express our appreciation for the cooperation and assistance we received from the LITC's management and staff during the course of our review.

Audit Report No. 03121-96J10601001

## DCAA PERSONNEL

| | |
|---|---|
| Primary contact regarding this audit: | Telephone No. |
| Gary LePage, EDP Auditor | 612-725-3296 |
| Other contacts regarding this audit: | |
| Alan Teal, Chief AM/EDP/OA | 214-650-4916 |
| Steve Thorsted, EDP Supervisory Auditor | 801-975-3553 x226 |
| Kenneth Hill, Branch Manager | 303-969-5000 |
| Sally Mills, Acting Supervisory Auditor | 303-969-5000 |
| Denver Branch Office Fax No. | 303-969-5056 |

**AUDIT REPORT AUTHORIZED BY:**

KENNETH L. HILL
Branch Manager
DCAA, Denver Branch Manager

**FOR OFFICIAL USE ONLY**

Audit Report No. 03121-96J10601001

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

DISTRIBUTION

DCAA, Lockheed Missiles and Space Co. Res. Ofc.
155D Moffett Pk. Dr., Bldg. 571
P.O. Box 60549
Sunnyvale, CA 94088-0549

DCAA, Lockheed Aeronautical Systems Co. Res. Ofc.
86 S. Cobb Drive, Bldg B2, Zone 0262
Sunnyvale, CA 94088-0549

DCAA, Lockheed Advanced Development Co. Res. Ofc.
1011 Lockheed Way
Palmdale CA 93599-001

DCAA, Pomona Valley Branch Office
1000 E. Garvey Ave. South, Suite 300
W. Covina, CA 91790-2900

DCAA, North Eastern Region Resident Office
65 Spit Brook Rd. Bldg. NHQ1-0519
Nashua, NH 03061-0868

DCAA, Atlanta Branch Office
2250 Newmarket Pkwy., Suite 124
Marietta, GA 30067-8749

DCAA, RAMA-3

DCAA, RSA-3 (ATTN: Steve Thorsted)

Permanent File

Audit Report No. 03121-96J10601001

RESTRICTIONS

1. Contractor information contained in the audit report may be proprietary. It is not practical to identify during the conduct of the audit those elements of the data which are proprietary (too few audit reports are requested by parties outside the contracting activity to warrant the additional effort). Proprietary determinations should be made in the event of an external request for access. The restrictions of 18 U.S.C. 1905 should be considered before this information is released to the public.

2. Under the provisions of Title 32, Code of Federal Regulations Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

3. The Defense Contract Audit Agency has no objection to release of this report, at the discretion of the contracting agency, to authorized representatives of LITC.

4. The information contained in this audit report should not be used for purposes other than action on the subject of this audit without first discussing its applicability with the auditor.

# Issues Raised March 14, 2001 (cont'd)

- LITC Did Not Follow Disclosed Practice
- LMC Response
  - LITC Followed CAS Disclosure Statement
  - Predetermined Rates Used Per CAS 418 (g)