IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 00-129C<br>(Judge Allegra) |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to RCFC 56(h)(1), defendant respectfully submits the following proposed findings of uncontroverted fact in support of Defendant's Motion For Summary Judgment:

1. In April 1994, Lockheed Corporation ("Lockheed") revised its disclosure statement. Def. App. 1.

2. Item 8.3.1.R of the disclosure statement sets forth Lockheed's description of its allocation of LITC costs to Lockheed's business segments. One of the expense pools to be allocated was the HPCC/Super Computer pool. As its name implies, this pool contained costs related to supercomputer services that were provided to the business segments. Def. App. 3-4.

3. The disclosure statement provides, in part:

> **Services provided to customers will be governed by service level agreements and documents of understanding. In these agreements customers commit to forecasts of resource usage. LITC plans| on asset expenditures and support requirements based on assessments of the workload requirements. Each company is billed for resources forecast by them, and allocated on their behalf.** A penalty is assessed on any company that significantly over-forecasts their support and resource requirements. A company, depending on the overall mix of work forecast variances, may be liable of 90% of their forecast. Those companies whose needs exceed their forecast will be accommodated subject to available capacity. Incremental spending

> to meet unforecasted needs will be borne exclusively by the company necessitating the investment.
>
> Direct charges- . . . **HPCC processing is being billed to the companies at standard rates per CPU hour for committed share processing and standard rates per wall clock hour for committed dedicated processing.** Available capacity above these levels is at no cost, to ensure maximum use of available resources. . . .
>
> For cost pools allocated on a usage rate basis, standard rates will be set at the start of the year and remain throughout the year provided over/under liquidation does not exceed 10%. Within this range the over/under liquidation will be rolled into the next year's rates. If the over/under liquidation exceeds 10%, rates will be adjusted to actuals a minimum of once a year, usually at year end.

Def. App. 3-4 (emphasis added).

4. Item 8.3.1.R was intended to address the allocation of both IBM computer costs and HPCC/Supercomputer Costs. Id.

5. In the summer of 1994, the Defense Contract Audit Agency ("DCAA") reviewed LITC's compliance with the rules of the Cost Accounting Standards Board and issued two audit reports: Audit Reports Nos. 3121-94J9200015 ("Audit Report 15") and 3121-94J9200016 ("Audit Report 16"). Def. App. 5-28. Audit Report 15 dealt with the allocation of costs related to LITC's IBM mainframe computers. Audit Report 16 dealt with the allocation of costs related to LITC's CRAY supercomputers.

6. Audit Report 15 opined that Lockheed's practice of allocating IBM computer costs based on commitments by the operating segments violated CAS 418 because that standard "recommends that the allocation of the costs be based on resource consumption." Def. App. 7. The auditors also found that the difference between the projected 1994 allocation of IBM computer costs based upon the commitments of the segments and the projected allocation of

those costs based upon the recorded usage for the first six months of 1994 was not significant. Id.

7. Audit Report 16 opined that Lockheed's practice of allocating CRAY supercomputer costs based on commitments by the operating segments violated CAS 418 because that standard "recommends that the allocation of the costs be based on resource consumption." It also found that the difference between the allocation of costs based on commitment and the allocation of costs based on resource consumption would result in an estimated cost impact to the Government of $1,236,010 over the course of the year 1994. Def. App. 15.

8. On November 22, 1994, James Rose, the Defense Contract Executive ("DCE") for Lockheed, wrote to the DCAA Resident Auditor at Lockheed Corporation concerning the CAS 418 noncompliance issue raised in Audit Report 15, with respect to IBM computer costs. Mr. Rose took note of DCAA's finding that the differences between the cost allocations using the LITC forecasting method and the allocation of the costs based on recorded usage were not significant. Based upon that information and a regulation providing that a change in allocation base is not required if the proper allocation base would not result in a material difference, Mr. Rose made a determination that "LITC's current practice of allocating cost meets the intent of CAS 418 requirement. Therefore, with this letter the issue of noncompliance with CAS 418 is resolved and disposed with no additional action required." A copy of the letter was sent to LMC. Pl. App. 18-19.

9. Mr. Rose never addressed the recommendations of Audit Report 16.

10. Following the merger of Lockheed with Martin Marietta in March 1995, responsibility for the cost accounting practices at Lockheed transferred to the DCE for Lockheed Martin Corporation, Louis G. Becker. Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 16.

11. A DCAA memorandum dated February 13, 1996, reflected the estimated impact of the CAS 418 noncompliance on cost-reimbursable contracts in 1994 was $1,077,075. Def. App. 29.

12. DCAA issued a report of a supplemental audit of fiscal year 1994 recorded costs on September 16, 1996. This report reflected the final variance in cost allocations for 1994 between the allocation used by Lockheed and an allocation based on actual usage by the various Lockheed segments. Def. App. 30-33.

13. On May 31, 1996, Mr. Becker issued a notice of noncompliance with CAS 418 to Lockheed Martin based upon the recommendations in Audit Report 16. Mr. Becker also requested that LMC provide a cost impact proposal. Pl. App. 23-24.

14. LMC responded that there was no CAS noncompliance and, therefore, no cost impact proposal was required. Def. App. 34-35.

15. For several months, the parties exchanged correspondence setting forth their respective opinions as to the requirements of CAS. Def. App. 36-44.

16. On June 17, 1997, Mr. Becker issued a final determination of noncompliance with CAS 403 and CAS 418, and he again requested that LMC submit a cost impact proposal within 60 days. Def. App. 45-47.

17. During the next several months, representatives of LMC and the DCE conducted negotiations in an attempt to resolve the CAS noncompliance issue. Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 18.

18. On December 19, 1997, LMC outlined a "compromise approach" with a description of how adjustments to the CRAY computer billings in 1994 and 1995 would be made "if an agreement is reached." Pl. App. 25; Def. App. 48.

19. On June 16, 1998, Lockheed Martin submitted its final settlement offer. Def. App. 48-49.

20. On March 16, 1999, Mr. Becker issued his final decision and demand for payment in the amount of $2,669,534. Pl. App. 26-27A.

21. Mr. Becker sent a follow-up letter renewing the demand for payment and advising Lockheed Martin that it could submit a proposal for deferment of collection if it disputed the amount demanded. Def. App. 50-51.

22. On May 21, 1999, LMC requested deferment of collection of the amount demanded while LMC appealed the final decision. Def. App. 52-53.

23. According to Lockheed, there were three "service level agreements and documents of understanding" such as are referenced in Lockheed's disclosure statement submitted to James Rose on April 1, 1994: (1) an Interdepartmental Communication from W. Bernstein, dated September 24, 1993; (2) a Service Level Agreement for LADC, January 1994 through December 1994, dated August 1994; and (2) a Service Level Agreement for LASC, January 1994 through December 1994, dated February 18, 1994. Def. App. 57.

24. The Interdepartmental Communication from W. Bernstein, dated September 24, 1993, projected CRAY costs for 1994 as follows:

| | |
|---|---|
| LADC | $2,800,000 |
| LASC | 2,189,000 |
| LMSC | 6,376,000. |

Def. App. 124, 127, 129, 132.

25. The Service Level Agreement for LADC, January 1994 through December 1994, dated August 1994, stated, "LADC has no work forecasted for the LITC, HPCC processors in 1994." Def. App. 85.

26. There were no "service level agreements and documents of understanding" reflecting commitments for CRAY usage in 1995. Def. App. 57 (Pl. Resp. to Interrog. No. 6).

27. For 1994, LMSC, LASC, and LADC committed to a certain level of costs based on anticipated CRAY usage. LMSC, LASC, and LADC committed to cost levels as follows:

| ***Customer*** | ***Dollar Commitment*** |
|---|---|
| LMSC | $ 6,376,000 |
| LASC | 2,188,550 |
| LADC | 1,469,000 |
| Total | $ 10,033,550 |

Def. App. 139-40 (Plaintiff's Responses to Requests for Admissions, Nos. 1-3); 156.

28. For 1994, the total costs billed by LITC for CRAY computers was as follows:

| ***Customer*** | ***Amount Billed*** |
|---|---|
| LMSC | $ 6,382,491 |
| LASC | 2,136,000 |
| LADC | 1,469,892 |
| Sanders | 8,113 |
| Total | $ 9,996,496 |

Def. App. 140-42 (Plaintiff's Responses to Requests for Admissions, Nos. 4-7).

29. For 1994, actual CRAY usage was as follows:

| ***Customer*** | ***Actual CPU Hours*** | ***Usage %*** |
|---|---|---|
| LMSC | 7,245.5 | 47.9 |
| LASC | 7,537.3 | 50.0 |
| LADC | 188.6 | 1.2 |
| LTOC | 112.8 | .7 |
| Sanders | 30.1 | .2 |
| | 15,114.3 | 100.0% |

Def. App. 142-43 (Plaintiff's Responses to Requests for Admissions, Nos. 8-12).

30. For 1994, LMSC and LADC did not utilize the CRAY computers in accordance with their respective commitments, but they were billed for the full amount of their commitment. Def. App. 144 (Plaintiff's Response to Request for Admissions, No. 14).

31. For 1994, LASC was not billed for the difference between its commitment and its actual usage of the CRAY. Def. App. 144 (Plaintiff's Response to Request for Admissions, No. 15).

32. LADC included the $1,469,882 costs billed by LITC in its fiscal year 1993 overhead claim. LADC was billed by LITC for its committed amount of $1,469,882 evenly over the 12 months of 1994. Def. App. 144-45 (Plaintiff's Responses to Requests for Admissions, Nos. 15-16).

33. Although LITC billed Sanders for CRAY usage, Sanders had not previously made any hour or dollar commitment for CRAY usage. Def. App. 145-46 (Plaintiff's Response to Request for Admissions, No. 18).

34. For 1995, LMSC and LASC each committed $634,000 for CRAY computer usage. Def. App. 147-48 (Plaintiff's Responses to Requests for Admissions, Nos. 23, 25); 156.

35. For 1995, LMSC also committed $2,154,000 for excess capacity for CRAY computer usage. Def. App. 147-48 (Plaintiff's Response to Request for Admissions, No. 24); 156.

36. For 1995, LASC also committed $757,000 for excess capacity for CRAY computer usage. Def. App. 148 (Plaintiff's Response to Request for Admissions, No. 26); 156.

37. For 1995, LITC billed LMSC $634,000 for CRAY computer usage. Def. App. 148-49 (Plaintiff's Response to Request for Admissions, No. 27[1]).

38. For 1995, LITC billed LMSC $1,684,000 for excess capacity. Def. App. 149 (Plaintiff's Response to Request for Admissions, No. 28[1]).

39. For 1995, LITC billed LASC $634,000 for actual CRAY computer usage. Def. App. 149 (Plaintiff's Response to Request for Admissions, No. 29[1]).

40. For 1995, LITC billed LASC $510,000 for excess capacity. Def. App. 149-50 (Plaintiff's Response to Request for Admissions, No. 30[1]).

41. For 1995, LMIT's actual CRAY usage cost was $11,785. Def. App. 150 (Plaintiff's Response to Request for Admissions, No. 31).

42. For 1995, LMSC actually used the CRAY computers for 4,959.5 CPU hours. Def. App. 150 (Plaintiff's Response to Request for Admissions, No. 32).

---

[1] Lockheed neither admitted nor denied this request for admission, although the information is within the possession of Lockheed. Therefore, pursuant to Rule 36, the request is deemed admitted.

43. For 1995, LASC actually used the CRAY computers for 6,186.8 CPU hours. Def. App. 150-51 (Plaintiff's Response to Request for Admissions, No. 33).

44. For 1995, LMTO actually used the CRAY computers for 27.3 CPU hours. Def. App. 151 (Plaintiff's Response to Request for Admissions, No. 34).

45. For 1995, LMIT actually used the CRAY computers for 111.2 CPU hours. Def. App. 151-52 (Plaintiff's Response to Request for Admissions, No. 35).

46. For 1995, Sanders actually used the CRAY computers for 79.9 CPU hours. Def. App. 152 (Plaintiff's Response to Request for Admissions, No. 36).

47. Although LITC billed LMIT for CRAY computer usage in 1995, LMIT had not previously made any hour or dollar commitment for CRAY computer usage. Def. App. 152 (Plaintiff's Response to Request for Admissions, No. 37[1]).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Doris S. Finnerman
DORIS S. FINNERMAN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

OF COUNSEL:

Gregory T. Allen
Raymond J. M. Wong
Defense Contract Management Agency

Tel: (202) 307-0300\
Fax: (202) 305-7643

Attorneys for Defendant

October 22, 2004