No. 00-129C
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

LOCKHEED MARTIN CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# APPENDIX IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DORIS S. FINNERMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0300
Fax: (202) 305-7643
Attorneys for Defendant

OF COUNSEL:

Gregory T. Allen
Raymond J. M. Wong
Defense Contract Management Agency

October 22, 2004

# INDEX TO APPENDIX


Description — Page

Letter from A.M. DiPasquale to James Rose, dated April 1, 1994, w/ excerpt from enclosed Disclosure Statement . . . . . 1

Audit Report No. 3121-94J19200015, dated September 19, 1994 . . . . . 5

Audit Report No. 3121-94J19200016, dated September 9, 1994 . . . . . 13

Memorandum from Kenneth L. Hill, Branch Manager, DCAA to Commander, Defense Contract Management Command, dated February 13, 1996 . . . . . 29

DCAA Supplemental Audit Report No. 3121-95J10250174-S1, dated September 16, 1996 . . . . . 30

Letter from A.M. DiPasquale to Louis G. Becker, dated December 6, 1996 . . . . . 34

Letter from Louis G. Becker to A.M. DiPasquale, dated January 8, 1997 . . . . . 36

Letter from A.M. DiPasquale to Louis G. Becker, dated March 7, 1997 . . . . . 39

Letter from Louis G. Becker to A.M. DiPasquale, dated March 17, 1997 . . . . . 41

Letter from A.M. DiPasquale to Louis G. Becker, dated March 21, 1997 . . . . . 43

Letter from Louis G. Becker to A.M. DiPasquale, dated April 1, 1997 . . . . . 44

Letter from Louis G. Becker to A.M. DiPasquale, dated June 17, 1997 . . . . . 45

Letter from Carolyn R. McGrath to Don Wheatley, dated June 16, 1998 . . . . . 48

Letter from Louis G. Becker to A.M. DiPasquale, dated April 21, 1999 . . . . . 50

INDEX TO APPENDIX (continued)

Letter from A.M. DiPasquale to Louis G. Becker,
dated May 21, 1999 . . . . . 52

Excerpt from Plaintiff's Objections and Responses to Defendant's
Second Set of Interrogatories, Second Request for Production of
Documents, and First Request for Admissions, dated June 25, 2001 . . . . . 55

Service Level Agreement for LADC, January 1994 through December 1994,
signed August 1994 . . . . . 61

Service Level Agreement for LASC, January 1994 through December 1994,
signed February 18, 1994 . . . . . 90

Facsimile from Ron Kercher to Carolyn McGrath,
attaching Interdepartmental Communication from W. Bernstein,
dated September 24, 1993 . . . . . 122

Letter from Jeri Kaylene Somers to Doris Finnerman,
attaching Plaintiff's Responses to Defendant's Fifth Set of Interrogatories
and Second Requests for Admissions, dated March 13, 2003 . . . . . 134

LITC Actual Cray Utilization vs. Budget Commitment, 1994-1996 . . . . . 156

Excerpt from "Issues Raised March 14, 2001" . . . . . 157

Letter from Renee Varin Potratz to William Bernstein,
attaching DCAA audit report no. 3121-96J10601001,
dated April 5, 1996 . . . . . 159

**Lockheed Corporation**

4500 Park Granada Boulevard
Calabasas, California 91399

April 1, 1994

Mr. James Rose
Defense Corporate Executive
Defense Contract Management District West
Lockheed Corporation
4500 Park Granada Boulevard
Calabasas, CA 91399

Subject: Revised Lockheed Corporation Disclosure Statement Dated April 1, 1994

Dear Mr. Rose:

Attached is a revised Disclosure Statement for Lockheed Corporation's home office. This supersedes the last version you received dated June 18, 1993. This statement incorporates the changes documented in our letter to you of October 8, 1993 and our subsequent conversation where you stated your wording preferences. In addition, we have expanded the description of LITC allocation methods for computing resources and made some minor wording changes in other sections to reflect recent developments.

We would be happy to provide you with copies of our redlined drafts to facilitate the review of the document.

Sincerely,

A. M. DiPasquale, Corporate Director
Government Finance Relations

Enclosure

cc: Richard Dodd, DCAA

94F19100001

| COST ACCOUNTING STANDARDS DISCLOSURE STATEMENT | COVER SHEET AND CERTIFICATION |
|---|---|
| *REQUIRED BY PUBLIC LAW 91-379* | LOCKHEED CORPORATION |

| Item No. | Item Description |
|---|---|
| 0.1 | Company or Reporting Unit: |
| | Name — LOCKHEED CORPORATION |
| | Street Address — 4500 Park Granada Boulevard |
| | City, State and ZIP Code — Calabasas, CA 91399 |
| | Division or Subsidiary of (if applicable) |
| 0.2 | Reporting Unit is: |
| | [x] Corporate (home) office   B. [ ] Group office   C. [ ] Division or subsidiary   D. [ ] Other |
| 0.3 | Official to Contact Concerning this Statement: |
| | Name and title — A. M. DiPasquale, Director, Government Finance Relations |
| | Phone number (including area code and extention) — (818) 876-2260 |
| 0.4 | Date of |
| | This statement — 4/1/94 |
| | Most recent prior statement — 6/18/93 |

CERTIFICATION

I certify that to the best of my knowledge and belief this Statement is the complete and accurate disclosure as of the above date by the above-name organization of its cost accounting practices, as required by the Disclosure Regulation of the Cost Accounting Standards Board under 50 U.S.C. App. 2168, Public Law 91-379 (4 CFR 351).

THIS DOCUMENT CONTAINS TRADE SECRETS AND COMMERCIAL OR FINANCIAL INFORMATION THAT IS PRIVILEGED OR CONFIDENTIAL. THE DISCLOSURE OF SUCH INFORMATION IS PROHIBITED UNDER THE FREEDOM OF INFORMATION ACT (5) U.S.C. SEC. 552) AND OTHER STATUTE(S) PROHIBITING DISCLOSURE (....E.G. 18 U.S.C. SEC. 1905).

A. M. DiPasquale,
Director, Government Finance Relations

THE PENALTY FOR MAKING A FALSE STATEMENT IN THIS DISCLOSURE IS PRESCRIBED IN 18 U.S.C. 1001

FORM CASB-DS-1

COST ACCOUNTING STANDARDS BOARD
**DISCLOSURE STATEMENT**
*REQUIRED BY PUBLIC LAW 91-379*

CONTINUATION SHEET
Page 15 of 20 Pages
Name of Reporting Unit
LOCKHEED CORPORATION

| Item No. | Item Description | | |
|---|---|---|---|
| | | 8.3.1 DIRECTLY CHARGEABLE EXPENSES | |
| | TYPE OF EXPENSE OR NAME OF POOL OF EXPENSES | 8.4.0 MAJOR TYPES OF EXPENSE | 8.5.0 ALLOCATION BASE |
| | R. Computers (LITC) | | |
| | o IBM Unclassified Computer (LITC) | Dedicated hardware, maintenance, software, proportionate share of labor/management support plus LITC facility, telecommunications, administration, disaster recovery and customer service allocation. | Standard rates for CPU usage based on committed to MIPS allocated, for DASD on megabytes allocated, and for tape on tape mountings. Unique software, dedicated hardware allocated support will be charged to requesting segment. |
| | o IBM Classified Computer (LITC) | Dedicated hardware, maintenance software, proportionate share of labor/management support plus LITC facility, telecommunications, administration, disaster recovery, security and customer service allocation. | Standard rates for CPU usage based on MIPS allocated, for DASD on megabytes allocated, and for tape on tape mountings. Unique software, dedicated hardware, and allocated support will be charged to requesting segment. |
| | o HPCC/Super Computer (LITC) | Dedicated hardware, maintenance software, proportionate share of labor/management support plus LITC facility, telecommunications, administration, disaster recovery and customer service allocation. | Machine unit pool usage is charged out to users based on wall clock hours for dedicated use and CPU hours for shared usage. Different wall clock hour rates apply, based on processor configuration. |
| | | Extended operations support includes labor costs for remote site CRAY, Convex, IBM, DEC, MPP, Tandem, and Unisys equipment at the operating companies. | Full time equivalent labor. |

NOTE: LITC has adopted industry practice with respect to its overall chargeout strategy. Services provided to customers will be governed by service level agreements and documents of understanding. In these agreements customers commit to forecasts of resource usage. LITC plans on asset expenditures and support requirements based on assessments of the workload requirements. Each company is billed for resources forecast by them, and allocated on their behalf. A penalty is assessed on any company that significantly over-forecasts their support and resource requirements. A company, depending on the overall mix of work forecast variances, may be liable for 90% of their forecast. Those companies whose needs exceed their forecast will be accommodated subject to available capacity. Incremental spending to meet unforecasted needs will be borne exclusively by the company necessitating the investment.

Direct charges-Where LITC acquires hardware, software or related products on behalf of another Lockheed company, LITC will bill these costs directly to that company at cost or in the case of a capital item will bill appropriate depreciation or amortization. 1993 Transition-IBM processing is being billed to the companies at a fixed price for CPU, DASD and Tape utilization. HPCC processing is being billed to the companies at standard rates per CPU hour for committed share processing and standard rates per wall clock hour for committed dedicated processing. Available capacity above these levels is at no cost, to enure maximum use of available resources.

FORM CASB-DS-1

| Item No. | Item Description |
|---|---|

8.3.1 DIRECTLY CHARGEABLE EXPENSES

| TYPE OF EXPENSE OR NAME OF POOL OF EXPENSES | 8.4.0 MAJOR TYPES OF EXPENSE | 8.5.0 ALLOCATION BASE |
|---|---|---|
| R. Computers (LITC) (continued) | | |

NOTE (continued):

Certain serviced company site costs may be billed to LITC for cost accumulation purposes. These costs will ultimately be billed back to the sites with no LITC overhead applied.

For cost pools allocated on a usage rate basis, standard rates will be set at the start of the year and remain throughout the year provided over/under liquidation does not exceed 10%. Within this range the over/under liquidation will be rolled into the next year's rates. If the over/under liquidation exceeds 10%, rates will be adjusted to actuals a minimum of once a year, usually at year end.

| TYPE OF EXPENSE OR NAME OF POOL OF EXPENSES | 8.4.0 MAJOR TYPES OF EXPENSE | 8.5.0 ALLOCATION BASE |
|---|---|---|
| S. Corporate Aircraft (Gulfstream) | Salaries<br>Fuel and Oil<br>Lease Costs<br>Repair and Maintenance<br>Maintenance | Formula described for allocating Residual expenses. |

Audit Report No.
3121-94J19200015
CHRON NO. 1032

19 September 1994

REPORT ON AUDIT OF CAS 418 NONCOMPLIANCE
ALLOCATION OF DIRECT AND INDIRECT COSTS
LOCKHEED INFORMATION TECHNOLOGY COMPANY
DENVER, COLORADO

Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

Contractor information contained in this audit report may be proprietary. The restrictions of 18 U.S.C. 1905 should be considered before this information is released to the public.

This report may not be released to any Federal agency outside the Department of Defense without the approval of Headquarters, DCAA, except to an agency requesting the report in negotiating or administering its contract.

DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
LAKEWOOD, COLORADO

CENTRAL REGION
DENVER BRANCH OFFICE
DEFENSE CONTRACT AUDIT AGENCY
7112 WEST JEFFERSON AVENUE SUITE 200
LAKEWOOD CO 80235-2327

IN REPLY REFER TO

Audit Report No. 3121-94J19200015 19 September 1994

SUBJECT: Report on Audit of CAS 418 Noncompliance
Allocation of Direct and Indirect Costs
Lockheed Information Technology Company
Denver, Colorado

TO: Mr. Richard Dodd
Resident Auditor, DCAA
Resident Office - Lockheed Corporation
4500 Park Granada Boulevard
Calabasas, California 91399-0357

1. Purpose and Scope of Audit

a. Our continuous audit of Lockheed Information Systems Company's (LITC) cost accounting practices during performance of contracts includes evaluating whether the LITC has complied with the CAS Board's rules, regulations, and standards, and FAR Part 31. The purpose of the audit was to determine if LITC has complied with the requirements of CAS 418. LITC is responsible for compliance with the requirements of this standard. Our responsibility is to express an opinion on compliance with those requirements based on our audit.

b. The audit was conducted in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the contractors accounting practices comply with the requirements referred to above. An audit includes examining, on a test basis, evidence about the contractors compliance with those requirements. We believe that our audit provides a reasonable basis for our opinion.

2. Summary of Audit Results

a. In our opinion, LITC is in noncompliance with CAS 418. This report is limited to the cited instances of noncompliance. Accordingly, we express no opinion on whether other practices are proper, approved, or agreed to for pricing proposals, accumulating costs, or reporting contractor performance data.

b. The results of audit were discussed with Ms. Jan Wade, LITC Supervisor of Administration, at our exit conference on 16 August 1994.

c. Information in this report should not be used without first discussing its applicability with the auditor.

PRINTED ON RECYCLED PAPER

Audit Report No. 3121-94J19200015

3. Statement of Conditions and Recommendations

Our audit disclosed that LITC's failure to comply with a cost accounting standard may result in increased cost paid by the government. The area of non-compliance is LITC's policies and practices regarding the allocation of IBM computer costs to the benefiting Lockheed divisions.

(a) Condition:

LITC estimates IBM computer costs at $25,438,557 for 1994. These costs are allocated based on a resource consumption termed Millions of Instructions Per Second (MIPS). These costs are allocated to the Lockheed divisions Missiles and Space Company (LMSC), Advanced Development Company (LADC), Aeronautical Systems Company (LASC), Austin Division (LAD), Aircraft Services (LAS), Corporate Offices (CORLAC), Aeromod Company, Inc. (LACI), and Sanders for 1994 based on a beginning of year commitment by those divisions for various levels of MIPS consumption.

LITC uses a preestablished rate, based on the forecasted LITC costs and the Lockheed segment commitment usage, to allocate the LITC IBM costs during the year. The billing rate is adjusted if the LITC total incurred costs vary from those budgeted by 10 percent or if an individual division's consumption exceeds 10 percent of the level committed to at the beginning of the year. Consumption that exceeds a division's commitment level but does not exceed 10 percent of that commitment, is not charged to the using division. Underutilization by a division of less than 90 percent of commitment results in that division being billed for 90 percent of their commited MIPS. For example, if a division is utilizing 50 percent of their committed level of MIPS, they will receive a cost allocation based on 90 percent of their committed level of MIPS.

We compared the projected 1994 annual allocation of IBM MIPS costs based on the LITC cost allocation practices versus allocation of the costs based on recorded usage for the first 6 months of 1994. The differences were not significant since the commitment usage and incurred usage were not significantly different, however, these practices violate 418.50(e)(1) which recommends that the allocation of the costs be based on resource consumption. Specifically, in situations where pool costs do not contain a material amount of management or supervisor costs, the standard specifies:

CAS 418.50(e)(1):...Homogenous indirect cost pools of this type have a direct and definitive relationship between the activities in the pool and benefitting cost objectives. The pooled costs shall be allocated using an appropriate measure of resource consumption. This determination shall be

made in accordance with the following criteria taking into consideration the individual circumstances: (1) The best representation of the beneficial or causal relationship between an indirect pool and the benefiting cost objectives is a measure of resource consumption of the activities of the indirect cost pool....

(b) Significance of Condition

The following two paragraphs are hypothetical situations at IMSC regarding potential impact of the current LITC policies and procedures regarding the allocation of IBM MIPS costs.

(i) LITC allocates a minimum of 90 percent of the budgeted costs based on the division's commitment level of usage regardless of the division's actual usage. The potential impact at LITC, with $10,705,000 annual budgeted costs, is a cost allocation of $9,634,500 ($10,705,000 x 90 percent) regardless of the actual IMSC usage of computer resources. IMSC would be absorbing costs allocable to to other divisions.

(ii) LITC allows up to 10 percent above commitment level of usage without any adjustment to the cost allocated to the user division. This could cause, in the case of IMSC, underallocation of up to $1,070,500 ($10,705,000 X 10 percent) before LITC would adjust the costs allocated to IMSC. Other division would be absorbing the costs allocable to IMSC.

(c) Recommendation

The costs allocation should be based on resource consumption used by that division.

(d) LITC's Reaction to the Issue

LITC believes their method of cost allocation to be fair and reasonable. The LITC written response is included as an attachment to this report.

(e) Auditor Comments on LITC's Reaction

Our DCAA, Technical Services Center, provided comments on LITC's data center billing practices as follows:

(i) LITC does not utilize a formal chargeback system for billing and allocating computer resources. LITC's customers are not billed for actual usage of the computer resources, but only on budgeted peak processing computer requirements. This method does not support a chargeback system which operates based on a customer's measured usage of computer resources.

Audit Report No. 3121-94J19200015

(ii) Normally, computer resource consumption provides the basis for charging customers for the computer resource costs.

(iii) LITC's customers should continue to forecast and commit to a certain level of computer resource usage, but LITC should consider using measured resource utilization as a basis for allocating the costs to the various divisions for use of those resources. This practice is possible using currently produced LITC reports and would not require major technical effort by LITC.

4. Disposition of Audit Results

a. Accounting counsel and any additional audit services which the contracting officer may require are available upon request. Please contact Mr. Joe Esterak, Supervisory Auditor, at (303) 969-5000. Our fax number is (303) 969-5056.

b. This audit was performed by Mr. Jon Brown, Auditor. We would appreciate your comments and suggestions for improving our audit services and/or related audit support.

DEFENSE CONTRACT AUDIT AGENCY

JAMES L. LASHBROOK, Branch Manager

Attachment:
LITC's Response Dated 31 August 1994

Copy furnished:
DCAA, CAC Network, Lockheed Corporation
LITC, Attn: Ed Meehan, Director of Finance (Thru the CACO)

Lockheed
Information Technology Company

1401 Del Norte Street
Denver, Colorado 80221

August 31, 1994

Mr. Jon Brown
Defense Contract Audit Agency
Denver Branch Office
7112 West Jefferson Avenue, Suite 200
Lakewood, CO 80235-2327

Subject: Report on Audit of CAS-418 Non-Compliance Allocation of Direct and Indirect Costs

Ref: DCAA Draft audit Report, Same Subject

Dear Mr. Brown:

LITC strenuously objects to DCAA's conclusion of CAS-418 non-compliance. LITC is in compliance with the spirit and letter of this standard's stated requirements. DCAA bases its finding on resource consumption being the only acceptable base to determine cost allocation. The CAS language speaks to beneficial or causal relationships in determining fair and equitable allocation of costs. LITC uses causal relationships to allocate its cost because it more fairly distributes its costs to segments serviced. DCAA's beneficial relationship based on consumption allocates cost beyond the benefits received. LITC's cost allocation process must give consideration to reasons expenses were incurred and for whose benefit.

All of LITC's customers previously had their own data centers. They know what a fair and reasonable price is for the services they require. They also understand that a commitment to a resource, whether acquired individually or through/from LITC, is a long-term commitment irrespective of usage.

DCAA comments that normally, computer resource consumption provides the basis for charging customers for the computer resource costs. LITC does not represent a normal situation. The customer dynamics are much more diverse than the normal data center circumstances. As such, other options must be explored. CAS-418 allows for a number of alternatives should conditions warrant.

CAS-418.50 (f)

> "provides for a special allocation where a particular cost objective in relation to other cost objectives receives significantly more or less benefit from an indirect cost pool than would be reflected by the allocation of such costs using a base determined pursuant to paragraphs (d) and (e) of this section."

CAS-418.50 (g)(3) states:

> The contracting parties may agree on pre-established rates which are not based on costs and activities anticipated for a cost accounting period. The contractor shall have and consistently apply written policies for the establishment of these rates.

LITC, from its inception, has had a commitment policy approved by its Board of Directors which states if you, as a customer, commit to a resource, you are responsible for the cost until such time as the issue is addressed. LITC's IBM pricing policy, as stated in the audit report and as concluded by DCAA, does not currently result in harm to the government. IBM workloads can be forecasted accurately and LITC does not anticipate wide swings in actual vs. forecast/-committed use. In the HPCC area, however, the situation is different. In 1994, the HPCC workload fell off due to a downturn in the defense business base, direct charging implementation for this resource, and alternative solutions being available to our customers. LASC, LMSC, and LADC are the primary customers and principal parties that committed to the expenditure of funds for HPCC resources. LASC is meeting its commitments; LMSC and LADC are not. DCAA's approach would have LASC pay a higher cost for their use, thereby relieving LMSC and LADC from their commitment. This is unfair to LASC and does not meet the spirit of the CAS-418 requirements. Where is the consideration for the causal relationship in DCAA's recommendation?

CAS-403.50 (a)(2) states:

> Where the expense of a given function is to be allocated by means of a particular allocation base, all segments shall be included in the base unless (i) any excluded segment did not receive significant benefits or <u>contribute significantly to the cause</u> of the expense to be allocated and (ii) any included segment did receive significant benefits from or <u>contribute significantly to the cause of the expense in question</u>. (Emphasis added.)

HPCC services can be considered in a class with special facilities. The CAS-418 standard does not provide guidance for accounting for the costs of special

facilities. Therefore, allowances must be made to ensure that the approach taken is fair and reasonable.

LITC believes its formal chargeback system is fair and reasonable; is compliant with the spirit and letter of the CAS; and passes the reasonable man test with respect to our chargeback approach. DCAA's position does not meet this test. It is, therefore, evident that other approaches which meet and are described in CAS-418 should be applied to LITC's situation. Doing so would allow the DCAA to find LITC compliant with CAS-418.

Thank you for the opportunity to provide these comments.

Sincerely,

Edward J. Meehan
Chief Financial Officer

EJM/csm

cc: W. Bernstein
A. DiPasquale, CORLAC
J. Wade