Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301-897-6781

LOCKHEED MARTIN

Anthony M. DiPasquale
Corporate Director
Government Financial Management

March 7, 1997

Mr. Louis G. Becker
Defense Corporate Executive
Defense Contract Management Command
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

Subject: Noncompliance with CAS 418-Determination in DCAA Audit
Allocation of CRAY Computer costs to LADC, LMSC and LASC

Dear Mr. Becker:

Thank you for the opportunity to provide additional information on this issue. It was very helpful that your office provided a detailed description of your position so that we could prepare a focused reply.

We inferred from your letter that you were unable to find justification in CAS 418 for the allocation method that Lockheed Martin was utilizing in 1994 and 1995 for two CRAY computers in Denver. Basically, you supported your position (confirming the finding of the DCAA audit) with three citations that you felt were more applicable to the situation in question than those cited by LMC in earlier correspondence. The first, CAS 418-(c) (2), states that pooled costs will be allocated based on the specific identifiability of resource consumption using (1) a resource consumption measure, (2) an output measure or (3) a surrogate that is representative of the resources consumed. CAS 418-50(e) reiterates that pooled costs shall be allocated using an appropriate measure of resource consumption, the first choice a measure of resource consumption followed by output of the activities. Your third reference is to CAS 403-40(b) which calls for centralized service functions to be allocated on the basis of the service furnished to or received by the segments. All three references are consistent in their requirement to allocate costs to segments benefiting from the resource supplied by the cost pool.

The DCAA's audit stated that the only acceptable allocation base was to use central processing time or wall clock hours, measurements of activity of the computer itself. One could argue that these are really measurements of output (the second choice in the allocation hierarchy) but since none of these terms are defined in CAS that isn't easy to state unequivocally. Lockheed Martin's position is that central processing time and wall clock hours are not the only way to measure resource consumption. Another way to look at it is that the resource that is being consumed is actually computing capacity. The corporation had a limited number of dollars to invest in very expensive CRAY computing resources. By requiring forecasts of usage from segments, the corporation was committing resources to a particular user segment. The computing center had committed to the segment that a certain amount of resources would be available to them for a year. Therefore, the computing capacity was "consumed" by the requesting segment as it was unavailable to others. Of course, one could argue that if a segment didn't use all the time that they had committed to, it was available for others to use. But that is not true. There was no one else to take up the slack, the other segment or segments were already using what they needed and had no requirement for additional capacity. The computing center provided the resources that were requested and committed the dollars to fixed costs.

As an alternative, the computing center could have gone out and obtained three computers, one for each segment. The segments would have then been allocated the cost of one computer each. The Government

wouldn't have measured the central processing time for the annual allocation of costs because it would have been irrelevant. In this situation the Government wouldn't have had any problem with the allocation amounts as long as usage was reasonable. If excess capacity developed, the Government would have expected a reduction in the number of computers (resources).

The CRAY computers were handled the same way. Instead of three computers, there were two to be shared among the three segments. Each segment was allocated a portion of the costs according to the capacity they stated that they needed. Excess capacity was eliminated as it was recognized. (As it turned out both CRAYS were removed from service in 1996.)

We believe that the method employed was consistent with CAS which allows for a selection from various acceptable allocation methods. Under CAS 418, we believe that the resource that was consumed was computer capacity. Additionally, under CAS 403 the service that was furnished was also computer capacity. Since CAS does not define resource consumption, we feel that our definition is just as viable as the DCAA's.

Sincerely,

A. M. DiPasquale

DEFENSE CONTRACT MANAGEMENT COMMAND
Defense Corporate Executive
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

IN REPLY REFER TO: DCMDE-GTC (D. Wheatley)

March 17, 1997

SUBJECT: Noncompliance with CAS 418 Determination
Audit Report No. 3121-94J19200016
Allocation of CRAY Computer costs to LADC, LMSC, and LASC

Mr. Anthony M. DiPasquale
Corporate Director, Government Financial Management
Lockheed Martin Corporation
6801 Rockledge Drive, Mail Point DM510
Bethesda, MD 20817-1877

Dear Mr. DiPasquale:

In an effort to resolve this issue, LMC and the Government have corresponded back and forth for approximately a year. On June 14, 1996, LMC stated its belief that the subject CAS 418 noncompliance issue had been dispositioned by the former DCE Jim Rose; however, a similar yet different issue had been dispositioned. On December 6, 1996, LMC stated its belief that the DCMC ADP Team had resolved this CAS 418 Noncompliance issue. However, the DCMC ADP team had issued a technical report, which in part related to the issue of LITC's CRAY computers, but the CAS 418 issue was not the purview of the report. In LMC's most recent letter, dated March 7, 1997, LMC attempts to defend its accounting practice, stating that, "Another way to look at it is that the resource that is being consumed is actually computing capacity... the computing capacity was "consumed" by the requesting segments as it was unavailable to others... there was no one else to take up the slack..."

I believe LMC's rationale is unpersuasive. The rationale ignores the clear provisions of CAS, and LMC has not offered one CAS provision which supports its practice of allocating costs based solely on estimates, with no provision to analyze the variance between estimated and actual costs, much less to make adjustments based upon the variance. The essence of LMC's argument is that estimation of resource consumption at the beginning of the year, when no one else is available to "take up the slack" during the course of the year, equates to the measurement of resource consumption, regardless of how the resource is actually consumed. This rationale seems to stretch the CAS provision beyond a reasonable interpretation. Lockheed correspondence clearly indicates that a segment may use, at no cost, any available capacity it needs, beyond its original estimate (provided excess capacity is available). One could argue that segments become incentivised to forecast lower than anticipated usage, in hopes of allowing other segments to subsidize their computer costs.

LMC goes on to argue that it could have purchased three computers, one for each segment, with each segment being allocated the full cost of a computer. LMC states, "The Government would not have measured the central processing time for the annual allocation of costs because it would have been irrelevant." First of all, LMC measures the "processing time" for computers, not the Government.

Secondly, if LMC chose to allocate the computer costs for each segment based only on estimated usage (the same manner it is allocating the computer costs to the segments), the CAS 418 noncompliance would have simply been "pushed down" to the next intermediate cost pool. Thirdly, LMC would still be required to allocate the costs of the computer at each segment based on a measure of resource consumption.

LMC's last argument is that in CAS 403, the service furnished is computer capacity. I do not see the term "capacity" used anywhere in CAS 403; however, CAS 403 does discuss centralized service functions and uses "centralized data processing" as an example. CAS 403 fully supports the Government position on this issue. CAS 403-50(b)(1) specifically states:

> (1) Section 9904.403-60 illustrates various expense pools which may be used together with appropriate allocation basis. The allocation of centralized service functions shall be governed by a hierarchy of preferable allocation techniques which represent beneficial or casual relationships. The preferred representation of such relationships is a measure of the activity of the organization performing the function. Supporting functions are usually labor-oriented, machine-oriented, or space-oriented. Measures of the activities of such functions ordinarily can be expressed in terms of labor hours, machine hours, or square footage. Accordingly, costs of these functions shall be allocated by use of a rate, such as a rate per labor hour, rate per machine hour or cost per square foot, unless such measures are unavailable or impractical to ascertain. In these latter cases the basis for allocation shall be a measurement of the output of the supporting function. Output is measured in terms of units of end product produced by the supporting function, as for example, number of printed pages for a print shop, number of purchase orders processed by a purchasing department, number of hires by an employment office.

LMC's argument that "computing capacity" is allocated and "consumed" when requesting segments forecast the need for specific amounts of computer resources, seems contrary to sound cost accounting and generally accepted business practice. All business entities commit to resources based upon estimates of the future need for those resources. A corporation purchases more buildings when it believes it needs more plant/office capacity, and it hires more employees when it believes it needs more labor capacity. However, CAS 418 does not allow for the allocation of labor costs based solely on beginning-of-the-year estimates, regardless of how actual labor is used during the year. If LMC's argument and application of CAS is carried to its logical conclusion,-- practically all costs could be allocated to Government contracts based solely upon beginning-of-the-year estimates, with no reconciliation to actual costs.

CAS 418 and 403 prescribe methods to be used for the equitable allocation of costs. CAS requires a measure of resource consumption to be used, not merely an estimate of resource consumption, as LMC purports. I will issue a determination of compliance or noncompliance by approximately March 28, 1997. If LMC wants to provide any additional information, please supply it as soon as possible. Any questions or comments regarding this matter may be directed to Don Wheatley.

Sincerely,

LOUIS G. BECKER
Defense Corporate Executive

CC:
DCAA / J. Ames, M. Klee

Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301-897-6781

RECEIVED
MAR 24 1997
DCE

LOCKHEED MARTIN

Anthony M. DiPasquale
Corporate Director
Government Financial Management

March 21, 1997

Mr. Louis G. Becker
Defense Corporate Executive
Defense Contract Management Command
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

Subject: Noncompliance with CAS 418 Determination
Audit Report No. 3121-94J19200016
Allocation of CRAY Computer Costs to LADC, LMSC and LASC

Dear Mr. Becker:

We continue to believe that the method utilized for the allocation of CRAY computer cost is in compliance with CAS 418. The issue appears to boil down to the definition of a resource consumption measure. CAS does not provide a definition, therefore, it is our opinion that there is more than one acceptable definition. This is supported by the fact that our agreement with the Government on the business computing portion of LITC demonstrates that arms length service agreements provide another acceptable method to determine resource consumption.

In an additional attempt to explain our logic, please consider this analogy. Underutilized leased space (within one year and the result of less than forecasted business activity) is a cost to the segment that leased the space, not to any other segments that may also separately lease space in the same building. In essence, LITC was leasing out computer capacity. This allocation method assigned the costs to the segment that caused the cost to be incurred.

Accordingly, if your intent is to issue a final determination of noncompliance on March 28, 1997, we request an extension to April 28 in order to perform additional research and to obtain other opinions on this matter. We also respectfully request that the prior DLA ADPE team be consulted. We believe that the only reason the issue was not previously resolved was that Mr. Rose and the ADPE team wanted to assess our CRAY cost cutting actions. They considered a timely response to budget variances critical to the service agreement method of charging. As we have mentioned before, LITC rapidly reduced personnel and released the equipment in a very responsive manner.

Sincerely,

A. M. DiPasquale

DEFENSE CONTRACT MANAGEMENT COMMAND
Defense Corporate Executive
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

IN REPLY REFER TO: DCMDE-GTC (D. Wheatley)

April 1, 1997

SUBJECT: Noncompliance with
CAS 418, Allocation of Direct and Indirect Costs and
CAS 403, Allocation of Home Office Expenses to Segments

Audit Report No. 3121-94J19200016
Allocation of CRAY Computer costs to LADC, LMSC, and LASC

Mr. Anthony M. DiPasquale
Corporate Director, Government Financial Management
Lockheed Martin Corporation
6801 Rockledge Drive, Mail Point DM510
Bethesda, MD 20817-1877

Dear Mr. DiPasquale:

In response to LMC's letter of March 21, 1997, I continue to believe that LMC's method used to allocate CRAY computer costs is in noncompliance with CAS 418 and CAS 403. LMC has had approximately one year to support its position regarding this issue. My intent is to issue a final determination of noncompliance; however, I will honor your request and give LMC until April 28, 1997 to provide additional information.

LMC requested that my office consult with the DLA ADPE team. Please be advised that during our research and review of this issue, members of that team were consulted. Any questions or comments regarding this issue may be directed to me or Don Wheatley.

Sincerely,

LOUIS G. BECKER
Defense Corporate Executive

CRAYNC.DOC

DEFENSE CONTRACT MANAGEMENT COMMAND
Defense Corporate Executive
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817-1877

IN REPLY REFER TO: DCMDE-GTC (D. Wheatley) June 17, 1997

SUBJECT: Final Determination of Noncompliance with
CAS 403, Allocation of Home Office Expenses to Segments and
CAS 418, Allocation of Direct and Indirect Costs

Allocation of CRAY Computer Costs

Mr. Anthony M. DiPasquale
Corporate Director, Government Financial Management
Lockheed Martin Corporation
6801 Rockledge Drive, Mail Point DM510
Bethesda, MD 20817-1877

Dear Mr. DiPasquale:

After giving due consideration to all the facts surrounding this issue, and allowing LMC many opportunities to support its position, the Government still believes that LMC is in noncompliance with CAS 403 and 418. Computer costs were allocated to Government contracts based solely upon estimated usage, which differed substantially from actual usage. This resulted in LMSC and LASC being allocated approximately $6.3M and $2.2M respectively, for basically the identical usage of wall-clock hours and CPU hours. Furthermore, even though LADC used basically none of the CRAY computing, and was not included in the beginning of the year budgeted forecast of estimated usage, LADC was allocated $1.4M. For over a year LMC has presented many different arguments in attempt to support the position that its practice is acceptable. I find none of the arguments persuasive.

The Government's position on this matter is detailed in my letters of March 17, 1997 and January 8, 1997

Most recently, LMC asked that I delay the issuance of the final determination until April 28, 1997, so LMC could provide additional data and hold a meeting with Mr. Ed Meehan of Enterprise Information Systems (EIS). A meeting was held on April 22, 1997 and LMC presented very little new information. At the meeting, LMC agreed to clarify if LASC had in fact used double the budgeted CPU hours, while only being charged for the budgeted hours. Additionally LMC agreed to provide copies of the service level agreements for use of the CRAY computers for 1994. I would like to respond briefly to these issues.

LMC's response concerning LASC being billed only for estimated CPU hours, when in fact LASC used double the estimated CPU hours is basically that, "in total" (CPU hours and wall-clock hours) LASC utilized computer hours equivalent to the dollar value of the budgeted hours. While in total the computer hours budgeted (6,890) and computer hours actually used (7,744) are similar, the

composition of the computer hours budgeted and computer hours used was different. The facts indicate that LASC had budgeted for 3,510 wall-clock hours at a rate of $370/hr. and 3,380 CPU- hours at a rate of $270/hr., budgeting total estimated usage of $2,211,300. However, when LASC only used 207 wall-clock hours, it was allocated $1,298,700 (the cost of 3,510 hours) and when LASC used 7,537 CPU hours (double the estimated CPU hour usage) it was allocated only $912,600 (the cost of 3,380 hours). LASC did in fact use double its estimated CPU hours. The shared CPU hours and dedicated wall-clock hours are not equivalent/interchangeable, as reflected in their different rates per hour. LMC's statement in a memo dated April 24, 1997, that "LASC did not double their projected usage... LASC usage equated to their commitment.." is not accurate. Furthermore, the same memo states that LMSC met its commitment of $6.4M. Mr. Meehan (EIS) was asked about this statement that LASC met its commitment of $6.4M, and he agreed it was inaccurate.

At the April 22, 1997 meeting LMC agreed to provide copies of the "1994 service level agreements." LMC provided only one such agreement. LMC has stated that the "service level agreements" were used to forecast usage at the beginning of the year , and that the companies committed at the beginning of the year to a certain level of computer usage; however, the LADC agreement for January - December 1994 was not signed until August of 1994. Furthermore, nowhere in the agreement does it detail the CRAY computer hours that LADC committed to, nor does it bind LADC to pay for a certain number of computer hours. Section 2.7.1.1 of the agreement states that any over or under recovery that exceeds 10%, will be proportionately allocated to the using companies. LMC did not follow the "service level agreement" and allocate the "under recovery" proportionately to the companies which used the CRAY computers. LMC has not substantiated its claims regarding the use of "service level agreements."

After careful review of the facts and giving due consideration to all of LMC's positions, in accordance with FAR 30.602-2(a) I have determined that LMC is in noncompliance with CAS 403-40(a)(1), CAS 403-40(b)(1), CAS 403 50-b(1), CAS 418-40(c)(2), CAS 418-50(e), CAS 418-50(g)(4) and (5). I have also determined that the cost impact is material. The rationale for this determination is contained primarily in my previous letters of March 17, 1997 and January 8, 1997, along with the narrative above.

Based upon these determinations, LMC is required to submit a cost impact proposal in the form and manner specified by the Contracting Officer, within 60 days, identifying the cost impact on each separate CAS covered contract from the date of failure to comply until the noncompliance is corrected. Per contract clause FAR 52.230-6(a)(3) and (b)(3) (eff. April 1996), Administration of Cost Accounting Standards, or its predecessor, I request that you submit a cost impact proposal which identifies the cost impact on each separate CAS covered contract from the date of failure to comply, until the noncompliance is corrected. Contracts containing the CAS clauses (e.g. FAR 52.230-2 or 52.230-3) are considered CAS covered. The cost impact proposal should be in sufficient detail to permit the evaluation and negotiation of the impact upon each covered contract and subcontract, and as a minimum should include the following information: (1) identification of all contracts and subcontracts that are CAS covered, (2) the impact (including cost, profit/fee, price/amount) on each contract or subcontract and shift of costs between CAS covered contracts by contract type and other contractor activity, (3) impact on funds of the various Agencies/Departments. The cost impact proposal shall include all changes made to the costing practices due to all changes in the organization's business relationships and activities. The cost impact statement with associated revised disclosure statement , if deemed necessary, should be provided to DCMC, ATTN: Mr. Don Wheatley and DCAA, ATTN: Mr. John Ames, by **August 18, 1997.**

Lastly, please be advised that if LMC does not submit a cost impact proposal or submits an inadequate cost impact proposal, the Government will exercise its contractual right per FAR 52.230-6(c), which is further explained in FAR 30.602-2(d), Remedies for contractor failure to make required submissions. If LMC decides that it will not submit a cost impact proposal, please notify this office as soon as possible. Any questions or comments regarding this issue may be directed to me or Don Wheatley.

LOUIS G. BECKER
Defense Corporate Executive

cc:
DCAA- J. Ames

Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301-897-6000

LOCKHEED MARTIN

June 16, 1998

Mr. Don Wheatley
Defense Contract Management Command
c/o Lockheed Martin Corporation
6901 Rockledge Drive
Bethesda, MD 20817

Subject: Treatment of Adjustments for CRAY Computer Costs Billed from LITC in 1994 and 1995

Reference: (1) DiPasquale to Becker, Dated December 6, 1996, Subject: Noncompliance with CAS 418 Determination; (2) DiPasquale to Becker, Dated March 7, 1997, Subject: Same; (3) DiPasquale to Becker, Dated March 21, 1997, Subject: Same; (4) McGrath to Wheatley, Dated December 19, 1997, Subject: Same

Dear Mr. Wheatley:

The purpose of this letter is to document my position regarding the CRAY computer issue. A summary of correspondence to your office follows.

- In Reference (1) we provided excerpts from the Joint DCMDW/DCMDN ADP Technical Review Report #OC-0017 dated November 8, 1994. The most notable quote is that the technical team found the algorithm fair and reasonable. The report does a good job of explaining the reasons for the billing methodology that was developed by LITC.

- In Reference (2) we reiterated our position that central processing time and wall clock hours are not the only basis available for allocating computer resources under CAS 418 as you suggest. Lockheed Martin had selected a resource consumption measure (computer resource commitments) under CAS 418 rather than the output measure of machine time which you prefer.

- In Reference (3) we reaffirmed our prior position and asked that Mr. Becker consult with the Joint DCMDW/DCMDN ADP Technical team prior to issuing a final determination letter.

- Finally in an attempt to settle the issue, Reference (4) outlined a compromise approach. Without agreeing that a noncompliance occurred, Lockheed Martin agreed to shift the costs as recommended by the DCAA to the participating companies based on usage. The operating companies handled these adjustments in accordance with local practice or, in the case of Missiles & Space, an existing advance agreement.

In summary, Lockheed Martin feels that our offer is very generous especially since we do not believe that a noncompliance has occurred. We have reallocated the costs as you requested. However, you do not like the resulting impact on contracts. Keep in mind that LMC is incurring a substantial financial cost if our proposal is accepted.

- For 1994, Aeronautical Systems Company will have increased overhead applied to a 56% U. S Government fixed price contract base resulting in $1.6m which can not be recovered.

- For 1995 Aeronautical Systems Company will accept another $.3m in overhead that it can not recover on fixed price contracts.

- For 1994, Skunk Works will have reduced overhead on a 70% cost reimbursement contracts base resulting in a $.9m disallowance.

- To date, Missiles and Space has written off $4.8m in CRAY costs that exceeded a self imposed cap.

Obviously, the Government has or will enjoy a cost avoidance of at least $7.6m in CRAY costs if our proposal is accepted. We will be making no more concessions on this issue, as we believe we have been more than reasonable in our attempts to settle this matter.

Attached is a copy of the specific service agreements you requested earlier for 1994. These are unsigned copies but these were easily located and will illustrate what the executed documents looked like.

Sincerely,

Carolyn R. McGrath

Carolyn R. McGrath, Manager
Government Financial Management

cc: Louis Becker

Attachment