IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00-129C |
| | ) | (Judge Allegra) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

(Pages 078-108)

Dated: November 22, 2004

Supplemental Declaration of James M. Blue 046-049

December 29, 1995 letter from CRAY Research, Inc. to Lockheed (with December 22 letters attached) 050-052

May 5, 1997 facsimile from Lockheed to Don Wheatley transmitting correspondence concerning disposition of CRAY computers 053-056

May 5, 1997 facsimile from Lockheed to Don Wheatley transmitting April 1996 DCAA audit report 057-068

October 10, 1997 Lockheed Memorandum with attachments 069-072

Lockheed Martin Skunk Works (LADC) FY 1997 Overhead Rate Agreement 073-074

*Federal Courts Admin. Act of 1992,* P.L. 102-572, 1992 U.S.C.C.A.N. 3921 075-077

DCAA Audit Guidance on Cost Accounting Standards (CAS) Cost Impact – Unilateral Changes in Cost Accounting Practice and Noncompliance with CAS and Disclosed Practices (Jan. 2002) 078-100

*In re Violation of Rule 28(c)*, Miscellaneous No. 774 (2004) 101-105

August 19, 2004 letter from Clarence Kipps to Doris Finnerman 106

October 2, 1997 letter from Lockheed to DCE Becker 107-108

**DEFENSE CONTRACT AUDIT AGENCY**
**DEPARTMENT OF DEFENSE**
**8725 JOHN J. KINGMAN ROAD, SUITE 2135**
**FORT BELVOIR, VA 22060-6219**

IN REPLY REFER TO

January 9, 2002
PAC 730.31/2002-3 02-PAC-004(R)

MEMORANDUM FOR REGIONAL DIRECTORS, DCAA
DIRECTOR, FIELD DETACHMENT, DCAA

SUBJECT: Audit Guidance on Cost Accounting Standards (CAS) Cost Impact – Unilateral Changes in Cost Accounting Practice and Noncompliance with CAS and Disclosed Practices

## SUMMARY

The purpose of this memorandum is to provide enhanced audit guidance on the computation and settlement alternatives of the CAS cost impact for unilateral cost accounting practice (CAP) changes and for noncompliances with CAS or a contractor's disclosed or established accounting practices.

## BACKGROUND

The CAS statute (P.L. 100-679) states at 41 USC 422 Subsection 26(h)(3) that:

> Any contract price adjustment undertaken ... shall be made ... to protect the United States from payment, in the aggregate, of increased costs (as defined by the Board). In no case shall the government recover costs greater than the increased cost (as defined by the Board) to the Government, in the aggregate, on the relevant contracts

The original CAS statute (P.L. 91-379) did not include language regarding "aggregate" increased costs. However, the original CASB in its implementing regulations at 4 CFR 331.70(f) established the concept of offsetting increased and decreased costs paid by the government. Congress reiterated the offset approach in P.L. 100-679 in 1988 by mandating that CAS impacts are to be dealt with in the aggregate, but the statute does not prescribe in detail how to compute "increased costs in the aggregate." While CAS regulations provide some guidance on increased costs and resolution of cost impacts in 9903.306, the regulations do not specifically address computation of increased costs in the aggregate.

**GUIDANCE**

Auditors should use a five-step process to calculate and assist resolving cost impacts resulting from unilateral CAP changes and CAS noncompliances. The first two steps involve ascertaining the impact on cost accumulation (i.e., cost measurement, assignment, and allocation) and its affect on contract prices. Steps 3 and 4 translate the resulting cost accumulation impact and its affect on contract prices into "increased costs in the aggregate" paid by the government, using the CAS Board's (CASB's) definitions of increased costs paid. Step 5 addresses settlement alternatives available to the cognizant Federal agency official (CFAO), who is responsible for administration of CAS matters. Three examples of the five-step process are included as an enclosure to this memorandum.

**Step 1 - Compute the increased/decreased cost accumulations for CAS-covered contracts (or impact on contract prices for estimating noncompliances).**

In Step 1, the cost impact is calculated for all CAS-covered contracts affected by a unilateral CAP change or noncompliance.

(a) Unilateral accounting changes.

The cost impact represents the difference between the estimated cost to complete (ETC) using the old accounting practice and the ETC using the new accounting practice. It is prospective from the effective date of the change until the end of the period of performance of the affected contracts.

(b) Noncompliance in cost accumulation.

The cost impact represents the difference between costs accumulated using the noncompliant practice and costs that would have been accumulated if a compliant practice had been used. The cost impact affects only flexibly-priced contracts, and only for the period during which the contractor accumulated costs in a noncompliant manner.

(c) Noncompliance in cost estimating.

The cost impact represents the difference between the contract price using the noncompliant practice and what the contract price would have been if it had been priced using a compliant practice. This type of noncompliance affects the costs and profit on fixed-price contracts and the fee on CPFF contracts, and represents the entire period of performance priced in the contract amount.

**Step 2 - For unilateral changes and cost accumulation noncompliances, combine the increased/decreased cost accumulations within the contract group. For estimating noncompliances, combine the cost impact of the noncompliance on the contract price within the contract group.**

In Step 2, there are two contract groups of CAS-covered contracts that we consider – flexibly-priced and fixed price (FP). In this step, the cost accumulation increases and decreases (for unilateral changes and accumulation noncompliances) developed in Step 1 are combined *within each contract group*. For estimating noncompliances, the increases and decreases to contract prices are combined *within contract group*. The flexibly-priced contract group includes cost reimbursement contracts and contracts subject to adjustment based on incurred costs. The FP group includes those types of fixed price contracts where the price does not vary based on contractor cost. Thus, the FP group excludes FPI and FP redeterminable contracts, which are included in the flexibly-priced contract group. Combining the impact within the contract groups is done for administrative convenience so the CFAO may adjust a few contracts rather than all contracts.

The impact on cost accumulations and contract prices is combined *only* within a contract group, not between contract groups. There are several reasons for this, as follows:

(a) Increased costs paid by the government on flexibly-priced contracts result from ***increased*** cost accumulations, while increased costs paid by the government on FP contracts result from ***decreased*** cost accumulations (CAS 9903.306). This difference makes it improper and mathematically unworkable to simply combine the cost accumulations across contract groups when calculating increased costs paid by the government.

(b) Combining the cost accumulations between contract groups could result in inequitable results. For instance, assume cost accumulations on FFP contracts decrease by a net $200 while cost accumulations on CPFF contracts increase by a net $200. If the cost accumulations are combined between contract groups, the government would recover nothing, which is not equitable since increased costs paid by the government occurred on both FFP and CPFF contracts.

(c) Combining the cost accumulations between contract groups presumes that cost shifts occur only within CAS-covered contracts. In fact, the operating hypothesis should be that accumulations did not shift solely between the CAS-covered contracts.

Cost shifts also affect existing non-CAS-covered contracts and/or future awards. Future awards are affected because the affected CAS-covered contracts usually have different periods of performance. In the case of an estimating noncompliance, the periods of performance for the individual affected CAS-covered FP contracts cover different cost accounting periods. Therefore, cost shifts must also affect existing non-CAS-covered and/or future contracts not included in the cost impact proposal.

**Step 3 – Determine the increased/decreased cost paid by the government for each contract group, using the net impact on cost accumulations (or contract price for estimating noncompliances).**

(a) Increased costs paid by the government.

Flexibly-priced contracts. Increased costs paid by the government occur when more costs are accumulated on flexibly-priced contracts as a result of a unilateral accounting change [CAS 9903.306(a)].

FP contracts. Increased costs paid by the government occur when less costs are accumulated on FP contracts as a result of an accounting change, or the negotiated contract price is higher as a result of estimating using a noncompliant practice [CAS 9903.306(b)]. It is commonly referred to as "windfall profit."

(b) Decreased costs paid by the government.

Decreased costs paid by the government are not defined by the CASB, although the CAS statute presumes that there can be decreased costs paid by the government since it provides for adjustments to remove only increased costs paid in the aggregate. We interpret "decreased costs paid" to be the conceptual opposite of the CASB's definition of "increased costs paid."

Flexibly-priced contracts. Decreased costs paid by the government occur when fewer costs are accumulated on flexibly-priced contracts as a result of an accounting change or noncompliance in cost accumulation. This occurs automatically as fewer costs are recorded on the contracts.

FP contracts. Decreased costs paid by the government occur when more costs are accumulated on FP contracts after an accounting change, or when the price negotiated using a noncompliant practice is lower than the price that would have been negotiated if a compliant practice had been used.

Consider the case of a CAP change for which greater costs will now be accumulated under the FP contract. If the CAP change had been known at the time of negotiations, a higher price would have been negotiated. The government has paid less through a lower negotiated price.

Similarly, if the price negotiated using a noncompliant practice is less than the price that would have been negotiated had a compliant practice been used, the government, in effect, has paid less than it would have paid if the compliant practice had been used.

**Step 4 – Determine aggregate increased costs paid by the government by combining across contract groups the increased/decreased costs paid by the government for each contract group.**

Once the increased/decreased costs paid by the government are determined for each contract group in Step 3 (i.e., flexibly-priced and FP contracts), these increases/decreases are combined to determine increased costs in the aggregate paid by the government.

Combining the increased/decreased costs paid by the government between the two contract groups to determine increased costs in the aggregate is consistent with CAS regulations which state in 9903.306(e):

> An adjustment to the contract price or of cost allowances pursuant to the Cost Accounting Standards clause at 9903.201-4(a) may not be required when a change in cost accounting practices or a failure to follow Standards or cost accounting practices is estimated to result in increased costs being paid under a particular contract by the United States. This circumstance may arise when a contractor is performing two or more covered contracts, and the change or failure affects all such contracts. The change or failure may ***increase the cost paid*** under one or more of the contracts, while ***decreasing the cost paid*** under one or more of the contracts. In such case, the Government will not require price adjustment for any ***increased costs paid*** by the United States, so long as the cost decreases under one or more contracts are at least equal to the increased cost under the other affected contracts ... In this situation, the contracting agencies would, of course, require an adjustment of the contract price or cost allowances, as appropriate, to the extent that the ***increases under certain contracts were not offset by the decreases under the remaining contracts***. [Emphasis added]

The congressional concept of costs paid in the "aggregate" in the current CAS statute (P.L. 100-679) is the functional equivalent of the concept of offsetting increased/decreased costs paid by the government discussed in CAS in 9903.306(e). The phrase "in the aggregate" recognizes in statute the practice of "offsetting."

We believe aggregating the impact across the respective groups of current CAS-covered contracts is a reasonable interpretation of the regulations. However, there may be rare instances when combining the increased/decreased costs paid by the government across the two groups of current contracts results in inequitable results. In these instances, auditors are not precluded from using another aggregation method to calculate the increased costs in the aggregate. For example, such a case might occur with a change in measurement. Consider a change in measurement that causes fewer costs to be incurred in the current period and greater costs to be incurred in subsequent periods. Depending on the mix of contract types, offsetting the aggregate costs paid by the government between current FP and flexibly-priced contracts could result in the appearance that there are no increased costs paid by the government and,

therefore, no contract adjustments are necessary to protect the government from increased costs paid. However, since more costs will be accrued in future periods, the government will be paying increased costs on new contracts in the future in the form of costs that have moved to the future periods. Without any downward adjustment to current contract prices, the same cost will be double-counted. In this case, the auditor should carefully analyze the situation and work closely with the CFAO when calculating increased costs in the aggregate paid by the government.

In most instances, however, increased costs in the aggregate paid by the government is calculated by combining the increased/decreased costs paid by the government for each group of current contracts.

The increased costs in the aggregate paid by the government determined in Step 4 should be reported in our audit report and represents the amount owed the government.

**Step 5 – Settlement Alternatives.**

It is the CFAO's responsibility to administer CAS. This includes resolution of the cost impact for CAP changes and noncompliances. However, in our advisory capacity, the auditor should assist the CFAO as necessary in settlement of these issues.

There are a number of settlement alternatives available to the CFAO to resolve the cost impact. Once the aggregate increased costs paid by the government are determined, the CFAO should work towards a settlement that precludes payment by the government of this amount.

Some of the options available to the CFAO include:

a. Contract adjustment(s).

- ✓ Adjust all contracts
- ✓ Adjust some contracts
- ✓ Disallow costs on flexibly-priced contracts
- ✓ Adjust targets and ceilings downward
- ✓ Adjust fixed fee downward on CPFF contracts, if significant

Note: Contract prices can be adjusted upward only to the extent of downward contract price adjustments on other contracts (9903.201-6(b)(3)).

b. Indirect rate adjustments.

This option is most appropriate when the indirect rates adjusted reflect the various agencies that experienced increased costs paid on their contracts. The adjustment should be for the aggregate increased costs paid by the government (including the impact on FP contracts),

adjusted for the government participation rate in the allocation base of the rate being adjusted. Indirect rate adjustments should be used only on final indirect rates rather than adjusted for in forward pricing rates to ensure that the government recovers the full amount it is owed. However, a final indirect rate in a future period can be adjusted through use of an advance agreement. Indirect rate adjustments are usually not appropriate when the contractor has little flexibly-priced work.

c. Cash payment.

This option is most appropriate when the amount of increased costs in the aggregate is small and writing a check is less burdensome than making contract or indirect rate adjustments.

**CONCLUDING REMARKS**

Revisions to the cost impact audit program, audit report shell, and CAM to reflect this guidance are currently in process.

If FAO personnel have any questions, they should contact regional personnel. If regional personnel have any questions, they should contact Ms. Susan Barajas, Program Manager, Accounting and Cost Principles Division, at (703) 767-3246.

**/SIGNED/**

Lawrence P. Uhlfelder
Assistant Director
Policy and Plans

Enclosure:
Three scenarios for cost impact calculations

DISTRIBUTION: C

**Scenario #1**
**Unilateral Change in Cost Accounting Practice**
**Affecting the Allocation of Costs**

The contractor decided to change its method of allocating fringe benefits from headcount to total labor dollars. The contractor proposed the change as a unilateral change. DCAA reviewed the change and determined it complies with CAS.

The contractor submitted a cost impact proposal for the change. Our analysis of the proposal is below.

**Step 1 – Compute the cost impact (increased/decreased cost accumulations) for CAS-covered contracts.**

For both fixed-price (FP) and flexibly-priced contracts, the cost impact is calculated as the difference between the estimated cost to complete (ETC) using the old accounting practice and the ETC using the new accounting practice.

The subject accounting practice change shifts allocations between contracts. This results in increased cost accumulations on some contracts and decreased cost accumulations on other contracts. In the schedule below, a positive number means more costs will be accumulated to the contract as a result of the accounting change, while a negative number means that less costs will be accumulated as a result of the accounting change.

| | *Flexibly-Priced* | *FP* | *Existing Commercial and Non-CAS-Covered* | *Future Contracts* |
|---|---|---|---|---|
| ***CPAF:*** | | | | |
| F19650-96-D-2222 | (340,000) | | | |
| DAA93-99-D-3333 | (240,000) | | | |
| NAS15-2000 | 50,000 | | | |
| ***CPFF:*** | | | | |
| F11626-99-D-5555 | 420,000 | | | |
| DE-AC08-99NB10733 | 40,000 | | | |
| ***FPI:*** | | | | |
| F09650-99-C-7777 | 80,000 | | | |
| F09650-98-C-8888 | (230,000) | | | |
| F42650-99-C-9999 | (70,000) | | | |
| ***FFP:*** | | | | |
| F04701-97-D-0001 | | (350,000) | | |
| F04701-98-C-1001 | | (400,000) | | |
| N62477-98-C-2002 | | 80,000 | | |
| N62477-99-C-3003 | | (130,000) | | |
| N00019-97-C-4004 | | 200,000 | | |
| ***Commercial Contracts*** | | | 20,000 | |
| ***Gov't Non-CAS-Covered*** | | | 540,000 | |
| ***Future Contracts*** | | | | 330,000 |

**Step 2 – Offset the increased/decreased cost accumulations within each contract group.**

When a change in allocation occurs, the change merely shifts costs between the contracts. In addition to the shift between existing contracts, a cost shift also occurs between existing and future contracts that are included in the contractor's forward pricing rate projections used to calculate the ETC on existing contracts. Therefore, the chart below includes a separate line to show the impact on cost allocations on future contracts. However, the impact of the cost accounting practice change on these future contracts does not impact our calculation of increased/decreased costs paid by the government. The impact of the accounting practice change is included in the forward pricing rates used to price the future contracts; therefore, no adjustment to future contracts is needed. It is shown here for illustrative purposes only, to show how the cost allocations balance between the contracts.

In our example, cost accumulations decrease by a net $290,000 and $600,000 on flexibly-priced and FP contracts, respectively. We use two contract groups for our analysis – flexibly-priced and FP.

| | ***Flexibly-Priced*** | ***FP*** | ***Existing Commercial and Non-CAS-Covered*** | ***Future Contracts*** |
|---|---|---|---|---|
| ***CPAF:*** | | | | |
| F19650-96-D-2222 | (340,000) | | | |
| DAA93-99-D-3333 | (240,000) | | | |
| NAS15-2000 | 50,000 | | | |
| ***CPFF:*** | | | | |
| F11626-99-D-5555 | 420,000 | | | |
| DE-AC08-99NB10733 | 40,000 | | | |
| ***FPI:*** | | | | |
| F09650-99-C-7777 | 80,000 | | | |
| F09650-98-C-8888 | (230,000) | | | |
| F42650-99-C-9999 | (70,000) | | | |
| ***FFP:*** | | | | |
| F04701-97-D-0001 | | (350,000) | | |
| F04701-98-C-1001 | | (400,000) | | |
| N62477-98-C-2002 | | 80,000 | | |
| N62477-99-C-3003 | | (130,000) | | |
| N00019-97-C-4004 | | 200,000 | | |
| ***Commercial Contracts*** | | | 20,000 | |
| ***Gov't Non-CAS-Covered*** | | | 540,000 | |
| ***Future Contracts*** | | | | 330,000 |
| | | | | |
| → Total | (290,000) | (600,000) | 560,000 | 330,000 |

**Step 3 – Determine the increased/decreased "cost paid" by the government for each contract group, using the net impact on cost accumulations.**

The government paid a net decrease of $224,000 on flexibly-priced contracts and a net increase of $600,000 on FP contracts, detailed as follows:

| *Contract Group* | *Increased/ (Decreased) Cost* | *Ref.* |
|---|---|---|
| Flexibly-priced: | | a. |
| CPAF | $ (530,000) | a.(1) |
| CPFF | 460,000 | a.(2) |
| FPI | (154,000) | a.(3) |
| Total – Flexibly-priced contracts | $ (224,000) | |
| FP | $ 600,000 | b. |

a. Flexibly-priced contracts.

For flexibly-priced contracts, increased costs paid by the government occur when more costs are accumulated on the contract as a result of the change. If fewer costs are accumulated on the contract, then the government experiences decreased costs paid.

(1) CPAF contracts.

In our example, the CPAF contracts will incur a net $530,000 less costs ( - $340,000 - $240,000 + $50,000 = $ -530,000). This represents decreased costs paid by the government.

Further, we assume that the award fee on the CPAF contracts is not impacted by the accounting change because the award provisions are based on delivery schedules, not costs. The contract contains no provision for any of the fee to be fixed. Therefore, even though the CPAF contracts will incur $530,000 less costs, the award fee is unaffected.

(2) CPFF contracts.

The CPFF contracts will incur a net $460,000 more cost accumulations ($420,000 + $40,000 = $460,000). This represents increased costs paid by the government.

(3) FPI contracts.

The FPI contracts will incur a net $220,000 less costs ($80,000 - $230,000 - $70,000 = $-220,000). This entire decrease in cost accumulations does not represent decreased costs paid by the government. The decrease in the cost accumulations must be adjusted by the contractor/government share ratio of 70/30. Therefore, only 70 percent of the decrease in cost accumulations represents the decreased costs paid by the government for these FPI contracts ($220,000 x 70% = $154,000).

b. FP contracts.

The net decrease in cost accumulations on FP contracts represents increased costs paid by the government. The net decrease in cost accumulations of $600,000 ($ -350,000 - $400,000 + $80,000 - $130,000 + $200,000 = $ -600,000) represents increased costs paid by the government.

**Step 4 – Determine aggregate increased costs paid by the government by offsetting across contract groups the increased/decreased costs paid by the government for each contract group.**

Increased costs paid by the government in the aggregate are the total of increased/decreased costs paid by the government determined in Step 3 above. In this case, the increased costs paid by the government in the aggregate are $376,000 ($600,000 - $224,000 = $376,000).

**Step 5 – Settlement Alternatives.**

The government could settle the cost impact using one of three methods: contract adjustment(s), indirect rate adjustment, or through a cash payment.

a. Contract adjustment(s).

The government could adjust one, more than one, or all contracts as long as it recovers the aggregate increased costs paid by the government of $376,000. Since the net increased costs paid by the government occurred only on the FP contract group, it is most logical to adjust the FP contracts rather than the flexibly-priced contracts.

b. Indirect rate adjustment.

The government could adjust the indirect rate such that the total amount of increased costs paid by the government ($376,000) will be recovered through the indirect rate application to the government flexibly-priced contracts. In our example, since the increased costs paid by the government resulted primarily from FP contracts, this settlement option may not be preferable since the indirect rate adjustment adjusts impact on flexibly-priced contracts rather than the FP contracts which experienced the increased costs paid by the government. However, if the CFAO decides to adjust an indirect rate, we recommend adjusting the rate on a completed fiscal year rather than adjusting forward pricing rates so the government is confident that it recovers the full amount to which it is entitled.

The adjustment could be formalized through a written agreement with the contractor to disallow a specified amount from the final indirect rate at the time of rate agreement/settlement.

For example, assume that the fringe rate for FY1999 will be adjusted. The government participation rate for flexibly-priced contracts in the G&A allocation base is used for application to the fringe rate. The government participation rate for flexibly-priced contracts in the G&A base is 50 percent. Our recommended disallowance for the FY1999 fringe rate is $752,000, calculated as follows:

| Increased cost in the aggregate | ÷ | Government flexibly-priced contract participation rate in the G&A allocation base | = | Amount of adjustment to the fringe pool |
|---|---|---|---|---|

$376,000 ÷ 0.50 = $752,000

c. Cash payment.

In this instance, the contractor might choose to submit a check to the government for the total increased costs paid by the government - $376,000.

## Scenario #2
## Estimating Only Noncompliance

The contractor decided to change its G&A allocation base from value-added to total cost input (TCI). It began estimating proposals using a G&A rate with a TCI base; however, it continued to record costs using a value-added base because the government took issue with a TCI base. Some of the existing contracts have significant direct material and subcontract costs, while other contracts are labor intensive. This difference in the contract composition resulted in higher G&A costs being proposed for material/subcontract intensive contracts when a TCI base was used. After analysis by the auditors, the CFAO determined that the contractor's estimating practice was in noncompliance with CAS 410. Subsequently, the contractor agreed that a value-added base was more appropriate than TCI, and it once again began proposing a G&A rate using a value-added base. At no time were contract costs accumulated with a G&A rate using a value-added base, so the noncompliance affected only cost estimates.

The auditor calculated a cost impact using the five-step process.

**Step 1 - Compute the cost impact on contract prices for CAS-covered contracts.**

A positive number means the contract price was negotiated too high as a result of a noncompliant practice used for pricing a proposal. A negative number means the contract price was negotiated too low as a result of using a noncompliant practice in pricing a proposal.

| | *Flexibly-Priced* | *FP* | *Existing Commercial and Non-CAS-Covered* | *Future Contracts* |
|---|---|---|---|---|
| ***CPAF:*** | | | | |
| F19650-96-D-2222 | 340,000 | | | |
| DAA93-99-D-3333 | 240,000 | | | |
| NAS15-2000 | (50,000) | | | |
| ***CPFF:*** | | | | |
| F11626-99-D-5555 | 420,000 | | | |
| DE-AC08-99NB10733 | (40,000) | | | |
| ***FPI:*** | | | | |
| F09650-99-C-7777 | (80,000) | | | |
| F09650-98-C-8888 | (230,000) | | | |
| F42650-99-C-9999 | 70,000 | | | |
| ***FFP:*** | | | | |
| F04701-97-D-0001 | | (350,000) | | |
| F04701-98-C-1001 | | 400,000 | | |
| N62477-98-C-2002 | | 80,000 | | |
| N62477-99-C-3003 | | 130,000 | | |
| N00019-97-C-4004 | | 200,000 | | |
| ***Commercial Contracts*** | | | (820,000) | |
| ***Gov't Non-CAS Covered*** | | | 110,000 | |
| ***Future Contracts*** | | | | (420,000) |

**Step 2 - Offset the impact of the noncompliance on the contract price within each contract group.**

When an estimating noncompliance occurs, the cost impact on contract prices will generally not balance between existing flexibly-priced, FP, and non-CAS-covered contracts. This imbalance occurs because the cost impact for CAS-covered contracts is calculated based on the price negotiated for the contract's entire period of performance. When a cost impact proposal includes contracts with periods of performance in different fiscal years, the corresponding cost impact also covers different years, and the impacts will not balance between the existing contracts.

We use two contract groups for our analysis – flexibly-priced and FP. In our example, flexibly-priced contracts and FP contracts were negotiated a net amount of $670,000 and $460,000 too high, respectively.

| | *Flexibly-Priced* | *FP* | *Existing Commercial and Non-CAS-Covered* | *Future Contracts* |
|---|---|---|---|---|
| ***CPAF:*** | | | | |
| F19650-96-D-2222 | 340,000 | | | |
| DAA93-99-D-3333 | 240,000 | | | |
| NAS15-2000 | (50,000) | | | |
| ***CPFF:*** | | | | |
| F11626-99-D-5555 | 420,000 | | | |
| DE-AC08-99NB10733 | (40,000) | | | |
| ***FPI:*** | | | | |
| F09650-99-C-7777 | (80,000) | | | |
| F09650-98-C-8888 | (230,000) | | | |
| F42650-99-C-9999 | 70,000 | | | |
| ***FFP:*** | | | | |
| F04701-97-D-0001 | | (350,000) | | |
| F04701-98-C-1001 | | 400,000 | | |
| N62477-98-C-2002 | | 80,000 | | |
| N62477-99-C-3003 | | 130,000 | | |
| N00019-97-C-4004 | | 200,000 | | |
| ***Commercial Contracts*** | | | (820,000) | |
| ***Gov't Non-CAS Covered*** | | | 110,000 | |
| ***Future Contracts*** | | | | (420,000) |
| | | | | |
| Total | 670,000 | 460,000 | (710,000) | (420,000) |

**Step 3 - Determine the increased/decreased "cost paid" by the government for each contract group, using the net impact on contract price.**

Increased costs paid by the government are a net decrease of $130,000 on flexibly-priced contracts and a net increase of $460,000 on FP contracts, detailed as follows:

| *Contract Group* | *Increased/ (Decreased) Cost* | *Ref.* |
|---|---|---|
| Flexibly-priced: | | a. |
| CPAF | 0 | a.(1) |
| CPFF | $38,000 | a.(2) |
| FPI | $ (168,000) | a.(3) |
| Total – Flexibly-priced contracts | $ (130,000) | |
| FP | $ 460,000 | b. |

a. Flexibly-priced contracts.

On flexibly-priced contracts, when the noncompliance relates only to cost estimates, only the fee is affected because the correct costs will be accumulated using compliant practices.

(1) CPAF contracts.

In our example, we assume that the award fee on the CPAF contracts is not impacted by the noncompliant cost estimate because the award provisions are based on delivery schedules, not costs. The contract contains no provision for any of the fee to be fixed. Therefore, even though the CPAF contracts were estimated a net amount of $530,000 too high ($340,000 + $240,000 - $50,000 = $530,000), the fee was unaffected by the noncompliance and there are no increased costs paid by the government on the CPAF contracts.

(2) CPFF contracts.

The CPFF contracts were estimated a net amount of $380,000 too high ($420,000 - $40,000 = $380,000). Assuming that the fixed fee negotiated equates to 10% of the negotiated cost, the fee on the CPFF contracts was estimated $38,000 too high ($380,000 x 10% = $38,000). This is the increased cost paid by the government on the CPFF contracts.

(3) FPI contracts.

On the FPI contracts, the contract prices were negotiated a net amount of $240,000 too low ( -$80,000 - $230,000 + $70,000 = -$240,000) as a result of using a noncompliant estimating practice. If the contractor had proposed using a compliant practice, the negotiated amounts would have been higher. The government's share of the amount the contract

was priced too low represents decreased costs paid by the government since the contractor would experience a loss of incentive profit if the target levels were not corrected. In our example, assuming a contractor/government share ratio of 70/30, the decreased cost paid by the government is $168,000 ($240,000 x 70% = $168,000).

b. FP contracts.

On the FP contracts, the contract prices were negotiated a net $460,000 too high. This results in a profit enlarged beyond that contemplated by the parties and represents increased costs paid by the government.

**Step 4 – Determine aggregate increased costs paid by the government by offsetting across contract groups the increased/decreased costs paid by the government for each contract group.**

Increased costs in the aggregate paid by the government are the total of increased costs on the flexibly-priced and FP contracts determined in Step 3 as follows:

| *Contract Group* | *Increased/ Decreased Cost* |
|---|---|
| Flexibly-priced | $ (130,000) |
| FP | 460,000 |
| Aggregate Increased Costs paid by the Gov't | $ 330,000 |

**Step 5 – Settlement Alternatives.**

The government could settle the cost impact using one of three methods: contract adjustment(s), indirect rate adjustment, or through a cash payment. In all cases, interest should also be collected on the amount of overpayment.

a. Contract adjustment(s).

The government could adjust one, more than one, or all contracts as long as it recovers the aggregate increased cost paid by the government of $330,000.

b. Indirect rate adjustment.

The government could adjust the indirect rate such that the total amount of increased costs paid by the government ($330,000) will be recovered through the indirect rate application to the government flexibly-priced contracts. We recommend adjusting the rate on a completed fiscal year rather than adjusting forward pricing rates so the government is confident that it recovers the full amount to which it is entitled.

The adjustment could be formalized through a written agreement with the contractor to disallow a specified amount from the final indirect rate at the time of rate agreement/settlement.

For example, assume that the G&A rate for FY1999 will be adjusted. The government participation rate for flexibly-priced contracts in the G&A allocation base is 50 percent. Our recommended disallowance for the FY1999 G&A rate is $516,000, calculated as follows:

| | | | | |
|---|---|---|---|---|
| Increased cost in the aggregate | ÷ | Government flexibly-priced contract participation rate in the G&A allocation base | = | Amount of adjustment to the G&A pool |

$330,000 ÷ 0.50 = $660,000

c. Cash payment.

The contractor may choose to submit a check for the amount of the noncompliance ($330,000). There is nothing that prevents it from doing this.

**Scenario #3**
**Concurrent Accumulation and Estimating Noncompliance**

The contractor decided to change its accounting practice, changing from functional direct labor rates (i.e., assembly, engineering, inspection, etc.) to a single segment-wide direct labor rate that includes all direct labor activity. It began estimating proposals and recording the single labor rate on January 1, 1997. After analysis by the auditors, the CFAO determined that the contractor was in noncompliance with CAS 418. The functions performed are materially disparate; however, the employees do not work in a single production unit yielding homogeneous outputs, nor do they perform as an integral team. This is in noncompliance with CAS 418.50(a)(2)(B). The contractor ultimately agreed to discontinue the practice of a single segment-wide direct labor rate and changed back to use of functional direct labor rates effective January 1, 2000.

The auditor calculated a cost impact using the five-step process.

Estimating noncompliances affect primarily FP contracts, while accumulation noncompliances affect only flexibly-priced contracts. Since the contractor both estimated and accumulated costs using a noncompliant practice, the cost impact affects both flexibly-priced and FP contracts.

**Step 1 - Compute the cost impact for CAS-covered contracts.**

For FP contracts, the cost impact is calculated as the difference between the contract price using the noncompliant practice and what the contract price would have been if it had been priced using a compliant practice. For flexibly-priced contracts, the cost impact is the difference between the costs accumulated using the noncompliant practice and the cost that would have been accumulated if a compliant practice had been used, plus any impact on fee.

In the schedule below, a positive number on flexibly-priced contracts means more costs are accumulated on the contract as a result of the noncompliance, while a negative number means that less costs are accumulated as a result of the noncompliance. On FP contracts, a positive number means the contract price was negotiated too high as a result of using a noncompliant practice in pricing a proposal, while a negative number means the contract price was negotiated too low as a result of using a noncompliant practice in pricing a proposal.

| | *Flexibly-Priced* | *FP* | *Existing Commercial and Non-CAS-Covered* | *Future Contracts* |
|---|---|---|---|---|
| *CPAF:* | | | | |
| F19650-96-D-2222 | 340,000 | | | |
| DAA93-99-D-3333 | 240,000 | | | |
| NAS15-2000 | (50,000) | | | |
| *CPFF:* | | | | |
| F11626-99-D-5555 | 420,000 | | | |
| DE-AC08-99NB10733 | (40,000) | | | |
| *FPI:* | | | | |
| F09650-99-C-7777 | (80,000) | | | |
| F09650-98-C-8888 | (230,000) | | | |
| F42650-99-C-9999 | 70,000 | | | |
| *FFP:* | | | | |
| F04701-97-D-0001 | | (350,000) | | |
| F04701-98-C-1001 | | 400,000 | | |
| N62477-98-C-2002 | | 80,000 | | |
| N62477-99-C-3003 | | 130,000 | | |
| N00019-97-C-4004 | | 200,000 | | |
| *Commercial Contracts* | | | (80,000) | |
| *Gov't Non-CAS-Covered* | | | 510,000 | |
| *Future Contracts* | | | | (1,560,000) |

**Step 2 - Offset the impact of the noncompliance on the cost accumulations (flexibly-priced contracts) and contract price (FP contracts) within each contract group.**

When there is a concurrent accumulation and estimating noncompliance, the cost impact on cost accumulations and contract prices generally will not balance between flexibly-priced, FP, and non-CAS-covered contracts. This imbalance occurs because the cost impact for accumulation noncompliance (flexibly-priced contracts) and estimating noncompliance (FP contracts) generally represent different time periods.

For flexibly-priced contracts, the cost impact is calculated as the difference between the costs accumulated using the noncompliant practice and the cost that would have been accumulated if a compliant practice had been used. It encompasses only the period during which the contractor accumulated costs incorrectly. On the other hand, for FP contracts, the cost impact is calculated as the difference between the contract price agreed to and the contract price that would have been agreed to had the contractor proposed using compliant practices. It includes the entire period of performance for each of the affected contracts, which might be longer or shorter than the period during which costs were accumulated incorrectly. Since the cost impacts for flexibly-priced and FP contracts generally represent different periods of performance, the cost impact between the different contract groups will not balance unless the impact of future contracts is included.

We use two contract groups for our analysis – flexibly-priced and FP. In our example, cost accumulations on flexibly-priced contracts increased by $670,000 due to the noncompliant practice, and contract prices on FP contracts were estimated $460,000 too high.

| | *Flexibly-Priced* | *FP* | *Existing Commercial and Non-CAS-Covered* | *Future Contracts* |
|---|---|---|---|---|
| ***CPAF:*** | | | | |
| F19650-96-D-2222 | 340,000 | | | |
| DAA93-99-D-3333 | 240,000 | | | |
| NAS15-2000 | (50,000) | | | |
| ***CPFF:*** | | | | |
| F11626-99-D-5555 | 420,000 | | | |
| DE-AC08-99NB10733 | (40,000) | | | |
| ***FPI:*** | | | | |
| F09650-99-C-7777 | (80,000) | | | |
| F09650-98-C-8888 | (230,000) | | | |
| F42650-99-C-9999 | 70,000 | | | |
| ***FFP:*** | | | | |
| F04701-97-D-0001 | | (350,000) | | |
| F04701-98-C-1001 | | 400,000 | | |
| N62477-98-C-2002 | | 80,000 | | |
| N62477-99-C-3003 | | 130,000 | | |
| N00019-97-C-4004 | | 200,000 | | |
| ***Commercial Contracts*** | | | (80,000) | |
| ***Gov't Non-CAS-Covered*** | | | 510,000 | |
| ***Future Contracts*** | | | | (1,560,000) |
| | | | | |
| Total | 670,000 | 460,000 | 430,000 | (1,560,000) |

**Step 3 - Determine the increased/decreased "cost paid" by the government for each contract group, using the net impact on cost accumulations (flexibly-priced contracts) and contract price (FP contracts).**

Increased costs paid by the government are $742,000 and $460,000 on flexibly-priced and FP contracts, respectively, detailed as follows:

| Contract Group | *Increased/ (Decreased) Cost* | Ref. |
|---|---|---|
| Flexibly-priced: | | a. |
| CPAF | $530,000 | a.(1) |
| CPFF | 418,000 | a.(1) |
| FPI | (168,000) | a.(2) |
| Total – Flexibly-priced contracts | $780,000 | |
| FP | $460,000 | b. |

a. Flexibly-priced contracts.

When concurrent estimating and accumulation noncompliances exist, one must consider the impact on both the negotiated fee and the recorded costs. If ***more*** costs are recorded as a result of the noncompliance, this represents increased costs paid by the government. It also means that the contract price was negotiated too high using the noncompliant practice when compared to cost expectations at the time of negotiations since less costs will be recorded once the noncompliance is corrected. The government paid increased costs for fee associated with increased costs estimated by using noncompliant practice.

If ***less*** costs are recorded as a result of the noncompliance, this represents decreased costs paid by the government. It also means that the contract price was negotiated too low because the noncompliant used in estimating. At the time of negotiations, the contractor expected to incur additional costs once the noncompliance is corrected.

(1) CPAF contracts.

In our example, $530,000 additional costs will be allocated to the CPAF contracts as a result of accumulating costs using a noncompliant practice.

Regarding the impact on fee, we assume in our example that the award fee on the CPAF contracts is not impacted by the noncompliant cost estimate because the award provisions are based on delivery schedules, not costs. The contract contains no provision for any of the fee to be fixed. Therefore, even though the CPAF contracts were estimated a net amount of $530,000 too high, the fee was unaffected by estimating the price using a noncompliant practice.

(2) CPFF contracts.

In our example, $380,000 additional costs will be allocated to the CPFF contracts as a result of accumulating costs using a noncompliant practice.

Regarding the impact on fee, we assume in our example that the fixed fee negotiated equates to 10% of the negotiated costs. Therefore, the fee on the CPFF contracts was estimated $38,000 too high ($380,000 x 10% = $38,000).

Total increased costs paid by the government on CPFF contracts is $418,000 ($380,000 + $38,000 = $418,000), which is the sum of the increased costs paid by the government related to both estimating and accumulating costs in a noncompliant manner.

(3) FPI contracts.

The decreased costs paid by the government are not the $240,000 indicated in the schedule. In our example, the government and contractor share the $240,000 decrease in a 70/30 ratio. Therefore, the decreased costs paid by the government are $168,000 ($240,000 x 70% = $168,000).

b. FP contracts.

On the FP contracts, the contract prices were negotiated a net $460,000 too high. This results in a profit enlarged beyond that contemplated by the parties and represents increased costs paid by the government.

Regarding the accumulation noncompliance, there are neither increased nor decreased costs paid by the government since correction of the accumulation noncompliance simply accumulates the proper amount commensurate with the effort that was priced.

**Step 4 – Determine aggregate increased costs paid by the government by offsetting across contract groups the increased/decreased costs paid by the government for each contract group.**

Increased costs paid by the government in the aggregate are the total of increased costs on the flexibly-priced and FP contracts determined in Step 3 as follows:

| *Contract Group* | *Increased Cost* |
|---|---|
| Flexibly-priced | $ 780,000 |
| FP | 460,000 |
| Aggregate Increased Costs paid by the Gov't | $ 1,240,000 |

**Step 5 – Settlement Alternatives.**

The government could settle the cost impact using one of three methods: contract adjustment(s), indirect rate adjustment, or through a cash payment. However, when the contractor corrects the noncompliance, the costs accumulated on flexibly-priced contracts will automatically correct without further action by the government. The government needs to take action to recover the remainder of the increased costs paid by the government of $498,000 ($460,000 on FFP contracts + $38,000 fee on CPFF contracts = $498,000). In all cases, interest should also be collected on the amount of overpayment.

a. Contract adjustment(s).

The government could adjust one, more than one, or all contracts as long as it recovers the $498,000 increased cost paid by the government. Some alternatives are as follows:

- Adjust one or more FP contracts downward for a total of $460,000 (the net increased costs on the FP contracts), and disallow costs on one or more CPFF contracts of $38,000 (the increased costs on the flexibly-priced contracts related to fee); or

- Adjust one or more FP contracts downward for a total of $498,000 (the remainder).

b. Indirect rate adjustment.

The government could adjust the indirect rate such that the remainder of increased cost paid by the government after the accumulated costs on flexibly-priced contracts self-adjust will be recovered through the indirect rate application to the government flexibly-priced contracts. We recommend adjusting the rate on a completed fiscal year rather than adjusting forward pricing rates so the government is confident that it recovers the full amount to which it is entitled.

The adjustment could be formalized through a written agreement with the contractor to disallow a specified amount from the final indirect rate at the time of rate agreement/settlement.

For example, assume that the labor overhead rate for FY1999 will be adjusted. The government participation rate for flexibly-priced contracts in the labor overhead allocation base is 50 percent. Our recommended disallowance for the FY1999 overhead cost is $996,000, calculated as follows:

| | | | | |
|---|---|---|---|---|
| Increased cost in the aggregate | ÷ | Government flexibly-priced contract participation rate in the labor overhead allocation base | = | Amount of adjustment to the labor overhead pool |

$498,000 ÷ 0.50 = $996,000

c. Cash payment.

The contractor may choose to submit a check for the amount of the noncompliance ($498,000). There is nothing that prevents it from doing this.

# United States Court of Appeals for the Federal Circuit

MISCELLANEOUS No. 774

IN RE VIOLATION OF RULE 28(c)

Blas P. Arroyo, Alston & Bird LLP, of Charlotte, North Carolina, for defendant/counterclaimant cross-appellant, The Esab Group, Inc. Of counsel was Richard M. McDermott.

Edward A. Haffer, Sheehan Phinney Bass & Green, PA, of Manchester, New Hampshire, for plaintiff/counterclaim defendant-appellant, Centricut, LLC (New Hampshire), and counterclaim defendant-appellant, Centricut, LLC (Delaware). Of counsel were Michael J. Bujold and Neal E. Friedman, Davis & Bujold, P.L.L.C., of Manchester, New Hampshire.

Appealed from: United States District Court for the District of New Hampshire

Judge Steven J. McAuliffe

# United States Court of Appeals for the Federal Circuit

MISCELLANEOUS No. 774

IN RE VIOLATION OF RULE 28(c)

Before MICHEL, CLEVENGER, and DYK, Circuit Judges.

PER CURIAM.

ORDER

On September 10, 2004, at oral argument in Centricut LLC v. Esab Group, Inc. (Nos. 03-1574, -1614), this court issued an order to Blas P. Arroyo, counsel for The Esab Group, Inc. ("counsel"), to show cause why sanctions should not be imposed for the filing of a Cross-Appellant's Reply Brief in violation of Fed. R. App. P. 28(c). Counsel submitted a written response urging that the filing of a non-conforming Reply Brief, while in violation of Rule 28(c), did not merit sanctions. We conclude that sanctions are not warranted in this case. However, in the future, similar violations of the Federal Rules of Appellate Procedure, or of our Local Rules of Practice, will likely result in sanctions.

DISCUSSION

The underlying case here involves a suit for patent infringement brought by The Esab Group, Inc. ("Esab") against Centricut LLC (New Hampshire) and Centricut LLC (Delaware) (collectively "Centricut"). Following a bench trial, the district court found infringement and granted damages in favor of Esab. Centricut appealed from the judgment of infringement and objected to the measurement of damages. Esab cross-

appealed, seeking to modify the judgment on damages. The merits of the appeal and cross-appeal have not been decided.

Rule 28(c) of the Federal Rules of Appellate Procedure provides, in pertinent part: "An appellee who has cross-appealed may file a brief in reply to the appellant's response to the issues presented by the cross-appeal." Rule 28(c) limits the content of Cross-Appellant's Reply Brief to "issues presented by the cross-appeal," and the Practice Notes promulgated by this court explicitly warn cross-appellants against exceeding the scope of Rule 28:

> [C]ounsel are cautioned, in cases involving a proper cross-appeal, to limit the fourth brief to the issues presented by the cross-appeal. In all cases, counsel should be prepared to defend the filing of a cross-appeal and the propriety of arguments presented in the fourth brief at oral argument.

Federal Circuit Rule 28 (2004) and Practice Note (Cross-Appeals). In large part, the Cross-Appellant's Reply Brief filed by Esab addressed issues pertinent only to the main appeal. Indeed, counsel for Esab conceded during oral argument that the vast majority of the Cross-Appellant's Reply Brief—roughly 20 of the brief's 23 pages—addressed issues relating only to the main appeal and not to the cross-appeal.

Contrary to counsel's argument that there is a lack of clarity in the rules concerning cross-appeal reply briefs, the language of Rule 28(c) is perfectly clear. The reply brief in the cross-appeal must be limited to cross-appeal issues and must not again address the main appeal. The fact that Federal Circuit Rule 31, which governs this court's procedures for filing briefs (including cross-appeal reply briefs) does not explicitly reference Rule 28's content limitations is of no import. Rule 28 is clear, and must be complied with.

This court has authority to impose sanctions for violations of the Federal Rules of Appellate Procedure or of its own rules. Federal Rule of Appellate Procedure 46(c) provides that a "court of appeals may discipline an attorney who practices before it . . . for failure to comply with any court rule." [1]

We accept counsel's representation that the violation of Rule 28(c) in this case was inadvertent. So far as we have been able to determine, this court has not in the past exercised its authority to impose sanctions for "inadvertent" violations of applicable court rules. Under these circumstances, we conclude that the imposition of sanctions in this case is not appropriate. However, we wish to make clear that it is the duty of counsel to familiarize themselves with applicable rules, and that, in future cases, serious violations of applicable rules, whether or not "inadvertent," will potentially subject counsel to sanctions.

This court, in order to get its work done, must insist on strict compliance with its rules. Violations of Rule 28(c)—and of other procedural rules such as Federal Circuit Rule 47.6 which prohibits the citation of nonprecedential opinions, or the rules governing situations in which a cross-appeal is appropriate—are all too frequent. In addition to imposing an unfair burden on opposing parties, violations of our rules also burden the court. The court must consider a large number of appeals each year. It can only

---

1 Federal Rule of Appellate Procedure 46(c) provides in its entirety:

> Discipline: A court of appeals may discipline an attorney who practices before it for conduct unbecoming a member of the bar or for failure to comply with any court rule. First, however, the court must afford the attorney reasonable notice, an opportunity to show cause to the contrary, and if requested, a hearing.

conduct its work fairly and efficiently if counsel cooperate by abiding by the pertinent rules.

Accordingly,

IT IS ORDERED THAT:

No sanctions be imposed in the present case.

FOR THE COURT

Nov-5 2004
Date

S/ Jan Horbaly
Jan Horbaly
Clerk

M&C MILLER & CHEVALIER
CHARTERED

655 FIFTEENTH STREET, N.W., SUITE 900
WASHINGTON, D.C. 20005-5701
202.626.5800 FAX: 202.628.0858
WWW.MILLERCHEVALIER.COM

CLARENCE T. KIPPS, JR.
202.626.5840
ckipps@milchev.com

August 19, 2004

VIA FACSMILIE

Doris S. Finnerman, Esquire
Commercial Litigation Branch, Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Dear Dorie:

Attached is a copy of Lockheed's response to your first request for admissions that we had delivered to you in June 2001.

I plan to substantially narrow the issues in this case. I understand that DCAA audited the attached schedule entitled "Cost Impact Conclusion" on page 5 of our October 23, 2001 submission to you entitled "DCMA – LOCKHEED MARTIN DISCUSSION." If you would provide me a copy of the results of DCAA's checking of the numbers on that schedule, I believe it would help narrow the issues and more quickly bring this case to a close. Thanks.

Sincerely,

Clarence T. Kipps, Jr.

Enclosure
bcc: David M. Christenson, Esquire (w/o encl.)
Mr. A. M. DiPasquale (w/o encl.)
Mr. James Blue (w/o encl.)

Lockheed Martin Corporation
6801 Rockledge Drive Bethesda, MD 20817
Telephone 301-897-6781

LOCKHEED MARTIN

RECEIVED
- 6 1997
DCE

Anthony M. DiPasquale
Corporate Director
Government Financial Management

October 2, 1997

Mr. Louis G. Becker
Defense Corporate Executive
Defense Contract Management Command
c/o Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817

Subject: Final Determination of Noncompliance with CAS 403 and 418
Audit Report No. 3121-94J19200016
Allocation of CRAY Computer Costs to LADC, LMSC and LASC

Dear Mr. Becker:

We continue to disagree with your conclusion that Lockheed Martin is noncompliant with CAS 403 and CAS 418 with regard to the allocation of CRAY computer costs from LITC. As previously stated, we believe that our allocation methodology is an acceptable measure of resource consumption and is compliant with CAS. As you requested in your letter of June 17, 1997 we are providing cost impact data for the years of alleged noncompliance.

COMPARISON OF BUDGET COMMITMENT TO ACTUAL USAGE ($ millions)

| | Company | Budget | Actual Use % | Actual Usage | Difference |
|---|---|---|---|---|---|
| 1994 | | | | | |
| | Missiles & Space | $6.376 | 48.1% | $4.802 | $(1.574) |
| | Aeronautical Systems | 2.211 | 50.4 | 5.038 | 2.827 |
| | Skunk Works | 1.400 | 1.5 | .147 | (1.253) |
| 1995 | Regular Agreement | | | | |
| | Missiles & Space | $.634 | 44.6 | .566 | (.068) |
| | Aeronautical Systems | .634 | 55.4 | .702 | .068 |
| | Excess Capacity(1) | | | | |
| | Missiles & Space | 1.684 | 44.6 | .979 | (.705) |
| | Aeronautical Systems | .510 | 55.4 | 1.215 | (.705) |

(1) The excess capacity amounts in the budget column are actual excess capacity costs rather than budget.

000135

CONTRACT TYPE BY COMPANY EXPRESSED AS A PERCENTAGE

| | | Missiles & Space | Aeronautical Sys | Skunk Works |
|---|---|---|---|---|
| 1994 | | | | |
| | Firm Fixed Price (2) | 5.3% | 65.9% | 27.4% |
| | Fixed Price Incentive | .4 | 1.0 | 2.4 |
| | Cost Plus | 94.3 | 33.1 | 70.2 |
| 1995 | | | | |
| | Firm Fixed Price (2) | 8.6% | 72.5% | N/A |
| | Fixed Price Incentive | .4 | .4 | |
| | Cost Plus | 91.1 | 27.1 | |

(2) Includes commercial, foreign (nonFMS) and intercompany sales.

Sincerely,

A. M. DiPasquale

cc: Don Wheatley, DCMC
John Ames, DCAA

000136