IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00-129C |
| | ) | (Judge Allegra) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims, Lockheed Martin Corporation ("Lockheed" or "Plaintiff") responds as follows to Defendant's Proposed Findings of Uncontroverted Fact, submitted in support of its Cross Motion for Summary Judgment.

## GENERAL DENIALS

1. Nearly all of the Government's Proposed Findings of Uncontroverted Fact are irrelevant, and some are incorrect. They confuse and complicate the simple issues before the Court. CAS 418, Lockheed's Corporate CAS Disclosure Statement, service level agreements, memoranda of understanding, DCAA's estimates of the cost impact of Lockheed's alleged failure to comply with CAS 418, and the operating companies'[1] forecasted CRAY costs all are irrelevant. They relate to the Government's counterclaim for alleged CAS noncompliance. Assuming, *arguendo*, CAS noncompliance, the CAS statute and regulations indisputably bar recovery by the Government unless such noncompliance resulted in the Government paying **increased cost.** The record shows that the Government did not pay increased cost under either Lockheed's resource commitment method or the Government's actual usage method, but instead underpaid the CRAY computer costs allocable to government contracts. Def. Brief at 22; *see* PFOF ¶¶ 23-24 (reflecting that the Government paid no increased cost and, in fact, underpaid Lockheed for the CRAY costs).

---

[1] In Plaintiff's Motion for Summary Judgment, Memorandum in Support thereof, and Proposed Statement of Uncontroverted Fact, Lockheed referred to what the Government calls "business segments" as "operating companies." The terms may be used synonymously.

**RESPONSES**

1. In April 1994, Lockheed Corporation ("Lockheed") revised its disclosure statement. Def. App. 1.

Response:

Agrees.

2. Item 8.3.1.R of the disclosure statement sets forth Lockheed's description of its allocation of LITC costs to Lockheed's business segments. One of the expense pools to be allocated was the HPCC/Super Computer pool. As its name implies, this pool contained costs related to supercomputer services that were provided to the business segments. Def. App. 3-4.

Response:

Agrees.

Counter Response:

As reflected in Item 8.3.1.R of Lockheed's Corporate CAS Disclosure Statement, Lockheed had one method for allocating costs from the IBM and HPCC/Super Computer ("CRAY") cost pools to the operating companies. Def. App. at 3-4, 52; PFOF ¶ 14.

3. The disclosure statement provides, in part:

> Services provided to customers will be governed by service level agreements and documents of understanding. In these agreements customers commit to forecasts of resource usage. LITC plans| on asset expenditures and support requirements based on assessments of the workload requirements. Each company is billed for resources forecast by them, and allocated on their behalf. A penalty is assessed on any company that significantly over-forecasts their support and resource requirements. A company, depending on the overall mix of work forecast variances, may be liable of 90% of their forecast. Those companies whose needs

> exceed their forecast will be accommodated subject to available capacity. Incremental spending
> to meet unforecasted needs will be borne exclusively by the company necessitating the investment.
>
> Direct charges- . . . HPCC processing is being billed to the companies at standard rates per CPU hour for committed share processing and standard rates per wall clock hour for committed dedicated processing. Available capacity above these levels is at no cost, to ensure maximum use of available resources. . . . For cost pools allocated on a usage rate basis, standard rates will be set at the start of the year and remain throughout the year provided over/under liquidation does not exceed 10%. Within this range the over/under liquidation will be rolled into the next year's rates. If the over/under liquidation exceeds 10%, rates will be adjusted to actuals a minimum of once a year, usually at year end.

Def. App. 3-4 (emphasis added).

Response:

Agrees. Irrelevant to the extent it concerns how Lockheed handles "over/under liquidation."

Counter Response:

*See supra* Counter Response #2.

4. Item 8.3.1.R was intended to address the allocation of both IBM computer costs and HPCC/Supercomputer Costs. *Id.*

Response:

Agrees.

Counter Response:

*See supra* Counter Response #2.

5. In the summer of 1994, the Defense Contract Audit Agency ("DCAA") reviewed LITC's compliance with the rules of the Cost Accounting Standards Board and issued two audit reports: Audit Reports Nos. 3121-94J9200015 ("Audit Report 15") and 3121-94J9200016 ("Audit Report 16"). Def. App. 5-28. Audit Report 15 dealt with the allocation of costs related to LITC's IBM mainframe computers. Audit Report 16 dealt with the allocation of costs related to LITC's CRAY supercomputers.

Response:

Agrees.

Counter Response:

*See* PFOF ¶¶ 11-14. Moreover, as reflected above in Counter Response #2, Lockheed had one method for allocating costs from the IBM and HPCC/Super Computer ("CRAY") cost pools to the operating companies. Def. App. at 3-4, 52; PFOF ¶ 14.

6. Audit Report 15 opined that Lockheed's practice of allocating IBM computer costs based on commitments by the operating segments violated CAS 418 because that standard "recommends that the allocation of the costs be based on resource consumption." Def. App. 7. The auditors also found that the difference between the projected 1994 allocation of IBM computer costs based upon the commitments of the segments and the projected allocation of those costs based upon the recorded usage for the first six months of 1994 was not significant. *Id.*

Response:

Lockheed agrees that DCAA stated these opinions in Audit Report 15.

Counter Response:

*See* PFOF ¶¶ 12-15.

7. Audit Report 16 opined that Lockheed's practice of allocating CRAY supercomputer costs based on commitments by the operating segments violated CAS 418 because that standard "recommends that the allocation of the costs be based on resource consumption." It also found that the difference between the allocation of costs based on commitment and the allocation of costs based on resource consumption would result in an estimated cost impact to the Government of $1,236,010 over the course of the year 1994. Def. App. 15.

Response:

Lockheed agrees that DCAA stated these opinions in Audit Report 16.

Counter Response:

*See* PFOF ¶¶ 11-15. Lockheed further states that though DCE Rose's letter specifically referenced Audit Report 15, which addressed LITC's allocation of IBM computer costs, the subject line of the letter -- "CAS 418 Noncompliance LITC Allocation of Direct and Indirect Costs" -- suggests that the letter also was applicable to DCAA's findings in Audit Report 16, which addressed LITC's allocation of CRAY computer costs. *Id.* This is because Lockheed had one method for allocating costs from the IBM and HPCC/Super Computer ("CRAY") cost pools to the operating companies. *See supra* Counter Response # 2; Def. App. at 3-4, 52; PFOF ¶ 14.

8. On November 22, 1994, James Rose, the Defense Contract Executive ("DCE") for Lockheed, wrote to the DCAA Resident Auditor at Lockheed Corporation concerning the CAS

418 noncompliance issues raised in Audit Report 15, with respect to IBM computer costs. Mr. Rose took note of DCAA's finding that the differences between the cost allocations using the LITC forecasting method and the allocation of the costs based on recorded usage were not significant. Based upon that information and a regulation providing that a change in allocation base is not required if the proper allocation base would not result in a material difference, Mr. Rose made a determination that "LITC's current practice of allocating cost meets the intent of CAS 418 requirement. Therefore, with this letter the issue of noncompliance with CAS 418 is resolved and disposed with no additional action required." A copy of the letter was sent to LMC. Pl. App. 18-19.

Response:

Agrees.

Counter Response:

*See supra* Counter Responses 5 & 7, collectively.

9. Mr. Rose never addressed the recommendations of Audit Report 16.

Response:

Disagrees.

Counter Response:

*See supra* Counter Responses 5 & 7, collectively.

10. Following the merger of Lockheed with Martin Marietta in March 1995, responsibility for the cost accounting practices at Lockheed transferred to the DCE for Lockheed Martin Corporation, Louis G. Becker. Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 16.

<u>Response:</u>

Agrees.

11. A DCAA memorandum dated February 13, 1996, reflected the estimated impact of the CAS 418 noncompliance on cost-reimbursable contracts in 1994 was $1,077,075. Def. App. 29.

<u>Response:</u>

Agrees that DCAA stated this opinion, but irrelevant.

12. DCAA issued a report of a supplemental audit of fiscal year 1994 recorded costs on September 16, 1996. This report reflected the final variance in cost allocations for 1994 between the allocation used by Lockheed and an allocation based on actual usage by the various Lockheed segments. Def. App. 30-33.

<u>Response:</u>

Agrees, but irrelevant.

13. On May 31, 1996, Mr. Becker issued a notice of noncompliance with CAS 418 to Lockheed Martin based upon the recommendations in Audit Report 16. Mr. Becker also requested that LMC provide a cost impact proposal. Pl. App. 23-24.

<u>Response:</u>

Agrees.

14. LMC responded that there was no CAS noncompliance and, therefore, no cost impact proposal was required. Def. App. 34-35.

Response:

Agrees.

Counter Response:

In response to Mr. Becker's May 31, 1996 request for a "cost impact proposal" (Pl. App. at 023-024), on December 6, 1996 Lockheed responded that no cost impact proposal was required because there was no CAS noncompliance. Def. App. 34-35. Though Lockheed has consistently maintained (and continues to maintain) that its method of allocating CRAY computer costs complied with CAS, on October 2, 1997, responding to Mr. Becker's May 31, 1996 and June 17, 1997 requests for a cost impact statement, Lockheed provided Mr. Becker with cost impact data for the years of alleged noncompliance. *See* Pl. App. at 107-08.

15. For several months, the parties exchanged correspondence setting forth their respective opinions as to the requirements of CAS. Def. App. 36-44.

Response:

Agrees.

Counter Response:

*See* PFOF ¶¶ 18-20.

16. On June 17, 1997, Mr. Becker issued a final determination of noncompliance with CAS 403 and CAS 418, and he again requested that LMC submit a cost impact proposal within 60 days. Def. App. 45-47.

Response:

Agrees.

Counter Response:

*See supra* Counter Response 14.

17. During the next several months, representatives of LMC and the DCE conducted negotiations in an attempt to resolve the CAS noncompliance issue. Plaintiff's Proposed Findings of Uncontroverted Fact, ¶ 18.

Response:

Agrees.

Counter Response:

*See* PFOF ¶¶ 18-20.

18. On December 19, 1997, LMC outlined a "compromise approach" with a description of how adjustments to the CRAY computer billings in 1994 and 1995 would be made "if an agreement is reached." Pl. App. 25; Def. App. 48.

Response:

Lockheed agrees that its December 19, 1997 letter informed the DCE's representative how it would handle the adjustments resulting from the change in cost accounting practice which it agreed to make, while continuing to maintain that its method complied with CAS. PFOF ¶¶ 18-20. Plaintiff disagrees with Defendant's characterization of the letter as a "compromise approach."

Counter Response:

*See* PFOF ¶¶ 18-20.

19. On June 16, 1998, Lockheed Martin submitted its final settlement offer. Def. App. 48-49.

Response:

Lockheed disagrees with the Government's characterization of the June 16, 1998 letter from Lockheed Martin to the Government as a "final settlement offer." By the time Lockheed wrote this letter, it had already implemented its agreement to change its cost accounting practice, notwithstanding the dispute between the DCE and Lockheed on the cost impact of the change. *See* PFOF ¶ 20.

20. On March 16, 1999, Mr. Becker issued his final decision and demand for payment in the amount of $2,669,534. Pl. App. 26-27A.

Response:

Agrees, but clarifies that Mr. Becker's letter demanded $2,669,534 plus interest.

Counter Response:

*See* PFOF ¶ 21.

21. Mr. Becker sent a follow-up letter renewing the demand for payment and advising Lockheed Martin that it could submit a proposal for deferment of collection if it disputed the amount demanded. Def. App. 50-51.

Response:

Agrees.

22. On May 21, 1999, LMC requested deferment of collection of the amount demanded while LMC appealed the final decision. Def. App. 52-53.

Response:

Agrees.

23. According to Lockheed, there were three “service level agreements and documents of understanding” such as are referenced in Lockheed’s disclosure statement submitted to James Rose on April 1, 1994: (1) an Interdepartmental Communication from W. Bernstein, dated September 24, 1993; (2) a Service Level Agreement for LADC, January 1994 through December 1994, dated August 1994; and (2) a Service Level Agreement for LASC, January 1994 through December 1994, dated February 18, 1994. Def. App. 57.

Response:

Agrees, but irrelevant.

24. The Interdepartmental Communication from W. Bernstein, dated September 24, 1993, projected CRAY costs for 1994 as follows:

LADC $2,800,000

LASC 2,189,000

LMSC 6,376,000.

Def. App. 124, 127, 129, 132.

Response:

Agrees, but irrelevant.

25. The Service Level Agreement for LADC, January 1994 through December 1994, dated August 1994, stated, "LADC has no work forecasted for the LITC, HPCC processors in 1994." Def. App. 85.

Response:

Agrees, but irrelevant.

26. There were no "service level agreements and documents of understanding" reflecting commitments for CRAY usage in 1995. Def. App. 57 (Pl. Resp. to Interrog. No. 6).

Response:

Agrees, but irrelevant.

27. For 1994, LMSC, LASC, and LADC committed to a certain level of costs based on anticipated CRAY usage. LMSC, LASC, and LADC committed to cost levels as follows:

*Customer Dollar*
*Commitment*

LMSC $ 6,376,000

LASC 2,188,550

LADC 1,469,000

Total $ 10,033,550

Def. App. 139-40 (Plaintiff's Responses to Requests for Admissions, Nos. 1-3); 156.

Response:

Agrees, but irrelevant.

28. For 1994, the total costs billed by LITC for CRAY computers was as follows:

*Customer Amount Billed*

LMSC $ 6,382,491

LASC 2,136,000

LADC 1,469,892

Sanders 8,113

Total $ 9,996,496

Def. App. 140-42 (Plaintiff's Responses to Requests for Admissions, Nos. 4-7).

<u>Response:</u>

Agrees, however, only the total aggregate cost billed by LITC to the three operating companies with government contracts (LMSC, LASC and LADC) for 1994-95 is relevant. The underlying detail is not relevant to for the Court to find that the Government paid no "increased cost" and dismiss the Government's counterclaim.

29. For 1994, actual CRAY usage was as follows:

*Customer*
*Actual CPU*
*Hours Usage %*

LMSC 7,245.5 47.9

LASC 7,537.3 50.0

LADC 188.6 1.2

LTOC 112.8 .7

Sanders 30.1 .2

15,114.3 100.0%

Def. App. 142-43 (Plaintiff's Responses to Requests for Admissions, Nos. 8-12).

Response:

Agrees, however, *see supra* response to #28.

30. For 1994, LMSC and LADC did not utilize the CRAY computers in accordance with their respective commitments, but they were billed for the full amount of their commitment. Def. App. 144 (Plaintiff's Response to Request for Admissions, No. 14).

Response:

Agrees, but irrelevant.

Counter Response:

Based upon actual utilization, LASC essentially met its committed levels for 1994. Both LMSC and LADC's actual usage was significantly below their committed levels, and they were billed up to their respective committed costs. *See* Plaintiff's Response to Request for Admission #14 (Def. App. at 144).

31. For 1994, LASC was not billed for the difference between its commitment and its actual usage of the CRAY. Def. App. 144 (Plaintiff's Response to Request for Admissions, No. 15).

Response:

Agrees, but irrelevant.

Counter Response:

Based upon actual utilization, LASC essentially met its committed levels for 1994. *See* Plaintiff's Responses to Request for Admission #14-15 (Def. App. at 144).

32. LADC included the $1,469,882 costs billed by LITC in its fiscal year 1993 overhead claim. LADC was billed by LITC for its committed amount of $1,469,882 evenly over the 12 months of 1994. Def. App. 144-45 (Plaintiff's Responses to Requests for Admissions, Nos. 15-16).

Response:

Disagrees, but irrelevant. LADC included the $1,469,822 LITC-billed CRAY computer costs for CFY 1994 as part of its fiscal year 1993 overhead claim. *See* Plaintiff's Response to Request for Admission 16 (Def. App. at 145). LADC was billed its committed amount of $1,469,892 evenly over the 12 months of 1994. *See* Plaintiff's Response to Request for Admission 17 (Def. App. at 145). As reflected in LADC's final overhead rate agreement for 1997, DCAA disallowed this amount. Pl. App. at 073-074.

33. Although LITC billed Sanders for CRAY usage, Sanders had not previously made any hour or dollar commitment for CRAY usage. Def. App. 145-46 (Plaintiff's Response to Request for Admissions, No. 18). Lockheed neither admitted nor denied this request for admission, although the information is within the possession of Lockheed. Therefore, pursuant to Rule 36, the request is deemed admitted.

Response:

Agrees, but irrelevant.

34. For 1995, LMSC and LASC each committed $634,000 for CRAY computer usage. Def. App. 147-48 (Plaintiff''s Responses to Requests for Admissions, Nos. 23, 25); 156.

Response:

Agrees, but irrelevant.

35. For 1995, LMSC also committed $2,154,000 for excess capacity for CRAY computer usage. Def. App. 147-48 (Plaintiff's Response to Request for Admissions, No. 24); 156.

Response:

Agrees, but irrelevant.

36. For 1995, LASC also committed $757,000 for excess capacity for CRAY computer usage. Def. App. 148 (Plaintiff's Response to Request for Admissions, No. 26); 156.

Response:

Agrees, but irrelevant.

37. For 1995, LITC billed LMSC $634,000 for CRAY computer usage. Def. App. 148-49 (Plaintiff's Response to Request for Admissions, No. 27).

Response:

Disagrees, however, irrelevant for the reasons set forth at Plaintiff's response to #28, above. The budget usage for LMSC was $634,000. *See* Plaintiff's Response to Request for Admission 27 (Def. App. at 149).

38. For 1995, LITC billed LMSC $1,684,000 for excess capacity. Def. App. 149 (Plaintiff's Response to Request for Admissions, No. 28).

Response:

Disagrees, however, irrelevant for the reasons set forth at Plaintiff's response to #28, above. Actual excess capacity for LMSC was $1,684,000. *See* Plaintiff's Response to Request for Admission 28 (Def. App. at 149).

39. For 1995, LITC billed LASC $634,000 for actual CRAY computer usage. Def. App. 149 (Plaintiff's Response to Request for Admissions, No. 291).

Response:

Disagrees, however, irrelevant for the reasons set forth at Plaintiff's response to #28, above. Budget usage for LASC was $634,000. *See* Plaintiff's Response to Request for Admission 29 (Def. App. at 149).

40. For 1995, LITC billed LASC $510,000 for excess capacity. Def. App. 149-50 (Plaintiff's Response to Request for Admissions, No. 301).

Response:

Disagrees, however, irrelevant for the reasons set forth at Plaintiff's response to #28, above. Actual excess capacity for LASC was $510,000. *See* Plaintiff's Response to Request for Admission 30 (Def. App. at 149-50).

41. For 1995, LMIT's actual CRAY usage cost was $11,785. Def. App. 150 (Plaintiff's Response to Request for Admissions, No. 31).

Response:

Agrees, however, *see supra* response to #28.

42. For 1995, LMSC actually used the CRAY computers for 4,959.5 CPU hours. Def. App. 150 (Plaintiff’s Response to Request for Admissions, No. 32).

Response:

Agrees, however, *see supra* response to #28.

43. For 1995, LASC actually used the CRAY computers for 6,186.8 CPU hours. Def. App. 150-51 (Plaintiff’s Response to Request for Admissions, No. 33).

Response:

Agrees, however, *see supra* response to #28.

44. For 1995, LMTO actually used the CRAY computers for 27.3 CPU hours. Def. App. 151 (Plaintiff'’s Response to Request for Admissions, No. 34).

Response:

Agrees, however, *see supra* response to #28.

45. For 1995, LMIT actually used the CRAY computers for 111.2 CPU hours. Def. App. 151-52 (Plaintiff’s Response to Request for Admissions, No. 35).

Response:

Agrees, however, *see supra* response to #28.

46. For 1995, Sanders actually used the CRAY computers for 79.9 CPU hours. Def. App. 152 (Plaintiff’s Response to Request for Admissions, No. 36).

Response:

Agrees, however, *see supra* response to #28.

47. Although LITC billed LMIT for CRAY computer usage in 1995, LMIT had not previously made any hour or dollar commitment for CRAY computer usage. Def. App. 152 (Plaintiff's Response to Request for Admissions, No. 371).

Response:

Agrees, however, *see supra* response to #28.

Respectfully submitted,

s/Clarence T. Kipps

_________________________________

Clarence T. Kipps, Jr., Esq.
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 626-5800
Fax: (202) 628-0858
Attorney of Record
Lockheed Martin Corporation

Of Counsel:

Angela B. Styles, Esq.
Kimberly R. Heifetz, Esq.
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 626-5800
Fax: (202) 628-0858

David M. Christenson, Esq.
LOCKHEED MARTIN CORPORATION
6801 Rockledge Drive
Bethesda, Maryland 20817
Tel: (301) 897-6127
Fax: (301) 897-6333

Dated: November 22, 2004