No. 00-129C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LOCKHEED MARTIN CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

Gregory T. Allen
Raymond J. M. Wong
Defense Contract Management Agency

DORIS S. FINNERMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0300
Fax: (202) 305-7643
Attorneys for Defendant

February 11, 2005

# TABLE OF CONTENTS

**PAGE(S)**


I. Lockheed's Noncompliance With CAS 418 Did Not Result In Any Impact On Costs Paid By The Government Under Fixed-Price Contracts . . . . . . . . . . . . 2

II. Lockheed's Failure To Present A Claim To The Contracting Officer For Losses It Allegedly Incurred By Selling The CRAY Computers Prevents The Court From Possessing Jurisdiction To Entertain Lockheed's Claim . . . . . . . . . . . . . 8

A. Lockheed's Offset Claim Does Not Arise From The Same Set Of Operative Facts As Those Considered By The Contracting Officer . . . . . . . . . . . 9

B. The Government Has Had No Notice Of Lockheed's Claim . . . . . . . . . . . . . . . . 12

C. Lockheed's Loss May Not Be Allocable To Government Contracts . . . . . . . . . . 14

II. Mr. Blue's Affidavit May Not Be Considered By The Court . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

Applied Companies v. United States,
144 F.3d 1470 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Attorney General v. Irish Northern Aid Committee,
530 F. Supp. 241 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Chen v. Mayflower Transit, Inc.,
315 F. Supp. 2d 886 (N.D. Ill. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Grenier v. Cyanamid Plastics, Inc.,
70 F.3d 667 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Kunz Const. Co. v. United States,
12 Cl. Ct. 74 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Larouche v. Webster,
175 F.R.D. 452 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

McKeown v. Sears Roebuck & Co.,
335 F. Supp. 2d 917 (W.D. Wis. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Midland Engineering Co. v. John A. Hall Construction Co.,
398 F. Supp. 981 (N.D. Ind. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

PACCAR, Inc.,
ASPCA No. 27978, 89-2 B.C.A. § 21,696 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Perry v. Martin Marietta Corp.,
47 F.3d 1134 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Reflectone, Inc. v. Dalton,
60 F.3d 1572 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Santa Fe Engineers, Inc. v. United States,
818 F.2d 856 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Silverman Laces, Inc.,
2002 WL 31412465 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Transamerica Premier Insurance Co. v. United States,
32 Fed. Cl. 308 (1994) . . . . . . . . . . 17, 18
Washington Central R.R. Co. v. National Mediation Board,
830 F. Supp. 1343 (E.D. Wis. 1993) . . . . . . . . . . 17

**FEDERAL STATUTES AND REGULATIONS**

41 U.S.C. § 422 . . . . . . . . . . 2, 5, 10

48 C.F.R.§ 9903.201-3 . . . . . . . . . . 8, 15

48 C.F.R. § 9903.201-4 . . . . . . . . . . 15

48 C.F.R. § 9903.306 . . . . . . . . . . 4, 6, 10

48 C.F.R. § 9904.418-40 . . . . . . . . . . Passim

Fed. R. Evid. 801 . . . . . . . . . . 17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | No. 00-129C |
| v. | ) | (Judge Allegra) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT

Lockheed's complaint alleges that its "method of allocation of LITC's CRAY computer costs in calendar years 1994 and 1995 complies with the requirements of CAS 418 and CAS 403," and it requests the Court to find that its allocation method was in compliance with the CAS. See Complaint, Count I and Prayer For Relief. In our cross-motion for summary judgment, we demonstrated that Lockheed's allocation of its CRAY computer costs did not comply with CAS 418 because the allocation was based solely upon forecasts of usage without adjusting for actual usage of the computers by Lockheed's operating companies. Cross-motion at 10-17.

In its opposition to our brief, Lockheed does not respond to this showing, and it does not offer any factual or legal basis to support its claim. Therefore, Lockheed has waived this claim.[1] See Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995) ("an issue raised in the

[1] Lockheed's conclusory allegation that it complied with CAS, Pl. Reply at 5-6, must be disregarded. Lockheed's only basis for this assertion is a conclusory remark by Mr. Blue that Lockheed complied with its Disclosure Statement. See Pl. App. 48, ¶¶ 7 and 8. This is clearly insufficient to prevent the Court from granting the Government's cross-motion for summary judgment. See Applied Companies v. United States, 144 F.3d 1470, 1475 (Fed. Cir. 1998) (conclusory statement in affidavit on ultimate issue does not create genuine issue of material fact sufficient to preclude summary judgment).

complaint but ignored at summary judgment may be deemed waived"); Chen v. Mayflower Transit, Inc., 315 F. Supp. 2d 886, 922 (N.D. Ill. 2004) ("Arguments not raised in opening briefs are waived"); McKeown v. Sears Roebuck & Co., 335 F. Supp. 2d 917, 939, 943 (W.D. Wis. 2004) (plaintiff waived claims by failing to respond to defendant's summary judgment motions or to develop an argument that would support his allegations). The Court should grant the Government's motion for summary judgment as to count I of the complaint.

I. Lockheed's Noncompliance With CAS 418 Did Not Result In Any Impact On Costs Paid By The Government Under Fixed-Price Contracts

When a contractor fails to comply with an applicable cost accounting standard, the contractor is liable for any increased costs, in the aggregate, which have been paid by the United States. 41 U.S.C. § 422. In our opening brief, we relied upon a document prepared by Lockheed to demonstrate that the effect of the noncompliance on cost-reimbursement contracts resulted in an overpayment by the Government of $540,000. Cross-Motion at 17. Lockheed does not dispute this cost effect. Pl. Reply at 6-7, n. 4. However, Lockheed contends that the Government's analysis of "increased costs in the aggregate" fails to include an alleged cost effect upon to Lockheed's fixed-price contracts.[2] Lockheed's conclusion is incorrect; in this case, the effect on costs paid by the Government under fixed-price contracts is $0.

---

[2] It is not entirely clear what amount Lockheed contends the Government underpaid on the fixed-price contracts. Lockheed alleges that even if its loss on the disposition of the CRAYs is disregarded, "the Government still underpaid Lockheed approximately $2.68 million of CRAY hourly computer costs allocable to government contracts." Pl. Reply at 6. Since the Government overpaid Lockheed by $540,000 for cost-reimbursable contracts, Lockheed presumably is alleging that the Government underpaid $3.22 million for the fixed-price contracts. Lockheed's current position is inconsistent with Lockheed's earlier contention that the Government underpaid $1.74 million for fixed-price contracts. See Def. App. 158. There is no evidentiary support for either figure. See section III, below.

When Lockheed estimated its costs for purposes of bidding on the fixed-price contracts in effect in 1994 and 1995 (the years of the noncompliance at issue in this case), its estimates were based upon the forecasts of usage made by the business segments.[3] These "commitments" were then used to allocate the costs in 1994 and 1995, and Lockheed did not subsequently make any allocation adjustment to reflect actual usage of the CRAY computers by the business segments. This failure to allocate the costs associated with providing CRAY computer services to its business segments in proportion to the relative benefits received was not in compliance with CAS 418. See 48C.F.R. § 9904.418-40(c) ("Pooled costs shall be allocated to cost objectives in reasonable proportion to the beneficial or causal relationship of the pooled costs to cost objectives. . . . "); Perry v. Martin Marietta Corp., 47 F.3d 1134, 1137 (Fed. Cir. 1995) (Pursuant to CAS 418, cost pools are "allocated back to the segment base and their corresponding cost objectives (the CAS-covered contracts the segments are performing) in proportion to the relative benefits received on the basis of an established methodology"). Notwithstanding Lockheed's failure to make any adjustments in 1994 and 1995 to reflect actual usage, the estimates of usage used to determine fixed-price contracts would not have been any different even if Lockheed had

---

[3] Lockheed's Disclosure Statement provided in part:

> Services provided to customers will be governed by service level agreements and documents of understanding. In these agreements customers commit to forecasts of resource usage. LITC plans on asset expenditures and support requirements based on assessments of workload requirements. Each company is billed for resources forecast by them, and allocated on their behalf.

Def. App. 3. Lockheed does not dispute our description of its estimating process; rather, it contends that such fact is irrelevant. Pl. Reply at 10.

used a compliant method for cost accumulation, that is, even if it used pre-established rates adjusted for actual costs. Since any adjustments for variances are generally made at the end of the accounting period, they do not affect the fixed-price contracts negotiated during the accounting period.

The relevant regulatory provision applicable to fixed-price contracts is not subsection (e) of 48 C.F.R. § 9903.306, as Lockheed contends. Pl. Reply at 8. Rather, the relevant provision is subsection (b), which provides:

> If the contractor under any fixed-price contract, including a firm fixed-price contract, fails during contract performance to follow its cost accounting practices or to comply with applicable Cost Accounting Standards, increased costs are measured by the difference between the contract price agreed to and the contract price that would have been agreed to had the contractor proposed in accordance with the cost accounting practices used during contract performance. The determination of the contract price that would have been agreed to will be left to the contracting parties and will depend on the circumstances of each case.

(emphasis added).[4]

Using this definition, Lockheed has not and cannot demonstrate that there is any difference between the contract price agreed to and the contract price that would have been agreed to. Lockheed does not contend that the estimates were inaccurate or misleading when they were made, nor does Lockheed contend that the estimates did not comply with the cost accounting standards. Therefore, even if Lockheed had subsequently made an adjustment in its

[4] While the regulation cited by Lockheed, section 9903.306(e), permits an adjustment to the contract price for fixed-price contracts where appropriate, it does not logically follow that a noncompliance with CAS will always have a cost impact on fixed-price contracts. There is a cost impact if and only if there is a difference between the contract price agreed to and the contract price that would have been agreed to.

allocation based upon actual usage, its price proposals for fixed-price contracts would still have been based upon the best estimates of usage at that time.

The following example demonstrates this analysis:

Assume that the contractor enters into two contracts: Contract A, a firm, fixed-price contract, and Contract B, a cost-reimbursable contract. Each contract is for a period of one year.

The contractor estimates, and the Government accepts, the following computer costs for each contract, based upon the commitments that the managers of Contract A and Contract B have made to the computer center. The commitments are based on the manager's best estimate of the computer hours each segment will require.

| | Commitment for computer costs |
|---|---|
| Contract A | $75,000 |
| Contract B | $75,000 |

The contractor's practice is to accumulate the commitment amount, a practice that is not in compliance with CAS. The contractor does not adjust the accumulated costs to reflect the difference between the commitment and the actual amount. At the end of the contract the actual computer costs used by each contract is as follows:

| | Actual computer costs |
|---|---|
| Contract A | $90,000 |
| Contract B | $60,000 |

The CAS statute states that the Government shall not pay more than the increased costs, in the aggregate, as defined by the CAS Board. 41 U.S.C. § 422(h)(3). The CAS Board has defined increased costs as follows: Increased costs are deemed to have resulted whenever the

cost paid by the Government is higher than it would have been had applicable cost accounting standards been complied with. 48 C.F.R. § 9903.306(a). For fixed-price contracts, the increased costs are measured by the difference between the contract price agreed to and the contract price that would have been agreed to. 48 C.F.R. § 9903.306(b),

In accordance with these definitions, the increased costs for Contract A, which is a fixed-price contract, is $0. In this example, the contract price agreed to for Contract A was $75,000. In addition, the price that would have been agreed to for Contract A had the contractor used a compliant practice is also $75,000, even if the contractor used a compliant practice of adjusting the commitment costs to actual cost. This is because the original estimate of $75,000 was the best estimate available to both parties at the time of negotiations. Neither party would know at the time of negotiations if or how much the actual costs would ultimately differ from the estimate. Whether the CAS required an adjustment to actual costs was irrelevant at the time of estimating the contract costs. Thus, the difference between the contract price that was agreed to ($75,000) and the contract price that would have been agreed to ($75,000) is $0.

The increased costs for Contract B is $15,000. As defined in section 9903.306(a), increased costs result whenever the cost paid by the Government is higher than it would have been had applicable cost accounting standards been complied with. Contract B is a cost-reimbursable contract. As such, the amount paid by the Government will equal the amount of accumulated costs. In this example, the cost paid by the Government will be $75,000 if the costs are accumulated using the noncompliant practice of using the commitment amount. However, the cost paid by the Government will be only $60,000 if the costs are accumulated using a

compliant practice of adjusting to actual costs. Therefore, the costs paid by the Government will be $15,000 higher than if a compliant practice had been used.

To compute the increased costs in the aggregate, one must add the increased costs computed for fixed-price contracts, as defined by the CAS Board, and the increased costs computed for cost-reimbursable contracts, as defined by the CAS Board. In this example, the increased costs in the aggregate total $15,000 ($0 plus $15,000).

To summarize, the actual costs accumulated under the contract are irrelevant for the fixed- price contract because under a fixed-price contract, the amount to be paid is fixed at the time the contract is negotiated. Thus, the contractor will receive $75,000 regardless of how much the actual computer costs are. However, for cost-reimbursable contracts, the actual costs accumulated are the basis for reimbursement of the costs. Thus, the noncompliance affects cost-reimbursable contracts; it does not impact fixed-price contracts.

This example is the same as the facts in this case. The increased cost for the fixed-price contracts is $0. The amount of increased cost for the cost-reimbursable contracts is the increased costs in the aggregate.

Lockheed's citation to a DCAA document that provides guidance on the determination of cost impact does not assist its position. Like the regulation cited by Lockheed, 48 C.F.R. § 9903.306(e), the guidance recognizes that fixed-price contracts may be relevant in determining cost impact. The guidance does not support Lockheed's conclusion that fixed-price contracts are relevant in all circumstances.

As the guidance and the regulations make clear, a CAS noncompliance may occur in estimating costs and/or in accumulating costs. See, e.g., 48 C.F.R. § 9904.401-30 (defining

"accumulating costs" and "estimating costs"); 48 C.F.R.§ 9903.201-3 (requiring a contractor to certify that its practices used in estimating costs in pricing the proposal are consistent with the cost accounting practices disclosed in its Disclosure Statement); 48 C.F.R. § 9904.401-60 (providing illustrations of practices used in estimating costs and practices used in accumulating costs). Thus, the DCAA guidance states: "Estimating noncompliances affect primarily [fixed-price] contracts, while accumulation noncompliances affect only flexibly-priced contracts." Pl. App. 95 (emphasis added).

In this case, there is no allegation that Lockheed's practices in estimating its costs were not in compliance with the CAS. See Pl. App. 26-27 (contracting officer's final decision). Rather, the issue here is Lockheed's accumulation noncompliance because the actual costs associated with the CRAYs were not properly allocated to the business segments which used these services. This accumulation noncompliance had a cost impact only upon cost-reimburseable contracts.

II. Lockheed's Failure To Present A Claim To The Contracting Officer For Losses It Allegedly Incurred By Selling The CRAY Computers Prevents The Court From Possessing Jurisdiction To Entertain Lockheed's Claim

In our opening brief, we demonstrated that the Court did not possess jurisdiction to consider two new claims asserted by Lockheed in its motion for summary judgment: (1) that Lockheed is entitled to allocate its costs associated with the sale of CRAY computers, which allocation should offset any cost impact resulting from an allocation of costs associated with the usage of the CRAY computers, and (2) that Lockheed is entitled to an equitable adjustment equal to the allocable portion of Lockheed's loss on the disposition of the CRAY computers. The latter claim has now been withdrawn by Lockheed. See Pl. Reply at 5. With respect to the first claim,

Lockheed asserts that it is seeking partial summary judgment as to entitlement only; Lockheed is unable to quantify "the precise amount" of the loss allegedly allocable to Government contracts. See Pl. Reply at 2, n. 1.

A. Lockheed's Offset Claim Does Not Arise From The Same Set Of Operative Facts As Those Considered By The Contracting Officer

Lockheed does not deny that it never presented a claim to the contracting officer addressing the allocation of costs associated with the sale of the CRAY computers. Nor does Lockheed deny that this claim was not raised in its complaint, its reply to the Government's counterclaim, or the joint preliminary status report. See Def. Cross-Motion at 20. Rather, Lockheed simply makes the conclusory assertion that the claim arises from "the same set of operative facts" that were considered by the contracting officer. See Pl. Reply at 3, 11-12.

The claim now asserted by Lockheed – that "Lockheed is entitled to charge government contracts the allocable portion of Lockheed's loss on the disposition of the CRAY computers," Pl. Reply at 1 – does not arise from the same set of operative facts that were considered by the contracting officer in making his final decision of March 16, 1999 (Pl. App. 26-27A). As reflected in the correspondence between Lockheed and the contracting officer, the relevant facts considered by the contracting officer were the annual commitments for usage of the CRAY computers agreed to by the business segments, the actual usage of CRAY computers by the business segments, and whether Lockheed's allocation of the actual costs based solely upon the commitments violated CAS 418. See Def. App. 34-47.

With respect to Lockheed's new claim, the operative facts include Lockheed's Disclosure Statement setting forth its practice for treatment of gains and losses upon disposition of property,

the fact that Lockheed traded-in its two CRAYs for a new CRAY, its actual accounting practices for recording property sale transactions, its actual treatment of the gains and losses associated with the sale of the CRAYs, and whether Lockheed's allocation of the costs associated with such sale was in accordance with CAS 409, as Lockheed contends. See Pl. Motion at 12; Pl. Reply at 11 (arguing that Lockheed is entitled to charge the Government for these losses in accordance with 48 C.F.R. § 9904.409(b)(4)).

The issue considered by the contracting officer was the allocation of costs incurred to provide CRAY computers for use by the business segments during the years 1994 and 1995. The issue presented by Lockheed's offset claim is the allocation of gains and losses upon the sale of the CRAY computers. These transactions did not occur at the same time nor was either transaction dependent upon the other. Because of the disparate nature of the accounting issues involved, they are addressed in separate sections of Lockheed's Disclosure Statement. See Def. App. 3-4 (addressing allocation of computer expenses); Def. App. 171-72 (addressing treatment of gains and losses on disposition of depreciable property).

These different accounting issues are also addressed in different provisions of the cost accounting standards, CAS 418 and CAS 409. Nor does the CAS provide for an offset for unrelated allocation issues. The CAS statute, 41 U.S.C. § 422(h), requires the Government to recover "increased costs" resulting from a noncompliance, but it does not provide for an offset against a different noncompliance. Accordingly, the CAS Board has not promulgated any regulations that permit offsets for different noncompliances. See 48 C.F.R. § 9903.306.

Thus, Lockheed's new claim is not simply an increase over the amount of the monetary claim that was before the contracting officer, as Lockheed suggests. In Santa Fe Engineers, Inc.

v. United States, 818 F.2d 856, 858-60 (Fed. Cir. 1987), the court rejected a similar argument. There, the contractor had submitted a claim to the contracting officer for increased costs resulting from three change orders. Upon appeal of the contracting officer's final decision, the contractor sought to recover an "impact" claim, arising from the collective nature of all the changes that were issued on the project. The court rejected the assertion that the contractor was merely increasing the amount of its claim. Rather, the court held that this latter claim was a new claim that had not been presented to contracting officer, and the court had no jurisdiction to entertain the claim. The circumstances are no different here.

Moreover, even if Lockheed's new claim were nothing more than a change in the dollar amount of the claim, the Court would still lack jurisdiction. In Kunz Const. Co. v. United States, 12 Cl. Ct. 74, 79 (1987), the Court acknowledged that it could exercise jurisdiction over a claim the dollar amount of which was enlarged over the amount presented to the contracting officer if (1) the increase in the amount of the claim is based on the same set of operative facts previously presented to the contracting officer, and (2) the court finds that the contractor neither knew nor reasonably should have known, at the time when the claim was presented to the contracting officer, of the factors justifying an increase in the amount of the claim. Accordingly, the Court did not possess jurisdiction to consider the contractor's claim for home-office overhead, which was known to the contractor but not included in its claim to the contracting officer. In this case, the contracting officer issued his final decision on March 16, 1999. At that time, Lockheed should have known the costs associated with the disposition of the CRAYs in 1995.

Lockheed tries to further avoid the requirement that it submit to the contracting officer a written demand seeking, as a matter of right, the payment of money in a "sum certain," see

Reflectone, Inc. v. Dalton, 60 F.3d 1572, (Fed. Cir. 1995), by contending that the Government has "available to [it] all the documentation necessary to calculate the amount of the underpayment." Pl. Reply at 15. Remarkably, Lockheed does not even identify the documents necessary for this calculation. This contention is also remarkable in light of Lockheed's admission that it is unable to quantify "the precise amount" of the loss allegedly allocable to Government contracts. See Pl. Reply at 2, n. 1.[5]

At bottom, Lockheed did not submit a claim to the contracting officer, and the claim, which has been presented here for the very first time, does not arise from the same set of operative facts presented to the contracting officer. The Court does not possess jurisdiction to entertain this claim.

B. The Government Has Had No Notice Of Lockheed's Claim

Lockheed falsely claims that "facts concerning Lockheed's loss on the disposition of the CRAY computers have been produced in discovery." Pl. Reply at 12. Mr. Blue's declaration, cited by Lockheed, does not support that assertion. Mr. Blue merely avers that the issue was discussed at a meeting between the parties on April 11, 2002, and that the presentation by Lockheed "included information on this topic." Pl. App. 48, at ¶ 9.

Notwithstanding five sets of interrogatories, four requests for production of documents, and a request for admissions propounded by the Government, Lockheed cannot identify a single discovery request relating to the sale of the CRAYs. The lack of discovery on this issue is apparent from the parties' dispute as to the date of the sale. In its opening motion, Lockheed

[5] Lockheed further fails to explain how it arrived at the conclusion that the disposition had a cost impact of $6.8 million, while it purportedly took write-offs totaling $7,442,615 (Pl. App. 69-72).

alleged that costs were properly allocable in 1995. Pl. Motion at 12. Lockheed, however, offered no evidence of that factual assertion. In our cross-motion, we demonstrated that Lockheed continued to use the CRAYs in 1996, which suggests that Lockheed did not dispose of the CRAYs in 1995. Cross-motion at 21, n. 5; Def. App. 40. In its reply, Lockheed asserted that the "record incontrovertibly shows that the CRAY computers were disposed of in December of 1995." Pl. Reply at 11. Finally, Lockheed provided an evidentiary basis for this allegation: two letter agreements dated December 22, 1995, between Lockheed and Cray Research providing for the sale by Lockheed and purchase by Cray of two CRAY computers, a leaseback by Lockheed of one of the CRAY computers, and a sale by Cray and purchase by Lockheed of a third, smaller CRAY computer. A third document, a letter from Cray, describes the transaction as a "trade-in." See Pl. App. 50-52. These documents were not provided to the Government during discovery (as demonstrated by the absence of a Bates number, which was added by Lockheed to all of the documents it produced during discovery).

With respect to Mr. Blue's assertion that "information on this topic" was presented by Lockheed to the Government at a meeting on April 11, 2002, Mr. Blue refers to the single-page document, "Cost Impact Conclusion," prepared by Lockheed for settlement discussions, Def. App. 158. The document references the "1997 Corporate Reallocation/Write Down," which is an apparent reference to the alleged 1995 sale of the computers. At an earlier meeting between the parties, in March 2002, Lockheed also made a presentation. In that presentation, Lockheed set forth a calculation of increased costs in the aggregate, and it did not include any loss allegedly attributed to the sale of the CRAY computers. Nor did the presentation contain any mention of the sale of the CRAY computers. See Def. App. 173-83 (Lockheed's power point presentation).

Finally, with respect to Lockheed's allegation that the Government "audited" the Lockheed document entitled "Cost Impact Conclusion," Pl. Reply at 3-4, 17, Lockheed is misinformed. The DCAA did not conduct an audit of the document or of the loss resulting from the sale of the CRAYs. The DCAA did not review any documents relating to Lockheed's sale of the CRAY computers. Rather, in preparation for trial, DCAA was requested to provide expert advice concerning the correctness of Lockheed's methodology. This advice by the DCAA is not discoverable. See Rule 26(b)(4)(B).

C. Lockheed's Loss May Not Be Allocable To Government Contracts

Presented for the very first time with a claim by Lockheed that it is entitled to allocate its costs associated with the sale of CRAY computers, we demonstrated in our cross-motion that, because it appeared that Lockheed was still using the CRAY computers in 1996, Lockheed's alleged loss incurred in 1996 had no relevance to increased costs paid by the Government in 1994 and 1995. Cross-motion at 21 n. 5. Notwithstanding this demonstration, Lockheed inexplicably contends that we are precluded from making any further arguments as to the merits of this claim. Pl. Reply at 2 and n.2.

At the same time, Lockheed has produced – for the very first time – documents describing the details of the transaction. These documents reflect that Lockheed traded-in the two CRAYs for $170,000, in return for a CRAY, which it purchased for $200,000. Def. App. 50-52. Under these circumstances, any loss resulting from the sale of the CRAYs may not be allocated to Government contracts.

The CAS regulations provide:

> (j)(1) Gains and losses on disposition of tangible capital assets shall be considered as adjustments of depreciation costs previously recognized and shall be assigned to the cost accounting period in which disposition occurs except as provided in subparagraphs (j)(2) and (3) of this subsection. . . .
> (2) Gains and losses on the disposition of tangible capital assets shall not be recognized where:
>
> * * *
>
> (ii) The asset is given in exchange as part of the purchase price of a similar asset and the gain or loss is included in computing the depreciable cost of the new asset.

48 C.F.R. § 9904.409-50. Thus, subsection (j)(2) appears to preclude Lockheed from recognizing a loss in this case.

Further, Lockheed's Disclosure Statement states that upon disposition, the gain or loss is taken into consideration in the depreciation cost basis of the new items, where trade-in is involved." Def. App. 171. The December 29, 1995, letter from Cray Research, Inc. to Lockheed (Pl. App. 50) states: "Enclosed are duly-executed copies of subject letters covering the purchase of a Cray J916 with related software license and maintenance services, in conjunction with the trade-in of the Cray YNP8X S/M 1720 and the YMP-4C 6M1522." This letter clearly shows that the existing Cray computers were a trade-in for the new Cray computer. Thus, in accordance with Lockheed's disclosed practices, the loss on the old CRAY computers must be included in the price of the new computers. It cannot be allocated in 1995, as Lockheed has asked for in its claim.

Furthermore, it would violate the CAS to permit Lockheed to allocate the loss as proposed since the allocation is inconsistent with its Disclosed Practices. 48 C.F.R. § 9903.201-4 requires that, for each contract, "The practices disclosed for this contract shall be the same as the practices disclosed and applied on all other contracts for and which contain a Cost

Accounting Standards (CAS) clause." In order to comply with this provision, Lockheed must include the loss in the price of the new CRAY computer, as provided in its Disclosure Statement; it cannot record the loss for 1995.

Even if Lockheed was permitted to deviate from its disclosed practices (which CAS does not permit), Lockheed's allocation claim still raises several unanswered questions. For example, did Lockheed include the two CRAYs in the purchase price of the new CRAY? Was the loss that Lockheed is now seeking included in computing the depreciable cost of the new CRAY? If the answer to either of those questions is yes, then not only is the claim inconsistent with Lockheed's disclosed practices, it also would represent a double-charge of its costs.

Finally, even if Lockheed's proposed new allocation does comply with the CAS, there is no authority permitting Lockheed to make this retroactive change and to reallocate costs to Government contracts. In PACCAR, Inc., ASPCA No. 27978, 89-2 B.C.A. § 21,696, the Armed Services Board of Contract Appeals refused to permit a contractor to change its allocation method retroactively. The contractor retroactively changed a noncompliant allocation method in order to comply with the CAS, and the change increased the costs on Government contracts. Nevertheless, the board denied the contractor's claims under either the cost accounting standards clause of its contracts or for reformation, holding that the DCAA's reviews of the company's disclosure statement did not amount to a guarantee or commitment that all areas of noncompliance would be discovered. Thus, the contractor was precluded from making a retroactive change that increased the costs to the Government.

For all of these reasons, the Court must decline to entertain Lockheed's claim relating to the sale of the CRAYs.

## III. Mr. Blue's Affidavit May Not Be Considered By The Court

Only evidence that would be admissible at trial may be considered by the Court in reviewing a motion for summary judgment. Rule 56(e); see also 10B Wright, Miller & Kane, Fed. Prac. & Proc. Civ. 3d § 2738. Contrary to the assertion by Lockheed, Pl. Br. at 18, Mr. Blue did not have "direct involvement in the transactions and events at issue" in this case. As Mr. Blue's supplemental declaration makes clear, his only involvement in this case has been to calculate damages. See Pl. App. 1-2, ¶¶ 1-3.

Mr. Blue's declaration is based entirely upon his review of documents. The information obtained from these documents is hearsay. See Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). While the documents may be excepted from the hearsay rule as business records, Lockheed has not made the required showing to demonstrate the application of the exception. See Rule 803(6); Washington Cent. R.R. Co. v. Nat' Mediation Bd., 830 F. Supp. 1343, 1353 (E.D. Wis. 1993) (under Rule 803(6), "the proponent bears the burden of establishing these foundational requirements through the testimony of the custodian," and striking declaration as inadmissible hearsay where foundation was not established).

Indeed, Lockheed has not even disclosed the documents upon which Mr. Blue relied. Lockheed relies upon Transamerica Premier Ins. Co. v. United States, 32 Fed. Cl. 308, 312-13 (1994), as authority for its position that it is not required to disclose these records. In Transamerica, a subrogation case, the issue was whether the surety had actually made a payment under its payment bond. To address this issue, the surety submitted the affidavit of a bond claims specialist, Mr. Pettygrove, who was employed by the surety and who had personal responsibility

for the claims filed against the bond. In addition, the surety provided documentation demonstrating the payment. In holding that the affidavit was sufficient, the Court observed that "the *primary* source of Mr. Pettygrove's information was not the company's books and records but, rather, the affiant's own 'personal knowledge of claims and expenses incurred by Transamerica for contractual obligations payable to claimants on various bonds executed by Transamerica,' including the matter in issue here." 32 Fed. Cl. at 312 (emphasis in original and added). Unlike Transamerica, the only source of Mr. Blue's information is the company's books and records. Accordingly, Mr. Blue's affidavit consists entirely of inadmissible hearsay. See In re Silverman Laces, Inc., 2002 WL 31412465 (S.D.N.Y. 2002) (summary judgment affidavit insufficient where affiant was not involved in the underlying transactions and his statements were based solely upon review of documents and interviews of witnesses); Larouche v. Webster, 175 F.R.D. 452, 455 (S.D.N.Y. 1996) (striking portions of affidavit of FBI supervisor that were not based upon personal knowledge); Attorney General v. Irish Northern Aid Comm, 530 F. Supp. 241, 252 (S.D.N.Y. 1981) (disregarding documents constituting inadmissible hearsay and affiant's conclusory interpretations of documents).

Lockheed's reliance upon the hearsay testimony of Mr. Blue runs afoul of other rules of evidence as well. Rules 1001 and 1002 require that, to prove the contents of a writing, the original writing or a duplicate is required. Rule 1006 permits the contents of voluminous writings to be summarized, but it requires that the documents, upon which the summary is based, be made available for examination. In short, Lockheed cannot avoid producing the documents upon which it relies by citing only to conclusory statements made by Mr. Blue. See Midland Eng'g Co. v. John A. Hall Constr. Co., 398 F. Supp. 981, 989 (N.D. Ind. 1975) (striking affidavit

where "best evidence" rule was violated by not producing the documents and affiant did not have personal knowledge of facts independent of the documents). The affidavit of Mr. Blue is hearsay and it must be disregarded by the Court.

CONCLUSION

For the foregoing reasons, defendant respectfully requests the Court to deny Lockheed's motion for summary judgment, grant defendant's cross-motion for summary judgment, and enter judgment in favor of the Government in the amount of $540,000 plus interest from March 16, 1999.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Doris S. Finnerman
DORIS S. FINNERMAN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 307-0300
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

Gregory T. Allen
Raymond J. M. Wong
Defense Contract Management Agency

February 11, 2005