**ELECTRONICALLY FILED ON JULY 1, 2005**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00-129C |
| | ) | (Judge Allegra) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IDENTIFYING AND SUMMARIZING**
**A DECISION INTERPRETING THE LANGUAGE IN CAS 9903.306(B)**

In *Astronautics Corporation of America*, ASBCA No. 49691, 1999 ASBCA LEXIS 71, the Armed Services Board of Contract Appeals ("ASBCA") interpreted FAR 30.306(b). CAS Reg. 9903.306(b) and FAR 30.306(b) are identical, except the CAS Reg. changed "his" to "its" in the first sentence. A copy of the decision is attached hereto as Exhibit A.

In *Astronautics*, the contractor had estimated the costs and negotiated the fixed prices on the basis of a cost allocation methodology that complied with CAS and the contractor's CAS disclosure statement. 1999 ASBCA LEXIS 71, *2-3. During performance the contractor changed its allocation methodology to one that failed to comply with CAS, and the noncompliance resulted in allocations of greater cost to fixed price and cost type contracts. *Id.* at *3-5. The contractor agreed to an adjustment of its cost type contracts, and the Government sought an adjustment under § 306(b) to the contractor's fixed price contracts. *Id.* at *4-10.

The reason for creating § 306(b) and its administrative interpretations are outlined in the decision. *Id.* at *17-22. The Board looked to DOD Working Group Item 76-4 which, in turn, looked to DOD guidance on "Increased Costs Paid Under CAS-Covered Contracts." *Id.* at *20-22. Working Group Item 76-4 provided:

> *Guidance*
>
> Increased costs to the Government under firm fixed price contracts should be considered to exist when the costs allocated to the contracts are less than would have been allocated if the method of allocation had not been changed.

*Id.* at *21-22. The Board also looked to the CAS Preamble accompanying the original promulgation of the § 306(b) language that stated:

> Preamble M, Para. 2 explains the need for a remedy when the contractor has adopted practices during contract performance 'that reduced his cost allocations below the allocation determined during the estimating process.' According to this reasoning, had the Government been aware of this new method of cost allocation at the time of price negotiation prior to award, it would have relied upon the reduced cost allocation to obtain a better contract price. Accordingly, a contract price adjustment precludes the contractor from obtaining any contract price advantage as a result of any CAS noncompliance during contract performance.

*Id.* at *27-28.

The Board held the contractor's noncompliance in *Astronautics* "did not reduce cost allocations during the performance of any of its fixed priced CAS-covered prime contracts" and, therefore, the Government was not entitled to an adjustment of those fixed price contracts under § 306(b). *Id.* at *28.

Respectfully submitted,

s/Clarence T. Kipps

Clarence T. Kipps, Jr., Esq.
MILLER & CHEVALIER Chartered
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 626-5800
Fax: (202) 628-0858

Attorney of Record
Lockheed Martin Corporation

Of Counsel:

Angela B. Styles, Esq.
Kimberly R. Heifetz, Esq.
MILLER & CHEVALIER Chartered
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 626-5800
Fax: (202) 628-0858

David M. Christenson, Esq.
LOCKHEED MARTIN CORPORATION
6801 Rockledge Drive
Bethesda, Maryland 20817
Tel: (301) 897-6127
Fax: (301) 897-6333

Dated: July 1, 2005

# Exhibit A

LEXSEE 1999 ASBCA LEXIS 71

Appeal of -- Astronautics Corporation of America

ASBCA No. 49691

Armed Services Board of Contract Appeals

99-1 B.C.A. (CCH) P30,390; 1999 ASBCA LEXIS 71

May 18, 1999

**CONTRACT:** Under All CAS-Covered Contracts

**JUDGES:**
[*1] JACK DELMAN, Administrative Judge. ALAN M. SPECTOR Administrative Judge, Acting Chairman, MARK N. STEMPLER, Administrative Judge, Vice Chairman, concur.

**COUNSEL:**
APPEARANCE FOR THE APPELLANT: Stephen D. Knight, Esq., Kirkland & Ellis, Washington, DC.

APPEARANCES FOR THE GOVERNMENT: Kelly T. McCracken, III, Esq., Chief Trial Attorney, Steven Gruenwald, Esq., Trial Attorney, Defense Contract Management, Command, Chicago (DLA).

**OPINIONBY:** DELMAN

**OPINION:**

OPINION BY ADMINISTRATIVE JUDGE JACK DELMAN

The Government seeks $ 13,260,912 from Astronautics Corporation of America ("ACA") based upon its purported failure to comply with certain cost accounting standards under CAS covered contracts and subcontracts. We have jurisdiction under the Contract Disputes Act (CDA), 41 U.S.C. § § 601-613, as amended. The Government's claim is before us on entitlement and quantum. For reasons stated we sustain the appeal. n1

n1 On the eve of trial, both parties filed summary judgment motions. In view of our disposition of the appeal, these motions are denied as moot.

[*2]

FINDINGS OF FACT

I. Background

1. During the years 1986-1989 ACA performed a number of CAS-covered prime contracts for DOD agencies, and performed a number of CAS-covered subcontracts for prime contractors who contracted with DOD agencies. Its CAS-covered prime contracts included cost-reimbursement type contracts and fixed price contracts.

2. In accordance with CAS requirements, ACA had submitted, and the Government had approved ACA's disclosure statement which disclosed its cost accounting practices for purposes of these contracts (app. 2nd supp. R4, tab 234). Item 4.1.0 of the disclosure statement provided that ACA's material handling overhead was allocated over a base of direct material cost (code L, see Part IV- Indirect Cost, Instructions at 9). Item 4.2.0 provided that ACA's General &

Administrative (G&A) cost was allocated over a base of cost input (code C, *id.* at 9, 10). ACA's Independent Research and Development (IR&D) cost was also allocated over a base of cost input (*id.*). The cost input base, being more inclusive, included those costs in the direct material cost base.

3. In 1989, DCAA initiated an incurred-cost audit of ACA for fiscal years 1985-1989. Based [*3] upon a review of certain overhead reports and schedules of incurred costs, the Government's auditor discovered that ACA had omitted certain material costs and other direct costs that should have been in the above referenced allocation bases for the determination of material handling overhead, G&A and IR&D, pursuant to its disclosed method of allocating these indirect costs. Since costs were omitted from these bases, the actual overhead rates calculated from these bases were materially higher than they should have been.

4. DCAA issued an audit report on or about 13 August 1990 which identified this problem. DCAA contended that as a result of these omissions, ACA had acted inconsistently with its disclosure statement and was in noncompliance with CAS 401, 410, 418, 420. The pertinent portions of these cost accounting standards are provided in an Appendix to this opinion.

5. The audit report also stated that ACA's noncompliance resulted in excessive charges and over-recovery of material overhead, G&A and IR&D costs on all ACA contracts and subcontracts for fiscal years 1985-1989. Based upon "potential government exposure and risk," the auditor estimated impact to Government contracts [*4] to be as much as $ 15,043,146 for the years in question.

6. By letter dated 7 May 1990 (R4, tab 1), ACA replied to a DCAA draft report which provided the above findings. In short, ACA did not dispute that the omissions occurred. It stated that the omissions were the result of an exclusion of amounts invoiced to ACA by "Astro Limited," a wholly-owned subsidiary of ACA in Israel that performed work related to ACA's subcontract with Hughes Aircraft under a DoD contract. Instead of performing all the work under the subcontract, ACA had agreed to transfer a portion of the work to its subsidiary in Israel, at Hughes' request, to assist Hughes in meeting its commercial offset requirements in Israel.

7. ACA's letter of 7 May, reasonably construed, did not dispute that these omissions constituted CAS noncompliance. In the letter ACA stated that it had corrected the overhead rates for future application, and was providing the Government with the cost impact under ACA's cost contracts for the period in question, revising its incurred costs to account for the error. ACA stated there was no impact on firm fixed price contracts. By letter to the Government dated 22 January 1991, ACA, again stated [*5] that it had provided the Government with the relevant cost impacts and that "this matter has been corrected" (R4, tab 2).

8. The Government was not satisfied with ACA's response. The DCAA recommended, *inter alia*, that the Administrative Contracting Officer (ACO) direct ACA to submit a cost impact statement to include all CAS covered contracts and subcontracts, including fixed price contracts. (R4, tab 4) The ACO did so, by letter dated 8 October 1991 (R4, tab 7). By reply to the Government dated 4 December 1991 (R4, tab 9), ACA, again, did not dispute the issue of CAS noncompliance. However it reiterated its position regarding the lack of cost impact to fixed price contracts.

9. By letter to ACA dated 30 January 1992, the Government issued an initial finding of noncompliance under CAS 401, 410, 418 and 420. Insofar as pertinent, the Government stated that ACA's failure to include the questioned costs in the appropriate allocation bases resulted in overstated overhead rates which affected all ACA contracts and subcontracts containing CAS clauses. Per FAR 30.602-2 "Noncompliance with CAS requirements," the Government allowed ACA 30 days within which to agree or disagree with the [*6] Government's initial findings.

10. Insofar as pertinent, FAR 30.602-2 provided that if a contractor agreed with the Government's initial finding it was required to correct the noncompliance and submit the impact of the noncompliance on its CAS-covered contracts and subcontracts. FAR 30.602-2(c)(1), (c)(3). If the contractor disagreed with the initial finding, the Government was required to review the contractor's position and make a final determination of compliance or noncompliance. FAR 30.602-2(d)(2) provides as follows:

> 30.602-2 Noncompliance with CAS requirements
>
> * * *
>
> (2) If the ACO makes a determination of noncompliance, or if the contractor fails to furnish the cost impact proposal, the ACO, with the assistance of the auditor, shall determine the cost impact of the noncompliance on contracts and subcontracts containing CAS clauses. The ACO may withhold an

amount not to exceed 10 percent of each subsequent payment request, related to the contractor's CAS-covered prime contracts, which contain the appropriate provisions, until the proposal has been furnished by the contractor.

11. By letter to the Government dated 3 March 1992 (R4, tab 14), ACA replied to the Government's [*7] initial findings. ACA reiterated that certain costs were not properly gathered in reporting certain overhead rates, and that ACA had made corrections to cost-reimbursement contracts to correct these rates, in accordance with FAR 30.602-2(c)(1). By taking this action, we find that ACA acknowledged CAS noncompliance, albeit limited to its cost-reimbursement contracts.

12. In its 3 March letter, ACA reiterated its strong objection to the Government's finding that ACA's fixed price contracts were affected by the noncompliance. ACA stated that it used separately developed budget figures to negotiate its fixed price contracts, that these budget figures contained the costs that ACA had excluded, and the Government had not been prejudiced.

13. By letter to ACA dated 26 June 1992, the Government issued its final determination of noncompliance with CAS 401, 410, 418, and 420, in accordance with FAR 30.602-2(d). The Government stated that "the data provided in your [3 March] response clearly establishes that the costs were not included in the appropriate base, that overheads were overstated, and support a determination that CAS noncompliances occurred." The Government requested, *inter alia*, [*8] that ACA submit the cost impact of the noncompliance on all CAS covered contracts and subcontracts.

14. By letter dated 31 July 1992, ACA provided its written rebuttal to the Government's findings. Again, it asserted the lack of any material impact to its fixed price contracts for reasons previously stated. ACA maintained that it had already satisfied its CAS responsibilities under the circumstances, stating in pertinent part as follows (R4, tab 23):

> 11. Therefore, Astronautics has:
>
> a. Corrected the noncompliance when it revised the overhead calculation in May 1990.
>
> b. Implemented a corrective action plan when it modified the overhead rate calculation program and implemented the annual reconciliation of the amounts on the overhead rate calculation to the amounts on the audited statements.
>
> c. Prepared and submitted a cost impact statement.

15. The parties continued to argue their positions at meetings and through written exchanges. In January 1993 DCAA, at the ACO's request, provided its own estimate of cost impact based on all of ACA's CAS covered contracts and subcontracts for fiscal years 1985-1990. The DCAA auditor recalculated overhead rates by including the amounts [*9] that had been excluded from the allocation bases, took the difference between these recalculated rates and ACA's budgeted rates which it assumed did not contain these amounts, and applied the difference to ACA's incurred costs on all CAS-covered Government contracts and subcontracts for fiscal years 1985 through 1990 to obtain an estimated cost impact in the amount of $ 6,474,587. (R4, tab 26) Notwithstanding the auditor's citation to FAR 30.306(b), which provided in part that a contractor's noncompliance shall be "measured by the difference between the contract price agreed to and the contract price that that would have been agreed to" absent the noncompliance, the auditor did not separately analyze any particular contract or contract price within the period under review, but rather relied on the incurred costs of ACA during the period. The auditor testified that she came up with her best estimate based upon the information she had at the time (tr. 2/10).

16. ACA submitted a more comprehensive cost impact study in January, 1994. ACA's position, however, remained the same - the Government's fixed priced contracts were not adversely affected by the matters in issue (R4, tab 35).

17. [*10] The parties continued to meet over the next several years in an attempt to resolve their differences. They were unable to do so. By letter to ACA dated 8 March 1996, the ACO issued a contracting officer's decision, seeking a recovery from ACA in the amount of $ 6,474,587, per the DCAA's calculations above, plus interest in the amount of $ 6,786,325 for a total of $ 13,260,912 (R4, tab 76). This appeal followed.

II. The Evidence at Trial

The Government's Witnesses

18. The Government called three witnesses and none were offered as expert witnesses. The Government called the DCAA auditor who performed the 1989 audit which uncovered the excluded costs. The auditor testified that he assumed that ACA's budgeted overhead rates used for its proposals under fixed price contracts were impacted by the inaccurate overhead data; he had no personal knowledge of how ACA, in fact, prepared its budgeted rates (tr. 1/102-03). He did not audit ACA's forward pricing rate proposals. He had no personal knowledge as to how ACA developed these proposals and whether ACA relied upon inaccurate overhead data to develop these proposals. He relied on the audit reports of other DCAA auditors who did [*11] audit these proposals to support his view that DCAA used historical information and historical rates to review ACA's overhead rates (tr. 1/110-11). These auditors did not testify.

19. The Government also called the DCAA auditor who developed the Government's estimated cost impact under ACA's negotiated fixed price contracts and subcontracts. The auditor's estimate proceeded on the assumption that ACA's overhead rates on its firm fixed priced contracts were overstated; she made no separate review of the matter (tr. 2/10). Nor did she make any analysis of the extent to which any such overstatements impacted contract prices with the Government. Instead, she relied on ACA's incurred costs per year, whether incurred as a prime contractor or subcontractor (finding 15).

20. The Government also called the ACO who issued the final determination of noncompliance and the contracting officer's decision. In essence, the ACO agreed with DCAA's analysis and accepted DCAA's recommendations. The ACO also assumed that there was a relationship between ACA's historical costs and the direct material portion of its budget, and that ACA's budgeted and proposed overhead rates for its fixed price contracts [*12] were affected by the omitted costs (tr. 1/147, 148, 157, 158). He was not familiar with ACA's budgeting methodology at the time he issued the final notice of noncompliance (tr. 1/142).

Appellant's Witnesses

21. ACA called four fact witnesses and two expert witnesses. ACA's president testified generally about the corporate product lines and how budgeting was accomplished. ACA's vice president of finance provided more detail on the latter issue, using corporate reports and schedules to describe ACA's budgeting process. In short, he testified, and we find that ACA's budgeting methodology took into account all material costs, and was not affected by the subject exclusions. For each product line, ACA determined material cost of sales as a percentage of sales based upon historical information. This percentage would be applied to forecasted sales to obtain forecasted material cost, which figure was adjusted in view of inventory levels and business judgments to come up with projected total material cost that would be used to develop ACA's overhead rates (tr. 2//149-50, 176-77). The inaccurate rates as found by DCAA on the overhead reports (finding 3) were not used in the above process [*13] (tr. 2/201). ACA's methodology was explained to the DCAA auditors who audited ACA's forward pricing rate proposals. The Government failed to call any of these auditors as witnesses.

22. ACA's accounting manager generally reaffirmed ACA's budget process. He also testified, and we find that in or around November 1986, ACA's vice president for finance directed him to remove certain direct cost gathers, including the cost incurred by its Israeli subsidiary related to the ACA-Hughes Aircraft subcontract, from overhead computations with the intent to better define, separate and reclassify these costs. This reclassification process did not take place in a timely fashion, with the result that the costs remained excluded for a number of years, until the DCAA discovered the omissions during the 1989 audit.

23. Appellant's manager of contracts analyzed the ACA fixed price work authorizations that were used by the Government to compute its claimed cost impact. As part of his analysis, he correlated work authorization numbers to their respective prime contracts and subcontracts. He eliminated subcontracts, contracts he believed were exempt from CAS, and contracts whose prices were definitized [*14] outside the relevant time period. He concluded that only a small subset of those contracts relied upon by the Government were CAS-covered prime contracts and could be subject of any consideration for cost impact (ex. A-8, Table G).

24. Appellant called two expert witnesses. Mr. Rodney Mateer, National Partner, Government Contracting Consultant Group, Deloitte & Touche, was qualified as an expert in CAS compliance, estimating systems and CAS administration (tr. 3/135-36, 195). Mr. Mateer offered his expert opinion on a number of issues relevant to this appeal. We find persuasive his opinion that ACA's practice of estimating purchase materials in 1985-90, using the cost of sales methodology above, complied with cost accounting standards and its disclosure statement (tr. 3/136). We also find persuasive his opinion that a prime contractor has the responsibility for the CAS violations of its subcontractors (tr. 3/158).

25. Mr. Nelson Shapiro, CPA, was qualified as an expert in accounting with particular expertise in Government contract cost accounting, cost accounting standards and cost accounting standards administration (tr. 3/194-95). In 1971, Mr. Shapiro was employed by the CAS Board [*15] as part of the staff, and later was promoted to project director and executive secretary. In 1980 he joined Touche Ross & Co. as a partner. He retired in 1991 and is now a consultant. Mr. Shapiro also offered his expert opinion on a number of subjects relevant to this appeal. We find persuasive his opinion that given the circumstances and based upon the contract and regulations, if there was a CAS noncompliance in ACA's accumulation and reporting of certain costs, ACA was only responsible to adjust its costs under its flexibly priced contracts, but not under its firm fixed price contracts (tr. 3/216-17).

26. In support of his opinion, Mr. Shapiro relied upon the CAS clause, FAR 52.230-3, the CAS regulations, FAR Subpart 30.3, and a number of interpretations of the CAS Board and the Government related to these provisions, which are set out in detail below.

27. The CAS clause, FAR 52.230-3, states in relevant part: n2

> (a) The contractor, in connection with this contract shall:
>
> * * *
>
> (5) Agree to an adjustment of the contract price or cost allowance, as appropriate, if the Contractor or a subcontractor fails to comply with an applicable Cost Accounting Standard, or to follow any [*16] cost accounting practice consistently and such failure results in <u>increased costs paid by the United States</u>. Such adjustment shall provide for recovery of the increased costs to the United States together with interest thereon computed at the rate determined by the Secretary of the Treasury pursuant to Pub. L. 92-41, 85 Stat. 97 . . . .

(App. 2nd supp. R4, tab 203 at 131-32 (emphasis added))

> n2 The standard CAS clause in the FAR went through a number of revisions during 1985-1990. We have reviewed the CAS clause during each of these years, and we find that this language is in all material respects contained in each clause.

28. The CAS Board's rules and regulations, FAR 30.306(b), define "increased costs paid by the United States" as follows:

> 30.306 Interpretations.
>
> In determining the amounts of increased costs in the clauses at 52.230-3, Cost Accounting Standards, . . . the following considerations apply:
>
> * * *
>
> (b) If the contractor under any fixed price contract, including a firm fixed price contract, [*17] fails <u>during contract performance</u> to follow his cost accounting practice or to comply with applicable Cost Accounting Standards, <u>increased costs are measured by the difference between the contract price agreed to and the contract price that would have been agreed to had the contractor proposed in accordance with the cost accounting practices used during contract performance</u>. The determination of the contract price that would have been agreed to will be left to the contracting parties and will depend on the circumstances of each case.

(*Id.*, at 133 (emphasis added)) See also 4 C.F.R. § 331.70 (1980), where this language is repeated essentially verbatim.

29. The CAS Board's comments on this regulation were published under Preamble M, located at 4 CFR § 331.10 (1989). Insofar as pertinent, Preamble M, para. 2 provided as follows (app. 2nd R4 supp., tab 207 at 10870-71):

> The question of adjustment of FFP's [firm fixed price contracts] has been the subject of extensive discussions since 1972. In its original promulgations the Board recognized that <u>there was increased cost paid by the U.S. under a FFP [firm fixed price] contract if during the accumulating and reporting</u> [*18]

process the contractor adopted practices that reduced his cost allocations below the allocation determined during the estimating process. [Emphasis added]

* * *

The Board's requirements concerning fixed priced contracts constitute a recognition of the fact that the price agreed to at the outset is higher than the price that would have been agreed to if the Government had known about the accounting change. This constitutes a constructive increase in the cost paid by the United States . . . .

30. Mr. Shapiro also relied upon two working group opinions published by the DOD Cost Accounting Standards Working Group which provided DOD's interpretation of the Government's remedy for CAS noncompliance under firm fixed price contracts (tr. 3/203-05). One such interpretation was provided under Defense Procurement Circular 75-6, reissued under Defense Procurement Circular 76-1:

**Increased Costs Paid Under CAS-Covered Contracts**

There are two major aspects of "increased costs paid" as interpreted under the CAS clause . . . by the CASB regulations . . .

(a) A contractor as the result of a failure to follow his disclosed or established accounting practices used during negotiations [*19] is paid more during performance than was contemplated at the time the contract was negotiated.

Example: a CPFF [cost plus fixed fee] CAS contract has $ 500,000 additional costs allocated to it as a result of a noncompliance. If all or any part of this $ 500,000 is paid by the Government, such payment constitutes an increased cost to the Government and must be recovered with interest.

(b) The contractor allocates less cost to a fixed-price contract than would have been allocated to the contract by use of the established or disclosed practice on which the negotiation of the contract was based.

Example: A FFP [firm fixed price] proposal is prepared in accordance with the contractor's disclosed cost accounting practices and applicable Cost Accounting Standards. During contract performance, the contractor noncomplies either by not following his disclosed practices or by not complying with applicable Cost Accounting Standards. The noncompliance results in $ 500,000 less costs being allocated to the contract than if appropriate practices had been followed. The contractor should be requested to correct the noncompliance and properly allocate the costs. However, if the contractor [*20] failed to correct the noncompliance and the Government paid the firm fixed price agreed to during negotiations, then the contractor is making an additional profit of $ 500,000 on this contract as a result of the noncompliance. The $ 500,000 additional profit is "increased costs" paid by the Government and must be recovered with interest.

(App. 2nd R4 supp., tab 211 at 8; tab 212 at 6087 (emphasis added))

31. DOD Working Group Item 76-4 provided as follows (app. 2nd R4 supp., tab 209):

Determining Increased Costs to the Government for CAS Covered FFP Contracts Interim Guidance, W.G. 76-4, October 1, 1976.

*Background*

Paragraph 4 CFR 331.70(b) of the CAS Rules and Regulations discusses the concept of "increased costs" on firm fixed-price (FFP) contracts as related to noncompliances, i.e., failure to follow disclosed practices or cost accounting standards.

DoD guidance on "Increased Costs Paid Under CAS-Covered Contracts" contained in DPC 75-6 [finding 30] gave an example of increased costs on FFP contracts where there was a noncompliance that resulted in less costs being allocated to the FFP contract than would have been had the appropriate practices been followed.

*Discussion* [*21]

In cases other than noncompliance the opinion has been expressed that no increased costs can occur unless the contract price of a FFP contract is actually increased. This concept cannot adequately protect the Government as was contemplated by PL 91-379, because it provides a situation under which a contractor may overtly or inadvertently adjust accounting procedures so as to cause less costs to be allocated to FFP contracts. The contractor may thus receive a windfall.

To protect the Government in all situations where FFP contracts are involved it is therefore necessary to recognize the phenomenon that occurs when cost allocations are decreased due to accounting changes. The CAS Board did so in 4 CFR 331.70(b). A basic premise of this paragraph is that the amount of such decrease represents the amount of "increased costs to the Government." It is logical that this premise be extended to apply to all cases involving FFP contracts.

*Guidance*

Increased costs to the Government under firm fixed price contracts should be considered to exist when the costs allocated to the contracts are less than would have been allocated if the method of allocation had not been changed. [emphasis [*22] added]

32. Based upon the above, Mr. Shapiro testified that the Government is entitled to an adjustment under its fixed price contracts for CAS noncompliance when the contractor's noncompliance during contract performance allocates less cost to the fixed price contract than if appropriate practices had been followed. Under the circumstances of this case, ACA's purported noncompliance resulted in overstated actual overhead rates, the effect of which would be to allocate greater cost to contemporaneously performed fixed price contracts (tr. 3/205). According to Mr. Shapiro, the harm sought to be remedied by the CAS clause and regulations simply had no application under these circumstances. He also stated that if a contractor supplies inaccurate overhead data on which the Government relies to its detriment to negotiate fixed priced contracts, there exists defective pricing legislation (the Truth in Negotiations Act) to protect the Government's interests (tr. 3/207). The Government did not assert a defective pricing claim here.

DECISION

I. CAS Noncompliance

There appears to be no dispute that under a number of its CAS-covered prime contracts between 1986 and 1989 ACA [*23] did not gather certain cost accounts in determining its allocation bases for the allocation of material overhead, G&A and IR&D costs, which had the effect of materially decreasing the bases upon which these overhead costs were measured, and increasing these overhead rates. Clearly, the cost input base used for the calculation of the G&A and IR&D rates did not represent the "total activity of the business unit" as required by CAS 410, 420. ACA did not dispute DCAA's finding of CAS noncompliance in this respect when it was advised of the omissions in 1990 (finding 7). In fact, ACA admitted in March 1992 that there was CAS noncompliance, albeit limited, and that it had already made the corrections required per FAR 30.602-2(c)(1) (finding 11). We are persuaded that the Government has shown CAS noncompliance under the circumstances. In view of this conclusion we need not address whether ACA changed its accounting practices as also contended by the Government.

II. ACA as Subcontractor

Under the CAS clause the contractor agrees to an adjustment of the contract price or contract cost if the contractor or its subcontractor fails to comply with applicable cost accounting standards. The [*24] Government seeks a recovery from ACA for the relevant period of time when ACA performed work directly for the Government as a prime contractor, and also when ACA performed work as a subcontractor under agreements to which the Government was not a party. In essence, the Government argues that under the CDA it may bypass the Government prime contractor and hold ACA directly liable for any CAS noncompliance under its subcontracts even though the Government did not have privity of contract with ACA under these subcontracts.

The CDA makes clear that the claims subject to the Act are those between the Government and the contractor. 41 U.S.C. § 605. The contractor is the entity that entered into the contract with the Government, *i.e.*, the prime contractor. With minor exceptions not relevant here, the general rule is that we do not have jurisdiction under the CDA over subcontractor claims filed directly against the Government or Government claims filed directly against a subcontractor. See *United States v. Johnson Controls, Inc.*, 713 F.2d 1541 (Fed. Cir. 1983); *General Dynamics Corporation*, ASBCA

No. 49339, 97-2 BCA P 29,167 at 145,031. [*25] We have also adhered to this rule in the CAS context. See *Systron Donner, Inertial Division*, ASBCA No. 31148, 87-3 BCA P 20,066 (Board had jurisdiction over the Government's CAS noncompliance claim under all of appellant's CAS-covered prime contracts but appellant had no right to appeal the determination of CAS noncompliance under its subcontracts). See also *Aydin Corporation*, ASBCA No. 50301, 97-2 BCA P 29,260. Moreover, the CAS clause itself strongly suggests that the contractor is responsible for the noncompliance of a subcontractor for purposes of contract adjustments (finding 27). Mr. Mateer also gave persuasive expert testimony to this effect (finding 24). The Government fails to cite to any persuasive authority that would warrant departure from this well settled rule.

We conclude that in these circumstances, the Government may not file a CAS claim directly against a subcontractor under the CDA. That is not to say that a CAS covered subcontractor may violate CAS with impunity. Rather, the Government's remedy is against the relevant CAS prime contractor under the contract in issue, and the Government may adjust the [*26] prime contract price or cost as appropriate to the extent a CAS covered subcontractor has failed to meet its CAS obligations.

III. <u>ACA as Contractor</u>

There is no dispute that once the Government discovered the relevant cost account omissions, ACA adjusted its billings under its flexibly priced contracts to reflect the corrected actual overhead rates. These contracts are not at issue here. The contracts in issue here are the firm fixed price contracts between ACA and the Government during the relevant time period.

The Government is bound by the regulations and implementing contract clauses which provide the parameters of the contract price adjustment. Under FAR 52.230-3, the standard CAS clause which was incorporated in all the relevant CAS covered fixed-price contracts, n3 the contractor agrees to a contract price adjustment if the contractor or its CAS covered subcontractor is noncompliant "and such failure results in any increased costs paid by the United States."

n3 The Government failed to introduce into evidence any of the dozens of contracts upon which its claim rests. While ACA disputes the applicability of CAS coverage to a number of these contracts, it does not dispute that it entered into a number of CAS-covered prime contracts during the relevant time period (finding 23), and does not appear to dispute that said contracts contained the standard CAS clause in the FAR. We shall so presume for the purposes of this opinion.

[*27]

The nature of these increased costs under a contractor's fixed-price contract is spelled out in FAR 30.306(b), Interpretations. This contract provision provides that these increased costs are incurred where the contractor fails to follow the applicable cost accounting standard "during contract performance" and that the cost differential "is measured by the difference between the contract price agreed to and the contract price that would have been agreed to had the contractor proposed in accordance with the cost accounting practices used during contract performance."

CAS Preamble M further explains the nature of this adjustment. We may look to the preamble to provide insight into the CAS standards, rules and regulations. *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1139 (Fed. Cir. 1995). Preamble M, Para. 2 explains the need for a remedy when the contractor had adopted practices during contract performance "that reduced his cost allocations below the allocation determined during the estimating process." According to this reasoning, had the Government been aware of this new method of cost allocation at the time of price negotiation prior to award, it [*28] would have relied upon the reduced cost allocation to obtain a better contract price. Accordingly, a contract price adjustment precludes the contractor from obtaining any contract price advantage as a result of any CAS noncompliance during contract performance.

Here, ACA's actions or inactions did not reduce cost allocations during the performance of any of its fixed priced CAS-covered prime contracts. If anything, ACA's omissions increased cost allocations to contemporaneously performed fixed price contracts (finding 32). The Government is not entitled to an adjustment under these contracts in accordance with the relevant CAS contract clause and regulations.

DOD's long standing interpretation of these provisions is also consistent with the conclusion we have reached (findings 30, 31). This interpretation is at odds with that offered by the Government in this appeal.

In view of all the foregoing, we conclude that the Government has not established it is entitled to a contract price adjustment under ACA's firm fixed price prime contracts within the meaning of the CAS clause and related CAS regulations.

The appeal is sustained as to ACA's prime contracts. It is dismissed as to ACA's [*29] subcontracts. n4

n4 The Government also argues that it relied on defectively calculated overhead rates when it negotiated and awarded ACA's fixed price contracts. This is a cause of action sounding in defective pricing in violation of the Truth in Negotiations Act that was not asserted by the contracting officer's decision in the Government's claim here. We are without jurisdiction to consider such a claim and pass no judgment on its merits. See *International Telephone & Telegraph Corporation/ElectroOptical Products Division*, ASBCA No. 27802, 83-2 BCA P 16,773.

Dated: 18 May 1999

JACK DELMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

ALAN M. SPECTOR
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

APPENDIX

Insofar as pertinent, the cost accounting standards relied upon by the Government provide as follows:

[*30]
401-40 Fundamental requirement.

(a) A contractor's practices used in estimating costs in pricing a proposal shall be consistent with his cost accounting practices used in accumulating and reporting costs.

410-40 Fundamental requirement.

* * *

(b)(1) The G&A expense pool of a business unit for a cost accounting period shall be allocated to final cost objectives of that cost accounting period by means of a cost input base representing the total activity of the business unit [inapplicable exception omitted].

* * *

410-50 Techniques for application.

* * *

(d) The cost input base used to allocate the G&A expense pool shall include all significant elements of that cost input which represent the total activity of the business unit.

* * *

(f) Cost input shall include those expenses which by operation of this Standard are excluded from the G&A expense pool and are not part of a combined pool of G&A expenses and other expenses allocated using the same allocation base.

418-40 Fundamental Requirement.

* * *

(c) Pooled costs shall be allocated to cost objectives in reasonable proportion to the beneficial or causal relationship of the pooled costs to cost objectives . . . [*31] .

* * *

418-50 Techniques for application.

(a) *Determination of direct cost and indirect cost.*

(1) * * *

(2) In accounting for direct costs a business unit shall use actual costs except that - [inapplicable condition omitted]

420-50 Techniques for application.

* * *

(f) The cost of IR&D and B&P projects accumulated at a business unit shall be allocated to cost objectives as follows:

(1) [not applicable]

(2) IR&D and B&P cost pools which are not allocated under subparagraph (f)(1) of this subsection, shall be allocated to all final costs objectives of the business unit by means of the same base used by the business unit to allocate its general and administrative expenses in accordance with [CAS 410-50] . . . .