# In The United States Court of Federal Claims

No. 00-129 C

(Filed: March 29, 2006)

_____

| | | |
|---|---|---|
| LOCKHEED MARTIN CORPORATION, | * | Government contract case; Cross-motions |
| | * | for summary judgment; Violation of CAS |
| Plaintiff, | * | 418; Failure to deny claims made in |
| | * | summary judgment motion; Increased |
| v. | * | costs as a result of a CAS violation; 41 |
| | * | U.S.C. § 422(h); Offsets between flexibly- |
| THE UNITED STATES, | * | priced and fixed-price contracts; Offset |
| | * | claim relating to disposition of tangible |
| Defendant. | * | property; Failure to comply with CDA |
| | * | requirements for perfecting claim; Issues |
| | * | arising out of "same set of operative |
| | * | facts;" Claims in the nature of setoff or |
| | * | recoupment. |

_____

## OPINION

_____

*Clarence T. Kipps, Jr.,* Miller & Chevalier Chartered, Washington, D.C., for plaintiff.

*Doris S. Finnerman*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Peter D. Keisler*, for defendant.

**ALLEGRA, Judge**:

This government contract case is before the court on the parties' cross-motions for summary judgment.

## I.    Facts and Procedural History

In 1992, Lockheed Martin Corporation (plaintiff or Lockheed) formed a wholly-owned subsidiary, Lockheed Information Technology Company (LITC), to provide centralized mainframe and supercomputer services to its various business segments.  Toward this end, LITC acquired two Cray supercomputers and various IBM mainframes for use by other Lockheed subsidiaries.  The predominant users of the CRAY computers were expected to be Lockheed Missiles and Space (LMSC), Lockheed Aeronautical Systems Company (LASC) and Lockheed Advanced Development Company.  At LMSC, the Cray computers were used exclusively in the performance of government contracts, while at LASC, they were used almost exclusively in the performance of government contracts or on independent research in support of government contracts.

For 1994 and 1995, the subsidiaries using the Cray supercomputers were charged under a method in which LITC allocated its costs by applying a fixed cost for CRAY computer resources to each operating company based upon each company's annual forecasted hours for CRAY computing resources.  In other words, plaintiff allocated supercomputer costs according to forecasts of supercomputer use, rather than actual use.  Plaintiff refers to this as the "resource commitment" method of allocation.

In September 1994, the Defense Contract Audit Agency (DCAA) reviewed LITC's compliance with the rules of the Cost Accounting Standards Board and issued two audit reports – Audit Report No. 3121-94J19200015 (Audit Report 15) and Audit Report No. 3121-94J19200016 (Audit Report 16).  Audit Report 16 addressed the allocation of costs from LITC's CRAY supercomputers and concluded that plaintiff's method violated Cost Accounting Standard (CAS)[1] 418 because that standard recommends that the allocation of the costs be based on resource consumption, rather than forecasts or estimates.  In critical regard, this report stated –

> LITC has two CRAY computers whose annual costs are estimated at $10,057,189 for 1994.  These costs are allocated to the Lockheed Missiles and Space Company (LMSC), Advanced Development Company (LADC), and Aeronautical Systems Company (LASC) based on a beginning of year usage commitment by these divisions for wall clock hours and shared Computer Processing Units (CPU).  The costs allocated using the beginning of the year usage commitment versus the costs allocated based on actual usages are significantly different for the various Lockheed divisions.  The practice violates CAS 418.50(e)(1) which recommends that the allocation of the costs be based on resource consumption.

The audit report estimated that plaintiff's method resulted in increased costs to the government of $1,236,010.  Audit Report 15 made similar observations and ultimately reached a similar conclusion regarding plaintiff's IBM mainframe computers.  However, it did not provide a precise estimate of the cost impact of the alleged CAS violation, suggesting that the increases were insignificant.

In November 1994, James Rose, the Defense Corporate Executive (DCE) then assigned to Lockheed, notified plaintiff's DCAA auditor that, with respect to Audit Report 15, "[w]hile resource consumption is one method of allocation [of costs], it is not the only method . . . .  CAS 418 allows for other methods of allocation as long as the allocation is equitable and results in a distribution of costs that is fair and reasonable."  Rose further noted that the differences between plaintiff's resource commitment method and an actual-usage method "were not significant," and concluded that "LITC's current practice of allocating cost meets the intent of CAS 418."  But,

---

[1]  "The CAS comprise a set of rules promulgated by the Cost Accounting Standards Board (CASB) that regulate the accounting practices of government contractors."  *Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1365 (Fed. Cir. 2003); *see also Boeing N. Amer. Inc. v. Roche*, 298 F.3d 1274, 1282-83 (Fed. Cir. 2002).

-2-

notably, Rose's letter did not refer to Audit Letter 16,[2] which, unlike Audit Letter 15, had asserted that plaintiff's method resulted in significantly increased costs to the government.

Subsequently, when Lockheed merged with Martin Marietta Corporation in March 1995, the former Lockheed Corporation headquarters were moved to Bethesda, Maryland, and Louis Becker replaced Rose as the DCE for Lockheed Martin.  On May 31, 1996, following a CAS audit of LITC's books, Becker wrote plaintiff that he had determined that Lockheed's allocation method did not comply with CAS 418 because that standard "recommends that the allocation of the costs be based on resource consumption."  Unlike Rose's earlier letter, this letter clearly relied upon Audit Letter 16, to which it referred explicitly.[3]  Following a lengthy exchange of correspondence, on June 17, 1997, Becker issued a final determination of noncompliance with CAS 418 (among other CAS sections), adding that "the cost impact [of noncompliance] is material."  Becker's letter required LITC to submit a cost impact proposal identifying "the cost impact of each separate CAS covered contract from the date of failure to comply, until the noncompliance is corrected."  It is unclear whether such a proposal was ever submitted.

Sometime after September of 1995, but apparently before the end of the year, plaintiff disposed of two of its CRAY computers, a transaction it claims resulted in a loss in 1995 of $6.8 million.  Documents provided by plaintiff indicate that, in late 1995, the two CRAY machines were sold and that another, smaller CRAY was leased back in the same or a related transaction.  Various other details of these transactions remain unclear.

There appears to be a dispute regarding plaintiff's actions following DCE Becker's 1996 determination letter.  Plaintiff's motion refers to an "agreement" that was "implemented" between Lockheed and the government under which plaintiff would "change its cost accounting practice" to conform to the government's actual-cost method.  Defendant, however, believes that no such agreement was ever reached, and that any modifications to plaintiff's accounting practices were implemented unilaterally by Lockheed.[4]  According to defendant, plaintiff made its "final settlement offer" on June 16, 1998, which offer was rejected by Becker the next day.  A letter in the record indicates that in "late 1997," the parties reached a "handshake agreement" intended to resolve the dispute and drafted a "Memorandum of Agreement" that "documented the fact that

---

[2]  Plaintiff's motion asserts, without qualification, that Rose's letter "rejected DCAA's opinion," and strongly implies that the rejected opinion involved the Cray computers.  It did not.

[3]  Plaintiff contends that Becker's letter "reversed course," suggesting that Becker overruled Rose's letter.  He did not; the two letters refer explicitly to different audits.

[4]  Defendant's brief refers to the document cited by plaintiff as evidence of the substance of the "agreement"– a letter dated December 19, 1997– as simply one of several offers made by plaintiff in "negotiations" attempting to "settle the CAS noncompliance issue."  Defendant appears to be correct about this: the December 19 letter, on its face, merely expresses "how [Lockheed] . . . will handle an adjustment to their CRAY billings generated in 1994 and 1995 *if an agreement is reached*" (emphasis added).

LMC had ultimately agreed to reallocate the CRAY costs per the DCAA report." The letter indicates that the government subsequently "withdrew" the handshake agreement and memorandum "because the cost impact [of the reallocation] . . . was unacceptable." In any case, neither party contends that any such agreement was actually binding.

On March 16, 1999, DCE Becker issued a final contracting officer's decision and demand for payment for "noncompliance with CAS 403 and 418 (CRAY Computers) . . . for calendar year 1994 and 1995." The decision noted that "computer costs were allocated to Government contracts on a basis that differed substantially from actual usage and/or the beneficial or causal relationship between supporting and receiving activities." Estimates of use "were not revised, nor were variances proportionately allocated to the cost objectives." Plaintiff's method, the decision concluded, "does not comply with CAS 403 or 418, and results in increased costs to the Government." Defendant sought $2,669,534.

On May 21, 1999, plaintiff requested that defendant defer collecting the $2,669,534, pending plaintiff's appeal of the contracting officer's decision. On March 16, 2000, plaintiff filed its complaint in this action. On June 12, 2000, defendant filed its answer and a counterclaim seeking increased costs. Eventually, this case was reassigned to the undersigned. Following a lengthy discovery period and settlement negotiations, the parties filed cross-motions for summary judgment, briefing and oral argument on which have now been completed.

## II.   DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative – and there are several here – will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho. Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). Rather, the court must determine whether the evidence presents a disagreement sufficient to require fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52. In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)); *see also L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

Plaintiff moves for summary judgment on two issues: (i) whether defendant's counterclaim for "increased costs" should be "dismissed with prejudice;" and (ii) whether plaintiff is entitled to charge the loss incurred upon disposition of its CRAY computers to government contracts.  Defendant's cross-motion raises three issues: (i) whether plaintiff's "resource commitment" cost allocation method for the Cray computers violated CAS 418; (ii) whether the alleged violation of CAS 418 "resulted in increased costs paid by the United States;" and (iii) whether plaintiff's claims regarding the allocation of losses incurred upon the disposition of certain CRAY computers "should be stricken" because they were not raised before the contracting officer or previously raised in this action.  In order to facilitate a somewhat more logical presentation, the court will consider these issues out of their original sequence.

A.      **Was There a Violation of CAS 418 Here, and If So, Did Defendant Incur Increased Costs as a Result?**

Initially, defendant contends that plaintiff's "resource commitment" method of cost allocation did not comply with CAS 418.  That cost accounting standard "provide[s] for consistent determination of direct and indirect costs . . . for the accumulation of indirect costs . . . in indirect cost pools," as well as  "guidance for relating to the selection of allocation measures based on the beneficial or causal relationship between an indirect cost pool and cost objectives." 48 C.F.R. § 9904.418-20.[5]  An "indirect cost," for this purpose, is "any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives." *Id*. at § 9904.418-30(a)(3).  An "indirect cost pool" is "a grouping of incurred costs identified with two or more cost objectives but not identified specifically with any final cost objective."  *Id*. at § 9904.418-30(a)(4).  It is undisputed that the costs at issue in this case are indirect pooled costs.

CAS 418 states that "[p]ooled costs shall be allocated to cost objectives in reasonable proportion to the beneficial or causal relationship of the pooled costs to cost objectives . . . ." *Id*. at § 9904.418-10(c).  It continues –

> If the cost pool does not contain a material amount of the costs of management or supervision of activities involving direct labor or direct material costs, resource consumption can be specifically identified with cost objectives.  The pooled cost shall be allocated based on the specific identifiability of resource consumption with cost objectives by means of one of the following allocation bases:
>
> (i)     A resource consumption measure,
> (ii)    An output measure, or
> (iii)   A surrogate that is representative of resources consumed.

---

[5]  All references to the C.F.R. (and the CAS) are to the versions in effect during the years in question.

*Id*. at § 9904.418-40(c)(2).  By way of additional guidance, 48 C.F.R. § 9904.418-50(e) states that "indirect cost pools . . . have a direct and definitive relationship between the activities in the pool and benefiting cost objectives" and that "[t]he pooled costs shall be allocated using an appropriate measure of resource consumption."  That subsection further explains that "the best representation of the beneficial or causal relationship between an indirect cost pool and the benefiting cost objectives is a measure of resource consumption of the indirect cost pool," but that "if consumption measures are unavailable or impractical to ascertain, the next best representation . . . is a measure of the output of the activities of the indirect cost pool."  *Id*. at §§ 9904.418-50(e)(1), (2).

"If neither resources consumed nor output of the activities can be measured practically," the regulation continues, "a surrogate that varies in proportion to the services received shall be used to measure the resources consumed," adding that "[g]enerally, such surrogates measure the activity of the cost objectives receiving the service."  *Id*. at § 9904.418-50(e)(3).  According to the regulation, a permissible surrogate is the use of "preestablished rates, based on either forecasted actual or standard costs," which, if used, "shall be reviewed at least annually, and revised as necessary to reflect the anticipated conditions."  *Id*. at § 9904.418-50(g)(1), (2).  In addition, if preestablished rates are revised during a cost accounting period, "and if the variances accumulated to the time of the revision are significant, the costs allocated to that time shall be adjusted to the amounts which would have been allocated using the revised preestablished rates."  *Id*. at § 9904.418-50(g)(5).

Defendant does not contest that the use of preestablished rates was permissible under the CAS, but asserts rather that plaintiff failed to review the rates "at least annually" and revise them "as necessary," as required by 48 C.F.R. § 9904.418-50(g)(5).  It notes that the disclosure statement that plaintiff drafted, as required by the CAS, indicated that –

> standard rates will be set at the start of the year and remain throughout the year provided over/under liquidation does not exceed 10%.  Within this range the over/under liquidation will be rolled into the next year's rates.  If the over/under liquidation exceeds 10%, rates will be adjusted to actuals a minimum of once a year, usually at year end.

Defendant avers that although "the actual utilization of CRAY computers changed significantly from the projected usage," plaintiff "did not adjust the amounts charged to its business segments, or to affected Government contracts, to reflect the variance between the preestablished rate and the actual usage rate of the computer services."  Nothing in the record controverts this assertion.

While plaintiff steadfastly maintains that its method of allocating computer costs accords with CAS 418, it offers no significant argument or evidence to that effect.  Rather, it repeatedly asserts that this court need not resolve this issue because under either its method for allocating costs or defendant's, defendant is not entitled to recover increased costs.  But, the root issue whether plaintiff complied with CAS 418 was properly raised by defendant in its cross-motion, leaving plaintiff with no choice but to respond, if it had a response – it could neither rest on its

earlier pleadings, nor leap past this liability issue to what is, in effect, a question of damages. *See* RCFC 56(e) ("[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (party "may not rest on mere allegations or denials of his pleading").  In failing to controvert defendant's proof on the compliance point, plaintiff has not shown that a genuine issue of material fact exists that precludes the granting of partial summary judgment.  Nor has it given this court any significant reason why ultimately it should not conclude that plaintiff's accounting method violated CAS 418.  *See Amaker v. Foley*, 274 F.3d 677, 680-81 (2d Cir. 2001) (where nonmoving party fails to deny claims in summary judgment and summary judgment is otherwise "appropriate," motion shall be granted).  Hence, the court finds, as a matter of law, that it is appropriate to conclude that the cost allocation method employed by Lockheed violated the CAS.

But, did this violation increase defendant's costs?  Preliminarily, one must define the legal framework for considering this issue.  41 U.S.C. § 422(h)(1)(B) requires the contractor and the United States to "agree to a contract price adjustment, with interest, for any increased costs paid" to the contractor by the United States because of the contractor's failure to comply with the cost accounting standards.  *See also* 48 C.F.R. § 9903.201-4(a)(5).  41 U.S.C. § 422(h)(3) provides that, where there are multiple "relevant contracts," the "increased cost" to the United States is determined by considering the costs among those contracts in the aggregate, *to wit* –

> In no case shall the Government recover costs greater than the increased cost . . . to the Government, in the aggregate, on the relevant contracts subject to the price adjustment, unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government.

Explaining this provision, 48 C.F.R. § 9903.306(e) states that "when a contractor is performing two or more covered contracts, and the change or failure affects all such contracts," the change in cost accounting practice "may increase the cost paid under one or more of the contracts, while decreasing the cost paid under one more of the contracts."  In such circumstances, "the Government will not require price adjustment for any increased costs paid by the United States," if "the cost decreases under one or more contracts are at least equal to the increased cost under the other affected contracts, provided that the contractor and the affected contracting officers agree on the method by which the price adjustments are to be made for all affected contracts." *Id*.

Defendant, however, asseverates that 48 C.F.R. § 9903.306(e) does not allow a contractor to offset or eliminate cost increases associated with the change in cost accounting practices in cost-reimbursement contracts with cost decreases triggered in fixed-priced contracts by the same accounting change.  In support of this argument, it quotes 48 C.F.R. § 9903.306(b), which states:

> If the contractor under any fixed-price contract, including a firm fixed-priced contract, fails during contract performance to follow its cost accounting practices or to comply with applicable Cost Accounting Standards, increased costs are measured by the difference between the contract price agreed to and the contract price that would have been agreed to had the contractor proposed in accordance with cost accounting practices used during contract performance. The determination of the contract price that would have been agreed to will be left to the contract parties and will depend on the circumstances of each case.

But, a keen observer would note that this provision deals only with a circumstance in which the price in a fixed-price contract was set *higher* than it should have been because the contractor failed to comply with COS. It does not deal with the reverse circumstance alleged here – that the price in other fixed-price contracts were *lower* because CRAY services that should have been charged to those contracts instead were reflected in the cost reimbursement contract *sub judice*.

That subsection (b) was designed to deal only with cost increases that inflated the price of a fixed-price contract is plain from the CAS Board's own comments upon the promulgation of a virtually identical regulation, 48 C.F.R. § 30.306(b) (1989) (currently codified, with slight modification, at 48 C.F.R. § 9903.306(b) (2005)). In the preamble to this regulation, the Board stated –

> In its original promulgations the Board recognized that there was increased cost paid by the U.S. under a FFP [firm fixed price] contract if during the accumulating and reporting process the contractor adopted practices that reduced his cost allocations below the allocation determined during the estimating process. . . . The Board's requirements concerning fixed priced contracts constitute a recognition of the fact that the price agreed to at the outset is higher than the price that would have been agreed to if the Government had known about the accounting change. This constitutes a constructive increase in the cost paid by the United States . . . .

*See* Preamble M, 4 C.F.R. § 331.10 (1989). Reflecting on this preamble, one contracting board has observed that cost allocations can impact the price in fixed-price contracts either in favor of the government or the contractor – the former occurs when, owing to a CAS violation, costs allocated to the contract are understated, leading to a price lower than should have been received by the government; the latter occurs when the costs allocated are overstated, leading to a higher price than should have been negotiated. *See Astronautics Corp. of America*, ASBCA No. 49691, 99-1 B.C.A. ¶ 30390 (1999); *see also Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1139 (Fed. Cir. 1995) (courts may look at preambles to provide insights into CAS standards). Notably, there is no hint in the preamble that this regulation requires a contractor to reimburse the government fully for increased costs under a cost reimbursement contract if the same CAS violation had the effect of decreasing costs in other fixed-price contracts. Such an interpretation of 48 C.F.R. § 9903.306(b), indeed, seemingly would violate the aggregation principle of 41 U.S.C. § 422(h), rendering the regulation suspect. *See generally*, *G.L. Christian & Assocs. v. United States*, 320

F.2d 345, 350 (Ct. Cl.), *cert. denied*, 375 U.S. 954 (1963) (to have force and effect of law, regulation cannot be inconsistent with any statute).  Fortunately, that is not a problem here, as defendant's interpretation of the regulations is – in a word – wrong.

Any notion that 48 C.F.R. § 9903.306(b) somehow constitutes a limitation on 48 C.F.R. § 9903.306(e) flies in the face of the DCAA's own guidance on calculating the cost impact of a noncompliance, when the noncompliance impacts both fixed price and cost-type contracts.  *See* DCAA, Audit Guidance on Costs Accounting Standards CAS Cost Impact Unilateral Changes in Cost Accounting Practice and Noncompliance with CAS and Disclosed Practices (Jan. 9, 2002). This guidance makes several important points.  First, it makes clear that 48 C.F.R. § 9903.306(b) should not be read as defining decreased costs paid by the government, stating that "[d]ecreased costs paid by the government are not defined by the CASB, although the CAS statute presumes that there can be decreased costs paid by the government since it provides for adjustment to remove only increased costs paid in the aggregate." *Id*. at 4.  Second, it recognizes that underestimating the costs associated with a fixed-priced contracts redounds to the government's benefit.  In this regard, it stresses that "[d]ecreased costs paid by the government occur when more costs are accumulated on [fixed-price] contracts after an accounting change, or when the price negotiated using a noncompliant practice is lower than the price that would have been negotiated if a compliant practice had been used," explaining further that "if the price negotiated using a noncompliant practice is less than the price that would have been negotiated had a compliant practice been used, the government, in effect, has paid less than it would have paid if the compliant practice had been used." *Id.*  Third, the guidance states that 48 C.F.R. § 9903.306(e) requires the increased/decreased costs paid by the government with respect to flexibly-priced and fixed-price contracts be "combined to determine increased costs in the aggregate paid by the government." *Id*. at 5.[6]  It indicates that, generally, the concept of costs paid in the "aggregate" in 41 U.S.C. § 422(h) "is the functional equivalent of the concept of offsetting increased/decreased costs paid by the government in CAS § 9903.306(e)." *Id.*  It thus concludes that "[i]n most instances, . . . increased costs in the aggregate paid by the government is calculated by combining the increased/decreased costs paid by the government for each group of current contracts," with the aggregate, if any, "represent[ing] the amount owed the government." *Id*. at 6.

---

[6] In this regard, the guidance draws a distinction between "cost accumulation" and "cost impact." To the extent cost accumulations on a fixed-price contract are, as a result of a CAS violation, lower than expected, the "cost impact" is that the government overpaid; conversely, to the extent cost accumulations on a fixed-price contract are higher than expected, the "cost impact" is that the government underpaid. The reverse is true as to flexibly-priced contracts – if cost accumulations are lower as the result of a CAS violation, the government has underpaid, and vice-versa. Accordingly, the guidance stresses that because of their differing impacts on cost impact, one cannot simply combine the cost accumulations of flexibly-priced and fixed-price contracts, but rather must consider only the cost impacts for each category of contract. *Id*. at 3. Defendant flatly misconstrues this guidance in suggesting that there can be no cost-accumulation at all in favor of a contractor in a fixed-price contract. Indeed, the entire DCAA guidance is quite to the contrary.

Based upon this guidance, not to mention the plain wording of the statute and FAR provisions at issue, defendant is incorrect in suggesting that decreased costs associated with other fixed-price contracts it had with Lockheed cannot have the effect of diminishing or even eliminating the cost increases associated with the noncompliance of the CAS in question. Were defendant correct, a contractor that used a computer only to service government contracts might still end up owing the government increased costs for a CAS violation, even if, rather than using that computer in a flexibly-priced contract as forecasted, the contractor instead used the computer entirely for other fixed-priced government contracts. This result, of course, would be anomalous and provide the government with a windfall. More importantly, it is precisely the result that Congress sought to avoid in admonishing that – "[i]n no case shall the Government recover costs greater than the increased cost . . . to the Government, in the aggregate, on the relevant contracts subject to the price adjustment." 41 U.S.C. § 422(h); *see also* 48 C.F.R. § 9903.201-4 (requiring the contracting officer to insert similar language in covered contracts).[7] Indeed, while the statute limits this aggregation principle, stating that it applies "unless the contractor made a change in its cost accounting practices of which it was aware or should have been aware at the time of the price negotiation and which it failed to disclose to the Government," defendant has not alleged, let alone shown, that this limitation was triggered here. This court will not allow defendant to create out of whole cloth yet another exception to the aggregation rule – one that finds no support in common sense, let alone the statute, the regulations thereunder, or the guidance thereon.

Returning to the facts, according to plaintiff, the total amount of allocable CRAY costs for 1994 and 1995 was $30.27 million, of which the United States paid only $20.79 million. In support of these figures, plaintiff introduced the affidavit of Lockheed's Director of Finance, James Blue, in which he states –

The total amount of CRAY costs allocable to government contracts using the Government's method is approximately $30.27 million, of which $23.46 million is

---

[7] The importance of the aggregation feature of this statute is highlighted by the legislative history of section 422(h), which was adopted as part of the Office of Federal Procurement Policy Act Amendments of 1988, Pub. L. 100-679, 102 Stat. 4055, 4063 (1988). As originally introduced, the bills that became that law would have required a contractor, in some circumstances, to reimburse the government for cost increases caused by CAS violations on a given contract, irrespective of whether those same violations saved the government costs in other contracts. *See* H.R. 3345, 100th Cong., 1st Sess. 13-14 (Sept. 25, 1987); S. 2215, 100th Cong., 2d Sess. 11-12 (March 24, 1988); S. 2215, 100th Cong., 2d Sess. 11-12 (as reported by S. Comm. on Gov't Affairs, July 8, 1988); H.R. 3345, 100th Cong., 2d Sess. 18-19 (as reported by H.R. Comm. on Gov't Operations, Sept. 9, 1988). In short, nothing in these bills accounted for cost decreases caused by CAS violations. Ultimately, however, this one-sided approach was discarded in favor of the more balanced "aggregate" language found in the current statute. *See* Chiles Amendment No. 3744 to S. 2215, 134 Cong. Rec. 31746, 31749 (Oct. 19, 1988), adopted by Senate, 134 Cong. Rec. 31686 (Oct. 19, 1988); *see also* 134 Cong. Rec. 32250, 32252 (Oct. 20, 1988) (House adoption of amended version of S. 2215). In many ways, defendant seeks to return the bill to its status *quo ante*, acting as if it had not been amended.

-10-

for CRAY hourly costs, and approximately $6.8 million is for Lockheed's loss on the disposition of CRAY computers.  Of these costs, the Government has paid Lockheed only $20.79 million, thereby leaving a gross underpayment of approximately $9.48 million.

Defendant complains that plaintiff has not explained how Mr. Blue's figures were derived and that his affidavit does not meet the requirements of RCFC 56 and should be stricken.  It focuses on that part of Rule 56(e) which states that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Specifically, it claims that Mr. Blue's affidavit constitutes inadmissible hearsay because it is "based entirely on his review of documents" and not on personal knowledge.

The latter assertion is incorrect.  This court rejected a similar argument in *United Medical Supply Co. v. United States*, 63 Fed. Cl. 430 (2005).  In that case, the shoe was on the other foot – defendant introduced affidavits to controvert critical portions of the plaintiff's proof, which affidavits, like the affidavit here, summarized the authors' views of various business records. The plaintiff objected to the affidavits, virtually on the same grounds that defendant invokes here. On brief, defendant asserted that "as the party opposing summary judgment, the Government 'need not produce evidence in a form admissible at trial.'" Defendant's Reply in Support of its Cross-Motion for Summary Judgment at 1 (Jan. 12, 2004) (quoting *Kanehl v. United States*, 38 Fed. Cl. 89, 98 (1997) (emphasis deleted)).  Rejecting plaintiff's objection, this court stated –

> Contrary to plaintiff's claim, the court believes that the affidavits supplied by defendant were "made on personal knowledge," which knowledge does not require that the affiant be personally involved in all of the matters at issue, but can include information obtained from a review of business records.  *See Cuyahoga Met. Hous. Auth. v. United States*, 60 Fed. Cl. 481, 483 n.1 (2004) ("lay witnesses may testify as to perceptions acquired by them through review of records . . . prepared in the ordinary course of business"); *see also Allied Sys., Ltd. v. Teamsters Auto. Transport Chauffeurs*, 304 F.3d 785, 792 (8th Cir. 2002), *cert. denied*, 538 U.S. 924, 123 S.Ct. 1583, 155 L.Ed.2d 315 (2003).  In the court's view, these affidavits standing alone, are sufficient to create questions of fact . . . .

*United Medical Supply*, 63 Fed. Cl. at 436 n.5.  Various other cases in this court and elsewhere, indeed, demonstrate that affidavits need not be corroborated by other evidence in order to demonstrate a genuine issue of fact.  *See, e.g., Becho, Inc. v. United States*, 47 Fed. Cl. 595, 604 n.11 (2000).[8]

---

[8]  *See, e.g., Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 57 (2d Cir. 1998) ("[t]here is nothing in [Rule 56] to suggest that nonmovants' affidavits alone cannot – as a matter of law – suffice to defend against a motion for summary judgment"); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (reversing district court's ruling that petitioner's affidavit alone did not show genuine issues of material fact, stating "[b]ut an affidavit is evidence for purposes of determining

Defendant was right in *United Medical Supply* and is wrong here.  As in *United Medical Supply*, in the court's view, the primary purpose of the Blue affidavit is to demonstrate that a question of fact exists as to whether plaintiff's violation of the CAS increased defendant's costs.  Despite defendant's importunings, this court concludes that such questions of fact exist on this subject, which require further elucidation at trial.  Accordingly, it denies plaintiff's motion and defendant's cross-motion to the extent that they seek to establish whether additional costs were – or were not – generated by plaintiff's violation of the CAS.

## B.   Losses incurred on the disposition of the CRAY computers.

In its motion, Lockheed initially argued that it was entitled to: (i) allocate its cost associated with the disposition of the CRAY computers, so as to offset any cost impact resulting from an allocation of costs associated with the usage of those computers ("the offset claim"); and (ii) receive an equitable adjustment equal to "the allocable portion of Lockheed's loss on the disposition of the CRAY computers" ("the equitable adjustment").  In its cross-motion and response, defendant retorts that these claims are not before the court because plaintiff never submitted a certified claim to the contracting officer as these points.  Subsequently, in its reply to its motion, Lockheed withdrew its equitable adjustment claim.  *See* Plaintiff's Reply in Support of its Motion for Summary Judgment and Opposition to Defendant's Cross Motion for Summary Judgment at 5 (Nov. 22, 2004).  From a jurisdictional standpoint, however, the issue remains whether plaintiff may, without a formal claim having been filed and then denied by the contracting officer, raise, by way of offset, the alleged losses that occurred on disposition of the CRAY computers in asserting that the government did not pay any increased costs as the result of Lockheed failure to comply with the CAS.

"The comprehensive procedures of the Contract Disputes Act [(CDA)] govern the resolution of contract disputes that arise between the government and contractors."  *Applied Cos. v. United States*. 144 F.3d 1470, 1477 (Fed. Cir. 1998).  The CDA expressly requires that "all claims by a contractor against the government . . . shall be in writing and shall be submitted to the contracting officer for decision."  41 U.S.C. § 605(a).[9]  Where the amount of a claim exceeds $100,000, the claim must be certified by the contractor.  *Id*. at § 605(c)(1).   Section 605 further requires "the contracting officer [to] issue his decisions in writing, and . . . [to] furnish a copy of the decision to the contractor."  *Id*. at § 605(a).  "The Federal Circuit has interpreted section 605

whether a genuine issue of material fact exists"); *see also* Edward Brunet, "Summary Judgment Materials," 147 F.R.D. 647, 667-68 (1993) ("As long as the witness is willing to swear to personal knowledge of the party's conduct, it is inappropriate for the court effectively to usurp the [trier of fact's] function by resolving issues of credibility on a summary judgment motion.").

[9]  The CDA likewise provides that "[a]ll claims by the government relating to a contract shall be the subject of a [final] decision by the contracting officer."  However, it removes from the contracting officer's authority certain claims or disputes "for penalties or forfeitures prescribed by statute or regulation which another Federal agency is specifically authorized to administer, settle, or determine."  41 U.S.C. § 605(a); *see also* 41 U.S.C. § 604.

to impose two distinct prerequisites to this court's jurisdiction over disputes between contractors and the government," this court recently stated, *to wit*, "the contractor must have submitted a 'claim' to a contracting officer, and the contracting officer must have issued a 'final decision' concerning that claim." *Renda Marine, Inc. v. United States*, 65 Fed. Cl. 152, 159 (Fed. Cl. 2005) (citing *England v. Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) and *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1578 (Fed. Cir. 1994)); *see also Braughler Co., Inc. v. United States*, 127 F.3d 1476, 1480 (Fed. Cir. 1997); *James M. Ellet Constr. Co. v. United States*, 93 F.3d 1537, 1541 (Fed. Cir. 1996).

It is undisputed that plaintiff did not file with the contracting officer a formal claim seeking an equitable adjustment equal to the allocable portion of its loss on the disposition of the CRAY computers. Nor, obviously, did the contracting officer somehow rule on such a claim. In earlier filings, plaintiff indicated that it would amend its complaint to raise this issue, if this case was not settled. But, it did not do so. Rather, Lockheed claims that information concerning the loss on the disposition of the CRAY computers was produced in discovery and audited by the Defense Contract Audit Agency, and thus is in play. It stresses that, at this juncture, it seeks only to raise the CRAY loss issue as basis for defeating defendant's claim that it is entitled to damages for plaintiff's violation of the CAS.

Plaintiff raises a number of theories in support of this court's jurisdiction, most of which deserve short shrift, *e.g.*, that the omission is a "technical defect" that the court may overlook or that the defect here involves one of lack of certification that this court may remedy. One of its theories, however, resonates somewhat: that this court is not deprived of jurisdiction over its CRAY assertions merely because plaintiff changed the theory of its defense to defendant's counterclaim, so long as the modification is "based on the 'same set of operative facts underlying the claim'" submitted to the contracting officer." *ThermoCor, Inc. v. United States*, 35 Fed. Cl. 480, 489 (1996) (*quoting Cerberonics, Inc. v. United States*, 13 Cl. Ct. 415, 417 (1987)); *see also Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003). At the root of the "same claim" principle is the concept of adequate notice, with the doctrine applying where a previously filed claim revealed all of the operative facts, but not if, under the circumstances, consideration of the claim would "circumvent[] [the contracting officer's] statutory role 'to receive and pass judgment on the contractor's entire claim.'" *ThermoCor*, 35 Fed. Cl. at 489 (quoting *Cerberonics*, 13 Cl. Ct. at 418); *see also Executive Court Reporters v. United States*, 29 Fed. Cl. 769, 775 (1993). This rule recognizes that "it would be very disruptive to a court's procedures, if theories, developed as a result of pretrial proceedings including discovery, had to be submitted to the contracting officer before the court could render a final decision on a claim." *ThermoCor*, 35 Fed. Cl. at 489 (*citing J.F. Shea Co. v. United States*, 4 Cl. Ct. 46, 54 (1983)). Under this view, as long as Lockheed's claims regarding the CRAY losses arose from the same set of operative facts underlying the claim filed by defendant, which was finally ruled upon by the contracting officer on March 16, 1999, it is properly before this court.

The "same claim" principle has been thoroughly explored in cases in which the assertion was that a claim was not new, but merely a variation on what had been presented to the contracting officer. Summarizing the law on this theory, this court recently stated –

A new claim is "one that does not arise from the same set of operative facts as the claim submitted to the contracting officer." *J. Cooper & Assoc., Inc. v. United States*, 47 Fed. Cl. 280, 285 (2000) (citing *Tecom, Inc. v. United States*, 732 F.2d 935, 936-937 (Fed. Cir. 1984)); *see also Foley Co. v. United States*, 26 Cl. Ct. 936, 940 (1992); *Cerberonics, Inc. v. United States*, 13 Cl. Ct. 415, 417 (1987). The same set of operative facts has been found where the contractor submits additional evidence pertaining to damages to support the same factual claim, *J.F. Shea Co., Inc.*, 4 Cl. Ct. at 55, or where the claim merely "augments the legal theories" underlying the certified claim. *Cerberonics*, 13 Cl. Ct. at 418-419; *Thermocor, Inc. v. United States*, 35 Fed. Cl. 480, 489-490 (1996). In contrast, the same set of operative facts has not been found where the contractor files a different type of claim from that presented to the contracting officer, *Sharman Co., Inc. v. United States*, 2 F.3d 1564, 1570 (Fed. Cir. 1993); *J. Cooper*, 47 Fed. Cl. at 285-286; *Metric Constr. v. United States*, 44 Fed. Cl. 513, 518-519 (1999); *Spirit Leveling Contractors v. United States*, 19 Cl. Ct. 84, 91 (1989), or where the facts require different kinds of proof. *Placeway Constr. v. United States*, 920 F.2d 903, 909 (Fed. Cir. 1990); *Foley*, 26 Cl. Ct. at 940.

*AAB Joint Venture v. United States*, 68 Fed. Cl. 363, 365-66 (2005); *see also Dangeng Shen Ho v. United States*, 49 Fed. Cl. 96, 101 (2001); *Johnson Controls World Servs., Inc. v. United States*, 43 Fed. Cl. 589, 593-94 (1999). The range of holdings reflected in this quote serves to map the contours of the "same claim" principle, indicating when it is properly invoked.

Here, it is not. Plaintiff's offset claim did not arise from the same set of operative facts as those considered by the contracting officer in rendering his 1999 decision. One indication of this comes from the correspondence and other materials that led up to that decision, none of which refers to the disposition of the CRAY computers. And while plaintiff avers that the contracting officer was aware of the disposal by 1997, it points to nothing in the record that indicates as much, let alone anything that suggests that the contracting officer, prior to his decision in 1999, was aware of the now alleged relationship between the loss on the disposition of the CRAY computers and any costs associated with the CAS violation. If plaintiff had evidence otherwise, it was obliged to bring it forth, at least in support of its motion for summary judgment, if not earlier, during discovery. Moreover, consideration of the loss claim, even in the form of an offset, would have required the contracting officer not only to consider the facts surrounding the sale and leaseback of the CRAY computers, as well as the accounting practices associated with that transaction, but also an entirely different portion of CAS – not CAS 418, but rather CAS 409.[10] Indeed, there remains a continuing dispute as to whether the loss on the disposition of the CRAY computers generated an adjustment in 1995, let alone one that could be offset against any increased costs associated with the violation of CAS 418.

---

[10] During the years in question, CAS 409 provided that the depreciable cost of a tangible capital asset shall be its capitalized cost less its estimated residual value. It also specified various criteria for assigning the depreciable cost of tangible capital assets to cost accounting periods and allocating such costs to cost objectives within such periods, including the proper treatment of gains and losses upon disposition of tangible capital assets. *See* 48 C.F.R. § 9904.404-40.

In short, this is neither a case in which plaintiff has submitted additional evidence on damages in support of a factual claim made before the contracting officer, nor one in which it is arguing a different legal theory based upon the same facts previously presented.  Rather, plaintiff's claim regarding the loss on the disposition of the CRAY computers is entirely new  – at least in terms of the CDA process – and should have been presented to the contracting officer in the first instance.  While perhaps convenient for purposes of streamlining this case, consideration of this claim clearly would undermine the contracting officer's role in violation of the CDA.  And – efficient or not – that this court will not and cannot do.

That plaintiff's claim is assertedly in the nature of an offset does not alter this calculus.  The rule in this circuit is that claims in the nature of counterclaims, setoffs and offsets are still subject to the requirements of  the CDA.  *See Joseph Morton Co., Inc. v. United States*, 757 F.2d 1273, 1280-81 (Fed. Cir. 1985) (counterclaim must first be raised with contracting officer); *Johnson Controls World Servs*., 43 Fed. Cl. at 595 (counterclaim subject to CDA requirements).  Departures from this rule have been based upon a construction of the CDA itself, with courts concluding either that a counterclaim either did not "relat[e] to a contract" within the meaning of 41 U.S.C. § 605(a) or involved an assertion of fraud covered by 41 U.S.C. § 604.  *See Applied Cos*., 144 F.3d at 1478 (setoff based upon computer error that led to erroneous payment "not related to a contract" within the meaning of the CDA); *Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 542-47 (Fed. Cir. 1988) (fraud assertion).  The case *sub judice*, of course, does not fit either scenario.  Moreover, while some non-contract cases suggest that a contractor might be able to raise a compulsory counterclaim in the nature of an offset or recoupment designed to reduce the government's recovery, there is no indication that plaintiff's claim regarding the loss on the CRAY computer dispositions is "compulsory" within the meaning of these cases.  This should not be surprising as cases defining what is "compulsory" in the case of a recoupment claim apply a standard similar to the "same operative facts" test employed under the CDA.[11]  *Eadem est ratio, eadem est lex.*

---

[11]  *See United States v. Dalm*, 494 U.S. 596, 611 (1990) (noting that the doctrines of recoupment and sovereign immunity "only [ ] permit a transaction which is made the subject of suit by plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole") (*quoting Rothensies v. Elec. Storage Battery Co.*, 329 U.S. 296, 299 (1946)); *United States v. Shaw*, 309 U.S. 495, 502 (1940) (implying waiver of sovereign immunity in tort case for "cross-actions" up to "the amount necessary as a setoff"); *Bull v. United States*, 295 U.S. 247, 261 (1935) (explaining that a monetary claim "may be used by way of recoupment and credit in an action by the United States arising out of the same transaction").  The Tenth Circuit summarized such cases, stating –

It is recognized, however, that – when the sovereign sues it waives immunity as to claims of the defendant which assert matters in recoupment-arising out of the same transaction or occurrence which is the subject matter of the government's suit, and to the extent of defeating the government's claim but not to the extent of a judgment against the government which is affirmative in the sense of involving relief different in kind or nature to that sought by the government or in the sense

If plaintiff's offset claim were allowed to proceed, then virtually any issue could be raised in a contract case without having been presented first to a contracting officer, limited only by the imagination and creativity of skilled lawyers to frame that claim as a recoupment.  This case provides no occasion to create such a gaping hole in the contract dispute resolution scheme so carefully crafted by Congress.  Accordingly, plaintiff may not proceed with its claim regarding the alleged loss on the 1995 disposition of the CRAY computers, at least at this time.

## III.    CONCLUSION

The court will not guild the lily.  Based on the foregoing, the court **GRANTS, IN PART**, and **DENIES, IN PART**, plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment.  On or before April 21, 2006, the parties shall file a joint status report indicating how this case should proceed.  Should the parties believe that the ultimate resolution of this case would be facilitated by staying the proceedings while a claim regarding the CRAY computer losses is presented by Lockheed to the relevant contracting officer, they shall so advise in that report.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

of exceeding the amount of the government's claims; but the sovereign does not waive immunity as to claims which do not meet the 'same transaction or occurrence test' nor to claims of a different form or nature than that sought by it as plaintiff nor to claims exceeding in amount that sought by it as plaintiff.

*Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1344 (10th Cir. 1982) (quoting *Frederick v. United States*, 386 F.2d 481, 488 (5th Cir. 1967)).  This court need not consider at this time whether these cases suggest a recoupment exception to the CDA procedure.  *See, however, United States v. Intrados/International Management Group*, 277 F. Supp. 2d 55, 63-64 (D.D.C. 2003) (suggesting, but not holding, that recoupment claims are subject to CDA procedure).